Appeal No. 2024-1796

# United States Court of Appeals for the Federal Circuit

**DOMETIC CORPORATION, DOMETIC SWEDEN AB,**
*Appellants*

**v.**

**INTERNATIONAL TRADE COMMISSION,**
*Appellee*

**CITIMARINE L.L.C., MABRU POWER SYTEMS, INC., SHANGHAI HOPEWELL INDUSTRIAL CO., LTD., SHANGHAI HEHE INDUSTRIAL CO., LTD.,**
*Intervenors*

Appeal from the United States International Trade Commission in Investigation No. 337-TA-1346.

## APPELLANTS' OPENING BRIEF

Stephen R. Howe
steve.howe@huschblackwell.com
HUSCH BLACKWELL LLP
511 N. Broadway, Suite 1100
Milwaukee, WI 53202
414-273-2100 Telephone
414-223-5000 Facsimile

Kara R. Fussner
kara.fussner@huschblackwell.com
Beau Jackson
beau.jackson@huschblackwell.com
Matthew M. Kamps
matt.kamps@huschblackwell.com
Avery Hitchcock
avery.hitchcock@huschblackwell.com

*Counsel for Appellants Dometic Corporation and Dometic Sweden AB*

October 30, 2024

## U.S. PATENT NO. 8,056,351 (Appx296-333)

### Claim 1

1. An air conditioning device for a nautical vehicle including:

a main body; and

a blower including an inlet and an outlet, the inlet being in air communication with the main body, the blower further including blades rotating therewithin about a first axis, and

an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet, the assembly including a guiding cover and a cylindrical duct element for maintaining the main body and the blower in air communication with one another, the duct element having a first base and a second base, and coupled to the blower at the second base, the first base of the duct element dimensioned to correspondingly fit the guiding cover, and the duct element being rotatably adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet.

### Claim 18

18. An air conditioning device for a nautical vehicle including:

a main body; and

a blower including an inlet and an outlet, the inlet being in air communication with the main body, the blower being rotatable about first axis so that the outlet can be oriented toward a first direction and a second direction, and the first and second directions point to substantially different lateral sides of the main body, and

an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet, the assembly including a guiding cover and a cylindrical duct element for maintaining the main body and the blower in air communication with one another, the duct element having a first base and a second base, and coupled to the blower at the second base, the first base of the duct element dimensioned to correspondingly fit the guiding cover, and the duct element being rotatbly[sic] adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2024-1796

**Short Case Caption** Dometic Corp. v. ITC

**Filing Party/Entity** Appellants Dometic Corporation, Dometic Sweden AB

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/30/2024

Signature: /s/ Stephen R. Howe

Name: Stephen R. Howe

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Dometic Corp. | | Dometic Sweden AB<br>Dometic Group AB (publ) |
| Dometic Sweden AB | | Dometic Group AB (publ) |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Bernardo Zito Porto<br>HUSCH BLACKWELL LLP | Andrea Shoffstall<br>formerly of HUSCH BLACKWELL LLP | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**


TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ iv

STATEMENT OF RELATED CASES ........ 1

JURISDICTIONAL STATEMENT ........ 2

INTRODUCTION ........ 3

STATEMENT OF THE ISSUES ........ 5

STATEMENT OF THE CASE ........ 6

I. THE PARTIES ........ 6

II. BACKGROUND OF THE TECHNOLOGY ........ 6

III. THE ’351 PATENT ........ 8

A. The “Guiding Cover” Within the Assembly of the Asserted Patent ........ 10

B. The Axis Limitation of the Asserted Patent ........ 12

IV. THE PROSECUTION HISTORY AND THE AMENDMENT TO OVERCOME DODGE ........ 14

V. THE VECTOR COMPACT, AN OLD-STYLE LEFT/RIGHT UNIT, COVERED BY THE DODGE PATENT ........ 18

VI. THE COMMISSION’S SUMMARY DETERMINATION OF INVALIDITY OF CLAIMS 1, 2, 4, 5, AND 7 ........ 19

VII. THE COMMISSION’S POST-TRIAL CLAIM CONSTRUCTION OF THE AXIS LIMITATION IN CLAIMS 18-22 ........ 25

SUMMARY OF ARGUMENT ........ 27

STANDARD OF REVIEW ........ 29

ARGUMENT ........................................ 30

I. THE COMMISSION ERRED IN FINDING THE VECTOR COMPACT ANTICIPATES CLAIMS 1, 2, 4, 5, AND 7. ........................................ 30

A. The Commission Erred in Construing "Guiding Cover." ........................................ 32

1. "Guiding Cover" Is a Component of the Assembly. ........................................ 33

2. "Guiding Cover" Is a Component of the Assembly *Including* a Flat Section, Circular Opening and Cylindrical Portion. ........................................ 36

3. "Guiding Cover" Is More than a Mere Cylindrical Protrusion. ........................................ 39

B. The Commission Erred in Finding that the Vector Compact Anticipates. ........................................ 42

1. There Was No Evidence of a "Guiding Cover" in the Vector Compact Under the Proper Claim Construction. ........................................ 42

2. Even Under the Commission's "Combination" Construction, the Vector Compact Lacked *an Assembly* including a Guiding Cover. ........................................ 43

II. THE COMMISSION ERRONEOUSLY CONSTRUED CLAIMS 18-22 TO REQUIRE "TWO MODES OF ROTATION," INCORRECTLY FINDING NONINFRINGEMENT AND LACK OF TECHNICAL DOMESTIC INDUSTRY ........................................ 48

A. The Claims' Recitation of "First" and "Second" Axes Does Not Mandate Separate Structures or Modes of Rotation or Evidence Disclaimer. ........................................ 51

B. The Commission Erred by Failing to Construe the "Axis Limitation" in View of the Surrounding Claim Language and the Specification, Thus Excluding Preferred Embodiments. ........................................ 56

1. The Claim Language Does Not Support the Commission's Construction. ........................................ 56

2. The Specification Does Not Support the Commission's Construction. ....................................................................59

C. The Commission Misapprehended Settled Law Regarding the Scope and Meaning of Drawings. ...............................................62

D. The Commission's Construction Violated the Doctrine of Claim Differentiation. ........................................................................65

E. The Balance of the Commission's Analysis Was Flawed and Contradicted by the Intrinsic Evidence. ............................................68

CONCLUSION ........................................................................................72

## CONFIDENTIAL MATERIAL OMITTED

The Addendum material omitted from the ALJ's Final Initial Determination (Appx85-186) on pages Appx145 and Appx180 was previously designated by the parties as confidential business information before the International Trade Commission and is subject to the Protective Order entered by the ALJ in the underlying Investigation, Inv. No. 337-TA-1346. The information redacted from Appx145 contains Respondents' confidential technical information. The information redacted from Appx180 contains confidential financial information relating to Dometic's sales.

The Commission Opinion regarding the Final Initial Determination (Appx4-82), the Commission Opinion regarding the Order No. 19 Initial Determination (Appx189-210), and the ALJ's Order No. 19 Initial Determination Granting-in-Part Respondents' Motion for Summary Determination (Appx211-246) were issued in both confidential and public versions, but there is no confidential business information in these documents.

There is no confidential information contained in Appellants' Opening Brief.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple Inc. v. Int'l Trade Comm'n*,
725 F.3d 1356 (Fed. Cir. 2013)....29

*Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*,
616 F.3d 1249 (Fed. Cir. 2010)....33

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*,
262 F.3d 1258 (Fed. Cir. 2001)....38

*Beloit Corp. v. Valmet Oy*,
742 F.2d 1421 (Fed. Cir. 1984)....40

*Connell v. Sears, Roebuck & Co.*,
722 F.2d 1542 (Fed. Cir. 1983)....31

*Dow Chem. Co. v. United States*,
226 F.3d 1334 (Fed. Cir. 2000)....64

*Edwards Lifesciences LLC v. Cook Inc.*,
582 F.3d 1322 (Fed. Cir. 2009)....46

*Engel Industries, Inc. v. Lockformer Co.*,
96 F.3d 1398 (Fed. Cir. 1996).... 38, 39

*Gaus v. Conair Corp.*,
363 F.3d 1284 (Fed. Cir. 2004)....33

*Google LLC v. EcoFactor, Inc.*,
92 F.4th 1049 (Fed. Cir. 2024) .... 33, 52, 53

*Grace Instrument Indus., LLC v. Chandler Instruments Co., LLC*,
57 F.4th 1001 (Fed. Cir. 2023) .... 36, 38

*Home Diagnostics, Inc. v. LifeScan, Inc.*,
381 F.3d 1352 (Fed. Cir. 2004)....52

*Homeland Housewares, LLC v. Whirlpool Corp.*,
865 F.3d 1372 (Fed. Cir. 2017)....38

*Honeywell Int'l, Inc. v. Int'l Trade Comm'n*,
341 F.3d 1332 (Fed. Cir. 2003)....................................................................30

*Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*,
540 F.3d 1337 (Fed. Cir. 2008)....................................................................72

*Indus. Tech. Rsch. Inst. v. LG Elecs. Inc.*,
No. CIV.A. 12-949 ES, 2014 WL 60043 (D.N.J. Jan. 6, 2014)..............................52

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
381 F.3d 1111 (Fed. Cir. 2004)....................................................................56

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
175 F.3d 985 (Fed. Cir. 1999)......................................................................64

*Kara Tech. Inc. v. Stamps.com Inc.*,
582 F.3d 1341 (Fed. Cir. 2009)....................................................................61

*Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*,
22 F.4th 1369 (Fed. Cir. 2022) ....................................................................46

*Lindemann Maschinenfabrik GMBH v. Am. Hoist & Derrick Co.*,
730 F.2d 1452 (Fed. Cir. 1984)....................................................................44

*Littelfuse, Inc. v. Mersen USA EP Corp.*,
29 F.4th 1376 (Fed. Cir. 2022) ....................................................................67

*Markman v. Westview Instruments, Inc.*,
517 U.S. 370 (1996).....................................................................................58

*Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*,
370 F.3d 1354 (Fed. Cir. 2004)....................................................................36

*NeoMagic Corp. v. Trident Microsystems, Inc.*,
287 F.3d 1062 (Fed. Cir. 2002)....................................................................41

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
545 F.3d 1359 (Fed. Cir. 2008)....................................................................44

*One-E-Way, Inc. v. Int'l Trade Comm'n*,
859 F.3d 1059 (Fed. Cir. 2017)....................................................................29

*Osram GmbH v. Int'l Trade Comm'n*,
505 F.3d 1351 (Fed. Cir. 2007)....29

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005).... 36, 38, 69

*Plantronics, Inc. v. Aliph, Inc.*,
724 F.3d 1343 (Fed. Cir. 2013)....63

*Semcon Tech, LLC v. Micron Tech., Inc.*,
660 F. App'x 908 (Fed. Cir. 2016) ....29

*Sorensen v. Int'l Trade Comm'n*,
427 F.3d 1375 (Fed. Cir. 2005)....56

*Therasense, Inc. v. Becton, Dickinson and Co.*,
593 F.3d 1325 (Fed. Cir. 2010).... 43, 44

*Thorner v. Sony Comput. Entm't Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012)....58

*Trading Techs. Int'l, Inc. v. eSpeed, Inc.*,
595 F.3d 1340 (Fed. Cir. 2010).... 61, 63

*Trustees of Columbia Univ. in City of New York v. Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016)....46

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1986).... 60, 69

*Wang Labs., Inc. v. Am. Online, Inc.*,
197 F.3d 1377 (Fed. Cir. 1999)....39

*Wright Med. Tech., Inc. v. Osteonics Corp.*,
122 F.3d 1440 (Fed. Cir. 1997)....67

**Statutory Authorities**

5 U.S.C. § 706 ....29

19 U.S.C. § 1337 .... passim

28 U.S.C. § 1295 ....2

35 U.S.C. § 102 ........................................ 4, 15, 44

35 U.S.C. § 103 ........................................ 15

**Rules**

37 C.F.R. § 1.84(h)(1) ........................................ 65

## STATEMENT OF RELATED CASES

No other appeal in or from the same International Trade Commission ("ITC") proceeding has been before this or any other appellate court.

Pursuant to Fed. Cir. R. 47.5, counsel is not aware of any other case that will directly affect or be directly affected by this appeal.

## JURISDICTIONAL STATEMENT

On March 7, 2024, the Commission issued its final determination under § 337. Appx1-3; Appx4-82. Within 60 days, on May 3, 2024, Dometic Corporation and Dometic Sweden AB timely filed their petition and notice of appeal, seeking review of the final determination and all underlying determinations. *See* 19 U.S.C. § 1337(c). This Court has jurisdiction under 28 U.S.C. § 1295(a)(6).

## INTRODUCTION

This is an appeal from an International Trade Commission, Section 337 investigation, finding anticipation on summary determination as to a first set of claims (Claims 1, 2, 4, 5 and 7), and noninfringement after trial as to a second set of claims (Claims 18-22) of the same U.S. Patent No. 8,056,351 (the "'351 Patent" Appx296-333). This stemmed from the Commission taking two diametrically opposed, and both erroneous, approaches to claim construction.

Regarding the first set of claims, the Commission construed the meaning of the term "guiding cover," a non-industry term defined in the '351 Patent. In the context of summary determination, the Commission construed the term **broadly**, despite the patent (1) providing a specific depiction of a "guiding cover" in a figure and describing the component in the specification; and (2) Claim 1 stating explicitly the claimed "guiding cover" is a separate structural component from the "main body" and "blower." Importantly, this patent-described and claimed "guiding cover" was a point of novelty that permitted issuance of the patent, including over a patent that covered the very product that the Commission found anticipatory. Nevertheless, the Commission found these Claims invalid over the old-style "Vector Compact" product sold by both the patentee, Dometic, and the accused infringers prior to the invention of the '351 Patent.

Following the evidentiary hearing, the Commission construed the second set of claims (Claims 18-22) as **narrowly requiring** "two modes of rotation," where one mode of rotation must be accomplished via a structure other than the claimed assembly. The intrinsic evidence never describes an assembled product with these requirements. Indeed, the ALJ and Commission found that the patent "discloses [ ] an embodiment" where "the duct element [is coupled] onto the blower so the two elements can rotate as a unitary structure about the guiding cover" (Appx127[1]; Appx32), and that the rotation axes can be "colinear – that is, the same – in some embodiments." Appx27.

Despite this, the Commission constructed a rationale to narrowly construe Claims 18-22 by reaching for meanings not intended within the patent, ignoring the intrinsic evidence, and excluding preferred embodiments like the one above from Claims 18-22. This led to the erroneous finding of noninfringement, and even a conclusion that Dometic did not practice its own patent.

As explained below, the finding of summary determination of invalidity under 35 U.S.C. § 102 should be reversed and remanded (for a trial as to infringement of those claims), and the findings of noninfringement and absence of technical domestic industry should be reversed.

[1] Unless otherwise noted, all emphasis added.

## STATEMENT OF THE ISSUES

1. Whether the Commission, on summary determination, erroneously found the Vector Compact product anticipates Claims 1, 2, 4, 5 and 7, based on:

(a) a legally erroneous claim construction of "guiding cover" that construed it as any combination of unrelated elements, and

(b) an erroneous conclusion that the Vector Compact includes an "assembly" including a "guiding cover" even though it includes only a shroud component of the "main body" and a direct connection between the main body and the blower.

2. Whether the Commission erred as a matter of law in construing the axis limitation in Claims 18-22 as requiring "two modes of rotation," resulting in an incorrect finding of non-infringement and lack of technical domestic industry.

3. Whether the Commission erred as a matter of law in construing the directional limitation[2] in Claims 18-22 to refer to a second mode of rotation of the blower, and not to the assembly, resulting in an incorrect finding of non-infringement and lack of technical domestic industry.

---

[2] Dometic's arguments concerning the "axis limitation" apply equally to the "directional limitation," because the Commission's construction for that latter depends on whether the "axis limitation" **requires** a separate mode of blower rotation that must be accomplished via a separate structure from the assembly. Appx38-39. As detailed below (*infra*, Argument, § II.A-E), because the axis limitation does not **require** the foregoing, rotation/adjustment of the assembly can satisfy the directional limitation in certain embodiments.

## STATEMENT OF THE CASE

### I. THE PARTIES

Appellants-Complainants, Dometic Corporation and Dometic Sweden AB (collectively "Dometic"), are part of an innovative group of companies that develop award-winning solutions for the mobile-living and marine industries, including air conditioners for marine vessels. Appx268, ¶ 20; Appx275, ¶ 57. The marine air conditioning units at issue here were invented by Dometic engineers in the United States and are manufactured and distributed exclusively from Dometic's Florida-based operations. Appx275, ¶ 57.

Intervenors and Respondents in the ITC matter, Citimarine and Mabru, are **former Dometic distributors** who have since opted to become the importers of the accused products for sale within the United States at a lower price. Appx288, ¶ 107; Appx15374; Appx27105-27106; Appx27218-27220. Intervenor-Respondents Shanghai Hopewell Industrial Co., Ltd. and Shanghai Hehe Industrial Co., Ltd. (collectively "Shanghai") represent the foreign source of the accused products. Appx269-270, ¶¶ 24-31; Appx27105-27106; Appx27218-27220.

### II. BACKGROUND OF THE TECHNOLOGY

Dometic engineers Frank Marciano and Ronald Pabisz conceived of an improved design for a marine air conditioning unit. *See* Appx7669-7672, 71:1-84:22; Appx7676-7677, 98:1-103:22; Appx7695, 175:1-177:22; Appx7698, 187:1-188:22; Appx296. Marine air conditioning units must be able to withstand the

forces of nature while often being crammed into any number of tight spaces, surrounded by other obstructions. *See* Appx2637; Appx2642; *see also* Appx327, 1:19-29. One of the most difficult tasks when installing a marine air conditioning system is orienting the outlet of the blower such that the air conditioner will function properly with the duct work throughout the nautical vessel. Appx2301-2302.

Prior to the invention, manufacturers, including Dometic, made marine air conditioners that were sold as separate left/right units. *See e.g.*, Appx2644-2675. These products had blowers that: (a) had to be completely removed from the air conditioning system and thereafter reattached in order for the blower to be properly oriented to connect with duct work (*see* Appx2644-2675); and (b) could only turn limited degrees due to interference from other air conditioning parts. Appx2644-2675.

Dometic's engineers conceived of a marine air conditioning unit that eliminated the need for separate left/right units. According to Respondent Citimarine in a printed advertisement issued prior to the ITC action, this invention "completely revolutionized self-contained boat air conditioning with patented innovations in marine air conditioning system design." Appx5590-5596.

The innovation was made possible through a novel combination of structural components. Specifically, the invention included an assembly with a "guiding

cover" situated between the main body of the air conditioning unit and the blower. The assembly allows rotation of the blower to different lateral sides, eliminating the need for separate left/right units and simplifying installation.

The invention had considerable advantages over other units of the time and enjoyed commercial success. Even Citimarine's CEO acknowledged the benefits of Dometic's technology in his own pending patent application from 2022. Appx5534-5568. The invention received other significant industry praise as well and won multiple awards for innovation. Appx7961-7962, ¶¶ 91-93; Appx9712-9713; Appx27190-27191; Appx27198-27200.

## III. THE '351 PATENT

In 2007, Dometic filed a provisional patent application directed to the novel marine air conditioning unit described above. Appx34987. Dometic timely filed a non-provisional application claiming priority thereto (Appx34987-35055), which issued as U.S. Patent No. 8,056,351 (Appx35255).

The '351 Patent describes and claims an air conditioning system having three distinct structures: "a main body, a blower, and an assembly." Appx332-333, Claim 1; Appx327, 1:35-37.






FIG. 2

Appx296; Appx298. As described in the specification, “the main body 4 comprises the drain pan 100 and what is mounted above it,” which includes at least the compressor, the evaporator and the condenser. Appx331-332, 9:58-65, 11:25-26.

These are arranged within the footprint of the drain pan to minimize the mounting area. Appx331, 9:61-65. The ’351 Patent also describes an optional “shroud” (depicted in Figure 5), that houses, *inter alia*, the compressor and evaporator. Appx328, 4:35-40.

The blower (2) is in air communication with the main body and adjacent to the assembly. Appx331-333, 12:52-13:3, 10:2-5, 11:24-40; Appx298. Components are configured to “reduce interference with the rotation of the blower. Appx330, 7:4-6.

The novel assembly permits adjustment of the blower with respect to the main body by including a guiding cover and a cylindrical duct element for maintaining the main body and the blower in air communication with one another, but configured such that the duct element is rotatably adjustable around the guiding cover. Appx332-333, 12:52-13:3, 11:41-44; Appx296, Abstract; Appx327, 1:50-58.

### A. The “Guiding Cover” Within the Assembly of the Asserted Patent

Claim 1 of the ’351 Patent recites, in part, an air conditioning device including “a main body,” “a blower,” and an “assembly for adjusting the blower with respect to the main body.” Appx332-333, 12:52-13:3. The claimed assembly includes, among other claimed elements, a “guiding cover.” The “guiding cover”

(which the ’351 Patent also calls a “fan duct plate”), is labeled as **element 170** in the Figures of the ’351 Patent. Appx331, 9:66-67; Appx317-318.




FIG. 22

Appx317 (annotated). The ’351 Patent generally describes the claimed “guiding cover 170” as including a “flat section 172 with a circular opening 174 for directing air to the adjacent blower 2 and has a cylindrical section 176 extending from the opening 174.” *See* Appx331, 9:65-10:5; *see also* Appx317-318. These elements are shown in Figure 23, an isolated view of the guiding cover of the assembly. Appx318. Every claim of the ’351 Patent requires an assembly with guiding cover. *See generally* Appx296-333.




FIG. 23

### B. The Axis Limitation of the Asserted Patent

Part of the novelty of the invention is the rotation of the blower for ease of installation. Asserted independent Claims 1 and 18 each recite two axes of rotation. *See* Appx332-333. Claim 1 recites a "blower further including [fan] blades rotating therewithin about a **first axis**, and an assembly for adjusting the blower with respect to the main body about a **second axis** so as to alter an orientation of the outlet." Appx332, 12:56-61. Claim 18, similarly, recites a "blower being rotatable about **first axis** so that the outlet can be oriented toward a first direct[i]on and a second direction, and the first and second directions point to substantially different lateral sides of the main body, and an assembly for adjusting the blower with respect to the main body about a **second axis** so as to alter an orientation of the outlet." Appx333, 14:7-12.

In Claim 1, the first axis is the line about which the fan blades rotate (Appx332, 12:56-58), and the second axis is the line about which the assembly

allows the blower to be adjusted with respect to the main body (Appx333, 13:1-3). Depending on the configuration of the blower and fan, these axes may be colinear or different for purposes of Claim 1. This is undisputed and not at issue on appeal.

The axes in Claim 18 are slightly different. The first axis (B in Fig. 30B-2 (Appx325)) in Claim 18 is the line about which the blower is rotatable to change the position of the outlet when viewed from the vantage point of the second base of the duct element (192 in Fig 30B-2 (Appx325)) that is **coupled** to the blower. Appx333, 14:11-12. The second axis (A in Fig. 30B-2 (Appx325)) is the line about which the assembly allows the blower to rotate to change the orientation of the outlet when viewed from the vantage point of the first base of the duct element (190 in Fig 30B-2 (Appx325)) that interfaces with the guiding cover. Appx327, 1:56-58; Appx333, 14:7-9. Claim 18 confirms this—describing these axes in relation to the "first base" and the "second base" and stating that "the duct element [has] a first base and a second base, and [is] coupled to the blower at the second base, the first base of the duct element dimensioned to correspondingly fit the guiding cover, and the duct element being rotatbly [sic] adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet." Appx333, 14:14-21.

Thus, whether the viewer looks at the blower rotating about the first axis at the second base, or the second axis at the first base, the viewer is watching the same mechanism of rotation, as shown in the annotated Figure 29, below:




Appx324 (annotated).

## IV. THE PROSECUTION HISTORY AND THE AMENDMENT TO OVERCOME DODGE

Claim 18's two axes language stems from an **examiner**-proposed amendment to copy the **assembly** limitation of Claim 1 into Claim 18. *See* Appx35229-35232. Specifically, on May 9, 2011, the examiner issued an Office Action, finding the claimed invention unpatentable in view of, *inter alia*, U.S. Patent No. 5,848,536 to Dodge et al. Appx35173-35199. Dodge was an older Dometic patent directed to an older left-right unit discussed more below. The

Examiner considered Dodge alone as anticipatory under 35 U.S.C. § 102, and in four different combinations under 35 U.S.C. § 103. *See* Appx35178-35185.

Dometic responded to that Office Action by filing both an Amendment and Remarks/Arguments to overcome the Examiner's rejections. *See* Appx35200-35214. As shown below, Claim 1 (then-claim 54) was amended to add the detailed assembly with guiding cover and cylindrical duct element limitation present in the issued claims:

> an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet, the assembly including a guiding cover and a cylindrical duct element for maintaining the main body and the blower in air communication with one another, the duct element having a first base and a second base, and coupled to the blower at the second base, the first base of the duct element dimensioned to correspondingly fit the guiding cover, and the duct element being rotatably adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet.

Appx35202. Claim 18 (then-claim 72) did not previously include **any** assembly limitation, and it had not previously been rejected over Dodge. Thus, the Applicant did not amend that claim (full text of claim shown below) and, instead, presented arguments for issuance over the cited reference:

> 72. (previously presented) An air conditioning device for a nautical vehicle including:
>
> A main body; and

> a blower including an inlet and an outlet, the inlet being in air communication with the main body, the blower being rotatable about an axis so that the outlet can be oriented toward a first direction and a second direction, and the first and second directions point to substantially different lateral sides of the main body.

Appx35205.

Thereafter, the Examiner initiated another interview (Appx35227-35233) and presented an Examiner's Amendment in which the Examiner took the assembly language in what is now Claim 1 (then claim 54) and propagated it through to what is now Claim 18 (then claim 72). Appx35229-35232. Because Claim 18 (then claim 72) had previously recited "the blower rotatable about **an** axis," and the claim was amended to include the assembly limitation of Claim 1 which referenced the "second axis," "an axis" in Claim 18 (then claim 72) was renamed a "first" axis as shown below:

> 72. (Previously presented) An air conditioning device for a nautical vehicle including: a main body; and a blower including an inlet and an outlet, the inlet being in air communication with the main body, the blower being rotatable about ~~an~~ first axis so that the outlet can be oriented toward a first direction and a second direction, and the first and second directions point to substantially different lateral sides of the main body, and an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet, the assembly including a guiding cover and a cylindrical duct element for maintaining the main body and the blower in air communication with one another, the duct element having a first base and a second base, and coupled to the blower at the second base, the first

> base of the duct element dimensioned to correspondingly fit the guiding cover, and the duct element being rotatably adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet.--

Appx35229. Nothing was discussed in terms of different/multiple modes of rotation in Claim 18.

Rather, the "assembly" was considered the same in Claims 1 and 18. In finding the claims allowable, the Examiner discussed each of the prior art references, including Dodge, and explained the claims (now 1 **and** 18) as amended were allowable because:

> The prior art [does not render unpatentable]: A method and apparatus of an air conditioning for a nautical vehicle including: **an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet, the assembly including a guiding cover and a cylindrical duct element for maintaining the main body and the blower in air communication with one another, the duct element having a first base and a second base, and coupled to the blower at the second base, the first base of the duct element dimensioned to correspondingly fit the guiding cover, and the duct element being rotatably adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet of instant claims [1 and 18].**

Appx35229. In other words, the Examiner considered that Claims 1 and 18 recited the same novel assembly, and this assembly was not present in Dodge or the other cited prior art, rendering the claims allowable.

After the Examiner's Amendment, an Amendment to the Specification and Claims was entered (Appx25236-35242), and a Notice of Allowance (Appx35223-35227) was sent to the Applicant. The '351 Patent issued shortly thereafter. *See* Appx35255.

## V. THE VECTOR COMPACT, AN OLD-STYLE LEFT/RIGHT UNIT, COVERED BY THE DODGE PATENT

The Commission based its finding of anticipation of Claim 1 (and dependent claims 2, 4, 5 and 7) on a product known as Vector Compact. The Vector Compact was a Dometic product covered by the Dodge patent (the same Dodge patent overcome during prosecution). It was sold as separate left- and right-hand units, depending on the configuration of the marine vessel in which the unit would be installed. Appx7670-7671, 76:8-77:13; *see also* Appx7669-7672, 71:1-84:22; Appx7893-7895.

The Vector Compact lacked both the configuration and functionality of the '351 Patent. For example, these units had many screws mounting the blower to the drain pan directly or via brackets or steel clamp on a protruding blower element, requiring a screw gun to remove the screws before the blower could be adjusted. Appx7685, 134:1-136:22; Appx7897-7898. And while the Vector Compact was the successor to even older units like the Vector Rotary, the Vector Compact failed to permit rotation of the blower outlet to even a fully vertical position, as shown below.




*See*, *e.g.*, Appx5599-5600. Importantly, as these older marine air conditioning units became more advanced—i.e., transitioning from older models to the Vector Compact—blower adjustability **decreased**. The smaller size of the Vector Compact resulted in an arrangement of components that further impeded blower adjustment. Appx7671-7672, 80:2-82:17; Appx7893-7900.

## VI. THE COMMISSION'S SUMMARY DETERMINATION OF INVALIDITY OF CLAIMS 1, 2, 4, 5, AND 7

The accused infringing products include a "guiding cover" component that is virtually identical to the guiding cover shown and described in the '351 Patent. For example, as shown in Respondents' product manual, the accused products have a component that looks almost exactly like the "guiding cover" of the '351 Patent. Appx13265.




Appx13265 (annotated).

Given the similarity of the accused component, and the apparent absence of such a component in the asserted prior art, Dometic did not seek a claim construction for the term at the time of the initial *Markman* hearing.

Respondents, too, did not seek a claim construction for "guiding cover." However, Respondents argued for certain constructions that touched on "guiding cover." For example, Respondents argued that "assembly for adjusting the blower with respect to the main body" in Claims 1 and 18 was a means-plus-function

limitation requiring all structures disclosed in Figures 22-27 including the "guiding cover disposed in covering relation with the leaving air side of the evaporator having a cylindrical section." Appx3134. Dometic argued, and the ALJ agreed, that independent Claims 1 and 18 sufficiently recited the structure of the assembly including: (i) a guiding cover; and (ii) a rotatably adjustable cylindrical duct element, wherein rotation of the duct element around the guiding cover adjusts the blower with respect to the main body. Appx2821-2828; Appx3769-3772.

Respondents also argued that "the duct element being rotatably adjustable around the guiding cover about the second axis" in Claims 1 and 18 meant "[c]apable of rotation, without partial disassembly such as removing and replacing screws, on the outside of the cylindrical section projecting from the guiding cover." Appx3134. Dometic disputed the additional limitations not present in the claims, and argued the phrase simply meant "the duct element can be rotated about an axis and relative to the guiding cover." The exact definition of "guiding cover" was never considered, as the '351 Patent both depicts and describes the guiding cover, as discussed above. *See* Appx331, 9:65-10:5.

In their Motion for Summary Determination, Respondents argued that a ring protruding from the body of the Vector Compact was the "guiding cover," as shown below. Appx224-225.




Appx7229.

Alternatively, Respondents argued that even if the guiding cover was construed as "a 'cover-like element' that includes a 'flat section with a circular opening for directing to the adjacent blower and has a cylindrical section extending from the opening,'" the Vector Compact had these elements. Appx7232 (quoting Appx7987-7988); *see also* Appx226. Respondents contended this could be found via a combination of: (1) a shroud that covers the evaporator of the unit (with a flat part); (2) a circular opening for directing air to the adjacent blower; and (3) a cylindrical section extending through the opening in the shroud, as depicted by Respondents below:




Appx7232.

Dometic opposed, noting that in the ’351 Patent, the “guiding cover” is more than a mere protrusion, a feature which is only part of the “guiding cover” described and claimed. Appx331, 10:2-5; Appx318. Dometic also argued that “guiding cover” could not be a combination of cherry-picked unrelated components near each other on the alleged prior-art device, and certainly not the shroud, which the ’351 Patent separately identified as an optional cover **over the main body, which is distinct from the assembly containing the guiding cover**. Appx13846; Appx13854. Dometic further noted that the Vector Compact lacked

an assembly entirely, which is the structure between the main body and blower that must include the claimed guiding cover. Appx13857.

The Initial Determination granting Summary Determination disagreed, finding "the Vector Compact has a 'guiding cover,' whether that element is interpreted as the combination of a flat section, circular opening, and cylindrical protrusion, or as just a cylindrical protrusion." Appx230. This was found in the combination of a portion of a flat section of the shroud, and the metal mating ring protruding through the shroud. As a result, the ALJ found all elements present and concluded "[t]here is thus no claim construction dispute that presently requires resolution." Appx230. The ALJ did not, however, address the fact that the claimed assembly including the guiding cover is distinct from the main body.

On review, the Commission likewise did not engage in a claim construction analysis, explaining that the ALJ found anticipation even under Dometic's proposed construction of the term. Appx202. In actuality, the ALJ did not adopt Dometic's proposed construction, and instead treated the construction as "a combination of a flat section, circular opening, and cylindrical protrusion" **anywhere in the product**. The Commission never grappled with the distinction. As a result, the Commission erroneously found Claims 1, 2, 4, 5, and 7 invalid as anticipated by the Vector Compact.

## VII. THE COMMISSION'S POST-TRIAL CLAIM CONSTRUCTION OF THE AXIS LIMITATION IN CLAIMS 18-22

After the Commission found Claims 1, 2, 4, 5, and 7 anticipated, an evidentiary hearing was held on remaining Claims 18-22.[3] At the conclusion of the Hearing, the ALJ asked the parties to brief the issue of whether the axis limitation of Claim 18 required two modes of rotation of the blower. *See* Appx25964-25968, 24:21-28:25; Appx26764, 839:1-17; Appx26759-26760, 834:13-835:5. Respondents argued, for the first time, that it did. Appx26991; Appx27242. Dometic argued it did not. Appx27116-27118 (asserting, *inter alia*, that "no structure distinct from the assembly or some second/separate mode of blower rotation is required for the blower to be 'rotatable about [a] first axis' as claimed.") (emphasis in original). Dometic's position acknowledged that no other structures are present in Claim 18 to enable a second mode of rotation, and that the axes limitation merely views the **same** mode of rotation from two different perspectives—from the blower end of the duct element (at the second base about the first axis), and from the opposite end of the duct element where it interfaces with the guiding cover (at the first base about the second axis). Appx27117-27118; Appx324 (annotated above, § III.B).

[3] After the Hearing, Dometic withdrew Claims 3, 11, and 17 from the Investigation, and only Claims 18-22 were subject to post-trial adjudication. Appx26776-26778.

Nevertheless, the ALJ found that, "under the plain language of the claim 'the blower being rotatable' refers to a different type of rotation from the assembly's rotation, and to a distinct structural component separate from the claimed portion of the assembly." Appx121. The ALJ based that decision on the claim language that states "'the duct element being [rotatably] adjustable around the guiding cover about the second axis at the first base so as to *alter the orientation of the outlet*.'" (emphasis in original) Appx122 (quoting Appx333, 14:4-20). Specifically, the ALJ said "[t]he plain and ordinary language 'to alter' implies that the outlet has an initial orientation, which is established by some other structure or arrangement and which can be changed" and "[t]hus, the assembly limitation provides a second means of rotation, which alters the orientation of the blower's outlet." Appx122.

The ALJ further contended that a comparison of the words "adjusting" and "rotating" in Claim 18 supported the decision. Appx122. Similarly, the ALJ reasoned that the dependent claims use the words "blower" and "rotated" or "rotatable" (Claims 20 and 21), or else refer to the first and second directions, "which have antecedent bases relating to the blower, not to the assembly." Appx122-123. The ALJ also mistakenly found that the specification contemplates a second mode of rotation wherein the blower is adjusted with respect to the duct element by misconstruing a portion of the specification describing **installation** of the blower with respect to the duct element. Appx123-127 (citing Appx327, 2:14-

17; Appx332, 11:4-23, 12:4-27; Appx319). Based on this reasoning, the ALJ concluded a POSA "would understand that decoupling the duct element from the blower, rotating it a discrete amount, and then recoupling it is a means of rotation contemplated by the claim." Appx128.

The ALJ found no violation of Section 337 because, under the ALJ's holding, two modes of rotation were required by Claim 18, and, according to the ALJ, none of the Accused Products infringed the '351 Patent, and none of the Domestic Industry Products practiced the remaining claims of the '351 Patent.

In pertinent part, the Commission's Opinion agreed with the ALJ and found no violation of Section 337. *See generally* Appx4-82. Dometic timely filed this appeal, and respectfully requests this Court reverse the decisions below, including that the Vector Compact is anticipatory prior art and the holding that Claim 18 requires two modes of rotation, which led to the incorrect findings of invalidity, noninfringement, and absence of technical domestic industry.

## SUMMARY OF ARGUMENT

Review and reversal of the Commission's decision to invalidate Claims 1, 2, 4, 5, and 7 is required because of the Commission's legal error in construing the term "guiding cover," and concomitant finding of anticipation based on an improper conclusion that the shroud of the "main body" could be the "guiding cover" of the "assembly." The Commission's finding of anticipation rested on the

mistaken belief that the ALJ found anticipation under Dometic's proposed claim construction. Yet Dometic's proposed construction—consistent with the intrinsic evidence—recognized that the "guiding cover" was a discrete component of the assembly having certain features, not any combination of those features found in different parts of the device. The claims separately recite a "main body," "blower," and "assembly," yet the Commission found anticipation by combining the shroud of the Vector Compact's main body with a separate mating ring to find anticipation. This was legally erroneous under the patent and likewise failed to draw inferences in Dometic's favor at summary determination, as was required.

Regarding Claims 18-22, the Commission erred as a matter of law by construing the axis limitation as requiring "two modes of rotation," despite the fact that no such requirement appears anywhere in the intrinsic evidence. Indeed, the intrinsic evidence states the first and second axes can be "identical" and explicitly discloses embodiments where the coupled blower and duct element of the assembly form a unitary structure, and thus rotating/adjusting either the duct element or the blower alone will cause both structures to rotate/adjust about an identical axis. When viewed as a whole, it is clear Claim 18 uses the "first" and "second" axes descriptors to describe the claimed rotation when viewed from two different perspectives. The Commission's construction to the contrary lacks

support from the intrinsic evidence and excludes preferred embodiments, and thus constitutes legal error.

## STANDARD OF REVIEW

This Court reviews the rulings of the ITC under the Administrative Procedure Act, 5 U.S.C. § 706. 19 U.S.C. § 1337(c); *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1355 (Fed. Cir. 2007). Rulings of law are decided *de novo*, and findings of fact shall be set aside if "unsupported by substantial evidence." 5 U.S.C. § 706(2)(E); *Apple Inc. v. Int'l Trade Comm'n*, 725 F.3d 1356, 1361 (Fed. Cir. 2013).

The Commission found anticipation on summary determination. This Court reviews the grant of summary determination *de novo*. *One-E-Way, Inc. v. Int'l Trade Comm'n*, 859 F.3d 1059, 1062 (Fed. Cir. 2017). Whether a prior art reference anticipates the claims is a question of fact, reviewed for substantial evidence, but on summary determination there must be no genuine dispute whether the limitations of the claimed invention are disclosed by an allegedly anticipating prior art reference, and all reasonable inferences must be drawn in the nonmovant's favor. *Semcon Tech, LLC v. Micron Tech., Inc.*, 660 F. App'x 908, 914 (Fed. Cir. 2016).

Claim construction, at any stage of the case, is a legal determination reviewed *de novo*. *Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1338 (Fed. Cir. 2003).

## ARGUMENT

### I. THE COMMISSION ERRED IN FINDING THE VECTOR COMPACT ANTICIPATES CLAIMS 1, 2, 4, 5, AND 7.

The old-style Vector Compact product lacked any component like the "guiding cover" of the '351 Patent. Yet at the summary determination stage and without having previously construed "guiding cover," the Commission found the Vector Compact anticipated Claims 1, 2, 4, 5 and 7. It reached this conclusion through an unreasonably broad claim construction of "guiding cover," and by misapplying the evidence to the claim language.

In opposing summary determination and based on the disclosure of the patent, Dometic argued the "guiding cover" of the '351 Patent (also called a "fan duct plate"), is a component of the assembly that includes a "flat section with a circular opening for directing to the adjacent blower and [it] has a cylindrical section extending from the opening." Appx9682. The ALJ found that "guiding cover" could alternatively be (1) "just a cylindrical protrusion" (Respondents' position); or (2) "the combination of a flat section, circular opening, and cylindrical protrusion." On review, the Commission did not entertain the first

construction, and instead based its findings on the fact that the ALJ **allegedly** adopted Dometic's proposed construction and still found anticipation.

But the ALJ's analysis **did not** adopt Dometic's proposed construction. Rather, it looked for a combination of a flat section, circular opening, and cylindrical protrusion **anywhere in the prior art device**. This was not an accurate adoption of Dometic's proposed construction. The '351 Patent does not refer to a "guiding cover" as any combination of a flat section, circular opening, and cylindrical protrusion found anywhere in the air conditioning unit. Rather, it defines the "guiding cover" as a component of the assembly having certain features including a "flat section with a circular opening for directing to the adjacent blower and has a cylindrical section extending from the opening." The erroneous, overbroad claim construction resulted in a finding of anticipation through piecemeal selection of unrelated elements to find a "guiding cover" where none existed in the prior art.

Even if "guiding cover" could be properly construed as any "combination of a flat section, circular opening, and cylindrical protrusion," the Commission erred in finding anticipation because the components are not "**arranged as in the claim**." *See Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed. Cir. 1983). This is because the claims require "**the assembly including** a guiding cover. . . ." Yet, the Commission cited to part of the Vector Compact shroud, i.e.,

an optional cover of the main body, and not part of what the patent calls the assembly, to find the "flat section" of the "guiding cover" in the Vector Compact. Thus, even under the Commission's overbroad claim construction, the configuration of the Vector Compact does not anticipate because there is no **assembly** including a guiding cover.

### A. The Commission Erred in Construing "Guiding Cover."

Claim 1 of the '351 Patent recites "an assembly including a **guiding cover**. . . ." In finding that the Vector Compact included a "guiding cover," the Commission found that the ALJ adopted Dometic's claim construction, but this is not the case. On the left is Dometic's proposed construction and on the right the ALJ's:

| **Dometic's Proposed Construction of "Guiding Cover"** | **The ALJ's Construction of "Guiding Cover"** |
|---|---|
| "a 'fan plate' that is a 'cover-like element' that includes a flat section with a circular opening for directing air to the adjacent blower and has a cylindrical section extending from the opening."<br><br>Appx202; Appx9682-9683. | "a combination of a flat section, circular opening, and cylindrical protrusion"<br><br>Appx230. |

The two constructions are not the same. Dometic argued that "guiding cover" was a "plate," a cover-like "element" of the assembly, having a configuration that included a "flat section with a circular opening for directing to the adjacent blower and has a cylindrical section extending from the opening."

Appx9682-9683. But the ALJ treated this as any "combination of a flat section, circular opening, and cylindrical protrusion" anywhere in the device. Appx230. Given the precise disclosure of the specification, and importance of the element in overcoming the prior art, this broadening of the construction was unwarranted and erroneous. A proper construction, as proposed by Dometic, defines "guiding cover" as a component of the assembly having the above features, not any collection of those features found across any number of unrelated components.

**1. "Guiding Cover" Is a Component of the Assembly.**

The '351 Patent describes and claims an air conditioning unit having three distinct parts: main body, assembly and blower. *See supra*, Statement of the Case, Section III (citing Appx332-333, 12:52-13:3; Appx327, 1:35-37). Each of these parts has its own components. When a patentee separates structures into discrete sets, a patentee creates a rebuttable presumption that such separately listed claim elements "indicate separate and distinct physical structure." *Google LLC v. EcoFactor, Inc.*, 92 F.4th 1049, 1058 (Fed. Cir. 2024); *see also Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) ("[w]here a claim lists elements separately, 'the clear implication of the claim language' is that those elements are 'distinct component[s]' of the patented invention.") (quoting *Gaus v. Conair Corp.*, 363 F.3d 1284, 1288 (Fed. Cir. 2004)).

Here, the claim language separates the blower, the assembly, and the main body, and specifically lists elements of the assembly. Appx332-333, 12:52-13:3. Claim 1, for example, recites:

> "a main body; and
>
> a blower including an inlet and an outlet. . .
>
> an assembly . . . the assembly including a guiding cover. . ."

Appx332-333, 12:52-13:3. Thus, the claim language creates the presumption that the assembly and its components must be separate from the main body, and the claim recites the guiding cover as part of the assembly. Nothing in the specification rebuts this presumption; to the contrary, it reinforces it.

In particular, the specification states "[i]n FIG. 1 the air conditioner 1 can largely be divided into a main body 4, and the blower 2" (Appx332, 11:24-25), with an assembly with "guiding cover 170 and duct element 184" positioned between. Appx331, 9:66-10:19; Appx327, 1:35-42. The "guiding cover (a/k/a "fan duct plate") is described exclusively as a discrete component of the assembly. For example, Figure 23 showing the guiding cover component 170 is identified as "an isolated view of a guide cover of the assembly." Appx329, 5:41.




FIG. 23

Appx318.

The ’351 Patent explains:

> As shown in FIGS. 1 and 22-23, a fan duct plate or a guiding cover 170 is fastened to a blower side of the evaporator 20 and is a cover-like element that is placed on the top of the evaporator 20. The guiding cover 170 (FIG. 23) includes a flat section 172 with a circular opening 174 for directing air to the adjacent blower 2 and has a cylindrical section 176 extending from the opening 174.

Appx331, 10:66-11:6; Appx318.

While the ’351 Patent identifies the guiding cover as a specific component of the assembly, it separately identifies an optional “shroud” as a housing on the “main body.” In particular, the specification states that “[t]he shroud structure houses the compressor, the evaporator and the condenser” (i.e., the portions identified as parts of the “main body”). Appx328, 4:43-45. The “shroud,” though

described as optionally formed of one or more parts for including noise reduction, etc., (*see* Appx328-330, 4:43-63, 6:20-24, 6:35-7:19), is, critically, always a separate and distinct structure from what the patent calls the "guiding cover." *Compare* Appx301 (showing optional "shroud" covers) *with* Appx317-318 (depicting the "guiding cover").

#### 2. "Guiding Cover" Is a Component of the Assembly *Including* a Flat Section, Circular Opening and Cylindrical Portion.

"In most cases, the best source for discerning the proper context of claim terms is the patent specification wherein the patent applicant describes the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (quoting *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1360 (Fed. Cir. 2004)). That is the situation here.

The specification exclusively depicts and describes the "guiding cover" as a "fan duct plate," i.e., a cover-like element that "includes a flat section with a circular opening for directing air to the adjacent blower and has a cylindrical section extending from the opening." Appx331, 9:65-10:15; Appx318. No party suggested "guiding cover" was an industry term or had any meaning apart for the disclosure of the patent, meaning the coined term "guiding cover" has the meaning given it by the patentee. *Grace Instrument Indus., LLC v. Chandler Instruments Co., LLC*, 57 F.4th 1001, 1010 (Fed. Cir. 2023).

The ’351 Patent includes figures depicting the patentee’s “guiding cover.” Labeled element 170, in assembly Figure 22, the “guiding cover” is shown below:




FIG. 22

Appx317 (annotated).

The specification of the ’351 Patent describes the “guiding cover” as having “a flat section 172 with a circular opening 174 for directing air to the adjacent blower 2 and [having] a cylindrical section 176 extending from the opening 174.” Appx331, 9:66-10:15. Subsequent references also show “guiding cover” to be a discrete component having the features described, which enable the functionality of the device. Appx331-332, 10:16-21, 10:27-30, 11:4-11, 11:18-21.[4]

[4] “Guiding cover” cannot be merely the protrusion, as the ’351 Patent describes the cylindrical protrusion as just one part of the guiding cover, noting that the “guiding

"Where the specification instructs as to the meaning of a claim term, 'the inventor's lexicography governs.'" *Grace Instrument Indus.*, 57 F.4th at 1010 (quoting *Phillips*, 415 F.3d at 1316). Here, the '351 Patent not only details the term "guiding cover," but it also implicitly defines the term because the '351 Patent uses the "term throughout the entire patent specification, in a manner consistent with only a single meaning." *Homeland Housewares, LLC v. Whirlpool Corp.*, 865 F.3d 1372, 1377 (Fed. Cir. 2017) (quoting *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1271 (Fed. Cir. 2001)) (internal quotations omitted).

Moreover, the prosecution history shows the '351 Patent issued in part because the patentee further defined the assembly limitation in claim language that already recited a main body and a blower. Appx35202. "'Prosecution history is especially important when the invention involves a crowded art field, or when there is particular prior art that the applicant is trying to distinguish.'" *Engel Industries, Inc. v. Lockformer Co.*, 96 F.3d 1398, 1405 (Fed. Cir. 1996) (citation omitted). Where the patentee adds a claim limitation in order to overcome the prior art, the construction of that limitation should "distinguish their claimed invention

---

cover 170 (Fig. 23) includes a flat section . . . **and** has a cylindrical section 176 extending from the opening 174." Appx331, 10:2-5.

over the prior art." *Id.*; *see also Wang Labs., Inc. v. Am. Online, Inc.*, 197 F.3d 1377, 1384 (Fed. Cir. 1999).

As noted above, the claimed assembly stems from Dometic's response to an Office Action amending then-Claim 54, now-Claim 1. Appx35202; *see also supra*, Statement of the Case, Section IV. Specifically, Dometic added a detailed account of the components of the assembly, and the mechanism of rotation permitted by the assembly, to overcome the Examiner's rejection over Dodge—the patent covering the Vector Compact. Appx35202. The patentee amended now-Claim 1 to include "the assembly including a guiding cover and a cylindrical duct element for maintaining the main body and the blower in air communication with one another. . . ," which Dodge lacked. Appx35210-35211. That language was the lynchpin of the Examiner's allowance of now-Claim 1 over Dodge, and thus the Vector Compact. Appx35223; Appx35229-35230. Thus, a construction that gives meaning to the "guiding cover" as a component of the assembly having the disclosed configuration is essential.

#### 3. "Guiding Cover" Is More than a Mere Cylindrical Protrusion.

During *Markman*, Respondents recognized the cylindrical protrusion was merely a **part** of the guiding cover (*see*, *e.g.*, Appx1910, Appx1913-1914; Appx3772-3773), but in seeking summary determination, Respondents changed course and argued it could be a cylindrical protrusion, alone. The ALJ considered

this a possible interpretation. The Commission did not entertain the notion that "guiding cover" could be "just a cylindrical protrusion," and did not comment on this plainly erroneous position.[5]

Respondents' claim that "guiding cover" in the '351 Patent was a mere cylindrical protrusion was based on Dometic, in infringement contentions, having allegedly only included an arrow to a cylindrical ring on the accused device to identify the "guiding cover." (see image below).




Appx7231.

[5] Because the Commission did not specifically comment on it, Respondents may argue the issue is not before this Court and requires remand. *See Beloit Corp. v. Valmet Oy*, 742 F.2d 1421, 1423 (Fed. Cir. 1984). However, to the extent the issue is subsumed in considering whether the Commission both adopted and applied the correct claim construction, it is appropriately before this Court and Dometic shows below why this construction too was legal error.

Yet, in the accused product (unlike in the asserted prior art), the arrow pointed to a singular component that was virtually identical to the "guiding cover" of the '351 Patent:

| | |
|---|---|
|   |   FIG. 23 |
| Guiding Cover (Accused Product) | Guiding Cover ('351 Patent) |

Appx13864. Dometic never contended that a **portion** of the component was the "guiding cover" and cannot be faulted for drawing a single arrow to the same component. Thus, any reliance on the annotated photograph for such a position is clear error. In any event, "[i]t is well settled that claims may not be construed by reference to the accused device." *NeoMagic Corp. v. Trident Microsystems, Inc.*, 287 F.3d 1062, 1074 (Fed. Cir. 2002).

The proper construction of "guiding cover" recognizes it as a component of the assembly having "a flat section with a circular opening for directing air to the adjacent blower and has a cylindrical section extending from the opening," not any combination of those features anywhere in the device. Because the Commission

applied an erroneous claim construction to find anticipation, the decision must be vacated.

### B. The Commission Erred in Finding that the Vector Compact Anticipates.

The decision granting summary determination of anticipation must be reversed because (1) under a proper claim construction of "guiding cover," no evidence was adduced, and (2) even under the Commission's erroneous overbroad "combination" construction, the finding of anticipation was erroneous because what was identified as the "guiding cover" included part of the shroud of the main body, and the claim requires the guiding cover be a component **of the assembly**.

#### 1. There Was No Evidence of a "Guiding Cover" in the Vector Compact Under the Proper Claim Construction.

Under a proper construction of the term, i.e., one recognizing "guiding cover" as "a 'fan **plate**' meaning a cover-like **element** that **included** a flat section with a circular opening for directing to the adjacent blower and [having] a cylindrical section extending from the opening" (Appx9682; Appx331, 9:66-10:5), it is undisputed the Vector Compact does not anticipate. Respondents argued, and the Commission found, a "guiding cover" only by cherry-picking unrelated pieces within the Vector Compact to meet the bounds of the Commission's construction. Specifically, Respondents contended the "guiding cover" in the Vector Compact could comprise a combination of "a metal cover-like element (also known as a

'shroud') that covers the evaporator of the unit," "has a circular opening for directing air to the adjacent blower," and a separate metal mating ring extending through the shroud. Appx7232. But combining unrelated components is inconsistent with a claim construction that requires a "plate" or "cover-like **element**" of the assembly possessing all three qualities. Only by reading out the essence of the claimed component was anticipation found. No evidence supported, nor did Respondents even argue, that any one component of the Vector Compact could comprise a "guiding cover."

#### 2. Even Under the Commission's "Combination" Construction, the Vector Compact Lacked ***an Assembly*** including a Guiding Cover.

Even assuming the Commission's "combination" construction of "guiding cover" was correct, the Commission erred in finding anticipation. This is because the claims require "**an assembly** including a guiding cover," and the patent separately identifies the "shroud" as a cover on the "main body."

For a claim to be anticipated, "each claim element must be disclosed, either expressly or inherently, in a single prior art reference, and the claimed arrangement or combination of those elements must also be disclosed, either expressly or inherently, in that same prior art reference." *Therasense, Inc. v. Becton, Dickinson and Co.*, 593 F.3d 1325, 1332–33 (Fed. Cir. 2010). "The requirement that the prior art elements themselves be 'arranged as in the claim' means that claims cannot be

'treated . . . as mere catalogs of separate parts, in disregard of the part-to-part relationships set forth in the claims and that give the claims their meaning.'" *Id*. at 1332 (quoting *Lindemann Maschinenfabrik GMBH v. Am. Hoist & Derrick Co*., 730 F.2d 1452, 1459 (Fed. Cir. 1984)). "[U]nless a reference discloses within the four corners of the document not only all of the limitations claimed but also all of the limitations *arranged or combined in the same way as recited in the claim*, it cannot be said to prove prior invention of the thing claimed and, thus, cannot anticipate under 35 U.S.C. § 102." *Id*. (emphasis in original) (*quoting Net MoneyIN, Inc. v. VeriSign, Inc*., 545 F.3d 1359, 1371 (Fed. Cir. 2008)).

In the Vector Compact, the "shroud" with a "circular opening" that Respondents identified as forming part of the "guiding cover" was part of the "main body" of that device as can be seen in photos below, **annotated by Respondents in their Motion for Summary Determination**. The front portion of the shroud, which Respondents claimed to be part of the guiding cover, is not merely attached to that main body; it **is** the main body, as identified by Respondents.







Appx7232; Appx7282; Appx7286.

The ALJ acknowledged the flat section "is part of the larger housing (or shroud) that encloses other air conditioner components," but the ALJ claimed "this makes no difference." Appx229. But it does make a difference, because the patent defines those as separate components. And nowhere in the specification is a "shroud" described as being part of the "assembly." The ALJ's finding, affirmed by the Commission, therefore fails as a matter of law. As discussed above, the assembly was central to allowance of the '351 Patent. To hold that the "guiding cover" can consist of part of the shroud of the main body—directly contradicting the intrinsic evidence—contravenes well-settled law because the patentee (1) expressly defined the term "guiding cover," and explicitly included it in the definition of the "assembly" in the claim language (Appx331-333, 9:66-10:14,

12:59-13:3); (2) always identified the shroud (a covering of the main body) as a separate and fundamentally different structure from the guiding cover; and (3) never included the "shroud" in the definition of assembly. *See supra* § I.A.1-3; *see also Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369, 1378 (Fed. Cir. 2022); *Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1365 (Fed. Cir. 2016) (finding statements in the specification were "not simply descriptions of the preferred embodiment" but, rather, were definitional); *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1334 (Fed. Cir. 2009).

In addition to this legal error, the Commission also, at the summary determination stage, failed to consider the evidence in the light most favorable to Dometic, the non-movant. The "guiding cover" of the '351 Patent is configured as shown and claimed because that configuration enables the rotation functionality of a duct element about the "guiding cover," also claimed. *See* Appx332-333, 12:52-13:3.

In opposition to Respondents' Motion, Dometic submitted testimony from a named inventor of the '351 Patent, Mr. Pabisz. Appx9682-9686; Appx13853-13855. A long-time Dometic employee, Mr. Pabisz was well-familiar with the old-style Vector Compact product sold by Dometic. He testified that the "notion of using a guiding cover in a cylindrical duct element for maintaining the main body

and the blower in air communication [was] new [. . .] at the time of the application for [the ’351 Patent].” He testified it was different from the “mating ring” in the Vector Compact and overcame the difficulties of that structure, explaining:

> . . .one of the difficulties with the Vector Compact, as I talked about earlier, was rotating that -- adjusting that blower . . . To fix that, we actually have what we call the guiding cover, which is a plate that had a stamped metal ring that was very smooth and consistently concentric . . . So the stamped metal plate, guiding cover we called it, allowed you to do that. And then the molded plastic ring that mated it to that, which we called the duct ring or the transition ring, allowed a very smooth transition between that plastic and that metal cover.

Appx7697, 182:20-184:4.

This testimony was buttressed by the expert testimony of Dr. Paulus, who agreed that the mating ring in the Vector Compact was simply a ring and nothing like the guiding cover of the ’351 Patent. Appx9682-9686.

The ALJ dismissed this testimony, stating that the physical nature of the materials was irrelevant. *See* Appx232. The ALJ ignored the testimony explaining the **configuration** of the guiding cover as a “plate” with certain features between the main body and blower imparted novelty and altered functionality over the mating ring of the Vector Compact. Appx232. The Commission also ignored the required **configuration** of the guiding cover that imparted functionality, and found the Vector Compact could rotate so the Vector Compact “does have a duct element that can rotate around the ‘guiding cover.’” Appx201.

This disregard and misunderstanding of the evidence ran afoul of both summary judgment law (reasonable inferences drawn in favor of nonmovant) and anticipation law. Respondents did not show, by clear and convincing evidence, giving all reasonable inferences to the non-movant, that the Vector Compact had all elements **arranged as in the claims**. Dometic therefore respectfully requests this Court reverse the Commission's finding of invalidity of Claims 1, 2, 4, 5 and 7, and remand this case for further proceedings.

## II. THE COMMISSION ERRONEOUSLY CONSTRUED CLAIMS 18-22 TO REQUIRE "TWO MODES OF ROTATION," INCORRECTLY FINDING NONINFRINGEMENT AND LACK OF TECHNICAL DOMESTIC INDUSTRY.

Claims 18-22 encompass air conditioning devices with a blower and duct element that are coupled. There is no dispute that, in some claimed embodiments, the blower and duct element are coupled such that they form a unitary structure, and thus rotating/adjusting the duct element (which is part of claimed assembly) necessarily rotates/adjusts the blower, and vice versa—much like a doorknob. Appx296, Abstract. Additionally, as detailed above, the blower and duct element each have an axis of rotation (first axis and second axis, respectively), and the intrinsic evidence confirms that, in some embodiments, these axes can be colinear—i.e., the same. Appx332, 11:32-38. Thus, Claims 18-22 include embodiments where rotating/adjusting either the duct element or the blower alone

will cause both structures to rotate/adjust about the same axis, because they are coupled and thus move as one. This is depicted in annotated Figure 29, below.




Appx324 (annotated).

The foregoing is undisputed, as the ALJ and Commission (1) acknowledged that "[c]ertainly the specification discloses such an embodiment" where "the duct element [is coupled] onto the blower **so the two elements can rotate as a unitary structure about the guiding cover**" (Appx127; Appx49); and (2) arrived at a construction where the first and second axes of Claims 18-22 can be "colinear – that is, the same – in some embodiments." Appx3778; Appx27. Nevertheless, the ALJ and Commission erroneously construed the "axis limitation" to "[1] **require** a different type of rotation separate from the assembly's adjustment/rotation, and [2] involving a structural component that may be a part of, but is identifiably distinct

from, the claimed portion of the 'assembly,'" thus reading out the very embodiments shown above. Appx28.

The evidence does not support this overly-narrow construction, and the Commission committed numerous legal errors in arriving thereon, namely (1) assuming that Claims 18-22's use of the terms "first" and "second" axis mandated distinct axes, structures, and mechanisms of rotation or resulted in disclaimer; (2) failing to construe the axis limitation in view of the intrinsic evidence, thereby excluding preferred embodiments from, and importing unclaimed features into, the claims; (3) misinterpreting the Figures; and (4) violating the doctrine of claim differentiation. *See* Appx4-82.

Thus, the Court must vacate the Commission's construction of the "axis limitation" (and its impact on the meaning of the "directional limitation"), adopt a proper construction therefor, and remand for further proceedings. The "axis limitation" **does not require**, and need not be satisfied by, (1) a structure identifiably distinct from the claimed assembly; or (2) a different type of rotation separate from the assembly's adjustment/rotation.

Because there is no dispute that under a proper construction, the Accused Products and Domestic Industry Products practice Claims 18-22, the Commission must be directed to find a violation under Section 337 on remand.

### A. The Claims' Recitation of "First" and "Second" Axes Does Not Mandate Separate Structures or Modes of Rotation or Evidence Disclaimer.

The Commission reasoned that because Claims 18-22 recite the terms "first" and "second" axis, they necessarily must refer to "distinct components of the patented invention." Appx46-47. Notwithstanding the ALJ's prior ruling that the first and second axes "need not be different," the Commission further found there must be two distinct axes, and that "the claim language [cannot] be satisfied by a single axis." Appx47. In the Commission's view, Dometic's position (no two modes of rotation required) would revert Claims 18-22 to their pre-examiner's amendment form. Appx45-47. The Commission is incorrect, and because its construction of the "axis limitation" rests on a flawed analysis of the words "first" and "second," in view of the intrinsic evidence, the Commission's construction constitutes legal error.

As an initial matter, the Commission misunderstood Dometic's position regarding the scope and meaning of the words "first" and "second." In the Commission's view, Dometic allegedly asserted that the first axis and second axis **must** be a single axis. Appx45. Not so. Dometic never argued that the construction of the "axis limitation" **must** result in one axis (i.e., an axis). Rather, Dometic has maintained that nothing in the intrinsic evidence **precludes** the first and second axes from being colinear—i.e., the same. Specifically, Dometic explained that in

view of the ALJ holding the claim language "does not 'logically' require the axes to be different **in every case**" (Appx27725; Appx3778), that POSA would "understand that Claim 18 **encompasses an embodiment** where the duct element and blower share the same [colinear] rotational axis." *See*, *e.g*., Appx27725-27726. Dometic never asserted Claims 18-22 should "revert" to their pre-examiner's amendment form, just that Claims 18-22 encompass—but are not limited to—embodiments where the first and second axes are identical.

Turning to the Commission's legal error, the fact that Claims 18-22 recite "first" and "second" axes does not necessarily imply (much less prove) that there **must** be two distinct axes, modes of rotation, and structures therefor, unless the intrinsic evidence explicitly compels such a result—which it does not. *Google LLC*, 92 F.4th at 1058 ("there is a 'presumption' that separately listed claim limitations may indicate separate and distinct physical structure, but that presumption may always be rebutted in the context of a particular patent.") (citation omitted); *Indus. Tech. Rsch. Inst. v. LG Elecs. Inc*., No. CIV.A. 12-949 ES, 2014 WL 60043, at *10 (D.N.J. Jan. 6, 2014) ("the claim language 'first,' 'second,' and 'third' does not necessarily implicate any such physical disconnection or independence.") (citing *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004)).

As in *Google LLC*, the intrinsic evidence rebuts any possible presumption that "first" and "second" axes indicate that there **must** be two distinct axes, modes of rotation, and structures therefor, because "the specification contemplates an embodiment in which"—and, in fact, states explicitly—that (1) the axes can be identical; and (2) the blower and duct element can rotate as a coupled, unitary structure, such that rotating/adjusting one necessarily rotates/adjusts the other about the same axis. *Google LLC*, 92 F.4th at 1058. The ALJ and Commission agree. Appx127; Appx27; Appx49; Appx3778. Indeed, as detailed above, Claim 18's use of the terms "first" and "second" axis is entirely consistent with viewing the manner of rotation from the perspective of two different portions of the claimed air conditioner – from the vantage point of the second base that is coupled to the blower, as well as the vantage point of the first base that interfaces with the guiding cover. *See supra*, Statement of the Case, Section III.B; Appx333, 14:14-21.

Regarding the first and second axis being identical in certain embodiments, the specification states the first and second axes **can be** identical, and the ALJ construed them accordingly. *See e.g.*, Appx3778; Appx327, 2:43-50; Appx332, 11:31-33, 11:54-57; Appx333, Claim 3. This is depicted below in Figures 30A-1 through 30B-2, where the axes A and B can be identical or parallel:




Appx325. Despite this, the Commission reasoned that because (what became) Claim 18 recited "an axis" during prosecution and was later amended to recite "a first axis" and "a second axis," any interpretation of Claim 18 that would encompass a single axis would "revert[] claim 18's first and second axes terms back to the unallowable pre-Examiner amendment version of the term." Appx45-47. This is wrong for multiple reasons.

First, Claims 18-22 (and, similarly, Claim 1) do not **require** the first and second axes to be the same **or** different, and refer to same manner of rotation when viewed from two different perspectives (i.e., from the first base and from the second base, respectively). *See supra*, Statement of the Case, Section III.B. Thus, the amendment from "an" axis to a "first" axis confirms Claims 18-22 were not

narrowed in that particular respect. Second, nothing in the prosecution history indicates the claim amendment was intended to require two distinct axes, much less two separate modes of rotation. Specifically, the amendment merely amended what became Claim 18 to include Claim 1's detailed language describing the claimed assembly. *See supra*, Statement of the Case, Section IV. The ALJ agreed during *Markman*, holding:

> [N]othing in the intrinsic evidence rules out … the two axes [of Claims 18-22 being] identical. Nor is there anything in the prosecution history ruling it out; **the Examiner's amendment … added a large number of limitations, including a second axis, but nothing in the amendment (to which the applicants did not respond) indicates that the first axis and the second axis must be different**.

Appx3780.

In that regard, nothing was discussed or implied during prosecution in terms of different modes of rotation accomplished via different structural components, much less any discussion or implication that Claim 18 was limited to air conditioning devices **requiring** the first and second axes be distinct, and that rotation thereabout **required** to be accomplished by distinct structures. Nevertheless, the Commission treated the prosecution history as if Dometic had disclaimed embodiments where rotation of the duct element can satisfy rotation of the blower about the same (colinear) axis. Not so, and thus the Commission committed legal error arriving at its narrow construction for the "axis limitation."

*Sorensen v. Int'l Trade Comm'n*, 427 F.3d 1375, 1378–79 (Fed. Cir. 2005) ("Disclaimers based on disavowing actions or statements during prosecution, however, must be both clear and unmistakable . . . Moreover, 'it is the applicant, not the examiner, who must give up or disclaim subject matter that would otherwise fall within the scope of the claims.'") (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1124 (Fed. Cir. 2004)).

As shown above, the "assembly" was considered the same in Claims 1 and 18. In finding the claims allowable, the Examiner discussed the prior art references, including Dodge, and explained Claims 1 **and** 18 as amended were allowable because of the claimed **assembly**, which was not present in the art. Appx35229. Nowhere did the Examiner state or imply that allowability stemmed from either multiple modes of rotation, separate structures for accomplishing the same, or non-colinear axes. Appx35229-35232.

### B. The Commission Erred by Failing to Construe the "Axis Limitation" in View of the Surrounding Claim Language and the Specification, Thus Excluding Preferred Embodiments.

#### 1. The Claim Language Does Not Support the Commission's Construction.

The Commission's construction further errs by reading out and contradicting (1) the claim language surrounding the "axis limitation;" and (2) the specification's description of the claimed air conditioning devices, including preferred embodiments. Regarding the claim language, Claim 18, and thus dependent Claims

19-22, require that (1) the claimed air conditioning devices have a blower that is "in air communication" with the main body; (2) the duct element and blower be "coupled;" (3) the cylindrical duct element to which the blower is "coupled" "maintain the main body and the blower in air communication with one another;" and (4) the duct element is "rotatably adjustable . . . so as to alter the orientation of the [blower] outlet." *See* Appx333, Claim 18.

Thus, a POSA would understand Claims 18-22 include embodiments where the **coupled** blower and duct element form a unitary structure and the first and second axes are identical, and thus rotating/adjusting the duct element about the second axis necessarily rotates/adjusts the blower about the first axis, and vice versa, because they move as one. Appx127; Appx27; Appx49; Appx3778 ("identifying claimed features by ordinal number ('first widget, 'second widget,' . . .) is simply standard drafting practice . . . and such language does not 'logically' require the axes to be different in every case."); *supra* § II (Appx324 (annotated)). Nevertheless, the Commission's construction limits Claims 18-22 by **requiring** that the blower **must** have a separate mode of rotation that **must** be accomplished by some other, unclaimed structure distinct from the assembly, thus injecting additional requirements into Claims 18-22 that are simply not required by the claim language—particularly "coupled"—ignoring well-settled law in the process.

*Markman v. Westview Instruments, Inc*., 517 U.S. 370, 389 (1996). ("[A] term can be defined only in a way that comports with the instrument as a whole.").

The Commission alleges this "separate mode of rotation" could be accomplished by de-coupling of the blower and duct element via removal of, e.g., unclaimed screws or rivets, thus disassembling the air conditioner, and then reassembling it in a different configuration. *See* Appx128. Notably, in that hypothetical embodiment, the Commission assumes that what "couples" the blower to the duct element (e.g., screws or rivets) can be removed and replaced. But Claims 18-22 do not contain any language indicating **how** the blower and duct element are coupled, much less whether the coupling is permanent/irreversible. *See* Appx333, Claim 18. While the ALJ and Commission focused on hypothetical, reversible coupling, they ignored equally plausible embodiments where the blower and duct element are irreversibly "coupled," such as via welding. In the latter embodiments, the blower and duct element would be inseparable and thus always rotate/adjust as a unitary structure—including in embodiments with identical axes. And yet, under the Commission's construction, such embodiments would fall outside the scope of Claims 18-22 even though the claim language does not compel this result, highlighting the impermissibly narrow and legally erroneous nature of the Commission's construction. *E.g.*, *Thorner v. Sony Comput. Entm't Am. LLC*,

669 F.3d 1362, 1367 (Fed. Cir. 2012) (a patentee "is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning").

### 2. The Specification Does Not Support the Commission's Construction.

The specification further confirms a POSA would understand Claims 18-22 include embodiments where the **coupled** blower and duct element form a unitary structure and the first and second axes are identical, and thus rotating/adjusting the duct element about the second axis necessarily rotates/adjusts the blower about the first axis, and vice versa, because they move as one—i.e., no "second mode" of rotation **and** distinct structural component is required in all claimed embodiments. *See*, *e.g.*, Appx332, 11:40-62 ("[a]s shown in FIGS. 1 and 29, **by rotating the blower 2 and the duct element 184**, the orientation of the outlet 218 of the blower 2 of the present invention can be altered and can vary by more than 270 degrees . . . **When the blower 2 is rotated from one direction to another direction about the second axis A**, the directions may point to two different lateral sides . . . of the air conditioner 1."); Appx332, 11:64-12:3 ("The orientation of the outlet 218 of the blower can be altered simply by . . . **rotating the duct element 184 to the desired orientation** . . . **The rotation of the blower duct element 184** occurs continuously without interference or break.").

Moreover, the specification does not limit or otherwise mandate how the blower and duct element are coupled, nor does it explicitly describe any

embodiment where the **blower** is removed from the duct element and rotated independently therefrom. *See generally* Appx296-333. Similarly, the specification does not require that the first and second axes must be different. Rather, the specification states explicitly that the axes can be identical. Appx332, 11:32-37 ("[t]hese first and second axes B and A . . . may be non-parallel (FIG. 30D) or identical (FIG. 30A)."); Appx325-326; *see also* Appx333, Claim 3. Thus, a POSA would understand from the specification that Claims 18-22 encompass embodiments where the "axis limitation" can be satisfied by the assembly's (i.e., duct element's) adjustment/rotation alone about a colinear axis. Appx127; Appx27; Appx49; Appx3778; *see also supra* § II (Appx324 (annotated)).

The Commission ignored the specification and its (and the ALJ's) own findings, concluding that rotation of the duct element (and thus rotation of the blower to which it is coupled) "so as to alter the orientation of [the blower] outlet" cannot satisfy the "axis limitation"—even in a scenario where the axes are identical. In doing so, the Commission excluded preferred embodiments from Claims 18-22, a legal error. *E.g.*, *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1986) (a construction that reads out preferred embodiments is "rarely, if ever, correct and would require highly persuasive evidentiary support, which is wholly absent in this case."). The Commission attempted to justify its overly narrow construction by adopting the ALJ's "finding" that:

> [D]isclosures by the '351 patent certainly **suggest** that "adjusting the orientation" of the blower that is fastened to the duct element with apertures 210 **may** involve decoupling the blower and rotating/adjusting the blower's orientation relative to the duct element . . . [T]he specification also discloses another type of rotation (about which the blower rotates with respect to the duct element) associated with restricting the maximum height "by adjusting the orientation in which the blower 2 is fastened to the duct element 184" using the apertures 210, e.g., as illustrated in Figures 22 and 24. [Appx124-128; Appx332, 12:13-24].

Appx49. As shown by the Commission's bolded, equivocal language above, these "findings" are speculative inferences and focus on limited portions of the specification to the exclusion of others. Thus, even if the Commission's findings as to these limited portions are correct (they are not), they are insufficient to limit Claims 18-22 to **require** a second mode of rotation accomplished via separate structure, because the specification falls well short of expressly limiting Claims 18-22 thereto. *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims."); *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1352 (Fed. Cir. 2010) (improper to limit claim to an "embodiment unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest execution or restriction.") (quotations omitted).

In fact, the specification confirms the Commission's findings are inaccurate, because, immediately following the passage at Appx332, 12:13-24 (which the Commission cites as allegedly disclosing "another type of rotation"), the specification states, "in the present embodiment, **the adjustment of the blower orientation** [described immediately above] **occurs through a sliding mechanism**—i.e., **not** by "decoupling the blower and rotating/adjusting the blower's orientation relative to the duct element." Appx332, 12:28-29. Similarly, the claims confirm that the alleged "type of rotation (about which the blower rotates with respect to the duct element) associated with restricting the maximum height" (Appx49) is not rotation as contemplated by Claims 18-22, but refers to a way to **install** (i.e., couple) the blower to the duct element. Appx333, Claim 17 (The air conditioning device of claim 1, wherein the **blower is installed with respect to the duct element** so that the maximum height of the air conditioning device is limited.").

### C. The Commission Misapprehended Settled Law Regarding the Scope and Meaning of Drawings.

The Commission's erroneous construction also credits the ALJ's misguided interpretations of specification figures and legally impermissible inferences therefrom. Appx50-51. These findings fail as a matter of law because there is no indication anywhere in the intrinsic evidence that the Figures represent "the precise proportions of the elements"—namely the relative spacings of any apertures and

how the blower and duct element are "coupled"—and therefore the Figures "cannot be relied upon to argue that the disputed terms should be limited to a particular structure." *E.g.*, *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1351 (Fed. Cir. 2013) ("Because the figures . . . do not evidence actual dimensions of the [claimed element] they cannot be relied upon to argue that the disputed terms should be limited to a particular structure.").

But this is precisely what the Commission did here, despite the specification being completely silent on the size, scale, and dimensions the duct element must have, much less how the blower and duct element are "coupled." *See generally* Appx296-333. *Trading Techs.*, 595 F.3d at 1352-55. Indeed, Claims 18-22 recite only a "cylindrical duct element" that is "coupled" to the blower without stating how said coupling occurs, without stating whether said coupling is irreversible, and without stating what is used to couple the blower to the duct, much less whether apertures are present in the duct element, and even less the spacing of any apertures. *See* Appx333, Claims 18-22.

Even assuming *arguendo* that the Commission's interpretation of Figures 22, 24A, 24B, and 25 is correct, because the Commission admits the Figures in question depict a preferred embodiment (Appx50-51), it is inappropriate to limit the scope of the Claims to said figures and the specification's description thereof at column 12 (which, as noted above, the Commission and ALJ misapprehended),

unless the evidence compels such a result. *E.g.*, *Dow Chem. Co. v. United States*, 226 F.3d 1334, 1341–42 (Fed. Cir. 2000); *Johnson Worldwide Assocs., Inc. v. Zebco Corp.,* 175 F.3d 985, 992 (Fed. Cir. 1999) ("mere inferences drawn from the description of an embodiment of the invention cannot serve to limit claim terms").[6]

Finally, the Commission credited the ALJ's incorrect interpretation of the nature and role of "exploded views" of Figures to improperly consider the claimed structural features in isolation. *Compare* Appx123 ("The specification, with reference to Figure 22 [], **suggests** that an air conditioner **may have** two distinct means of rotating a blower that affect the orientation of the outlet") *with* Appx329, 5:39-40 ("FIG. 22 is an exploded view of an assembly for connecting the blower to the air conditioner."). In reality, said features, as recited in the claims, undeniably fit together to form an assembled air conditioning device that need not be disassembled, such as the embodiment shown in Fig. 29. In doing so, the Commission failed to analyze the "air conditioning device" as described and claimed, drew erroneous conclusions regarding the scope and content of the intrinsic evidence, and arrived at a construction that is not **required** by the intrinsic

[6] Notably, the ALJ rejected Respondents' argument during *Markman* that the "assembly for adjusting the blower with respect to the main body" in Claim 18 should be construed as "Structure disclosed in Figures 22-27." *See* Appx3768. Thus, because the ALJ previously held Claims 18-22 **were not limited to the preferred embodiments disclosed in Figures 22-27**, the law foreclosed the Commission from adopting a construction limited to its interpretation of Figures 22-27 here. *Dow Chem. Co.*, 226 F.3d at 1341–42.

evidence. 37 C.F.R. § 1.84(h)(1) ("[e]xploded views . . . show the relationship or order of assembly of various parts . . . ."); *see also* Appx26298, 375:3-10.

### D. The Commission's Construction Violated the Doctrine of Claim Differentiation.

The Commission's construction also violates the doctrine of claim differentiation with respect to at least Claim 22. Claim 22 recites "[t]he air conditioning device of claim 18, wherein the air conditioning device further includes a clamp element for maintaining the blower oriented with respect to the main body, and wherein **only** loosening of the clamp element is necessary **to change** orientation of the blower." Appx333, 14:29-33. A preferred embodiment includes a clamp element 186, as shown below:



FIG. 22

Appx317 (annotated).

This is significant, because while the Commission credited the ALJ's conclusion that the Figures support its narrow construction (Appx52), the specification's description of that preferred embodiment makes clear "[t]he

orientation of the outlet 218 of the blower can be altered simply by loosening the clamp element 186, rotating the duct element 184 to the desired orientation and tightening the clamp element 186." Appx332, 11:64-12:3; *see also* Appx328, 3:7-15; Appx333, 14:34-53. In other words, neither Claim 22 nor preferred embodiments contemplate the Commission's required second mode of rotation accomplished by a separate structure to achieve the "axis limitation," because the intrinsic evidence states said blower adjustment/rotation can be accomplished **solely** by loosening the clamp element and then rotating the duct and thereby the blower outlet, which, again, can be coupled to form a unitary structure. *See* Appx333, 14:29-33 ("wherein **only** loosening of the clamp element is necessary to change the orientation of the blower."). The specification further confirms that the clamp element, when present, is part of the assembly. Appx329, 5:48 (FIG. 26 is a view of a clamp element of the assembly.").

In sum, the intrinsic evidence shows the clamp element is "a claimed portion of the assembly" (Appx329, 5:48), only loosening the claimed clamp element is necessary to "change the orientation of the blower," and the claimed clamp element "maintains the blower oriented with respect to the main body." Appx333, 14:29-33. This establishes that the Commission's construction violates the doctrine of claim differentiation. Specifically, Claim 22 is irreconcilable with the Commission's construction because (1) the clamp element "maintaining the blower

with respect to the main body" necessarily means the blower and duct will remain coupled under the scope of Claim 22, cannot be disassembled, and will rotate as a unitary structure (Appx333, 14:29-33; Appx332, 11:64-12:3; Appx328, 3:7-15) thus precluding a "different type of rotation separate from the assembly's adjustment/rotation" from being **required**; and (2) Claim 22 and the specification confirm the clamp element, which is part of the assembly, can **alone** be loosened to "change the orientation of the blower," and thus no separate structural component is necessary to practice Claim 22. Appx333, 14:29-33.

In effect, the Commission's construction results in independent Claim 18 being **narrower** than dependent Claim 22, confirming the construction is legally erroneous and must be reviewed and reversed. *Littelfuse, Inc. v. Mersen USA EP Corp.*, 29 F.4th 1376, 1380 (Fed. Cir. 2022) ("By definition, an independent claim is broader than a claim that depends from it, so if a dependent claim reads on a particular embodiment of the claimed invention, the corresponding independent claim must cover that embodiment as well."); *Wright Med. Tech., Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1445 (Fed. Cir. 1997) ("[W]e must not interpret an independent claim in a way that is inconsistent with a claim which depends from it").

### E. The Balance of the Commission's Analysis Was Flawed and Contradicted by the Intrinsic Evidence.

The balance of the Commission's arguments is negated by the intrinsic evidence. For example, the Commission adopted the ALJ's conclusion that "patent draftee [sic] described the assembly's function as '*adjusting*' the blower rather than '*rotating*' it, which suggests the operations in the two limitations **might** differ . . . The use of two different terms to describe changing the orientation of the blower outlet thus reveals that there are two different modes of changing the orientation." Appx122 (italics in original); Appx30. This argument fails.

First, the intrinsic evidence uses rotation and adjustment synonymously—i.e., these terms hardly suggest two different operations. Appx328, 3:7-15 ("a method of adjusting an air conditioning device is provided . . . The method includes the steps of loosening the clamp element, **orienting the outlet of the blower to a desired direction by hand through rotation about the axis**, and tightening the clamp element to maintain the blower oriented with respect to the main body."); *see also*, *e.g.*, Appx332, 11:1-3, 11:64-12:3, 11:40-62, 11:4-11; Appx328, 3:7-15. Moreover, there is nothing in the intrinsic evidence that precludes embodiments where the assembly's (i.e., duct element's) rotation about the second axis also makes "the blower . . . rotatable" about the first axis, because the axes can be identical and the blower and duct element can rotate/adjust as a unitary structure. *Supra* § II.A-C.

The Commission's analysis of the dependent claims is also unavailing and contradicted by the intrinsic evidence. First, as detailed above, the Commission's construction violates the doctrine of claim differentiation at least with respect to Claim 22. Second, the Commission's analysis of Claims 20-21 is irreconcilable with the intrinsic evidence. In particular, the Commission adopted the ALJ's finding that "claims 20 and 21 confirm that the blower is rotatable without reference to the assembly – i.e., 'where the blower *can be* rotated' and 'the blower *is* rotatable,' respectively." Appx30-31 (emphasis in original). However, the specification's description of these claimed embodiments confirms the opposite is true. *Phillips*, 415 F.3d at 1315 ("the specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'") (quoting *Vitronics*, 90 F.3d at 1582).

In particular, the specification states in relevant part:

> As shown in FIGS. 1 and 29, by rotating the blower 2 and the duct element 184, the orientation of the outlet 218 of the blower 2 of the present invention can be altered and can vary by more than 270 degrees . . .
>
> The orientation of the outlet 218 of the blower can be altered simply by loosening the clamp element 186, rotating the duct element 184 to the desired orientation and tightening the clamp element 186. The rotation of the blower duct element 184 occurs continuously without interference or break.

Appx332, 11:40-12:3. Thus, the specification confirms blower rotation "without interference" (Claim 20) and "more than 270 degrees" (Claim 21) can be accomplished by **rotating the duct element** to which the blower is coupled to alter the orientation of the blower outlet "by more than 270 degrees" and/or "continuously without interference or break." Appx332.

The foregoing also demonstrates the patentees equated blower rotation/adjustment with "altering the orientation of the [blower] outlet." The passage quoted immediately above is particularly notable because (1) it is the only description in the specification regarding how 270 degree rotation is achieved by the claimed air conditioning unit; (2) the description occurs in the context of a broader recitation of a preferred embodiment of the invention (*see* Appx332, 11:1-12:50); and (3) Figures 1 and 29, which the passage identifies specifically as depicting 270 blower degree rotation, are complete, intact air conditioning units where the duct and blower rotate as a unitary structure due to their being "coupled," as shown below:




Appx297; Appx324.

Moreover, the specification's description of the embodiments recited in Claims 20-21 further confirms the patentees (1) treated the coupled blower/duct as a unitary structure such that rotation/altering the orientation of one component results in rotation/altering the orientation of the other; and, contrary to the Commission's conclusion, (2) described the embodiments of Claims 20-21 with blower rotation being in "reference to the assembly" (i.e., duct element). *Compare* Appx332-333, 11:40-12:3, 14:24-28 *with* Appx123.

Finally, the Commission's supplemental findings regarding Mr. Pabisz's testimony fail. First, the Commission distorts and takes out of context testimony that was not offered at the evidentiary hearing, and further acknowledges Mr. Pabisz was not testifying about claim scope or any claim terms, referred to a single figure and an unclaimed structural feature (the shroud), and "did not testify to the

exact means on how the blower can rotate with respect to the duct element." Appx55-59. Second, even if the Commission's interpretation of Mr. Pabisz's testimony is accurate (and it is not), it cannot negate the intrinsic evidence, which confirms repeatedly Claims 18-22 **do not require** two modes of rotation or distinct axes. *Supra* § II.A-D; *Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1346–47 (Fed. Cir. 2008).

In view of the foregoing errors of law, Dometic respectfully requests the Court vacate the Commission's erroneous construction of Claims 18-22, adopt Dometic's proposed construction, and remand with instructions to find infringement and technical domestic industry, and therefore a violation of Section 337 as to such claims.

## CONCLUSION

For the foregoing reasons, the finding of invalidity of Claims 1, 2, 4, 5 and 7 should be reversed and the Court should issue a ruling that the Vector Compact does not anticipate. As to Claims 18-22, the findings of noninfringement and absence of technical domestic industry should likewise be reversed, and the case remanded with instructions to enter a finding of violation of Section 337 and for further proceedings.

Dated: October 30, 2024

Respectfully submitted,

*/s/ Stephen R. Howe*
Stephen R. Howe
steve.howe@huschblackwell.com
Avery Hitchcock
avery.hitchcock@huschblackwell.com
HUSCH BLACKWELL LLP
511 N. Broadway, Suite 1100
Milwaukee, WI 53202
414-273-2100 Telephone
414-223-5000 Facsimile

Kara R. Fussner
kara.fussner@huschblackwell.com
HUSCH BLACKWELL LLP
8001 Forsyth Blvd., Suite 1500
St. Louis, MO 63105
314-480-1500 Telephone
314-480-1505 Facsimile

Matthew M. Kamps
matt.kamps@huschblackwell.com
HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, IL 60606
312-655-1500 Telephone
312-655-1501 Facsimile

Beau Jackson
beau.jackson@huschblackwell.com
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
816-983-8000 Telephone
816-983-8080 Facsimile

*Counsel for Appellants Dometic Corporation and Dometic Sweden AB*

# Addendum

## (*Public*)

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C.**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN MARINE AIR CONDITIONING SYSTEMS, COMPONENTS THEREOF, AND PRODUCTS CONTAINING THE SAME** | **Investigation No. 337-TA-1346** |

# NOTICE OF A COMMISSION DETERMINATION TO REVIEW IN PART AND, ON REVIEW, TO AFFIRM WITH MODIFICATION A FINAL INITIAL DETERMINATION FINDING NO VIOLATION; TERMINATION OF INVESTIGATION

**AGENCY**: U.S. International Trade Commission.

**ACTION**: Notice.

**SUMMARY**: Notice is hereby given that the U.S. International Trade Commission has determined to review in part and, on review, to affirm with modification a final initial determination ("FID") of the presiding administrative law judge ("ALJ"). The investigation is terminated.

**FOR FURTHER INFORMATION CONTACT**: Namo Kim, Esq., Office of the General Counsel, U.S. International Trade Commission, 500 E Street, S.W., Washington, D.C. 20436, telephone (202) 205-3459. Copies of non-confidential documents filed in connection with this investigation may be viewed on the Commission's electronic docket (EDIS) at *https://edis.usitc.gov*. For help accessing EDIS, please email *EDIS3Help@usitc.gov*. General information concerning the Commission may also be obtained by accessing its Internet server at *https://www.usitc.gov*. Hearing-impaired persons are advised that information on this matter can be obtained by contacting the Commission's TDD terminal, telephone (202) 205-1810.

**SUPPLEMENTARY INFORMATION**: On December 7, 2022, the Commission instituted this investigation based on a complaint, as supplemented, filed by Dometic Corporation of Rosemont, Illinois and Dometic Sweden AB of Solna, Sweden (collectively, "Dometic"). 87 FR 76216-17 (Dec. 13, 2022). The complaint alleges violations of section 337 of the Tariff Act of 1930, as amended,19 U.S.C. 1337 ("section 337") based upon the importation into the United States, the sale for importation, and the sale within the United States after importation of certain marine air conditioning systems, components thereof, and products containing same by reason of the infringement of certain claims of U.S. Patent No. 8,056,351 ("the '351 patent"). *Id.* The complaint further alleges that a domestic industry ("DI") exists. *Id.* The notice of institution named four (4) respondents: (1) Shanghai Hopewell Industrial Co. Ltd. of Shanghai, China; (2)

Shanghai Hehe Industrial Co. Ltd. of Shanghai, China; (3) CitiMarine, L.L.C. of Doral, Florida; and (4) Mabru Power Systems, Inc. of Dania Beach, Florida (collectively, "Respondents"). *Id.*

On August 28, 2023, the Commission granted in part summary determination that the economic prong of the DI requirement is satisfied. Order No. 23, *unreviewed by* Comm'n Notice (Aug. 28, 2023).

On September 13, 2023, the Commission affirmed an initial determination granting in part summary determination of invalidity of claims 1-2, 4-5, 7 of the '351 patent. Order No. 19, *aff'd by* Comm'n Notice (September 13, 2023).

The presiding ALJ held an evidentiary hearing on September 18-21, 2023.

On October 31, 2023, the Commission affirmed an initial determination terminating the investigation with respect to claims 3, 11 and 17 of the '351 patent. Order No. 30, *unreviewed by* Comm'n Notice (October 31, 2023). Accordingly, at the time the FID was issued, claims 18-22 of the '351 patent remained pending.

On December 8, 2023, the ALJ issued the FID finding no violation of section 337. Specifically, the FID finds that Dometic failed to show infringement or to satisfy the technical prong of the DI requirement because "the DI Products do not possess two axes" as required by the remaining asserted claims under the FID's claim construction. Despite finding no infringement, the ALJ conducted an independent analysis of the accused products beyond the infringement theories presented by Dometic and determined that some accused products satisfy all limitations of the asserted claims. Lastly, the FID finds that all remaining asserted claims are valid.

The FID also includes a Recommended Determination ("RD") recommending, should the Commission find a violation of section 337, that the Commission issue: (1) a limited exclusion order with the Commission's standard certification provision, which does not identify non-infringing articles as requested by the respondents; and (2) a cease-and-desist order against any respondent found to be in violation. The RD further recommends that the Commission set no bond (zero percent) during the period of Presidential review.

On December 22, 2023, both parties (Dometic and Respondents) petitioned for Commission review of FID's findings. Specifically, Dometic requests Commission review of the FID's findings concerning: (1) claim construction; (2) non-infringement; (3) the technical prong of the DI requirement; and (4) validity of the asserted claims concerning the claim construction and secondary considerations. Respondents request Commission review of the FID's findings concerning: (1) the technical prong; (2) certain factual findings related to infringement; (3) excluding Respondents' failure of proof arguments related to infringement; and (4) validity, in particular whether a certain product qualifies as prior art and whether the ALJ abused his discretion by excluding a certain prior art exhibit.. Respondents also request contingent review of the following issues: (1) claim construction and (2) validity.

On December 27, 2023, the Commission published its post-RD *Federal Register* notice seeking submissions on public interest issues raised by the relief recommended by the ALJ

should the Commission find a violation. 88 FR 89466-67 (Dec. 27, 2023). No responses were filed from the public.

On January 4, 2024, both parties (Dometic and Respondents) responded to each other's petition for review of the FID.

On January 9, 2024, both parties (Dometic and Respondents) filed a statement on the public interest pursuant to Commission Rule 210.50(a)(4), 19 CFR 210.50(a)(4).

The Commission, having reviewed the record in this investigation, including the FID and the parties' petitions and responses thereto, has determined to review in part and, on review, to affirm with modification the FID's finding of no violation. In particular, the Commission reviews and, on review, supplements with supporting extrinsic evidence the FID's construction of the claim limitation "the blower being rotatable about [a] first axis so that the outlet can be oriented toward a first direct[i]on and a second direction, and the first and second directions point to substantially different lateral sides of the main body" recited in claim 18 of the '351 patent. The Commission has also determined to review the FID's findings concerning infringement and the technical prong of the DI requirement and, on review, to affirm the FID's finding of non-infringement and non-satisfaction of the technical prong, but to vacate the ALJ's independent findings that some of the accused products (*i.e.*, Mabru SC07, which represents all Mabru accused products) satisfy all limitations of the asserted claims, as well as the ALJ's independent technical prong findings on the DI products. The Commission has further determined to review and, on review, to take no position on certain of the FID's invalidity findings and the findings that certain accused products satisfy a dependent claim limitation of the '351 patent. The Commission has determined not to review the remainder of the FID.

The Commission issues its opinion herewith setting forth its determinations on certain issues. The investigation is terminated.

The Commission vote for this determination took place on March 7, 2024.

The authority for the Commission's determination is contained in section 337 of the Tariff Act of 1930, as amended (19 U.S.C. 1337), and in Part 210 of the Commission's Rules of Practice and Procedure (19 CFR Part 210).

By order of the Commission.

Lisa R. Barton
Secretary to the Commission

Issued: March 7, 2024

**PUBLIC VERSION**

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C.**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN MARINE AIR CONDITIONING SYSTEMS, COMPONENTS THEREOF, AND PRODUCTS CONTAINING THE SAME** | **Investigation No. 337-TA-1346** |

**COMMISSION OPINION**

**TABLE OF CONTENTS**


I. INTRODUCTION ........ 2
II. BACKGROUND ........ 2
A. Procedural Background ........ 2
B. The Asserted Patent – U.S. Patent No. 8,056,351 ........ 5
C. The Private Parties ........ 11
D. Relevant Products ........ 12
III. LEGAL STANDARDS ........ 15
A. Commission Review of the Final ID ........ 15
B. Claim Construction ........ 16
C. Infringement ........ 18
D. Domestic Industry – Technical Prong ........ 19
E. Invalidity ........ 21
IV. ANALYSIS ........ 21
A. Claim Construction ........ 21
B. Infringement ........ 56
C. Domestic Industry – Technical Prong ........ 68
D. Invalidity ........ 77
V. CONCLUSION ........ 77

## I. INTRODUCTION

On December 8, 2023, the presiding Administrative Law Judge ("ALJ") issued a final initial determination ("FID") in this investigation finding no violation of section 337 of the Tariff Act of 1930, as amended (19 U.S.C. § 1337) ("section 337") based on non-infringement and failure to satisfy the technical prong of the domestic industry ("DI") requirement.

Having considered the FID and the parties' submissions, the Commission has determined to review the FID in part. On review, the Commission has determined to affirm with modification the FID's finding of no violation. Specifically, the Commission affirms with modification the FID's claim construction of the asserted claims, *i.e.*, claims 18-22 of U.S. Patent No. 8,056,351 ("the '351 patent") (JX-0001), to require ***two modes of rotation*** for the claimed blower. The Commission also affirms with modification the FID's findings of no violation based on non-infringement and failure to satisfy the DI's technical prong because the complainants failed to show that both the accused products and the DI products satisfy the asserted claims under the proper construction. This opinion sets forth the Commission's reasoning in support of this determination.

## II. BACKGROUND

### A. Procedural Background

On December 13, 2022, the Commission instituted this investigation based on a complaint, as supplemented, filed by Dometic Corporation of Rosemont, Illinois and Dometic Sweden AB of Solna, Sweden (collectively, "Dometic"). 87 Fed. Reg. 76216-17 (Dec. 13, 2022). The complaint alleges violations of section 337 based upon the importation into the United States, the sale for importation, and the sale within the United States after importation of certain marine air conditioning systems, components thereof, and products containing same by reason of infringement of claims 1-5, 7, 11, and 17-22 of the '351 patent. *Id*. The complaint further alleges that a domestic industry exists. *Id*. The notice of investigation named four (4) respondents: (1) Shanghai Hopewell Industrial Co. Ltd.

("Shanghai Hopewell Industrial") of Shanghai, China; (2) Shanghai Hehe Industrial Co. Ltd. ("Shanghai Hehe Industrial") of Shanghai, China; (3) CitiMarine, L.L.C. ("CitiMarine") of Doral, Florida; and (4) Mabru Power Systems, Inc. ("Mabru") of Dania Beach, Florida (collectively, "Respondents"). *Id*. The Office of Unfair Import Investigations is not participating in this investigation. *Id*.

On May 1, 2023, the ALJ issued an order construing certain terms of the asserted claims. Order No. 11 (May 1, 2023) (the "*Markman* Order").

On August 28, 2023, the Commission granted in part summary determination that the economic prong of the domestic industry requirement is satisfied. Order No. 23, *unreviewed by* Comm'n Notice (Aug. 28, 2023).

On September 13, 2023, the Commission affirmed an initial determination granting in part summary determination of invalidity of claims 1-2, 4-5, 7 of the '351 patent. Order No. 19, *aff'd by* Comm'n Notice (September 13, 2023).

On September 18-21, 2023, the ALJ held an evidentiary hearing.

On October 31, 2023, the Commission affirmed an initial determination terminating the investigation with respect to claims 3, 11, and 17 of the '351 patent. Order No. 30, *unreviewed by* Comm'n Notice (October 31, 2023). Accordingly, at the time the FID was issued, claims 18-22 of the '351 patent remained pending.

On December 8, 2023, the ALJ issued the FID finding no violation of section 337. Specifically, the FID finds that Dometic failed to satisfy the technical prong of the DI requirement because "the DI Products do not possess two axes" as required by the asserted claims.

The FID also finds no infringement of the asserted claims remaining in this investigation, *i.e.*, claims 18-22 of the '351 patent, based on the same failure of proof. Despite finding no infringement, the ALJ conducted an independent analysis of the accused products beyond the infringement theories

presented by Dometic and determined that some accused products satisfy all limitations of the asserted claims. Lastly, the FID finds that all remaining asserted claims are valid.

The FID also includes the ALJ's Recommended Determination ("RD") recommending, should the Commission find a violation of section 337, that the Commission issue: (1) a limited exclusion order with the Commission's standard certification provision, which does not identify non-infringing articles as requested by the respondents; and (2) a cease and desist order against any respondent found to be in violation. The RD further recommends that the Commission set no bond (zero percent) during the period of Presidential review.

On December 22, 2023, both parties (Dometic and Respondents) petitioned for Commission review of the FID's findings.[1]

Dometic requests Commission review of the FID's findings concerning: (1) claim construction; (2) non-infringement; (3) the technical prong; and (4) validity of the asserted claims concerning the claim construction and secondary considerations.

Respondents request Commission review of the FID's findings concerning: (1) the technical prong; (2) certain factual findings related to infringement; (3) excluding Respondents' failure of proof arguments related to infringement; and (4) validity, in particular whether a certain product qualifies as prior art and whether the ALJ abused his discretion by excluding a certain prior art exhibit. Respondents also request contingent review of the following issues in the event Commission decides to review the ALJ's claim construction: (1) claim construction and (2) validity.

On December 27, 2023, the Commission published its post-RD *Federal Register* notice seeking submissions on public interest issues raised by the relief recommended by the ALJ should the

[1] *See* Complainants' Petition For Review Of The Initial Determination And Recommended Determination On Remedy And Bond (Dec. 22, 2023) ("Compl. Pet."); Respondents' Petition For Review Of Initial Determination On Violation Of Section 337 (Dec. 22, 2023) ("Resp. Pet.").

Commission find a violation. 88 Fed. Reg. 89466-67 (Dec. 27, 2023). No responses from the public were filed.

On January 4, 2024, both parties (Dometic and Respondents) responded to each other's petition for review of the FID.[2]

On January 9, 2024, both parties (Dometic and Respondents) filed statements on the public interest pursuant to Commission Rule 210.50, 19 C.F.R. § 210.50.[3]

### B. The Asserted Patent – U.S. Patent No. 8,056,351

The '351 patent is titled "blower for marine air conditioner." '351 patent at cover page. Dometic currently asserts claims 18-22 with respect to infringement and the technical prong. FID at 6. The '351 patent's background recognizes a well-known problem in the field of marine air conditioners, that "[a]n air conditioning system equipped with features that allow for easy installation is necessary for situations where it must be installed" in a nautical vehicle with limited space available. '351 patent at 1:19-28.

As a solution, the '351 patent claims ***two axes of rotation or adjustment*** of "a blower" (*e.g.*, **2** in Figure 1 or Figure 29, shown below) for an easy installation of the air conditioner (*e.g.*, **1** in Figure 1 or Figure 29, shown below). *See id.* at cl. 18, Figs. 1 and 29 (shown below).

---

[2] *See* Complainants' Response To Respondents' Petition For Review Of Initial Determination On Violation Of Section 337 (Jan. 4, 2024) ("Compl. Response"); Respondents' Response To Complainants' Petition For Review Of Initial Determination And Recommended Determination On Remedy And Bond (Jan. 4, 2024) ("Resp. Response").

[3] *See* Complainants' Submission On The Public Interest (Jan. 9, 2024) ("Compl. Sub."); Respondents' Submission On The Public Interest (Jan. 9, 2024) ("Resp. Sub.").




FIG. 1



FIG. 29

’351 patent at Figs. 1 and 29.

As recited in claim 18, the blower is rotatable about “***a first axis***” to orient the blower’s outlet to different lateral sides of the air conditioning device’s main body. *See id.* at cl. 18; Figs. 1 and 29 (shown above) (the blower’s outlet pointing to different lateral sides of the main body), 11:52-54 (“The lateral sides refer to opposing sides with respect to a vertical plane such as left and right” as shown in Figs. 1 and 29.), 12:4-27 (“adjusting the orientation in which the blower **2** is fastened to the duct element **184**.”).

The blower is also adjusted about “***a second axis***” by “an assembly” that includes “a guiding cover” (*e.g.*, 170 in Fig. 22, shown below) and “a cylindrical duct element” (*e.g.*, 184 in Fig. 22, shown below). *See id.* at cls. 1, 18, and Fig. 22 (shown below). When the blower **2** is coupled to the cylindrical duct element **184**, rotating the duct element **184** around the guiding cover **170** adjusts the blower **2**’s orientation because the blower **2** rotates together with the duct element **184**. *Id.*; *see also id.* at 11:64-67 (“The orientation of the outlet **218** [*see* Figure 28] of the blower [**2**] can be altered simply by loosening the clamp element **186**, rotating the duct element **184** to the desired orientation and tightening the clamp element **186**.”).

**PUBLIC VERSION**




FIG. 22

’351 patent at Fig. 22.

The ’351 patent specification suggests that ***the two axes of rotation or adjustment*** (as recited in claim 18) allow for an easy installation in a limited space because (1) the blower’s outlet can point to different lateral sides and (2) the air conditioner’s overall height can be limited. *See id.* at cl. 18, 11:41-54 (“As shown in FIGS. 1 and 29, by rotating the blower **2** and the duct element **184**, the orientation of the outlet **218** of the blower **2** of the present invention can be altered . . . As a result, the blower **2** can easily be connected with ducts approaching the air conditioner **1** from various angles, such as from either lateral side [left or right] (FIG. 1 or FIG. 29) or top of the air conditioner **1**.”), 12:4-6 (“The non-concentric cylinder shape of the duct element **184** (FIGS. 24A, 24B and 25) is designed to limit the overall height of the air conditioner **1**.”), Figs. 24A, 24B, and 25 (shown below).




FIG. 24A




FIG. 24B

’351 patent at Figs. 24A and 24B.




FIG. 25

’351 patent at Fig. 25.

The specification explains that the air conditioner’s overall height can be limited “by adjusting the orientation in which the blower **2** is fastened to the duct element **184**,” *e.g.*, using “apertures **210** for

coupling the duct element **184** onto the blower **2**." *Id.* at 11:1-4, 12:6-24. The relevant portions of the specification state the following:

> Since it is possible for the outlet **218** of the blower **2** to substantially increase the height of the air conditioner **1** when the outlet **218** is located near the top of the air conditioner **1**, the blower **2** and the duct element **184** are attached at a predetermined orientation relative to one another such that the maximum height of the air conditioner **1** will be kept below a certain value despite various orientations of the blower **2**. One way to do this is by attaching the blower **2** to duct element **184** so that, when axis **B** (FIG. 30B-1) [shown below] is at its lowest relative to axis **A**, the blower **2** is oriented to reach its vertically longest position. As shown in FIG. 30B, the blades of the blower **2** rotate around **B** while the blower **2** is rotated with respect to the air conditioner **1** around **A**. The overall height of the air conditioner **1** with the rotatable blower **2** will change depending on how the blower **2** is fastened in relation to the duct element **184**. Therefore, ***the maximum height of an air conditioner 1 can be restricted by adjusting the orientation in which the blower 2 is fastened to the duct element 184***.

'351 patent at 12:6-24 (emphasis added), Figs. 30A and 30B (shown below).




FIG. 30A-1




FIG. 30A-2




FIG. 30B-1




FIG. 30B-2

’351 patent at Figs. 30A and 30B.

Lastly, the specification describes that, in Figures 30A and 30B, “the blades **214** of the blower **2** rotate about a first axis **B** while the blower **2** itself can be rotated about a second axis **A**,” and that “[t]hese first and second axes **B** and **A** are substantially parallel and spaced apart (FIG. 30B) in the present embodiment but, in other embodiments, they may be non-parallel (FIG. 30D) or identical (FIG. 30A).” *Id.* at 11:30-37. Dometic, in its *Markman* opening brief describing claim 18, explained that this language in “the specification confirms ***the claimed axes*** can be different (*e.g.*, substantially parallel but spaced apart) or identical,” acknowledging that the first axis **B** and second axis **A** as illustrated in Figures 30A and 30B correspond to the claimed “first axis” and “second axis” in claim 18. Dometic’s Opening *Markman* Brief, EDIS Doc. ID No. 792266 at 19 (March 10, 2023) (emphasis added) (citing ’351 patent at 11:30-37 and 1:44-47).

Therefore, the ’351 patent specification discloses that there are ***two structures for the two axes of rotation or adjustment*** (as recited in claim 18) to orient the blower’s outlet. The *first* is for rotating or “adjusting the orientation” of the blower **2** based on “how the blower **2** is fastened in relation to the duct element **184**,” *e.g.*, using the apertures **210**. ’351 patent at 12:19-24, 11:1-4, Figs. 22, 24, 25, and 30. The *second* is for “rotating the duct element **184** to the desired orientation,” which rotates and alters the orientation of the blower’s outlet attached thereto. *Id.* at 11:64-67.

Claim 18 is the only remaining independent claim asserted in this investigation, and claims 19-22 directly or indirectly depend from claim 18. The remaining asserted claims recite the following (disputed limitations **bolded**):

> 18. An air conditioning device for a nautical vehicle including:
>
> a main body; and a blower including an inlet and an outlet, the inlet being in air communication with the main body,

> ***the blower being rotatable about [a] first axis so that the outlet can be oriented toward a first direct[i]on and a second direction, and the first and second directions point to substantially different lateral sides of the main body***, and
>
> an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet, the assembly including a guiding cover and a cyli[n]drical duct element for maintaining the main body and the blower in air communication with one another,
>
> the duct element having a first base and a second base, and coupled to the blower at the second base, the first base of the duct element dimensioned to correspondingly fit the guiding cover, and
>
> the duct element being rotat[a]bly adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet.
>
> 19. The air conditioning device of claim 18, wherein the first direction and the second direction point to substantially opposite directions.
>
> 20. The air conditioning device of claim 19, wherein the blower can be rotated without interference from a compressor, an evaporator or a condenser.
>
> 21. The air conditioning device of claim 18, wherein the blower is rotatable by more than 270 degrees.
>
> 22. The air conditioning device of claim 18, wherein the air conditioning device further includes a clamp element for maintaining the blower oriented with respect to the main body, and wherein only loosening of the clamp element is necessary to change orientation of the blower.

’351 patent at cls. 18-22.

### C. The Private Parties

#### 1. Complainants

Complainants Dometic develop and produce marine air conditioners for nautical vehicles. Compl. Pet. at 1; *see also* Complaint at 2. Dometic claims to be the market leader in the marine air conditioning industry. *Id.*

#### 2. Respondents

Respondents Shanghai Hopewell Industrial and Shanghai Hehe Industrial (collectively "Shanghai Respondents") both have a principal place of business in Shanghai, China, and "are the original equipment manufacturers of the accused products at issue in this investigation." FID at 3.

Shanghai Respondents sell the accused products to respondents CitiMarine and Mabru, both of which have a principal place of business in Florida, that import and sell the products in the United States to end users. *Id.* at 3.

### D. Relevant Products

#### 1. Accused Products

The notice of investigation defines the scope of the investigation and the accused products as "marine air conditioning systems for use in nautical vehicles, having marine blower systems adapted to nautical vehicles, main body systems for use in marine air conditioning units, or assemblies for adjusting the blower with respect to the aforementioned main body." 87 Fed. Reg. 76216.

Specifically, Dometic accuses the following products sold by Respondents as infringing the asserted claims of the '351 patent, and contends that CitiMarine's CT-6 (CPX-0001) (**bolded**) and Mabru's SC07 (CPX-0002) (**bolded**) are representative of all CitiMarine and Mabru accused products, respectively:

| CitiMarine Accused Products | | Mabru Accused Products | |
|---|---|---|---|
| **Model No.** | **Product Description** | **Model No.** | **Product Description** |
| CT-6S 12VDC Kit | Marine Air Conditioner 6,000 BTU W/ 1200W Inverter | SC05DC | Marine Air Conditioner SC 5000 BTU 12V DC (Copper) |
| **CT-6 (Representative Product)** | Marine Air Conditioner 6,000 BTU – 115V – 50/60HZ | **SC07 (Representative Product)** | Self-Contained 7000 BTU 115V 50/60HZ Marine Air Conditioner Copper Fin (Heating And Cooling) |
| CT-6H | Marine Air Conditioner 6,000 BTU – 230V – 50/60HZ | SC07 | Self-Contained 7000 BTU 230V 50/60HZ Marine Air |

| | | | |
|---|---|---|---|
| | | | Conditioner Copper Fin (Heating And Cooling) |
| CT-6HS | Marine Air Conditioner 6,000 BTU – 230V – 50/60HZ W/Soft Start | SC07DC | Marine Air Conditioner SC 7000 BTU 12V DC (Copper) |
| CT-10 | Marine Air Conditioner 10,000 BTU – 115V – 50/60HZ | SC12 | Self-Contained 12000 BTU 115V 50/60HZ Marine Air Conditioner Copper Fin (Heating And Cooling) |
| CT-10H | Marine Air Conditioner 10,000 BTU – 230V – 50/60HZ | SC12 | Self-Contained 12000 BTU 230V 50/60HZ Marine Air Conditioner Copper Fin (Heating And Cooling) |
| CT-12 | 12,000 BTU Marine Air Conditioner – 115V – 50/60HZ | SC12DC | Marine Air Conditioner SC 12000 BTU 12V DC (Copper) |
| CT-12H | Marine Air Conditioner 12,000 BTU – 230V – 50/60HZ | SC17 | Self-Contained 17000 BTU 115V 50/60HZ Marine Air Conditioner Copper Fin (Heating And Cooling) |
| CT-16 | Marine Air Conditioner 16,000 BTU – 115V – 50/60HZ | SC17 | Self-Contained 17000 BTU 230V 50/60HZ Marine Air Conditioner Copper Fin (Heating And Cooling) |
| CT-16H | Marine Air Conditioner 16,000 BTU – 230V – 50/60HZ | SC17VFD | Marine Air Conditioner SC17VFD 17000 BTU 115V Self-Contained |
| CT-25H | Marine Air Conditioner 25,000 BTU – 230V – 50/60HZ | SC17VFD | Marine Air Conditioner SC17VFD © 17000 BTU 230V Self- Contained |

*See* FID at 7-8.

Although Respondents disputed representativeness, the FID finds that the evidence supports Dometic's position that the above-bolded products are representative of other accused products. FID at 8. In particular, the FID acknowledges the deposition testimony of Liang Ming, Chief Executive Officer of the Shanghai Respondents, that the accused products "her companies make for CitiMarine and Mabru are 'structurally . . . identical except for their BTU[4] capacity.'" FID at 8 (citing JX-0003C at 26:21-24, 35:5-36:8); *see also* Hearing Tr. at 397:21-398:14 (Dr. Paulus, Dometic's expert, quoting Ms. Ming's deposition testimony). The FID also acknowledges that "CitiMarine's 'Installation & User Manual'

[4] British thermal units.

**PUBLIC VERSION**

appears to be the same for the entire 'CT series,' and Mabru's 'Installation Manual' appears to be the same for the entire 'SC series.'" *Id.* at 8-9 (citing JX-0089 at 7, 9; CX-1069 at 1-3). The FID also credits the deposition testimony of Mr. Mabru, Mabru's vice president, that he "could not think of any differences between Mabru's SC17 model and other models currently sold by Mabru." *Id.* at 9 (citing JX-0008C (Mabru Tr.) at 13:11-12, 52:11-53:8, 61:23-62:7).

**2. Domestic Industry Products**

Dometic identifies the DTG and Voyager product lines as the articles protected by the '351 patent. FID at 9, 59-67. In particular, Dometic submitted two physical exhibits, DTG8 (CPX-0003) for the DTG series and TX10 (CPX-0006) for the Voyager series as representative of their respective product lines. FID at 9; *see also* CPX-0003 and CPX-0006. Respondents do not dispute the representativeness of these two DI products. *Id.* A description of Dometic's DTG series is shown below:

**MECHANICAL SYSTEMS:**
**DOMETIC TURBO GLOBAL AIR-CONDITIONING UNIT**

Dometic's unique global air conditioning unit Turbo Global Air Conditioning won for category Mechanical Systems.



The Dometic Turbo Global Air Conditioning unit with versatile compressor eliminates the need of any voltage regulating devices and literary takes away national borders for vessels. Boaters can now just plug into any shore power at any harbor around the world.

"The air conditioner to replace them all. Dometic goes global with support for any voltage around the world," said Phil Gutowski, one of the BWI judges as motivation for the award.

CDX-005.14 (citing CX-1020 at 2).

A description of Dometic's Voyager series is shown below:




CDX-005.15 (citing CX-0524 at 1).

## III. LEGAL STANDARDS

### A. Commission Review of the Final ID

When the Commission reviews an initial determination, in whole or in part, it reviews the determination *de novo*. *Certain Soft-Edged Trampolines and Components Thereof*, Inv. No. 337-TA-908, Comm'n Op. at 4 (May 1, 2015). Upon review, the "Commission has 'all the powers which it would have in making the initial determination,' except where the issues are limited on notice or by rule." *Certain Flash Memory Circuits & Prods. Containing Same*, Inv. No. 337-TA-382, USITC Pub.

No. 3046, Comm'n Op. at 9-10 (July 1997) (quoting *Certain Acid-Washed Denim Garments & Accessories*, Inv. No. 337-TA-324, Comm'n Op. at 5 (Nov. 1992)). With respect to the issues under review, "the Commission may affirm, reverse, modify, set aside or remand for further proceedings, in whole or in part, the initial determination of the administrative law judge." 19 C.F.R. § 210.45(c). The Commission also "may take no position on specific issues or portions of the initial determination," and "may make any finding or conclusions that in its judgment are proper based on the record in the proceeding." *Id.*; *see also Beloit Corp. v. Valmet Oy*, 742 F.2d 1421, 1423 (Fed. Cir. 1984).

### B. Claim Construction

Claim construction "begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "Where a claim lists elements separately, 'the clear implication of the claim language' is that those elements are 'distinct component[s]' of the patented invention." *Becton, Dickinson and Co. v. Tyco Healthcare Gr., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) (citing *Gaus v. Conair Corp.*, 363 F.3d 1284, 1288 (Fed. Cir. 2004); *Engel Indus., Inc. v. Lockformer Co.*, 96 F.3d 1398, 1404-05 (Fed. Cir. 1996) (concluding that where a claim provides for two separate elements, a "second portion" and a "return portion," these two elements "logically cannot be one and the same")). This is further supported when the specification "confirms" that the separated claim elements are in fact separate. *Becton*, 616 F.3d at 1254-55 (citing *Astrazeneca AB v. Mut. Pharm. Co.*, 384 F.3d 1333, 1336 (Fed. Cir. 2004) ("A long line of cases indicates that evidence intrinsic to the patent — particularly the patent's specification, including the inventors' statutorily-required written description of the invention — is the primary source for determining claim meaning."); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (The specification "is the single best guide to the meaning of a disputed [claim] term.")). "In the absence of any evidence to the contrary . . . the use of these different terms in the claims connotes different

meanings." *CAE Screenplates, Inc. v. Heinrich Fiedler GmbH Co.*, 224 F.3d 1308, 1317 (Fed. Cir. 2000).

Claim construction focuses on the intrinsic evidence, which consists of the claims themselves, the specification, and the prosecution history. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *see also Markman v. Westview Instr., Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc). As the Federal Circuit in *Phillips* explained, courts must analyze each of these components to determine the "ordinary and customary meaning of a claim term" as understood by a person of ordinary skill in art at the time of the invention. *Id.* at 1313. "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).

"Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claims terms." *Phillips*, 415 F.3d at 1314; *see Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) ("In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point [ ] out and distinctly claim [ ] the subject matter which the patentee regards as his invention."). The context in which a term is used in an asserted claim can be "highly instructive." *Id.* at 1314. Additionally, other claims in the same patent, asserted or unasserted, may also provide guidance as to the meaning of a claim term. *Id.* "Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee." *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he specification may reveal a special

definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Id.* at 1316.

In addition to the claims and the specification, the prosecution history should be examined, if in evidence. *Id*. at 1317; *see Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004). The prosecution history can "often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*; *see Chimie v. PPG Indus. Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution.").

When the intrinsic evidence does not establish the meaning of a claim, then extrinsic evidence (*i.e.*, all evidence external to the patent and the prosecution history, including dictionaries, inventor testimony, expert testimony, and learned treatises) may be considered. *Id*. Extrinsic evidence is generally viewed as less reliable than the patent itself and its prosecution history in determining how to define claim terms. *Id.* "The court may receive extrinsic evidence to educate itself about the invention and the relevant technology, but the court may not use extrinsic evidence to arrive at a claim construction that is clearly at odds with the construction mandated by the intrinsic evidence." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 977 (Fed. Cir. 1999).

### C. Infringement

Section 337 prohibits "the importation into the United States, the sale for importation, or the sale within the United States after importation . . . of articles that infringe a valid and enforceable United States patent . . . ." 19 U.S.C. § 1337(a)(1)(B). Direct infringement includes making, using, offering to sell, or selling a patented invention or importing a patented invention into the United States, without consent of the patent owner. 35 U.S.C. § 271(a).

**PUBLIC VERSION**

"An infringement analysis entails two steps. The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing." *Markman*, 52 F.3d at 976. A patentee may prove infringement either literally or under the doctrine of equivalents. Infringement of either sort must be proven by a preponderance of the evidence. *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988). A preponderance of the evidence standard "requires proving that infringement was more likely than not to have occurred." *Warner-Lambert Co. v. Teva Pharm. USA, Inc.*, 418 F.3d 1326, 1341 n.15 (Fed. Cir. 2005).

To prove direct infringement, the plaintiff must establish by a preponderance of the evidence that one or more claims of the asserted patent read on the accused product or process, either literally or under the doctrine of equivalents. *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 261 F.3d 1329, 1336 (Fed. Cir. 2001). Each limitation in a patent claim is considered material and essential to an infringement determination. *See London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1538 (Fed. Cir. 1991). "Literal infringement of a claim exists when each of the claim limitations reads on, or in other words is found in, the accused device." *Allen Eng. Corp. v. Bartell Indus.*, 299 F.3d 1336, 1345 (Fed. Cir. 2002). Literal infringement is a question of fact. *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). "To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly." *Microsoft Corp. v. GeoTag, Inc.*, 817 F.3d 1305, 1313 (Fed. Cir. 2016) (quoting *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995). If any claim limitation is found to be absent from the accused product or process, then there is no literal infringement. *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 141, 1247 (Fed. Cir. 2000).

**D. Domestic Industry – Technical Prong**

In an investigation based on a claim of patent infringement, section 337 requires that an industry in the United States, relating to the articles protected by the patent, exist or be in the process of being

established. 19 U.S.C. § 1337(a)(2). Under Commission precedent involving allegations of patent infringement, the DI requirement has been divided into (i) a "technical prong" (which requires articles covered by the Asserted Patent) and (ii) an "economic prong" (which requires certain levels of activity with respect to the protected articles or patent itself). *See Certain Video Game Systems and Controllers*, Inv. No. 337-TA-743, Comm'n Op. at 6-7 (April 14, 2011).

The technical prong of the domestic industry requirement is satisfied when the complainant in a patent-based section 337 investigation establishes that it is practicing or exploiting the patents at issue. *See* 19 U.S.C. §§ 1337 (a)(2), (3); *Certain Microsphere Adhesives, Process for Making Same and Prods. Containing Same, Including Self-Stick Repositionable Notes*, Inv. No. 337-TA-366, Comm'n Op. at 8 (Jan. 16, 1996). "In order to satisfy the technical prong of the domestic industry requirement, it is sufficient to show that the domestic industry practices any claim of that patent, not necessarily an asserted claim of that patent." *Certain Ammonium Octamolybdate Isomers*, Inv. No. 337-TA-477, Comm'n Op. at 55 (Aug. 28, 2003). Historically, the Commission permits the complainant's products, and those of its licensees, to be considered for technical prong purposes. *See Certain Magnetic Tape Cartridges and Components Thereof*, Inv. No. 337-TA-1058, Comm'n Op. at 28-29 (April 9, 2019).

The test for claim coverage for the purposes of the technical prong of the domestic industry requirement is the same as that for infringement. *See Certain Doxorubicin and Preparations Containing Same*, Inv. No. 337-TA-300, Initial Determination at 109 (May 21, 1990), *aff'd*, Views of the Commission at 22 (Oct. 31, 1990); *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1375 (Fed. Cir. 2003). "First, the claims of the patent are construed. Second, the complainant's article or process is examined to determine whether it falls within the scope of the claims." *Id*. As with infringement, the technical prong of the domestic industry can be satisfied either literally or under the doctrine of equivalents. *Certain Dynamic Sequential Gradient Devices and Component Parts Thereof*, Inv. No. 337-TA-335, ID at 44, Pub. No. 2575 (May 15, 1992). In short, the patentee must establish by a

preponderance of the evidence that the domestic industry product practices one or more claims of the patent.

### E. Invalidity

A party cannot be held liable for infringement if the asserted patent claim is invalid. *See Pandrol USA, LP v. AirBoss Railway Prods., Inc.*, 320 F.3d 1354, 1365 (Fed. Cir. 2003). Patent claims are presumed valid (35 U.S.C. § 282), so a respondent challenging validity must overcome this statutory presumption by "clear and convincing" evidence of invalidity. *Checkpoint Systems, Inc. v. Int'l Trade Comm'n*, 54 F.3d 756, 761 (Fed. Cir. 1995).

## IV. ANALYSIS

The Commission's findings, conclusions, and supporting analysis follow. The Commission affirms and adopts the FID's findings, conclusions, and supporting analysis that are not inconsistent with the Commission's opinion.

### A. Claim Construction

#### 1. Final ID

The FID's finding of no violation is based on the construction of claim 18's "axis limitation" ("the blower being rotatable about [a] first axis so that the outlet can be oriented toward a first direct[i]on and a second direction") and "directional limitation" ("the first and second directions point to substantially different lateral sides of the main body").

The ALJ construed the axis limitation and the directional limitation during the *Markman* proceeding as provided below:

PUBLIC VERSION

| Disputed Terms (Claim 18) | Dometic's Proposed Construction | Respondents' Proposed Construction | *Markman* Order's Construction (May 1, 2023) |
|---|---|---|---|
| "the blower being rotatable about [a] first axis so that the outlet can be oriented toward a first direct[i]on and a second direction"<br>(FID refers to this term as the "axis limitation") | "Plain and ordinary meaning<br>The blower can be rotated about an axis, whereby rotation of the blower can result in the blower outlet being oriented toward a second direction from a first direction." Order No. 11 at 22. | "Capable of rotation about a first axis, which is different than the second axis, so that the outlet can be oriented in at least two different directions." Order No. 11 at 22. | "'the blower can be rotated about a first axis so that the blower outlet can be oriented toward a first direction and toward a second direction' and the 'first axis' and the 'second axis' need not be different." Order No. 11 at 26. |
| "the first and second directions point to substantially different lateral sides of the main body"<br>(FID refers to this term as the "directional limitation") | "Plain and ordinary meaning<br>The first and second directions point to substantially opposing sides of the main body with respect to a vertical plane, such as left and right." Order No. 11 at 26. | "First direction points substantially to the first lateral side (*i.e.*, more than 45 degrees from straight up or down) and second direction points substantially to the other lateral side (*i.e.*, more than 45 degrees from straight up or down)<br>Alternatively, if no discernible degree of rotation is specified, indefinite." Order No. 11 at 26. | "'first and second directions point to substantially opposing sides of the main body with respect to a vertical plane.'" Order No. 11 at 29. |

Order No. 11 at 22, 26, and 29.

In addition to the construction of these terms from the *Markman* proceeding, the FID addresses whether the structure allowing the blower's rotation about a "***first axis***" for the axis limitation requires "some structure distinct from the 'assembly for adjusting the blower . . . about a ***second axis***'" and whether the claim requires "***two modes of rotation*** for the blower." FID at 25, 40 (emphasis added); Order No. 19 at 30; Hearing Tr. at 834:13-835:2, 839:1-17; Complainants' Revised Initial Post-Hearing Brief ("CIB") at 16-21 (October 13, 2023); Respondents' Initial Post-Hearing Brief ("RIB") at 16-24 (October 4, 2023). Similarly, the FID addresses whether the directional limitation "can be satisfied by

the claimed assembly [involving a second axis], or must be satisfied by the structure that also satisfies the axis limitation [involving a first axis]." *Id.* at 41; Hearing Tr. at 834:17-835:2, 839:1-17; CIB at 44-45; RIB at 19.

A summary of the FID's construction for these disputed limitations is provided below:

| **Disputed Terms (Claim 18)** | **Dometic's Proposed Construction** | **Respondents' Proposed Construction** | **FID's Construction** |
|---|---|---|---|
| "the blower being rotatable about [a] first axis so that the outlet can be oriented toward a first direct[i]on and a second direction"<br>(FID refers to this term as the "axis limitation") | "the claim term . . . does not require some structure distinct from the 'assembly for adjusting the blower with respect to the main body;' or two modes of rotation for the blower." CIB at 16. | "requires a different type of rotation, or rotation involving different structural components, than Claim 18's separate limitations relating to 'an assembly for adjusting the blower . . . about a second axis . . . .'" RIB at 16. | "The axis limitation is construed to require a different type of rotation separate from the assembly's adjustment/rotation, and involving a structural component that may be a part of, but is identifiably distinct from, the claimed portion of the 'assembly.'" FID at 31. |
| "the first and second directions point to substantially different lateral sides of the main body"<br>(FID refers to this term as the "directional limitation") | "only one type of rotation is needed, such that the directional limitation may be satisfied by the assembly." FID at 41 (citing CIB at 44-45) | "rotation of the blower about the first axis" satisfies the directional limitation rather than by "rotation around the guiding cover." FID at 41 (citing RIB at 19). | "The directional limitation . . . incorporating the construction from Order No. 11, is construed as 'said first and second directions resulting from rotation about said first axis point to substantially opposing sides of the main body with respect to a vertical plane.'" FID at 42 (citing Order No. 11). |

FID at 31 and 41-42; CIB at 16 and 44-45; RIB at 16 and 19.

The FID recognizes that the axis limitation of claim 18 ("the blower being rotatable about [a] first axis so that the outlet can be oriented toward a first direct[i]on and a second direction") was already "construed during the *Markman* process," but finds that the earlier "construction did not address whether this term requires a different type of rotation separate from the duct element's '[rotatable] adjust[ment]

. . . about the second axis,' or rotation involving a different structural component than the claimed assembly, or both." *Id.* at 29-30 (citing Order No. 11 at 26).

During the *Markman* proceeding, Dometic argued that the two axes may be "the same or different" and Respondents argued that the two axes must be different. *Id.* at 23 (citing Order No. 11 at 22); Dometic's Opening *Markman* Brief at 18). The ALJ recognized an implicit understanding that "there must be two identifiable axes, even if they are colinear – that is, the same – in some embodiments." FID at 23-24 (citing Order No. 11 at 25). Based on this understanding, in the *Markman* Order, the ALJ found that the "first axis" and the "second axis" limitations need not be different, largely adopting Dometic's proposed construction, and left open the question of "how the first axis fits into all this," because "claim 18 does not recite exactly how the blower is 'rotat[ed] about [the] first axis.'" *Id.* at 29, 40 (citing Order No. 11 at 26).

The *Markman* Order "further observed that 'the shape of the duct element (symmetrical vs. asymmetrical) determines whether ***the axes of rotation*** are identical or merely parallel,'" which implicitly indicated that "there must be two such axes" regardless of whether the two are identical or parallel. *Id*. at 40 (citing Order No. 11 at 25) (emphasis added). Therefore, the FID explains, the *Markman* Order's "finding that 'the two axes need not be different' (which was the explicit holding) did not resolve whether only one axis is permissible." *Id*. at 40.

The ALJ revisited this claim construction issue when rejecting Dometic's motion for summary determination on the DI's technical prong. *See* Order No. 20 (July 18, 2023). In Order No. 20, the ALJ "added that even if the two axes need not be different, 'that does not relieve Dometic from identifying two axes,' which [Dometic] failed to do" in its motion. FID at 24-25; Order No. 20 at 3-4 (citing Order No. 11 at 26).

Lastly, at the hearing, the parties (Dometic and Respondents) were asked to brief whether the claim term "the blower being rotatable about [a] first axis" requires "some structure distinct from the

'assembly for adjusting the blower with respect to the main body"' and whether the claim requires "two modes of rotation for the blower." *Id.* at 25, 40; Order No. 19 at 30; Hearing Tr. at 834:13-835:2, 839:1-17; CIB at 16-21; RIB at 16-24. Dometic argued that "the axis limitation requires neither two types of rotation nor rotation involving a structural component different from the assembly" such that only a single axis of rotation is sufficient to satisfy claim 18. *Id.* at 25-26, 30 (citing CIB at 16-21). Respondents argued that "[c]laim 18 requires [that] the two types of claimed rotation be distinct from one another." *Id.* at 30 (citing RIB at 16, 17).

The parties (Dometic and Respondents) were also asked to brief whether the directional limitation of claim 18 ("the first and second directions point to substantially different lateral sides of the main body") "can be satisfied by the claimed assembly, or must be satisfied by the structure that also satisfies the axis limitation." *Id.* at 41; Tr. at 834:17-835:2, 839:1-11; CIB at 44-45; RIB at 19. Dometic argued that only one type of rotation is needed, such that the directional limitation may be satisfied by the assembly. FID at 41 (citing CIB at 44-45 ("the center point of the first base will be the center point of rotation of the blower and the cylindrical duct element")). Respondents argued the opposite, that two types of rotation are needed such that the directional limitation must be satisfied by the structure that also satisfies the axis limitation and not the assembly. *Id.* at 41 (citing RIB at 19).

The FID's claim constructions for the axis limitation and the directional limitation largely adopt Respondents' proposed constructions. As summarized in the table above, the FID construes the axis limitation "to require a different type of rotation separate from the assembly's adjustment/rotation, and involving a structural component that may be a part of, but is identifiably distinct from, the claimed portion of the 'assembly.'" *Id.* at 31. The FID construes the directional limitation "as 'said first and second directions resulting from rotation about said first axis point to substantially opposing sides of the main body with respect to a vertical plane.'" *Id.* at 42 (citing Order No. 11).

The FID's reasonings for the claim construction of the axis limitation and the directional limitation are summarized below.

***a. The Axis Limitation***

*First*, the FID finds that "the plain language of the claim limitation 'the blower being rotatable' refers to a different type of rotation from the assembly's rotation, and to a distinct structural component separate from the claimed portion of the assembly." *Id.* at 32 (citing RIB at 17-20).

Relevant portions of claim 18 relating to the "first axis" and the "second axis" are recited in the table below:

| **"First Axis" in Claim 18** | **"Second Axis" in Claim 18** |
|---|---|
| "the blower being rotatable about [a] ***first axis*** so that the outlet can be oriented toward a first direct[i]on and a second direction, and the first and second directions point to substantially different lateral sides of the main body" | "an assembly for adjusting the blower with respect to the main body about a ***second axis*** so as to alter an orientation of the outlet, the assembly including a guiding cover and a cyli[n]drical duct element for maintaining the main body and the blower in air communication with one another,<br>. . .<br>the duct element being rotat[a]bly adjustable around the guiding cover about the ***second axis*** at the first base so as to alter the orientation of the outlet." |

'351 patent at cl. 18.

The FID finds that the "blower being rotatable" limitation (on the left of the table shown above) is a first type of rotation and simply provides that the blower is capable of rotation about a first axis so that the outlet can be oriented. *Id.* at cl. 18; FID at 32. The FID further finds that the "assembly"

limitation (on the right of the table shown above) provides the function of "***adjusting*** the blower with respect to the main body about a second axis so as ***to alter*** an orientation of the outlet." FID at 32 (emphasis added). In particular, the claimed assembly includes "a guiding cover and a cyli[n]drical duct element" as the structure for the function of ***adjusting*** the blower, which is accomplished by "the duct element being rotat[a]bly adjustable around the guiding cover about the ***second axis*** at the first base so as ***to alter*** the orientation of the outlet." '351 patent at cl. 18; FID at 32-33 (emphasis added). The FID finds that "[t]he plain and ordinary language '***to alter***' implies that the outlet has an initial orientation, which is established by some other structure or arrangement and which can be changed." FID at 32-33 (emphasis added). The FID therefore finds that the assembly provides a second type of rotation, which is "to alter" the orientation of the blower's outlet. *Id.* In particular, the FID finds that the distinction between "***being rotatable***" (about a first axis) and "***adjusting***" (about a second axis) suggests that the operations of the two limitations might differ and supports that claim 18 requires two different modes of rotation about the two axes. *Id.* at 33.

The FID also finds that the operations of "the blower being rotatable" and "an assembly for adjusting" as claimed "are accomplished over distinctly recited axes – a 'first axis' (about which the blower rotates) and a 'second axis' (about which the duct element rotates relative to the guiding cover), respectively." *Id*. The FID explains that "[t]hese are the plain and ordinary words of the patent claim, and such differences in terminology prove that there are two distinct types of rotation." *Id.*

The FID further finds that asserted claims 19-21, which depend from claim 18, support the understanding that claim 18 requires two distinct types of rotation because "[t]hese claims lack language implying that the assembly's and blower's rotations are the same." *Id.* at 33-34. Specifically, the FID notes that "[c]laim 19 refers to the first and second directions, which have antecedent bases relating to the blower, not to the assembly. And claims 20 and 21 confirm that the blower is rotatable without

reference to the assembly – *i.e.*, 'where the blower *can be* rotated' and 'the blower *is* rotatable,' respectively." *Id.* at 34.

*Second*, the FID finds that the '351 patent specification is consistent with the construction requiring two rotation modes involving two structures. *Id.* (citing RIB at 20-22). The FID references Figure 22 of the '351 patent to explain that the specification suggests "two distinct means of rotating a blower that affect the orientation of the outlet – *i.e.*, (1) via the orientation of the blower **2** when coupling the blower **2** to the duct element **184** and (2) via rotation of the duct element **184** relative to the guiding cover **170** when the blower is coupled to the duct element." *Id.* at 34; '351 patent at Fig. 22 (shown below), 12:4-27, 2:14-17 (disclosing the first type of rotation when coupling the blower **2** to the duct element **184**), and 11:4-23 (disclosing the second type of rotation of the duct element **184** relative to the guiding cover **170** when the blower is coupled to the duct element).



FIG. 22

'351 patent at Fig. 22.

For the second type of rotation, the FID recognizes that the parties do not dispute that the specification discloses that "rotation of the blower's outlet results from the duct element 184 rotating relative to the guiding cover 170 when the blower is coupled to the duct element." *Id.* at 35 (citing '351 patent at 11:4-23). The FID explains that Dometic focused on this second type of rotation as supporting its proposed construction, arguing that the specification discloses "the coupling of the duct element onto the blower so the two elements can rotate as a unitary structure about the guiding cover." *Id.* at 38; CIB at 17-19 ('351 patent at 11:1-3, 10-20); Complainant's Reply Post-Hearing Brief ("CRB") at 7-8 (October 16, 2023). The FID agrees that the specification discloses this second type of rotation, but the FID also finds that the specification discloses the first type of rotation, which Dometic disputes. FID at 38.

For the first type of rotation, the FID finds that "the specification describes a way to connect the blower to the duct element that permits rotation of the blower relative to the duct element – *i.e.*, the blower is 'attached at a predetermined orientation' relative to the duct element to limit the overall height of the air conditioning unit." *Id.* at 35-37 (citing '351 patent at 2:14-17, 11:1-4, 11:41-47, 12:4-27, Figs 22, 24A, 24B, and 25). In particular, the FID considers the following disclosure from the specification for the first type of rotation:

> The non-concentric cylinder shape of the duct element **184** (FIGS. 24A, 24B and 25) is designed to limit the overall height of the air conditioner **1**. Since it is possible for the outlet **218** of the blower **2** to substantially increase the height of the air conditioner 1 when the outlet 218 is located near the top of the air conditioner 1, ***the blower 2 and the duct element 184 are attached at a predetermined orientation*** relative to one another such that the maximum height of the air conditioner 1 will be kept below a certain value despite various orientations of the blower 2. One way to do this is by ***attaching the blower 2 to duct element 184*** so that, when axis B (FIG. 30B-1) is at its lowest relative to axis A, the blower 2 is oriented to reach its vertically longest position. As shown in FIG. 30B, the blades of the blower 2 rotate around B while the blower 2 is rotated with respect to the air conditioner 1 around A. ***The overall height of the air conditioner 1 with the rotatable blower 2 will change depending on how the blower 2 is <u>fastened</u> in relation to the duct element 184***. Therefore, ***the maximum height of an air conditioner 1 can be restricted by adjusting the orientation in which the blower 2 is <u>fastened</u> to the duct element 184.*** Moreover, the

**PUBLIC VERSION**

> conical cylinder shape of the duct element 184 and the curvature 178 of the guiding cover 170 contribute to a smoother air flow within the air conditioner 1.

’351 patent at 12:4-27 (emphasis added); *see also id.* at 2:14-17 (“the blower is installed with respect to the duct element in such a way that the maximum height of the air conditioning device is limited”).

The FID also finds that the first type of rotation is further supported by six apertures **210** as illustrated in Figures 24A and 24B (shown below) that suggest six possible orientations of how the blower may be fastened relative to the duct element. *Id*. at 36; ’351 patent at 11:2-3 (“apertures **210** for coupling the duct element **184** onto the blower **2**”). The FID notes that “Figure 24B, in particular, appears to show screws or rivets inserted into the apertures, presumably for attaching the blower to the duct element,” and Figure 25 similarly illustrates the six apertures, allowing “six possible orientations of the blower when coupled to the duct element – *i.e.*, working clockwise around the duct element, the blower could be attached at orientations of approximately 2 o’clock, 4 o’clock, 6 o’clock, 8 o’clock, 10 o’clock, and 12 o’clock.” *Id.* at 36-37; ’351 patent at Fig. 25 (shown below).




FIG. 24A




FIG. 24B

’351 patent at Figs. 24A and 24B.




FIG. 25

’351 patent at Fig. 25.

The FID also finds that the specification discloses limiting the maximum height of the air conditioner by “attaching the blower 2 to duct element 184 so that, when axis B (FIG. 30B-1) is at its lowest relative to axis A, the blower 2 is oriented to reach its vertically longest position.” *Id.* at 38 (citing ’351 patent at 12:11-16); *see also* ’351 patent at Fig. 30B (shown below).




FIG. 30B-1




FIG. 30B-2

’351 patent at Figs. 30B-1 and 30B-2.

The FID finds that “[i]f the blower can be attached to the duct element in a configuration to ‘reach its vertically longest position,’ it stands to reason that it can also be attached in a configuration to

reach a different position, which would necessitate rotating the blower about axis B and then attaching it to the duct element at a different 'predetermined orientation.'" FID at 39 (citing '351 patent at 12:10). The FID therefore finds that "a person of ordinary[5] skill in the art would understand that decoupling the duct element from the blower, rotating it a discrete amount, and then recoupling it is a means of rotation contemplated by the claim." *Id.* at 39 (citing CIB at 18).

*Third*, the FID finds that Dometic's proposed construction "would read the axis element entirely out of the claim," and "require the blower's outlet orientation to change solely as a result of adjusting the assembly." *Id.* at 39 (citing Respondents' Reply Post-Hearing Brief ("RRB") at 5 (October 16, 2023)). The FID finds that under Dometic's interpretation, claim 18 would effectively read:

> An air conditioning device for a nautical vehicle including:
>
> a main body; and
>
> a blower including an inlet and an outlet, the inlet being in air communication with the main body~~, the blower being rotatable about first axis so that the outlet can be oriented toward a first directon and a second direction, and the first and second directions point to substantially different lateral sides of the main body~~, and
>
> an assembly for adjusting the blower with respect to the main body about an ~~second~~ axis so as to alter an orientation of the outlet so that the outlet can be oriented toward a first direction and a second direction, and the first and second directions point to substantially different lateral sides of the main body, the assembly including
>
> a guiding cover and a [cylindrical] duct element for maintaining the main body and the blower in air communication with one another,

[5] The FID applies that a person having ordinary skill in the art of the '351 patent at the time of invention "would have had two or more years of relevant industry experience in the fabrication or design of nautical air conditioning units, and sufficient education to understand such air conditioning units, through university studies or otherwise, with additional experience substituting for education and vice versa." FID at 27-28 (Citing Order No. 11 at 9). This skill level is not disputed by the parties. *Id*. at 28.

> the duct element having a first base and a second base, and coupled to the blower at the second base, the first base of the duct element dimensioned to correspondingly fit the guiding cover, and
>
> the duct element being [rotatably] adjustable around the guiding cover about the ~~second~~ axis at the first base so as to alter the orientation of the outlet.

FID at 40 (citing RRB at 5).

*Fourth*, the FID finds that the prosecution history of the '351 patent is consistent with the construction requiring two rotation modes involving two structures. *Id.* at 37. The FID notes that claim 18 (which was claim 72 during the prosecution) was allowed only after an Examiner's amendment change[d] the language regarding the blower from "rotation about an axis" to "about [a] first axis," and added the assembly limitation "for adjusting the blower . . . about a second axis . . . ." *Id.* (citing JX-002-244) (Examiner's amendment of original claim 72, which became present claim 18 of the '351 patent, shown below).

> - Claim 72 has been amended and replaced by the following:
>
> --72. (Previously presented) An air conditioning device for a nautical vehicle including: a main body; and a blower including an inlet and an outlet, the inlet being in air communication with the main body, the blower being rotatable about ~~an~~ first axis so that the outlet can be oriented toward a first direction and a second direction, and the first and second directions point to substantially different lateral sides of the main body, and an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet, the assembly including a guiding cover and a cylindrical duct element for maintaining the main body and the blower in air communication with one another, the duct element having a first base and a second base, and coupled to the blower at the second base, the first base of the duct element dimensioned to correspondingly fit the guiding cover, and the duct element being rotatably adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet.--

JX-002-244 (Notice of Allowance and Examiner-Initiated Interview Summary dated August 25, 2011 showing the Examiner's amendment of claim 72, which later became claim 18 of the '351 patent).[6]

Therefore, the FID finds that "[i]n adding the 'assembly' limitation, the amendment further specified that the guiding cover requires adjustment/rotation about a 'second axis.' Thus, amending the claim language during prosecution from 'an axis' to a 'first axis' suggests that the blower's rotation must occur over a different axis than the assembly's rotation." FID at 37.

The Commission notes that prior to the Examiner's amendment, the Examiner rejected original claim 72 as anticipated by U.S. Patent No. 6,101,829 to Robinson ("Robinson"). JX-0002-195 (Office Action dated May 9, 2021) (citing Robinson at 1:4-10, 1:37-54, 2:37-67, 3:38-49, Figs. 1-4).[7] Original claims 54[8] and 58[9] recited the assembly limitation that the Examiner added to claim 72 in the

---

[6] The Examiner's amendment was authorized by the applicant's attorney of record on August 8, 2011. JX-002-244.

[7] For example, the cited portions of Robinson disclose that "[a] blower assembly is provided which includes a central axis about which the blower assembly is supported for rotation relative to the housing" and "[t]he blower assembly **16** is formed of sheet metal with a blower **32** and the blower motor **34** contained therein." Robinson (US 6,101,829) at 1:37-54, 3:38-49.

[8] Original claim 54 of the '351 patent application recited:

> An air conditioning device for a nautical vehicle including:
> a main body; and
> a blower including an inlet and an outlet, the inlet being in air communication with the main body, the blower further including blades rotating therewithin about a first axis, and an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet.

JX-0002-073.

[9] Original claim 58 of the '351 patent application recited:

> The air conditioning device of claim 54, the assembly including a guiding cover and a cylindrical duct element for maintaining the main body and the blower in air communication with one another, the duct element having a first base and a second base, and coupled to the blower at the second base, the first base of the duct element

Examiner's amendment. JX-0002-073 – JX-002-074. The Examiner also rejected claim 54 as anticipated by U.S. Patent No. 5,848,536 to Dodge et al. ("Dodge"), and claim 58 as obvious over Dodge in view of U.S. Patent No. 2,185,387 to Welland et al. ("Welland"). JX-0002-194 – JX-002-197 (Office Action dated May 9, 2021) (citing Dodge and Welland).

The Commission also notes that the Examiner's reasons for allowing claim 72, as amended by the Examiner's amendment, were stated as: "[t]he prior art of record when consider as a whole, alone or in combination, neither anticipates nor renders obvious . . . instant claims 54, 72, and 77." JX-002-245 – JX-002-248. The Examiner also provided a summary of how the prior art of record fails to teach claim 72 as amended. *Id.* Therefore, the Examiner's amendment of claim 72 (now claim 18 of the '351 patent), which amended the blower's "rotation about ***an axis***" to "about [a] ***first axis***," and added the assembly limitation "for adjusting the blower . . . about a ***second axis*** . . .," was to overcome the prior art of record. JX-002-244 – JX-002-248 (emphasis added).

Lastly, regarding the extrinsic evidence, the FID notes that the testimony of Dr. Paulus, Dometic's expert, and Mr. Pabisz, Dometic's corporate representative and a named inventor of the '351 patent, "has been considered, and it is outweighed by the intrinsic evidence." *Id.* at 41.

### *b. The Directional Limitation*

For the directional limitation, the FID finds that "Dometic's proposed construction would, in essence, improperly move the directional limitation into the assembly limitation, even though the antecedent basis of 'the first and second directions' is clearly 'a first [direction] and a second direction,' which is part of the axis limitation. *Id.* at 42 (citing CIB at 44-45). The FID also finds that the '351 patent's dependent claims 19-21 support the understanding that claim 18 requires two modes of rotation

> dimensioned to correspondingly fit the guiding cover, and the duct element being rotatably adjustable around the guiding cover about the second axis at the first base.

JX-0002-074.

because "dependent claims 20 and 21 add the requirement that the 'blower,' not the assembly, must be 'rotated' or 'rotatable' in certain ways"; and "although claim 19 does not recite a blower, its antecedent basis for 'the first direction and the second direction' is also clearly found in the axis limitation." *Id.*

Putting everything together, the FID finds that "the claim language demonstrates that the directional limitation pertains to the blower, not to the assembly," and "the directional limitation of claim 18, 'the first and second directions point to substantially different lateral sides of the main body,' incorporating the construction from Order No. 11, is construed as 'said first and second directions resulting from rotation about said first axis point to substantially opposing sides of the main body with respect to a vertical plane.'" *Id.*

### 2. Analysis

In its petition for review, Dometic contends that the ALJ violated numerous canons of claim construction when construing the axis limitation and the directional limitation of claim 18, "including (1) failing to construe the disputed term in view of the surrounding claim language and the specification; (2) excluding surrounding claim language and preferred embodiments from the claims; (3) importing unclaimed features—whether described in the specification or imagined—into the claims; (4) distorting the scope and content of the Figures; (5) misapprehending the requirements for disclaimer; and (6) violating the doctrine of claim differentiation." Compl. Pet. at 8. Dometic's arguments about the FID's claim construction generally apply to both the axis limitation and the directional limitation. *Id.* at 6-29. The Commission finds Dometic's arguments unpersuasive for the reasons described below.

#### *a. The Axis Limitation and The Directional Limitation*

*First*, Dometic characterizes the procedural background on the FID's construction of the axis limitation and the directional limitation as an "eve of trial," unilateral decision by the ALJ "without identifying what term or phrase he 'needed some help in understanding.'" *Id.* at 6. This characterization

directly contradicts the FID and the procedural history of this investigation. As explained above in Section IV.A.1., the FID explains that the parties were on notice of this claim construction issue since the *Markman* Order (issued on May 1, 2023), which identified "the ambiguity of exactly how the blower can be rotated about the first axis." FID at 29-30 (citing Order No. 11 at 25); *see also id.* at 23-24 ("[Dometic] was on notice that the claim apparently covers a blower rotatable relative to the duct element, or rotatable in itself, or otherwise satisfying the "rotat[ed] about [the] first axis" limitation of claim 18, as distinct from the "[rotatably] adjustable . . . about the second axis" duct element."). The FID explains that the parties were again put on notice regarding this claim construction issue when the ALJ rejected Dometic's motion for summary determination on the technical prong, where the order "suggested that construction of the claim language may be appropriate to establish the precise scope of the claim." FID at 25 (citing Order No. 20 at 4).

Dometic also argues that the ALJ mandated the parties to brief this claim construction issue "despite **all** parties taking the same position throughout the Investigation regarding what was required . . . to satisfy the 'rotatable blower' language of Claim 18. Specifically, the parties **always** took the position that Claim 18 required only one mode of blower rotation achieved via one or more components of the assembly . . . ." Compl. Pet. at 7 (emphasis in original). Again, this characterization contradicts the procedural background of this investigation. *See, e.g.*, FID at 23 (describing the initial claim construction disputes between the parties where Respondents argued that the first and second axes must be different whereas Dometic argued that the axes may be the same or different), 30-31 (describing the claim construction disputes in the parties' post-hearing briefs on the axis limitation), 41-42 (describing the claim construction disputes in the parties' post-hearing briefs on the directional limitation). Respondents also disagree with Dometic for the same reasons described in the FID, noting that they "explicitly argued that the axes must be different and/or distinct" in their opening *Markman* brief. Resp. Response at 11-12 (citing Respondents Opening *Markman* Brief, EDIS Doc. ID No. 792262 at 22-23);

FID at 23 (citing Order No. 11 at 22). Therefore, the Commission finds that the ALJ did not contradict the consistent understanding of the parties and properly concluded that further construction was required based on Dometic's theories on infringement and DI technical prong. FID at 22-27, 29-31; Resp. Response at 12. In any event, Dometic does not contend that it was deprived of due process or any other procedural rights, nor do we find that to be the case, due to the ALJ's request at the hearing for supplemental claim construction briefing on this issue in the parties' post-hearing briefs for the FID. *Id.* at 25; CIB at 16-21; RIB at 16-24.

*Second*, Dometic contends that the FID's construction of the axis limitation would "require repeated de-coupling of the blower and duct element" to rotate the blower about a first axis, and that this reads out and contradicts the claim terms "being in/maintaining the main body and blower in air communication," "coupled," or "air conditioning device." Compl. Pet. at 11 (citing Pretrial Tr. (J., Elliot) at 25:11-21). In other words, Dometic argues that "de-coupling" the blower from the duct element, rotating the blower, and "re-coupling" the blower to the duct element in a different orientation is inconsistent with the claim terms recited below (with emphasis added by Dometic) that require being in/maintaining a fully assembled air conditioner. *Id.* at 10-14.

> **An air conditioning device** for a nautical vehicle including…
>
> **a blower including an inlet and an outlet, the inlet <u>being in air communication with the main body</u>**…
>
> the assembly including a guiding cover and **a cylindrical [sic] duct element <u>for maintaining the main body and the blower in air communication</u> with one another**,
>
> the duct element having a first base and a second base, and **coupled to the blower at the second base**….

Compl. Pet. at 11 (citing relevant portions of claim 18 with emphasis).

Dometic appears to read claim 18 as requiring the claimed air conditioning device to be fully assembled at *all times*, such that decoupling the blower from the duct element as allegedly required by the FID's construction would "destroy the required 'being in/maintaining the main body and blower in air communication,' 'coupled,' and 'air conditioner' claim language in the process." *Id.* However, the FID's construction does not require such decoupling, and thus does not contradict the claim language. FID at 31; *see also* Resp. Response at 13. Instead, the axis limitation is construed to "require a different type of rotation separate from the assembly's adjustment/rotation, and involving a structural component that may be a part of, but is identifiably distinct from, the claimed portion of the 'assembly.'" FID at 31; *see also id*. at 41 ("This construction, to be sure, assigns a broad meaning to 'rotatable,' because the rotation of the preferred embodiment is cumbersome, but a construction that excludes the preferred embodiment is 'rarely, if ever, correct.' *See Vitronics*, 90 F.3d at 1583. So at minimum a structure corresponding to the preferred embodiment (as in FIG. 24B) satisfies the claim."). Dometic's argument about decoupling and recoupling the blower for the rotation addresses merely an embodiment (*e.g.*, as illustrated in Figs. 24 and 25) disclosed in the specification for effectuating the rotation. The FID correctly finds that the claims are broad enough to encompass this embodiment. *See CUPP Computing AS v. Trend Micro Inc.*, 53 F.4th 1376, 1381 (Fed. Cir. 2022) ("[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct.").

Even if the axis limitation as construed by the FID requires such decoupling (which it does not), this does not read out or contradict the claim terms "being in/maintaining the main body and blower in air communication," "coupled," or "air conditioning device." As Respondents explain, even Dometic's arguments during the *Markman* proceeding indicate that there is no reading out or contradicting the terms at issue. Resp. Response at 14-15. Specifically, Dometic in its *Markman* brief *disagreed* with Respondents' proposed construction of the term "duct element being rotatably adjustable" recited in claim 18 as a rotation "without partial disassembly such as removing and replacing screws." Dometic's

Opening *Markman* Brief at 14-17 (emphasis added). Dometic argued that "Respondents' proposed construction [excluding disassembly for the rotation of the duct element] again highlights a transparent attempt to avoid infringement at the expense of a proper claim construction analysis." *Id.* at 14. Rather, Dometic argued that the term "the duct element being rotatably adjustable" should be construed as having its plain and ordinary meaning that can cover "'***partial disassembly***' of the duct element to rotate it around the guiding cover." *Id.* (emphasis added). In particular, Dometic cited the '351 patent's disclosure that "***it may be necessary to adjust the orientation of the blower 2 after completely removing the duct element 184 from the guiding cover 170***" to support its proposed construction that "the duct element being rotatably adjustable" may involve disassembly. *Id.* at 16-17 (emphasis in original) (citing '351 patent at 12:28-36). The *Markman* Order adopted Dometic's proposed construction. Order No. 11 at 17-21.

In other words, Dometic admitted that claim 18 allows disassembly or decoupling of "the duct element being rotatably adjustable."[10] Dometic's Opening *Markman* Brief at 14-17; Order No. 11 at 17-21. Dometic did not argue in its *Markman* brief (and does not argue in its petition) that its construction allowing disassembly or decoupling of "the duct element being rotatably adjustable" reads out or contradicts any terms in claim 18 such as "the inlet being in air communication with the main body" and "duct element for maintaining the main body and the blower in air communication." *See* Dometic's Opening *Markman* Brief at 14-17; Compl. Pet. at 10-14. Indeed, Dometic argued that such disassembly or decoupling is supported by intrinsic evidence. Dometic's Opening *Markman* Brief at 16-17 (citing '351 patent at 12:28-36 and prosecution history generally).

[10] When the duct element is disassembled from the guiding cover for its rotation, the blower that is attached to the duct element is necessarily disassembled or decoupled from the claimed air conditioning device. *See, e.g.*, '351 patent at 12:28-36, Figs. 22, 24, 30, and cl. 18.

In its petition for review, however, Dometic contradicts its own prior construction by arguing that the claimed "blower being rotatable" cannot be decoupled for its rotation, thereby disallowing disassembly of the claimed air conditioning device. *Compare* Dometic's Opening *Markman* Brief at 14-17 *with* Compl. Pet. at 10-14. The Commission finds Dometic's argument in its petition to be unpersuasive. If "the duct element being rotatably adjustable" recited in claim 18 can be decoupled for rotation as Dometic argued during the *Markman* proceeding without contradicting the terms such as "the inlet being in air communication with the main body" or "duct element for maintaining the main body and the blower in air communication," it follows that the "blower being rotatable" recited in claim 18 can also be decoupled for its rotation without contradicting the terms at issue. *Id.*

As Dometic argued in its *Markman* brief, the intrinsic evidence such as the '351 patent stating that "***it may be necessary to adjust the orientation of the blower 2 after completely removing the duct element 184 from the guiding cover 170***" supports the finding that there is no contradiction or reading out of the terms at issue. Dometic's Opening *Markman* Brief at 16-17 (emphasis in original) (citing '351 patent at 12:28-36). More pertinently, the rotation involving disassembly of the blower (or the duct element) necessarily ends with the blower being "re-coupled" to the air conditioning device, and when "re-coupled," it is consistent with the claim terms "being in/maintaining the main body and blower in air communication," "coupled," or "air conditioning device."

*Third*, Dometic contends that the FID's construction of the axis limitation "reads out and contradicts the claim term 'so as to alter the orientation of the outlet.'" Compl. Pet. at 14. For starters, Dometic argues that the ALJ "does not discuss this claimed phrase at all in the ID." *Id.* However, the FID discusses this very phrase in detail to explain how the plain language of the claim supports the FID's construction of the axis limitation. FID at 32-33 ("The plain and ordinary language 'to alter' implies that the outlet has an initial orientation, which is established by some other structure or arrangement and which can be changed.").

Dometic also suggests that the FID's construction of the axis limitation requiring a different type of rotation separate from the assembly's adjustment/rotation is inconsistent with the earlier *Markman* Order's (Order No. 11) finding that the first axis and the second axis need not be different. Compl. Pet. at 14. However, this is based on Dometic's misunderstanding of the *Markman* Order. As explained above in Section IV.A.1., the *Markman* Order left open the question of "how the first axis fits into all this," because "claim 18 does not recite exactly how the blower is 'rotat[ed] about [the] first axis.'" FID at 29, 40 (citing Order No. 11 at 26). The *Markman* Order "further observed that 'the shape of the duct element (symmetrical vs. asymmetrical) determines whether ***the axes of rotation*** are identical or merely parallel,'" implicitly indicating that "there must be two such axes." FID at 40 (citing Order No. 11 at 25) (emphasis added). Therefore, as the FID explains, the *Markman* Order's "finding that 'the two axes need not be different' (which was the explicit holding) did not resolve whether only one axis is permissible." *Id.* at 40. Indeed, in rejecting Dometic's motion for summary determination on the technical prong, the ALJ cited the *Markman* Order to explain "that even if the two axes need not be different, 'that does not relieve Dometic from identifying two axes.'" *Id.* at 25; Order No. 20 at 3 (citing Order No. 11 at 26).

Based on this misunderstanding of the *Markman* Order, Dometic argues that the first and second axes can be satisfied by only one mode of rotation (which is incorrect) and improperly rewrites claim 18 by conflating a "first axis" and a "second axis" to "[an] axis." Compl. Pet. at 14-15. Specifically, Dometic argues in its petition for review that "[c]laim 18 can be rewritten in relevant part as:"

> [T]he blower being rotatable **about [an] axis** so that the outlet can be oriented toward a first directon [*sic*] and a second direction…the duct element being rotatbly [*sic*] adjustable around the guiding cover **about the [] axis** at the first base so as to alter the orientation of the outlet.

Compl. Pet. at 14 (emphasis in original).

However, claim 18 (which was claim 72 during prosecution of the ’351 patent) was allowed over the prior art only after the Examiner’s amendment amending the term “about an axis” to “about a first axis,” and adding the assembly limitation with “a second axis.” *Id.* at 37 (citing JX-002-244, shown below). Dometic’s proposed construction that rewrites “a first axis” and “a second axis” as “[an] axis” effectively reverses the Examiner’s amendment that placed claim 18 in condition for allowance. *Compare* Compl. Pet. at 14 (Dometic proposing to rewrite claim 18’s “first axis” and “second axis” as “[an] axis,” shown above) *with* JX-002-244 (Examiner’s amendment amending “an axis” to “a first axis” and adding the assembly limitation about “a second axis,” shown below). Therefore, Dometic’s proposed construction that rewrites claim 18 is not only improper, but also reverts claim 18’s first and second axes terms back to the unallowable pre-Examiner amendment version of the term, an axis. *Id.*

- Claim 72 has been amended and replaced by the following:

--72. (Previously presented) An air conditioning device for a nautical vehicle including: a main body; and a blower including an inlet and an outlet, the inlet being in air communication with the main body, the blower being rotatable about ~~an~~ first axis so that the outlet can be oriented toward a first direction and a second direction, and the first and second directions point to substantially different lateral sides of the main body, and an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet, the assembly including a guiding cover and a cylindrical duct element for maintaining the main body and the blower in air communication with one another, the duct element having a first base and a second base, and coupled to the blower at the second base, the first base of the duct element dimensioned to correspondingly fit the guiding cover, and the duct element being rotatably adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet.--

JX-002-244 (Notice of Allowance and Examiner-Initiated Interview Summary dated August 25, 2011 showing the Examiner’s amendment of claim 72, which was allowed as claim 18 of the ’351 patent).

In addition, the plain language of the claim distinctly recites “a ‘first axis’ (about which the blower rotates) and a ‘second axis’ (about which the duct element rotates relative to the guiding cover), respectively,” and it is improper to rewrite the two distinct terms as “an axis.” FID at 33. “Where a

claim lists elements separately, 'the clear implication of the claim language' is that those elements are 'distinct component[s]' of the patented invention." *Becton,* 616 F.3d at 1254 (citation omitted).[11] Just because the first and second axes "need not be different," as recognized by the ALJ, does not eliminate the requirement for two separate axes or allow the claim language to be satisfied by a single axis as rewritten by Dometic. *See* Compl. Pet. at 14; Order No. 11 at 25.

Dometic also cites portions of the '351 patent specification describing the rotation of the duct element **184** altering the orientation of the blower's outlet (attached to the duct element **184**) about a second axis, and argues that this allegedly supports that a single axis of rotation is sufficient to satisfy claim 18's first axis and second axis limitations. Compl. Pet. at 15 (citation omitted). In Dometic's view, the ALJ "not only ignored the foregoing intrinsic evidence, but he also never addressed or explained why rotation of the duct element (and thus rotation of the blower to which it is coupled) 'so as to alter the orientation of [the blower] outlet' is somehow precluded from satisfying the blower rotation requirement." *Id.* at 16 (citing FID at 29-42). This argument is not persuasive. As Respondents acknowledge in their response, there is no dispute that the FID's construction requires the ability of the duct element to rotate around the guiding cover about the second axis (at the first base of the duct element) so as to alter the orientation of the blower's outlet. Resp. Response at 16. Therefore, the ALJ considered the '351 patent specification describing the rotation of the duct element around the guiding cover. *Id.*; *see also* FID at 29-42. As the FID finds, however, the claim also requires another mode of

[11] Recently, the Court of Appeals for the Federal Circuit clarified *Becton* by explaining that "there is a 'presumption' that separately listed claim limitations may indicate separate and distinct physical structure, but that presumption may always be rebutted in the context of a particular patent." *Google LLC v. EcoFactor, Inc.*, No. 22-1750, 14 (Fed. Cir. 2024). In the present investigation, the Commission finds that neither the intrinsic evidence nor the extrinsic evidence can rebut the presumption that separately listed claim limitations involving a "first axis" and a "second axis" indicate separate and distinct physical structure. *See generally* Section IV.A. In fact, both the intrinsic evidence and the extrinsic evidence support the FID's claim construction requiring two distinct modes of rotation involving a "first axis" and a "second axis." *Id.*

rotation about a first axis separate from the assembly's adjustment/rotation. FID at 31, 42; '351 patent at cl. 18. As discussed above in Section IV.A.1., the FID provides detailed explanations as to why the axis limitation involving the blower is construed to require "a different type of rotation separate from the assembly's adjustment/rotation" involving the duct element.

Dometic also argues that the FID's construction renders the term "so as to alter the orientation of the outlet" superfluous. Compl. Pet. at 16. As explained above in Section IV.A.1., the FID discusses in detail about how "[t]he plain and ordinary language '***to alter***'" supports construing the axis limitation to require a different type of rotation to alter the orientation of the outlet that is separate from the assembly's adjustment/rotation. FID at 31-33 (emphasis added). To the contrary, the FID's construction avoids rendering the "first axis" and the "second axis" claim limitations superfluous. *Id.* at 40.

*Fourth*, Dometic contends that the FID's constructions read the preferred embodiment out of the claims, invent claim requirements and import those into the claims, and misinterpret the intrinsic evidence. Compl. Pet. at 17. Dometic essentially argues that the '351 patent specification does not support the FID's construction of the axis and directional limitations because nothing in the specification suggests "that the duct element **184** identified in the 'preferred embodiment' [or anywhere else in the specification] can be unscrewed, detached, or separated from the blower **2**." *Id.* at 17. In Dometic's view, "there is absolutely nothing in the specification that indicates that **after** 'attaching [/coupling] the blower **2** to the duct element **184**' at a 'predetermined orientation,' the blower can then be detached/decoupled and then reattached/recoupled somewhere else." *Id.* at 18 (emphasis in original) (citing '351 patent at 12:4-29). Because the specification allegedly lacks support for this mode of rotation, Dometic disagrees with the FID's finding that "a person of ordinary skill in the art would understand that decoupling the duct element from the blower, rotating it a discrete amount, and then recoupling it is a means of rotation contemplated by the claim." *Id.* at 17-18.

Dometic, however, does not address the specification's relevant disclosures such as "***adjusting the orientation*** in which the blower **2** is fastened to the duct element **184**," where the blower is fastened to the duct element using apertures **210**. '351 patent at 12:13-24,11:1-4, Figs. 22, 24, 25, and 30 (emphasis added); *see generally* Compl. Pet. at 17-19. Such disclosures by the '351 patent certainly suggest that "adjusting the orientation" of the blower that is fastened to the duct element with apertures **210** may involve decoupling the blower and rotating/adjusting the blower's orientation relative to the duct element. *Id.*

Dometic instead points to the specification's disclosure that "the adjustment of the blower orientation occurs through a sliding mechanism," which relates to the rotation of the duct element around the guiding cover, which adjusts the blower as the duct element rotates together with the blower. *Id.* at 18. However, as discussed above in Section IV.A.1., while the FID recognizes that the specification certainly discloses this type of rotation (about which the duct element rotates relative to the guiding cover) cited by Dometic, the FID explains in detail that the specification also discloses another type of rotation (about which the blower rotates with respect to the duct element) associated with restricting the maximum height "by adjusting the orientation in which the blower **2** is fastened to the duct element **184**" using the apertures **210**, *e.g.*, as illustrated in Figures 22 and 24. FID at 35-39; '351 patent at 12:13-24,11:1-4, Figs. 22, 24, 25, and 30.

The Commission disagrees with Dometic's reading of the '351 patent that nothing in the specification suggests the rotation of the blower by decoupling the duct element from the blower, rotating it a discrete amount, and then recoupling it is a means of rotation. Compl. Pet. at 17-18; FID at 35-39; '351 patent at 12:13-24. The specification discloses the rotation of the blower with respect to the duct element as a way to restrict the overall height of the air conditioner, and this disclosure supports the FID's construction of the axis and directional limitations. *See supra* Section IV.A.1.

*Fifth*, Dometic contends that the FID's construction is "based largely on [the ALJ's] personal interpretations of specification drawings, legally impermissible extrapolations therefrom, and speculation." Compl. Pet. at 19 (citing FID at 34-37). Dometic mainly argues that the FID's analysis of the '351 patent's Figures 22, 24A, 24B and 25 as disclosing the rotation of the blower with respect to the duct element based on how "the blower 2 is fastened to the duct element" is an embodiment created by the ALJ. *Id.* at 19; '351 patent at 12:13-24. Specifically, Dometic disputes the FID's finding that "the Figures disclose 'evenly spaced six apertures illustrated in Figures 22, 24A, 24B, and 25' and therefore '[t]hese apertures suggest six possible orientations of the blower relative to the duct element.'" *Id.* at 20. Dometic argues that "[s]uch conclusions fail as a matter of law because there is no indication anywhere in the intrinsic evidence that said Figures represent 'the precise proportions of the elements'—the relative spacings of the apertures in this case—and therefore the Figures 'cannot be relied upon to argue that the disputed terms should be limited to a particular structure.'" *Id.* at 20 (citing *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1351 (Fed. Cir. 2013); *Hailes v. Albany Stove Co.*, 123 U.S. 582, 587 (1887)). Dometic further argues that, even if the Figures are to scale, the Figures do not show evenly spaced six apertures, relying on a version of Figure 25 annotated with PDF measurement tools on how the apertures are spaced. *Id.* at 20-21; '351 patent at Fig. 25 annotated by Dometic (shown below).




FIG. 25

'351 patent at Fig. 25 (annotated by Dometic).

Dometic's argument is unpersuasive. As stated in Section IV.A.1., the ALJ used the text of the specification to properly analyze the drawings and did not rely merely on his personal interpretations of the Figures as alleged. *See* FID at 34-37; '351 patent at 12:6-24 ("One way to do this is by attaching the blower 2 to duct element 184 so that, when axis B (FIG. 30B-1) is at its lowest relative to axis A, the blower 2 is oriented to reach its vertically longest position . . . The overall height of the air conditioner will change depending on how the blower 2 is fastened in relation to the duct element 184.").

In addition, as Respondents argue:

> Those measurements [by Dometic], which are not evidence and have no indication of accuracy, nonetheless fail to demonstrate any difference in distance beyond measurement error—the spacing between the holes, according to Complainants' measurements, varies by 0.02-0.03 inches. Even if it were appropriate to read disclosed capabilities out of a patent specification due to precise measurement of figures—and Complainants appear to agree it is not—Complainants fail entirely to demonstrate that the miniscule differences in spacing between the holes disclosed in Figure 25 would prevent fastening the blower to the duct element at differing orientation.

Resp. Response at 21.

Dometic also argues that "there is no intrinsic evidence indicating that the patentees disclaimed a duct element having apertures that **are not** evenly spaced, and thus the claims must **also** encompass such duct elements in addition to what the ALJ alleges are duct elements having 'evenly spaced six apertures illustrated in Figures 22, 24A, 24B, and 25.'" Compl. Pet. at 21 (citing FID at 36-37) (emphasis in original). The FID made no such findings that would exclude unevenly spaced apertures. The FID's claim construction of the axis and directional limitations does not require a duct element having evenly spaced six apertures; instead, the FID simply finds that the specification's disclosures on how the blower can be fastened to the duct element makes it rotatable, *e.g.*, at different increments using the apertures **210** as illustrated in Figures 22 and 24, which supports the FID's construction. FID at 34-37; '351 patent at 12:13-24, 11:1-4, Figs. 22, 24, 25, and 30B.

*Sixth*, Dometic contends that the FID's construction violates the doctrine of claim differentiation with respect to asserted claim 22.[12] Compl. Pet. at 23. Dometic argues that because claim 22 requires that "only loosening of the clamp element is necessary to change orientation of the blower," it does not allow for the blower's rotation with respect to the duct element, for example, by decoupling and recoupling the blower from the duct element. *Id.* at 23. Dometic argues that, in effect, the FID's construction of claim 18 results in it being narrower than its dependent claim 22. *Id.* at 25-26 (citing *Littelfuse, Inc. v. Mersen USA EP Corp.*, 29 F.4th 1376, 1380 (Fed. Cir. 2022)).

The Commission does not find that claim 18, as construed by the FID, is narrower than claim 22. For example, "loosening of the clamp element" to rotate the duct element (and the orientation of the blower) as recited in claim 22 is related to one of the two types of rotations disclosed in the specification, which the FID recognizes as being undisputed by the parties. FID at 33 ("Claim 22 clearly pertains to the duct element/guiding cover connection . . . ."), 35 ("The parties do not dispute the second rotation type, where rotation of the blower's outlet results from the duct element **184** rotating relative to the guiding cover **170** when the blower is coupled to the duct element."). That is, claim 22's "loosening of the clamp element" pertains to claim 18's "duct element being rotat[a]bly adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet," such that only the loosening of the clamp, as opposed to other means, is necessary to allow the duct element to rotate around the second axis thereby changing the blower's orientation. *Id.* at 33; *see also* '351 patent at 10:16-20 ("a duct element **184** is placed between the guiding cover **170** and the

---

[12] Claim 22 of the '351 patent recites:

> The air conditioning device of claim 18, wherein the air conditioning device further includes a clamp element for maintaining the blower oriented with respect to the main body, and wherein only loosening of the clamp element is necessary to change orientation of the blower.

'351 patent at cl. 22.

blower **2** by clamping it around the cylindrical section **176** of the guiding cover **170** with a band clamp or a clamp element **186**"), Fig. 22 (illustrating the duct element **184** and the clamp element **186)**.

*Lastly*, Dometic contends that the FID's claim construction analysis is flawed and contradicted by the intrinsic evidence. Compl. Pet. at 26. Dometic argues that the FID's findings on how the plain language of the claim supports the claim construction is negated by the intrinsic evidence, repeating the same argument that claim 18 requires only a single axis of rotation. *Id.* Dometic points to the claim language requiring that "the blower is 'coupled' to the duct element of the assembly," suggesting that the blower cannot be rotatable independent from the duct element and can rotate only with the duct element. *Id.* As stated above in Section IV.A.1. and this Section, however, nothing about the FID's construction is contradicted by the plain language of the claim requiring two axes of rotation, or the specification disclosing two different modes of rotation.

Dometic also argues that the FID's findings on how the dependent claims support the claim construction are contradicted by the intrinsic evidence. *Id.* at 27. Dometic, however, simply refers back to the alleged violation of the claim differentiation doctrine based on claim 22, which is already discussed and rejected above. Dometic also argues that the FID's findings on how claims 20-21 support the claim construction is irreconcilable with the intrinsic evidence by citing to the portions of the specification about which the duct element rotates relative to the guiding cover about a second axis. *Id.* at 27. As already discussed above, however, nothing in the specification's relevant disclosures is inconsistent with the FID's findings that there is another mode of rotation about which the blower rotates with respect to the duct element. As discussed above in Section IV.A.1., claims 20-21 "confirm that the blower is rotatable without reference to the assembly – *i.e.*, 'where the blower *can be* rotated' and 'the blower *is* rotatable,' respectively," and therefore support the FID's construction. FID at 34.

Dometic also argues that the FID's findings on how the prosecution history supports the claim construction is inconsistent with the *Markman* Order's statement that "nothing in the intrinsic evidence

rules out use of a symmetrical duct element for claim 18, such that the two axes are identical. Nor is there anything in the prosecution history ruling it out; the Examiner's amendment cited by Respondents added a large number of limitations, including a second axis, but nothing in the amendment (to which the applicants did not respond) indicates that the first axis and the second axis must be different." Compl. Pet. at 29 (citing Order No. 11 at 25). Again, Dometic is misunderstanding the *Markman* Order as construing the claims to only require a single axis of rotation, *i.e.*, a single mode of rotation, but the FID explains that this is not the case. FID at 25, 41; *see supra* Section IV.A.1. That is, although the *Markman* Order noted that "the 'first axis' and the 'second axis' need not be different," the ALJ later clarified that "even if the two axes need not be different, 'that does not relieve Dometic from identifying two axes,' which it failed to do." FID at 25 (citing Order No. 11 at 26; Order No. 20 at 3). The FID also explains that "the first axis about which the 'blower' may rotate" and "the second axis about which the 'duct element' may rotate . . . may or may not be colinear," and even if the two axes are colinear, claim 18 as construed still requires "two distinct types of rotation" for the two axes. *Id.* at 33.

As discussed above in Section IV.A.1.a., the FID finds that the prosecution history supports the FID's construction of claim 18 requiring such two distinct types of rotation for the two axes (even if the two axes may be colinear) because the Examiner's amendment changed the claim language regarding the blower's "rotation about an axis" to "a first axis" and separately added the assembly limitation requiring adjustment/rotation about "a second axis." *See* FID at 37 (citing JX-002-244). The Examiner also provided a detailed summary of how the Examiner's amendment placed the claims in condition for allowance over the prior art. *See* JX-002-244 – JX-002-248 (Notice of Allowance and Examiner-Initiated Interview Summary dated August 25, 2011 explaining that "[t]he prior art of record when consider as a whole, alone or in combination, neither anticipates nor renders obvious" claim 72 as amended by the Examiner). Therefore, the FID's findings on how the prosecution history supports the FID's construction requiring "two distinct types of rotation" for the two axes (even if the two axes may

be colinear) is not inconsistent with the *Markman* Order's statement that "nothing in the [Examiner's] amendment . . . indicates that the first axis and the second axis must be different." FID at 31, 33, and 37; Order No. 11 at 25.

### *b. Extrinsic Evidence*

Respondents generally agree that the FID's claim construction is legally correct, but contend that "the ALJ did not cite additional, extrinsic evidence confirming that his construction is correct." Resp. Response at 89 (citing FID at 41). Respondents then point to the deposition testimony of Mr. Pabisz, Dometic's corporate representative and a named inventor on the '351 patent, as relating to "whether one of skill in the art would have understood the dual axes of the disclosed duct element to be part of the claimed invention." *Id.* at 8-9 (citing JX-0010C (Pabisz Dep. Tr.) at 184:9-19,184:20-185:6; JX-0136-024). The Commission agrees that Mr. Pabisz's deposition testimony is extrinsic evidence admitted into the record supporting the FID's construction.

While the Commission affirms the FID's construction of the axis limitation and the directional limitation, which is fully supported by the intrinsic evidence, and supplements the FID's reasoning as explained above, the Commission further supplements the FID's findings with the following extrinsic evidence that is consistent with the intrinsic evidence and further confirms the FID's claim construction.

Ronald Pabisz testified at his deposition, both in his individual capacity and as a corporate representative of Dometic, about the ***two axes of rotation*** as the "crux" of the '351 patent. *See* JX-0010C at 17:17-37:20 (testimony regarding Notice of Corporate Deposition to Dometic including the topics on which Mr. Pabisz has been designated to testify on behalf of Dometic), 81:17-82:15 (testimony regarding challenges for inventing the subject matter of the '351 patent), 184:9-185:14 (testimony regarding the "crux" of the '351 patent). Mr. Pabisz testified that the challenges of inventing the subject matter of the '351 patent included keeping the same dimensions of the air conditioner and "still be able to turn this blower from one direction to the other" and "keep the height" of the air conditioner as "you

try to turn the blower from one direction to the other . . . .” JX-0010C (Pabisz Dep. Tr.) at 81:17-82:15. Mr. Pabisz also testified that “[t]he shape as it’s shown in page – Figures 24 is the real – the crux of the patent here in having a ring that allowed you to have ***two axes*** within the same ring; ***an axis for the blow[er] rotation*** *and* ***an axis for the rotation relative to the shroud***[13] . . . It’s the ***ability for it to have two rotations of axes that’s novel***.” *Id.* at 184:9-19, 185-5-14.

Mr. Pabisz also identified the ***two axes*** at his corporate deposition by marking an axis for “Blower” and another axis for “Shroud.” *See* JX-0136-024 (Pabisz Dep. Ex. 15, which is Figure 24B of the ’351 patent) (shown below on left); JX-0010C (Pabisz Dep. Tr.) at 185:5-13 (shown below on right).




A It's the ability for it to have two rotations of axes that's novel.
Q Okay. And can you take the pen and mark on Figures 24a or maybe I think it's Figure 24b where those two axes roughly would be and what they correlate to?
A (Indicating).
Q And I see you marked blower and shroud, am I reading that correctly?
A Uh-huh (affirmative response).

Mr. Pabisz’s testimony is referring to the duct element **184** in Figure 24 as a “ring” allowing two modes of rotation: (1) a rotation of the "Blower” relative to the duct element about a first axis, and (2) another rotation of the duct element itself relative to the "Shroud” about a second axis. JX-0010C (Pabisz Dep. Tr.) at 184:9-185:14.

---

[13] We note that the ’351 patent specification identifies a “shroud structure” as one of the exterior components of the air conditioner that “houses the compressor, the evaporator and the condenser.” ’351 patent at 4:43-44. In detail, “Figs 1-2 shows an air conditioner **1** . . . a blower **2**, and a shroud structure (FIG. 5) composed of a supply side cover **10**, a return side cover **12** and a heat exchanger cover **14**.” ’351 patent at 6:17-22.

Dometic argued, in its reply post-hearing brief, that Mr. Pabisz's testimony does not support Respondents' proposed construction of the axis and directional limitations because the testimony appears to be referring to the fan blade axis (recited in claim 1), and he "was not being asked about Claim 18 nor the scope of any terms recited therein." CRB at 8 (citing JX-0010C (Pabisz Dep. Tr.) at 184:9-185:13).

We disagree with Dometic's argument that Mr. Pabisz's testimony appears to be referring to the fan blade axis. Mr. Pabisz clearly identified the two axes as "Blower" and "Shroud" in his marking of Figure 24B, and not the fan blade. *See* JX-0136-024 (Pabisz Dep. Ex. 15 showing annotated Figure 24B of the '351 patent) (shown above on left); JX-0010C (Pabisz Dep. Tr.) at 185:5-14 (shown above on right). Mr. Pabisz's identification of the two axes "Blower" and "Shroud" in Figure 24B as being the "crux" of the '351 patent is not only consistent with the specification, but also with his earlier testimony that one of the challenges of inventing the subject matter of the '351 patent was to "keep the height" of the air conditioner as "you try to turn the blower from one direction to the other…." JX-0010C (Pabisz Dep. Tr.) at 81:17-82:15. The specification discloses that "the maximum height of an air conditioner **1** can be restricted by adjusting the orientation in which the blower **2** is fastened to the duct element **184**," and Mr. Pabisz's testimony is consistent with how the patent contemplates restricting the air conditioner's maximum height; namely, by rotating the blower (as opposed to the fan blade) based on how it attaches to the duct element in different orientations. '351 patent at 12:21-24; JX-0010C (Pabisz Dep. Tr.) at 81:17-82:15, 184:9-185:13; JX-0136-024 (Pabisz Dep. Ex. 15).

While Dometic is correct that Mr. Pabisz was not explicitly "being asked about Claim 18 nor the scope of any terms recited therein," he was testifying about the disclosure in Figure 24B, which illustrates the claimed invention of the '351 patent. CRB at 8; JX-0010C (Pabisz Dep. Tr.) at 184:9-185:13 (testifying what Mr. Pabisz regarded as the crux of the '351 patent). This additional extrinsic evidence, which is consistent with the intrinsic evidence, is relevant to understanding the specification,

and further supports the FID's construction of the axis and directional limitations as requiring two modes of rotation by claim 18.

For example, Dometic's claim construction argument that "the axis limitation requires neither two types of rotation nor rotation involving a structural component different from the assembly" such that only a single axis of rotation is sufficient to satisfy claim 18 appears inconsistent with the testimony of its own corporate representative and a named inventor of the '351 patent, Mr. Pabisz. In contrast to Dometic's argument as to the scope of the invention, its corporate representative testified the "crux" of the '351 patent as having ***two axes*** of rotation within the ring (referring to the duct element **184** in Figure 24), where a first axis is for the blower's rotation relative to the duct element, and a second axis for the rotation of the duct element itself relative to the shroud. FID at 25-26, 30 (citing CIB at 16-21); JX-0010C (Pabisz Dep. Tr.) at 184:9-185:14.

Mr. Pabisz's testimony also appears inconsistent with Dometic's argument in its petition that the ALJ used his personal interpretations to improperly "create" an embodiment where "a second mode of blower rotation is accomplished by 'decoupling the duct element from the blower, rotating it a discrete amount, and then recoupling it is a means of rotation'" because such blower rotation "is not described anywhere in the intrinsic evidence, much less shown in any Figure." Compl. Pet. at 19 (citing FID at 34-37, 39). While Mr. Pabisz did not testify to the exact means on how the blower can rotate with respect to the duct element, he nonetheless testified the crux of the '351 patent as describing the blower rotating with respect to the duct element. JX-0010C (Pabisz Dep. Tr.) at 184:9-185:14. As explained in detail above, the specification expressly discloses this mode of rotation. '351 patent at 2:14-17, 12:4-27. Therefore, Mr. Pabisz's understanding of the '351 patent contradicts Dometic's argument that the ALJ "created" an embodiment that is unsupported by the specification.

Lastly, Mr. Pabisz's testimony is consistent with the FID's finding that "a person of ordinary skill in the art would understand that decoupling the duct element from the blower, rotating it a discrete

amount, and then recoupling it is a means of rotation contemplated by the claim." Resp. Response at 8-9 (citing JX-0010C (Pabisz Dep. Tr.) at 184:9-19,184:20-185:6; JX-0136-024); FID at 39. As an inventor of the '351 patent and Dometic's director of engineering, Mr. Pabisz certainly qualifies as a person of ordinary skill in the art,[14] and his testimony is thus highly relevant to the skilled artisan's understanding of the crux of the '351 patent. JX-0010C (Pabisz Dep. Tr.) at 184:9-185:14. "As a general rule, an inventor will be a person of at least ordinary skill in the relevant art, . . . [and] it will be the rare case in which an inventor is not one possessing skill in the art." *Byrne v. Wood, Herron &* oriented toward a first direct[i]on and a second direction," (the "axis limitation") and "the first and seco*Evans, LLP*, 450 F. App'x 956, 964 (Fed. Cir. 2011), *vacated on other grounds*, 568 U.S. 1190 (2013).

Accordingly, based on the previous discussion, the Commission affirms with modification the FID's construction of the claim limitations "the blower being rotatable about [a] first axis so that the outlet can be nd directions point to substantially different lateral sides of the main body" (the "directional limitation") recited in claim 18 with extrinsic evidence as discussed above.

### B. Infringement

The Commission affirms the FID's finding of non-infringement based on Dometic's failure to meet its burden of proof and vacates the ALJ's independent findings that some of the accused products

[14] Mr. Pabisz testified that he has worked as an engineer in the field of marine air conditioners at least since 1996 starting as a quality engineer at Marine Air Systems and became a director of engineering in 2001, which is the same title that he holds at Dometic today. JX-0010C (Pabisz Dep. Tr.) at 9:5-12:3, 13:11-16. Therefore, Mr. Pabisz's engineering experience satisfies the undisputed skill level that a person having ordinary skill in the art of the '351 patent at the time of invention "would have had two or more years of relevant industry experience in the fabrication or design of nautical air conditioning units, and sufficient education to understand such air conditioning units, through university studies or otherwise, with additional experience substituting for education and vice versa." FID at 27-28 (citing Order No. 11 at 9).

(*i.e.*, Mabru SC07, which represents all Mabru accused products) satisfy all limitations of the certain asserted claims.

### 1. Final ID

The FID applies its claim construction discussed *supra* in Section IV.A.1. and finds that Dometic failed to allege or prove that the accused products satisfy the axis and directional limitations requiring two modes of rotation. FID at 25-26, and 42-59. Dometic's theory of infringement of the axis and directional limitations consisted of its argument that all accused products and the DI products have "their blowers affixed to their cylindrical duct elements" and are "never meant to be separate," thereby forming "a unitary structure for purposes of rotation," allowing only one mode of rotation where the blower and the assembly structure, which includes the duct element, rotate together. CIB at 20 and 45 (citing Hearing Tr. (testimony of Dometic's expert, Dr. Paulus) at 369:5-375:16); *see also* FID at 26. Therefore, based on Dometic's theory, the FID finds no infringement of any of the asserted claims, *i.e.*, claims 18-22, because Dometic simply failed to allege or prove that either the accused products or the asserted DI products satisfy the axis and directional limitations requiring two modes of rotation. FID at 26 and 46.

Respondents attempted to argue that "the blower on the Accused Products cannot rotate relative to the duct element, so that neither the axis limitation nor the directional limitation is satisfied." *Id.* at 43 (citing RIB at 35-37). However, this argument was stricken because Respondents failed to raise it in their contentions, which left Respondents with, in essence, "no permissible noninfringement argument." *Id.* (citing RIB at 35; CRB at 12; Hearing Tr. at 12:7-21).

Below is a breakdown of independent claim 18, and the FID's findings about which limitation is satisfied or not satisfied by the accused products:

| Claim 18 (Asserted) | Infringement |
|---|---|
| An air conditioning device for a nautical vehicle including: | Not disputed that this limitation is satisfied. FID at 44. |
| a main body; and a blower including an inlet and an outlet, the inlet being in air communication with the main body, | Not disputed that this limitation is satisfied. FID at 44. |
| the blower being rotatable about [a] first axis so that the outlet can be oriented toward a first direct[i]on and a second direction, and the first and second directions point to substantially different lateral sides of the main body, and<br>(The FID refers to these limitations as the "axis limitation" and the "directional limitation") | As these limitations are construed, Dometic failed to show, by a preponderance of the evidence, that the accused products satisfy this limitation. FID at 45-46. |
| an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet, the assembly including a guiding cover and a cyli[n]drical duct element for maintaining the main body and the blower in air communication with one another, | Not disputed that this limitation is satisfied. FID at 50-52. |
| the duct element having a first base and a second base, and coupled to the blower at the second base, the first base of the duct element dimensioned to correspondingly fit the guiding cover, and the duct element being rotat[a]bly adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet. | Not disputed that this limitation is satisfied. FID at 52-53. |

As summarized in the table above, the FID finds that Dometic failed to meet its burden of proving that any accused products satisfy the axis and directional limitations. *Id.* at 45-46. Dometic argued that the axis limitation is met because "the duct element and the blower operate as a unitary structure during rotation and rotate together about the same axis to orient the direction of the outlet—*i.e.*, the first and second axes of the Accused Products are identical and fall within the scope of Claim 18." *Id.* at 45-46 (citing CIB at 26; Hearing Tr. (Paulus) at 412:11-414:7, 415:1-11, 481:1-483:16 (describing how the duct elements of the accused products are mated to their blowers), 481:24-482:6;

CDX-005.36; JX-0195C at ¶¶ 125-130; CX-0851; CX-0876; CX- 1011; CX-0912). Similarly, Dometic argued that the directional limitation is met because "the blower outlet of the Accused Products can be oriented toward a first direction and a second direction as claimed via rotating the blower/duct element about the same axis." FID at 46 (citing CIB at 27; CX-1069.013; CX-0496; CX-0499; JX-0089.011; JX-0092).

The FID finds that, as the axis and directional limitations are construed, "'the blower being rotatable about [a] first axis' requires rotation of the blower involving a structural component other than the 'assembly for adjusting the blower,' and the two claimed directions must "result[] from rotation about said first axis,'" and that Dometic has failed to show these limitations satisfied under the proper construction. *Id.* at 46. Therefore, the FID finds non-infringement of claim 18 because Dometic failed to show, by a preponderance of the evidence, that the axis and directional limitations are satisfied by the accused products. *Id.* at 26 and 45-46.

For the remaining limitations of claim 18 other than the axis and the directional limitations, the FID finds that Dometic has shown that the accused products meet those limitations as alleged in view of the testimony of Dometic's expert, Dr. Paulus. *Id.* at 43-44, 50-53.

Notwithstanding finding non-infringement based on Dometic's failure of proof according to Dometic's theory of infringement, the ALJ appears to have conducted additional infringement analysis beyond the arguments and issues raised by Dometic by "scour[ing] the record" on his own. *Id.* at 27, 46-50, and 53. Although the FID finds that "Dometic has not met its burden of proving that the axis and directional limitations are met in any Accused Product," it relies upon the ALJ's additional *sua sponte* "[e]xamination of the physical and photographic evidence" to find that "both [axial and directional] limitations are met in the Mabru SC07, but not in the CT-6." *Id.* at 46. Specifically, the FID states that "Mabru SC07, however, shows that the duct element is coupled to the blower by screws placed in four evenly-spaced apertures. Measurement of the distances of the apertures from each other shows that four

orientations of the blower relative to the duct element are possible; the duct element can be rotated 90, 180, or 270 degrees, and then reattached, because the apertures are evenly spaced apart. This was confirmed by manual testing." *Id.* at 48-49 (citing CPX-0002, physical exemplar of the SC07; CX-1012, shown below with "[o]ne such screw . . . on the upper right of the flat portion of the duct element, partially covered by insulation, and the remaining three are completely covered by the insulation."). Based on this additional analysis, the FID finds that "although Dometic has not proven that Mabru's Accused Products meet the axis or directional limitations, in fact those limitations are satisfied in those products." *Id.* at 50.



CX-1012 (Photograph of Mabru SC07 product).

For claims 19-22, the FID finds that "because Dometic has not carried its burden to show that claim 18 is infringed," claims 19-22 that depend from claim 18 are "necessarily not infringed." *Id.* at 53-59. The FID, however, then also continues on to analyze whether the limitations in claim 19 is nonetheless satisfied. *Id* at 53 ("So although it is more likely than not that the Mabru SC07 blower and

duct element can be oriented so that they may be detached, rotated 180 degrees, and reattached, thus satisfying the additional element of claim 19, Dometic cites no evidence of this.”).

**2. Analysis**

The Commission affirms the FID's finding of non-infringement based on Dometic's failure to prove that the accused products satisfy the axis and directional limitations. *See* FID at 42-59; *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 198-99 (2014) (“It is well established that the burden of proving infringement generally rests upon the patentee,” which is not simply procedural, but it is “a substantive aspect of a claim.”). However, the Commission vacates the ALJ's independent findings at pages 46-50 and 53 as discussed below.

***a. The Commission Affirms the FID's Finding of Non-Infringement***

Dometic, in its petition for review, contends that: (1) the FID misapprehends the record, and disregards the evidence presented, Compl. Pet. at 30-38; (2) the FID inconsistently finds that Mabru's accused products (represented by Mabru SC07) satisfy the valid claims, but are not infringed, *id.* at 39-41; and (3) if the Commission were to find in Dometic's favor with respect to the claim construction of the axis and the directional limitations and Dometic's argument about the FID's error in finding non-infringement would result in infringement of the accused products, *id*. at 39-44. Dometic's arguments are unpersuasive for the reasons described below.

*First*, Dometic contends that it presented evidence of the first axis and the second axis in the accused products as well as the DI products, but the FID improperly finds that Dometic failed to identify the first and second axes at issue. *Id.* at 30-31. Dometic essentially argues that it relied on the *Markman* Order's construction of claim 18 that “the ‘first axis’ and the ‘second axis’ need not be different,” and presented evidence that the first axis and the second axis being identical in the accused products and the DI products meet the limitations at issue. *Id.* at 31 (citing Order No. 11 at 26). However, as described

above in Sections IV.A.1. and IV.A.2.a., Dometic's argument is based on a misunderstanding of the procedural history and the ALJ's claim construction in this investigation wherein the ALJ clarified, revisited, and further construed the construction of the first and second axes limitations and consequently as requiring two modes of rotation in claim 18. As explained, the parties were put on notice of the claim construction issue for the axis and directional limitations in the *Markman* Order and again when the ALJ denied Dometic's motion for summary determination on the technical prong. FID at 29-30 (citing Order No. 11 at 25); *see also id.* at 23-24 ("[Dometic] was on notice that the claim apparently covers a blower rotatable relative to the duct element, or rotatable in itself, or otherwise satisfying the "rotat[ed] about [the] first axis" limitation of claim 18, as distinct from the "[rotatably] adjustable . . . about the second axis" duct element."); FID at 25 (citing Order No. 20 at 4).

The FID also properly considers and rejects Dometic's argument that these limitations are met by the duct element and the blower operating as "a unitary structure during rotation and rotate together about the co-linear first and second axes to orient the direction of the blower outlet—*i.e.*, the first and second axes of the Accused Products are identical and fall within the scope of Claim 18." FID at 46; Compl. Pet. at 34. Because this theory entirely omits the two modes of rotation as discussed above in Sections IV.A.1. and IV.B.1. and no evidence was presented to meet these limitations, the FID properly finds that Dometic failed to present evidence on the two modes of rotations as required by the FID's claim construction of the axis and directional limitations. FID at 46.

*Second*, Dometic contends that the FID's inconsistent finding "represents factual and legal error, and indeed an abuse of discretion, mandating Commission review and reversal." Compl. Pet. at 39-40. Dometic points to the FID's finding that the Mabru accused products satisfy all limitations of the certain asserted claims (based on the ALJ's independent analysis of Mabru SC07 as the representative product for the Mabru accused products) as being inconsistent with the FID's finding that none of the asserted claims are infringed based on a failure of proof. *Id.* As discussed below in Section IV.B.2.b., the

Commission vacates the FID's inconsistent findings because Dometic did not present evidence or argument that would warrant the ALJ's independent analysis. As a result of the vacatur, there is no inconsistency with the FID's noninfringement findings based on failure of proof. Therefore, this argument is moot.

*Third,* Dometic contends that finding in Dometic's favor with respect to the claim construction of the axis and the directional limitations and Dometic's argument about the FID's error in finding non-infringement would result in infringement of the accused products. Compl. Pet. at 39-44. As explained above in Section IV.A.2., Dometic's arguments with respect to the FID's claim construction of the axis and directional limitations are not persuasive. Dometic's arguments with respect to the FID's finding of non-infringement based on Dometic's showing of a single mode of rotation in the accused products are also not persuasive.

Accordingly, the Commission affirms the FID's finding that Dometic failed to satisfy its burden of proof to show infringement under the proper claim construction of claim 18 and its dependent claims. As explained below, the Commission vacates the FID's additional independent analysis for the of Mabru SC07 product.

Respondents, in their petition for review, contend that: (1) the FID errs in finding that CitiMarine imports its accused products without a "Duct Ring" which prevents rotation of a blower around a full 270 degrees, Resp. Pet. at 8-14; (2) the FID errs in finding that CitiMarine CT-6 and Mabru SC07 are representative of the accused products, *id.* at 14-15; (3) the ALJ abused his discretion by excluding Respondents' failure of proof arguments based on Respondents' proposed construction of the axis and directional limitations, *id.* at 27-29; and (4) the FID errs in finding infringement of certain accused products for which Dometic failed to present its case, *id*. at 29-34.

*First*, Respondents contend that the FID's finding that CitiMarine imports its accused products without a "Duct Ring" is erroneous. *Id.* at 8-14. As explained in the FID, the '351 patent refers to this

duct ring component as a "duct collar **216**," shown in Figure 28, below. FID at 55-56 (citing '351 patent at 11:37-39, Fig. 28); '351 patent at Fig. 28 (shown below).




FIG. 28

'351 patent at Fig. 28.

The implication of the FID's finding that the CitiMarine accused products are imported *without* a "Duct Ring" is that they satisfy the 270-degree rotational requirement of claim 21.[15] In any event, regardless of this finding, the FID ultimately finds that the CitiMarine accused products do not infringe claim 21 because claim 18, from which that claim depends, is not infringed. The Commission affirms the FID's finding that "because Dometic has not carried its burden to show that claim 18 is infringed, claim 21 necessarily is not infringed." FID at 57. Because the finding that the CitiMarine accused products do not infringe claim 18 is dispositive with respect to claim 21, the Commission does not need

[15] Claim 21 recites: "The air conditioning device of claim 18, wherein the blower is rotatable by more than 270 degrees." '351 patent at cl. 21. The accused products *without* a duct ring attached have a blower that can rotate by more than 270 degrees and therefore satisfy claim 21. FID at 54-57. The FID finds that the CitiMarine accused products are imported *without* a duct ring attached, and therefore satisfy claim 21. *Id.* In contrast, the FID finds that the Mabru accused products are imported *with* a duct ring attached, and therefore do not satisfy claim 21. *Id.*

to reach the issue of whether the additional limitation added by claim 21 is satisfied by the CitiMarine accused products. *Beloit Corp.*, 742 F.2d at 1423 (Commission may take "no position" on a single issue, which may often save the Commission, the parties, and the Federal Circuit substantial unnecessary effort).

*Second*, Respondents dispute the FID's factual determination that CitiMarine CT-6 and Mabru SC07 are representative of the accused products. Resp. Pet. at 14-16. As discussed above in Section II.D.1., the FID considers evidence from both parties and credits, for example, the deposition testimony of Liang Ming, Chief Executive Officer of the Shanghai Respondents, that the accused products "her companies make for CitiMarine and Mabru are 'structurally . . . identical except for their BTU capacity.'" FID at 8 (citing JX-0003C at 26:21-24, 35:5-36:8); *see also* Hearing Tr. at 397:21-398:14 (Dr. Paulus, Dometic's expert, quoting Ms. Ming's deposition testimony). Dometic, in its post-hearing brief, also provided additional evidence supporting representativeness, such as the deposition testimony of Mr. Ripoll (CitiMarine's corporate representative) and Mr. Mabru (Mabru's corporate representative). CIB at 10-12 (citing JX-0007C (Ripoll Tr.) and JX-0008C (Mabru Tr.)). Mr. Ripoll testified that "the CT units," "[t]hey're all the same, exactly the same. They just have different location of stuff. They have different connections maybe." JX-0007C (Ripoll Tr.) at 172:19-173:3. Mr. Mabru testified that Mabru products do not have different installation manuals because, "[i]n function and installation, they're very similar units. So we didn't find the need to have different manuals for different systems." JX-0008C (Mabru Tr.) at 61:23-62:7. Dometic also argued that its expert, Dr. Paulus, provided his expert opinion at the hearing that such evidence "confirmed that Mabru SC07 and CitiMarine CT-6 are representative of the Mabru and CitiMarine accused products, respectively." CIB at 12 (citing Hearing Tr. at 397:21-410:18, JX-0089, JX-0090; JX-0111). The FID acknowledges that "Respondents' arguments against representativeness rely largely on attacking the methodology of Dometic's expert Dr. Paulus, and are unconvincing in view of the documentary evidence and lay testimony." FID at 9.

**PUBLIC VERSION**

Respondents disagree and argue that Dometic failed to prove CitiMarine CT-06 product as representing all CitiMarine accused product, particularly as it relates to claim 21 because Dometic has not shown that the blowers in other accused products have a 270-degree rotation. Resp. Pet. at 14-16. Respondents, however, do not argue and have not shown that the blowers in other accused products are in fact not capable of achieving 270-degree rotation. *Id.* Instead, Respondents argue that Dometic and its expert, Dr. Paulus, failed to examine other accused products. *Id.* Respondents mainly rely on the cross-examination of Dr. Paulus at the hearing, shown below, to argue that he did not analyze how the varying size of the accused products affects their rotation. *Id.* (citing Hearing Tr. at 445:15-446:16).

> Q. You didn't analyze how that change in size affects the overall amount of rotation?
> A. No. I based it on the knowledge that they were representative, and in general, ***as they get bigger, there's more room for rotation, and they all function the same way, they have the same rotational elements***, so . . .
> Q. What do you base that on, that opinion you just provided?
> A. I read ***a lot of literature about the other products***.
> Q. But not based on any analysis of the products; right?
> A. Well, no. ***There's measurements in the different material that come with the products, so I did see how the widths and depths would change and the function of how the drain pan, its shape. I looked at all of those things***.
> Q. That could change the amount rotation; right?
> A. Potentially.
> Q. Potentially. Did you calculate a specific amount of rotation that could be achieved by the CT or the SC07?
> A. I observed that it was more than three-quarters of the way around.
> Q. 271 or more?
> A. Correct.
> Q. That's your opinion, it's 271 or more?
> A. Well, it's greater than 270 is my opinion.

Hearing Tr. at 445:15-446:16 (Cross-examination of Dr. Paulus) (emphasis added).

In view of Dr. Paulus' testimony shown above, the Commission is not persuaded by Respondents' argument that Dometic failed to consider how the varying size of the accused products affects their rotation. Resp. Pet. at 14-16. While Dr. Paulus may not have physically examined the other accused products, he testified that he examined "a lot of literature about the other products" and all

of those "measurements in the different material that come with the products," so he "did see how the widths and depths would change" and applied his understanding that "as they get bigger, there's more room for rotation, and they all function the same way, they have the same rotational elements." Hearing Tr. at 445:15-446:16 (Cross-examination of Dr. Paulus) (shown above). Based on review of the evidence, the Commission does not find the FID's factual determination on this issue to be erroneous. The Commission therefore affirms the FID on this issue.

*Third*, Respondents contend that the ALJ abused his discretion by excluding Respondents' failure of proof argument for both the accused products and the DI products, but acknowledge that this "appears to be harmless error" because the FID nonetheless reaches the same conclusion. *Id.* at 27-28. As discussed above in Section IV.B.1., the ALJ excluded Respondents' failure of proof argument because Respondents did not raise it in their contentions. FID at 43 (citing RIB at 35; CRB at 12; Hearing Tr. at 12:7-21). Respondents do not appear to dispute the fact that such non-infringement argument was not raised in their contentions. Resp. Pet. at 28. Instead, Respondents explain that although the ALJ identified a potentially unresolved claim construction issue regarding the axis and directional limitations in Order Nos. 11, 19, and 20, Dometic "never sought to amend their contentions to address the unresolved claim construction issue or its impact on infringement or technical prong." *Id.* (citing FID at 30, Order Nos. 11, 19, and 20). Because Dometic did not amend their contentions, Respondents argue that "there were essentially no contentions on the issue to which Respondents could respond." *Id.*

The Commission finds that the ALJ reasonably excluded these arguments. As Respondents acknowledge, the parties were put on notice of this issue at least since the *Markman* Order. *Id.* (citing FID at 30, Order Nos. 11, 19, and 20). Based on the notice from the ALJ, Respondents could have preserved the failure of proof issue as a possible non-infringement argument regardless of whether Dometic amended or did not amend their contentions. In any event, Respondents admit that even if the

ALJ abused his discretion by excluding the failure of proof argument (but he did not), this was a harmless error. *Id.* at 27-28. Although we find no error in the ALJ's exclusion of Respondents' non-infringement arguments, the FID also appropriately found that Dometic did not satisfy its own burden of proving infringement. Therefore, this issue has no bearing on the outcome of this investigation.

*Fourth*, Respondents request that the Commission review the ALJ's failure to address infringement of all products accused by Dometic, and "affirmatively" find that Dometic "failed to meet their burden to prove infringement, entitling Respondents to a specific finding of non-infringement." Resp. Pet. at 29-34. Specifically, Respondents argue that the FID fails to include affirmative finding of non-infringement for the products Dometic identified early in this investigation, but ultimately did not accuse as infringing the asserted claims, *i.e.*, claims 18-22, at the evidentiary hearing. *Id.*

As Dometic explains, however:

> [D]uring fact discovery, Dometic initially identified a number of non-self-contained marine air conditioners as potentially infringing the Asserted Patent. After further discovery, however, Dometic substantially narrowed its contentions to assert infringement only against Respondents' self-contained marine air conditioners (*i.e.,* dropping infringement allegations against Respondents' air handlers, chillers, and evaporators). Indeed, Dometic made this abundantly clear in its final infringement contentions, removing many products from the earlier list and stating it was 'no longer asserting infringement by products other than the self-contained units . . . .'

Compl. Response at 48.

Accordingly, the products Dometic withdrew during fact discovery are not before the Commission for adjudication and the ALJ reasonably declined to make infringement findings as to those products.

***b. Vacating the ALJ's Independent Findings***

The Commission finds that the FID's findings that the Mabru accused products satisfy all limitations of the asserted claims (based on the ALJ's independent analysis of Mabru SC07 as the representative product of the Mabru accused products) are inconsistent with its finding of non-

infringement and vacates the FID's additional findings that are beyond the issues and arguments raised by the parties.

*First*, the FID finds that Dometic did not present any argument or evidence that the Mabru products infringe the asserted claims based on the proper construction of claim 18. Specifically, Dometic presented no argument or evidence in its pre-hearing and post-hearing briefs, nor did it present argument or evidence at the hearing under any infringement theory other than the "unitary structure" theory that the duct element cannot rotate independently of the blower. *See* CIB at 20 ("[A]ll of the physical products in evidence in this Investigation have their blowers affixed to their cylindrical duct elements—whether by a weld or numerous screws that bolt the duct to the bower—that make said duct elements and blowers a unitary structure for purposes of rotation, such that the duct element cannot rotate independently of the blower and vice versa."); Complainants' Pre-Hearing Brief ("CPB") at 35-43; CIB at 15-35; FID at 42-53. As discussed above, in light of the FID's construction of the axis and direction limitations and Dometic's theory that all the accused products have a unitary structure with regard to the blower and duct element, the FID finds no infringement for any of the asserted claims. The record, therefore, provides no basis for the FID to present an alternative analysis that was never argued before the ALJ.

*Second*, despite finding no infringement based on Dometic's theory of its case, the FID conducts its own infringement analysis and finds that infringement is satisfied for the Mabru SC07 accused product. The FID explains that the duct element of the Mabru SC07 is coupled to the blower by screws placed in four evenly-spaced apertures. The FID reasons that the screws can be removed, and the blower can be rotated 90, 180, or 270 degrees, and then reattached because the apertures are evenly spaced apart. FID at 48-50. According to the FID, this satisfies the axis and direction limitations as construed.

The FID's independent infringement findings that the blower of the Mabru SC07 can be rotated with respect to the duct element are directly contrary to Dometic's theory that said duct elements and blowers constitute "a unitary structure for purposes of rotation, such that the duct element cannot rotate independently of the blower." CIB at 20; *see also* CPB at 35-4, CIB at 15-35.

Moreover, by conducting his own examination of the physical and photographic evidence including manual inspection and manipulation of the accused products for an infringement analysis that was directly contrary to the theory raised by Dometic, the ALJ may have deprived the parties, and in particular Respondents, of notice of that novel analysis or an opportunity to be heard as to whether that analysis was correct. *See In re Magnum Oil Tools, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016) (holding that under the APA, an administrative agency "must base its decision[s] on arguments that were advanced by a party, and to which the opposing party was given a chance to respond."). Accordingly, the Commission vacates the ALJ's independent fact findings and *sua sponte* infringement analysis.

Therefore, the Commission vacates the following statements in the FID regarding claim 18:

- "Examination of the physical and photographic evidence nonetheless shows that both limitations are met in the Mabru SC07, but not in the CT-6. In the CitiMarine CT-6, the duct element is coupled to the blower by five screws:" FID at 46-47 (citing CX-0880).

- "As depicted, a duct element is coupled to blower, and is detached from the main body of the CT-6. The duct element has five apertures (where one is only slightly visible given the camera perspective), which are arranged in a five pointed star pattern or pentagon-like shape, with each aperture containing a screw. Measurement of the distances of the apertures from each other shows that when all five screws are removed, the blower and duct element can be rotated relative to each other, but there is no amount of rotation where all five apertures line up, such that all five screws can be used to reattach the blower and duct element at other than the original orientation. *See* CPX-0001; CX-0880. This was manually tested; when the blower is rotated approximately 60-70 degrees (in either direction), at most four of five screws can be inserted, and the greater the rotation the fewer the apertures that line up. Thus, without drilling new apertures, only one orientation of the blower relative to the duct element is possible where all five screws secure the two components." *Id.* at 47.

- "And attaching the blower and duct element after rotation with fewer than the intended number of screws surely does not fall within the scope of 'rotatable' about an axis. So the duct element cannot be rotated 90, 180, or 270 degrees, or any other amount, relative to the blower and then reattached, simply because the screw holes do not line up. Nor is there any

other evidence of the required 'rotatab[ility].' Therefore, the axis and directional limitations are not satisfied in the CitiMarine CT-6." *Id.* at 48.

- "Examination of the Mabru SC07, however, shows that the duct element is coupled to the blower by screws placed in four evenly-spaced apertures. Measurement of the distances of the apertures from each other shows that four orientations of the blower relative to the duct element are possible; the duct element can be rotated 90, 180, or 270 degrees, and then reattached, because the apertures are evenly spaced apart. This was confirmed by manual testing. *See* CPX-0002 (physical exemplar of the SC07). To be sure, the testimony on this point is equivocal, because although Dr. Paulus initially testified that the duct element and blower were attached by screws, he later agreed that they were attached by welds. *See* Tr. (Paulus) at 482:7-17. The confusion results from the insulation covering the screws:" *Id.* at 48-49 (citing CX-1012).

- "One such screw can be seen in the photograph above on the upper right of the flat portion of the duct element, partially covered by insulation, and the remaining three are completely covered by the insulation. *See* CPX-0002. The welds appear to be how the cylindrical portion of the duct element is attached to the flat portion of the duct element, rather than how the duct element is attached to the blower." *Id.* at 49.

- "In any event, insulation adjustment and manual disassembly confirmed that the duct element and blower can be detached, rotated 90, 180, 270, and 360 degrees, and then reattached (at each orientation) using all four screws. Moreover, although such rotation likely requires detaching the duct element from the guiding cover to gain access to the four screws, the SC07 installation manual shows that no other component interferes with rotation, by at least 90 degrees, to either side of the main body with respect to a vertical plane. *See* CX-1069 at 13. Therefore, although Dometic has not proven that Mabru's Accused Products meet the axis or directional limitations, in fact those limitations are satisfied in those products." *Id.* at 49-50.

The Commission also vacates the following statements in the FID regarding claim 19:

- "So although it is more likely than not that the Mabru SC07 blower and duct element can be oriented so that they may be detached, rotated 180 degrees, and reattached, thus satisfying the additional element of claim 19, Dometic cites no evidence of this. And the CitiMarine CT-6 blower is incapable of so rotating." *Id.* at 53.

### C. Domestic Industry – Technical Prong

The Commission affirms the FID's finding that the technical prong is not satisfied based on Dometic's failure of proof and vacates certain of the ALJ's independent findings.

### 1. Final ID

As described above in Section IV.B.1., Dometic argued that "every physical product in evidence, Accused and DI, has a 'unitary structure' to the blower and duct element, 'such that the duct element cannot rotate independently of the blower and vice versa.'" FID at 26 (citing CIB at 20). Therefore, consistent with its infringement analysis, the FID finds that the technical prong is not satisfied because the DI products "do not satisfy either the axis limitation or the directional limitation, and Dometic makes no effort to prove that they do." *Id.* at 61.

The FID recognizes that Respondents raised two arguments on why the DI products fail to satisfy the asserted claims, *i.e.*, claims 18-22. *Id.* at 60. *First*, Respondents argued that the DI products fail to satisfy the axis and directional limitations, but the ALJ struck this argument for the same reason he struck Respondents' similar non-infringement argument, *i.e.*, because Respondents failed to preserve this argument in their contentions. *Id.* at 60 (citing RIB at 45; CRB at 22-23; Hearing Tr. at 12:7-24). *Second*, Respondents argued that the DI products "lack a 'cylindrical' duct element" because the plain language definition of "'cylindrical' means true cylinder," and the duct element of the DI products do not have true cylinder-shaped duct element. RIB at 44; FID at 60-61 (comparing Fig. 24B with CX-0956, picture of duct element on DTG, one of Dometic's DI product lines, shown below).

**PUBLIC VERSION**




FIG. 24B



’351 patent at Fig. 24B; CX-0956.

The FID rejects Respondents’ second argument as meritless because “a construction that excludes the preferred embodiment is ‘rarely, if ever, correct,’” and the DI products (as illustrated in CX-0956 showing DTG’s duct element, shown above on the right) “possess duct elements shaped like the same asymmetric truncated cones found in one of the two embodiments” as disclosed in Figure 24B (shown above on the left). FID at 60-61 (citing *Vitronics*, 90 F.3d at 1583). Therefore, the FID finds that the technical prong is not satisfied because Dometic failed to meet its burden of proving that the axis and directional limitations are met in the DI products. *Id.* at 62-63.

The FID recognizes that Dometic made the same arguments it made for infringement, that the axis and directional limitations are met in the DI Products because “the duct element and the blower operate as a unitary structure during rotation and rotate together about the same axis to orient the direction of the outlet—*i.e.*, the first and second axes of the DI Products are identical and fall within the scope of Claim 18.” *Id.* at 62 (citing CIB at 45). Accordingly, the FID rejects Dometic’s arguments for the same reasons as it finds no infringement based on the FID’s construction of the axis and directional

limitations. *Id.* at 63. Specifically, the FID finds that "Dometic has not shown, by a preponderance of the evidence, that the DI Products meet either requirement." *Id.* at 26 (citing relevant caselaw) and 63.

However, similar to the ALJ's independent infringement analysis described above in Section IV.B.1., the ALJ appears to have conducted additional DI analysis beyond the arguments raised by the parties, by performing "manual disassembly, rotation, and attempted reattachment of the screws" of "both representative DI Products (the DTG (CPX-0003) and Voyager (CPX-0006))." *Id*. at 26-27 and 63. Specifically, the FID finds that the DI Products have "an asymmetric five-aperture configuration for attaching the duct element to the blower," such that "only one orientation is possible where all five apertures line up so that all five screws secure the duct element to the blower." *Id*. at 62-63 (citing CX-0880 and CX-0956, shown below). Based on this additional manual inspection and manipulation of the DI products, the FID also finds that the DI products do not satisfy the axis and directional limitations. *Id.* at 63.





CX-0880; CX-0956.

### 2. Analysis

#### *a. The Commission Affirms the FID's Finding that the Technical Prong is Not Satisfied*

Because there is no distinction between the issue of infringement and technical prong in this case, in keeping with the Commission's determination regarding infringement, the Commission similarly affirms the FID's finding that the technical prong of the domestic industry is not satisfied based on Dometic's failure of proof. That is, Dometic failed to allege or prove that its DI products satisfy the axis and directional limitations as properly construed by the FID requiring two modes of rotation. FID at 59-67. Dometic presented no argument or evidence in its pre-hearing and post-hearing briefs, nor did it present argument or evidence at the hearing under any theory about the DI's technical prong other than the "unitary structure" theory allowing only one mode of rotation that the FID acknowledges. *See* CPB at 51-62; CIB at 42-51; FID at 59-67.

Respondents, in their petition for review, contend that: (1) the ALJ abused his discretion by excluding Respondents' failure of proof arguments based on Respondents' proposed construction of the axis and directional limitations, Resp. Pet. at 27-29; and (2) the ALJ's finding that the DI products contain a "cylindrical" duct element is legally erroneous, *id.* at 3-8.

The Commission rejects Respondents' abuse of discretion argument for the same reasons discussed *supra* in Section IV.B.2.a.

For their second argument, Respondents again contend that the duct element in the DI products lacks the "true cylinder shape" allegedly required under the plain meaning of "cylindrical" for the claim term "cylindrical duct element." *Id.* at 3-8. The Commission does not find this argument to be persuasive. As described above, the FID finds that the duct element in the DI products is shaped like the same duct element illustrated in Figure 24B of the '351 patent. FID at 60-61 (describing the duct

element shape as "asymmetric truncated cones") (comparing Fig. 24B with CX-0956, shown above in Section IV.C.1.).

In addition, the '351 specification also describes that the duct element's cylindrical shape can be "substantially described as a conical cylinder." '351 patent at 10:23-25; *see also id.* at 12:24-27 ("Moreover, the conical cylinder shape of the duct element **184** and the curvature **178** of the guiding cover **170** contribute to a smoother air flow within the air conditioner **1**."). Nothing in the '351 patent suggests that the "cylindrical duct element" as claimed cannot have "a conical cylinder shape" as described in the specification, or a "asymmetric truncated cone" shape illustrated in Figure 24B of the '351 patent. *Id.*; FID at 60-61. Therefore, the Commission finds that the FID properly rejects Respondents' argument because "a construction that excludes the preferred embodiment, as described in Figure 24 or preferred embodiments described in the specification, is 'rarely, if ever, correct.'" *Vitronics*, 90 F.3d at 1583; '351 patent at 10:23-25, 12:24-27, Figs. 22, 24, and 25.

Accordingly, the Commission affirms the FID's DI findings based on Dometic's failure of proof.

***b. Vacating the ALJ's Independent Findings***

Similar to the infringement analysis discussed above in Section IV.B., Dometic presented no argument or evidence for the DI's technical prong other than the "unitary structure" theory that the FID finds, and the Commission affirms, to be insufficient to satisfy the DI's technical prong as discussed above. *See* CPB at 51-62; CIB at 42-51; FID at 59-67. The record, therefore, provides no basis for the FID to present an alternative analysis that was never argued before the ALJ.

Accordingly, for the reasons discussed above with regard to the ALJ's independent infringement analysis, the Commission also vacates the following statements in the FID regarding whether the technical prong is satisfied by the DI products for claim 18:

- "But the DI Products, like CitiMarine's Accused Products and unlike Mabru's Accused Products, have an asymmetric five-aperture configuration for attaching the duct element to the blower:" FID at 62-63 (citing CX-0880; CX-0956).

PUBLIC VERSION

- "Although the absolute distances between each pair of apertures in the DI Products differ from the distances in the CT-6—they are closer together in the DI Products—the relative orientations of the five apertures are clearly virtually identical." *Id.* at 63.
- "More to the point, manual disassembly, rotation, and attempted reattachment of the screws confirmed that both representative DI Products (the DTG (CPX-0003) and Voyager (CPX-0006)) suffer from the same problem as the CT-6: only one orientation is possible where all five apertures line up so that all five screws secure the duct element to the blower." *Id.* at 63.

### D. Invalidity

The Commission has determined to review the FID's validity findings (FID at 68-87) and, on review, takes no position on these issues. The Commission finds no violation of section 337 based on its finding that claims 18-22 of the '351 patent are not infringed by the accused products and not practiced by the DI products. Thus, the Commission need not reach the issue of invalidity of these claims. *Beloit Corp.*, 742 F.2d at 1423 (Commission may take "no position" on a single issue, which may often save the Commission, the parties, and the Federal Circuit substantial unnecessary effort).

## V. CONCLUSION

The Commission has considered all of the other arguments by the parties and does not find them persuasive. Therefore, for the reasons set forth herein, the Commission determines that Dometic has not established a violation of section 337 by Respondents with respect to claims 18-22 of the '351 patent. Accordingly, the investigation is terminated with a finding of no violation of section 337.

By order of the Commission.

Lisa R. Barton
Secretary to the Commission

Issued: March 11, 2024

**UNITED STATES INTERNATIONAL TRADE COMMISSION**

**Washington, D.C.**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN MARINE AIR CONDITIONING SYSTEMS, COMPONENTS THEREOF, AND PRODUCTS CONTAINING THE SAME** | **Inv. No. 337-TA-1346** |

**NOTICE OF INITIAL DETERMINATION ON VIOLATION OF SECTION 337**

Administrative Law Judge Cameron Elliot

(December 8, 2023)

On this date, I issued an initial determination on violation of section 337 in the above-referenced investigation. Below are my Initial Determination and the Conclusions of Law from said filing, which are a matter of public record. A complete public version of the Initial Determination will issue when all the parties have submitted their redactions and I have had an opportunity to review such redactions.

**SO ORDERED.**

Cameron Elliot
Administrative Law Judge

**CONCLUSIONS OF LAW**

1. The importation requirement of Section 337 is satisfied for all Respondents.

2. Dometic has not proven infringement of any claim of U.S. Patent No. 8,056,351.

3. Respondents have not proven the invalidity of claims 18-22 of U.S. Patent No. 8,056,351.

4. Dometic has not proven the existence of articles protected by any claim of U.S. Patent No. 8,056,351.

5. There is no violation of section 337 with respect to U.S. Patent No. 8,056,351.

**INITIAL DETERMINATION AND ORDER**

Based on the foregoing, it is my Initial Determination that there is no violation of Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain marine air conditioning systems, components thereof, and products containing the same, involving the asserted claims of U.S. Patent No. 8,056,351.

[redacted]

**UNITED STATES INTERNATIONAL TRADE COMMISSION**

**Washington, D.C.**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN MARINE AIR CONDITIONING SYSTEMS, COMPONENTS THEREOF, AND PRODUCTS CONTAINING THE SAME** | **Inv. No. 337-TA-1346** |

**INITIAL DETERMINATION ON VIOLATION OF SECTION 337 AND RECOMMENDED DETERMINATION ON REMEDY AND BOND**

Administrative Law Judge Cameron Elliot

(December 8, 2023)

Pursuant to the Notice of Investigation and Rule 210.42(a) of the Rules of Practice and Procedure of the United States International Trade Commission, this is my Initial Determination in the matter of *Certain Marine Air Conditioning Systems, Components Thereof, and Products Containing the Same*, Investigation No. 337-TA-1346.

[redacted]

**TABLE OF CONTENTS** **Page**


I. INTRODUCTION ..... 1
A. Procedural Background ..... 1
B. The Parties ..... 2
C. The Asserted Patent and Claims ..... 4
D. Products at Issue ..... 6
1. Accused Products ..... 7
2. Domestic Industry Products ..... 9
II. STANDARDS OF LAW ..... 9
A. Standing ..... 9
B. Claim Construction ..... 10
C. Infringement ..... 13
D. Domestic Industry ..... 16
1. Technical Prong ..... 16
2. Economic Prong ..... 17
E. Invalidity ..... 18
1. 35 U.S.C. § 101 ..... 18
2. 35 U.S.C. § 102 ..... 19
3. 35 U.S.C. § 103 ..... 19
4. 35 U.S.C. § 112 ..... 21
III. OVERVIEW ..... 22
IV. IMPORTATION AND STANDING ..... 27
V. U.S. PATENT NO. 8,056,351 ..... 27
A. Level of Ordinary Skill in the Art ..... 27
B. Claims at Issue ..... 28
C. Claim Construction ..... 29
D. Infringement ..... 42
1. Claim 18 ..... 44
a. An air conditioning device for a nautical vehicle including: a main body; and a blower including an inlet and an outlet, the inlet being in air communication with the main body ..... 44

[redacted]


b. the blower being rotatable about [a] first axis so that the outlet can be oriented toward a first direct[i]on and a second direction, and the first and second directions point to substantially different lateral sides of the main body, and ........ 45

c. an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet, the assembly including a guiding cover and a cylindrical duct element for maintaining the main body and the blower in air communication with one another, ........ 50

d. the duct element having a first base and a second base, and coupled to the blower at the second base, the first base of the duct element dimensioned to correspondingly fit the guiding cover, and ........ 52

e. the duct element being rotat[a]bly adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet. ........ 52

2. Claim 19 ........ 53

3. Claim 20 ........ 53

4. Claim 21 ........ 54

5. Claim 22 ........ 57

E. Domestic Industry – Technical Prong ........ 59

1. Claim 18 ........ 61

a. An air conditioning device for a nautical vehicle including: a main body; and a blower including an inlet and an outlet, the inlet being in air communication with the main body ........ 61

b. the blower being rotatable about [a] first axis so that the outlet can be oriented toward a first direct[i]on and a second direction, and the first and second directions point to substantially different lateral sides of the main body, and ........ 62

c. an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet, the assembly including a guiding cover and a cylindrical duct element for maintaining the main body and the blower in air communication with one another, ........ 63

d. the duct element having a first base and a second base, and coupled to the blower at the second base, the first base of the duct element dimensioned to correspondingly fit the guiding cover, and ........ 64

[redacted]


e. the duct element being rotat[a]bly adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet. ....65

2. Claim 19 ....66

3. Claim 20 ....66

4. Claim 21 ....67

5. Claim 22 ....67

F. Validity ....68

1. Prior Art ....68

2. Anticipation ....70

a. Vector Compact ....70

b. Vector Rotary ....75

3. Obviousness ....77

4. 35 U.S.C. § 101 ....81

5. 35 U.S.C. § 112 Indefiniteness ....86

VI. DOMESTIC INDUSTRY - ECONOMIC PRONG ....87

VII. CONCLUSIONS OF LAW ....87

VIII. RECOMMENDED DETERMINATION ON REMEDY AND BOND ....88

IX. INITIAL DETERMINATION AND ORDER ....93

[redacted]

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| CDX | Complainants' Demonstrative Exhibit |
| CIB | Complainants' Revised Initial Post-Hearing Brief |
| CPB | Complainants' Pre-Hearing Brief |
| CPX | Complainants' Physical Exhibit |
| CRB | Complainant's Reply Post-Hearing Brief |
| CX | Complainants' Exhibit |
| Tr. | Hearing Transcript |
| JX | Joint Exhibit |
| RDX | Respondents' Demonstrative Exhibit |
| RIB | Respondents' Initial Post-Hearing Brief |
| RPB | Respondents' Pre-Hearing Brief |
| RPX | Respondents' Physical Exhibit |
| RRB | Respondents' Reply Post-Hearing Brief |
| RX | Respondents' Exhibit |

[redacted]

# I. INTRODUCTION

## A. Procedural Background

Complainants Dometic Corporation and Dometic Sweden AB (together, "Dometic" or "Complainants") filed the complaint underlying this investigation on November 7, 2022. The complaint alleged respondents Citimarine L.L.C., Mabru Power Systems, Inc., Shanghai Hopewell Industrial Co., Ltd., and Shanghai Hehe Industrial Co., Ltd. (together, "Respondents") import or sell in connection with an importation certain marine air conditioning systems and components thereof that infringe one or more claims of U.S. Patent No. 8,056,351 ("the 351 Patent", or the "Asserted Patent").

By publication of a notice in the *Federal Register* on December 13, 2022, the U.S. International Trade Commission ordered that:

> Pursuant to subsection (b) of section 337 of the Tariff Act of 1930, as amended, an investigation be instituted to determine whether t there is a violation of subsection (a)(1)(B) of section 337 in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain products identified in paragraph (2) by reason of infringement of one or more of claims 1-5, 7, 11, and 17-22 of the '351 patent, and whether an industry in the United States exists as required by subsection (a)(2) of section 337[.]

87 Fed. Reg. 76216 (December 13, 2022).

On December 7, 2022, the investigation was reassigned to me. EDIS Doc. ID 785899. On January 5, 2022, I set a target date of April 11, 2024, for completion of this investigation. Order No. 4. Also, on January 5, 2022, I set a *Markman* hearing date of April 18, 2023, and the evidentiary hearing for September 18-22, 2023. Order No. 5. The *Markman* hearing was canceled on March 23, 2023, and the parties' claim construction disputes were resolved on May 1, 2023. Order Nos. 7, 11.

On June 12, 2023, Respondents moved (1346-009) for summary determination of invalidity based on anticipation and/or obviousness for claims 1-5, 7, and 18-22 of the 351 Patent.

[redacted]

On July 18, 2023, the motion was granted in part by determining claims 1, 2, 4, 5, and 7 were invalid as anticipated by the Vector Compact product. Order No. 19. On September 13, 2023, the Commission determined to review Order No. 19 and, on review, to affirm with supplementation the initial determination in the relevant part. EDIS Doc. ID 804266.

On June 26, 2023, Dometic moved (1346-012) for summary determination that the economic prong and technical prong of the domestic industry requirement were satisfied. The motion was granted in part on July 28, 2023, determining that Dometic met the requirements of subsection (C) of the economic prong of the domestic industry requirement based on substantial investments in the exploitation of the 351 Patent through research and development. Order No. 23. On August 28, 2023, the Commission determined not to review Order No. 23. EDIS Doc. ID 803394.

The evidentiary hearing took place on September 18-21, 2023.

On September 29, 2023, Dometic moved (1346-029) for partial termination of the investigation by withdrawal of claims 3, 11, and 17 of the 351 Patent. The motion was granted via initial determination on October 2, 2023. Order No. 30. On October 31, 2023, the Commission determined not to review Order No. 30. EDIS Doc. ID 807448.

Pursuant to the procedural schedule, the parties submitted initial and reply post-hearing briefs on October 4, 2023, and October 16, 2023, respectively.

As of the date of this initial determination, no motions remain pending.

**B. The Parties**

Complainant Dometic Corporation is a Delaware corporation with a principal place of business in Rosemont, Illinois. CIB at 5. Complainant Dometic Sweden AB is incorporated in Sweden, with a principal place of business in Solna, Sweden, and "owns, by assignment, all rights,

[redacted]

title, and interest in and to the '351 Patent, which it has licensed to Dometic Corporation." CIB at 5 (citing JX-0245 at ¶¶ 16, 17; JX-0249C at ¶¶ 6, 8).

Respondent Citimarine, L.L.C. is a company organized under the laws of Florida, having its principal place of business in Doral, Florida. RIB at 5. Citimarine "purchases the products at issue from the Shanghai Respondents, imports them into the United States, and sells the products in the United States to end users." *Id.*

Respondent Mabru Power Systems, Inc. is a company organized under the laws of Florida, having its principal place of business in Dania Beach, Florida. RIB at 6. Mabru "purchases the products at issue from the Shanghai Respondents, imports them into the United States, and sells the products in the United States to end users." *Id.*

Respondent Shanghai Hopewell Industrial Co., Ltd. is organized under the laws of China with a principal place of business in Shanghai, China, and was previously known as Shanghai Hehe Industrial Co., Ltd. *See* JX-0386C at 18. There is some confusion in the record regarding the relationship between the two companies. According to Respondents, Shanghai Hehe Industrial Co., Ltd. is formally no longer in operation, but the corporate designee for both companies, Ms. Liang Ming, testified that she has been the CEO of "Shanghai Hehe Corporation" since 2013. Tr. (Liang) at 277:13-22. The parties have in any event treated the two firms as one entity, and for simplicity they are referred to as the "Shanghai Respondents." The Shanghai Respondents are the original equipment manufacturers of the Accused Products at issue in this investigation and sell those products to Citimarine and Mabru for importation into the United States. *See* JX-0386C at 18; RIB at 8.

[redacted]

### C. The Asserted Patent and Claims

The 351 Patent, titled "Blower for Marine Air Conditioner," issued on November 15, 2011, to inventors Frank Marciano and Ronald Pabisz. The 351 Patent reports an assignment on its face to Dometic Corporation and claims priority to a provisional application filed on February 9, 2007.

The 351 Patent relates generally to the manufacture, use, and installation of adjustable nautical air conditioning units. *See* 351 Patent at Abstract. The claims are directed to an air conditioning device for use in a nautical vehicle. *Id.* at cl. 18. The patent explains that "[t]he installation of an air conditioning system in a nautical vehicle must make use of the limited space available in the vehicle." *Id.* at 1:19-21. The claims cover a nautical air conditioner with a main body, a blower, and an assembly, where the assembly includes a guiding cover and rotatably adjustable duct element, and where the assembly enables rotation of the blower "with respect to the main body about a second axis so as to alter an orientation of the outlet." *Id.* at 1:41-43. Figures 1 and 29, reproduced below, illustrate "an example embodiment of an air conditioner with a blower incorporating aspects of the present invention" (*id.* at 5:3-5), where "FIG. 29 is a perspective view of the air conditioner with the blower oriented differently from FIG. 1" (*id.* at 5:52-53).

[redacted]



FIG. 1


FIG. 29

*Id.* at FIGS. 1, 29.

The duct element of the claimed assembly has a first base and a second base. *See* 351 Patent at cl. 18. The first base is dimensioned to fit the guiding cover, such that the duct element is "[rotatably] adjustable" about the guiding cover. *Id.* The second base is where the duct element is coupled to the blower. *Id.* The 351 Patent further explains that the blower 2 can be attached at a predetermined orientation relative to the duct element 184 to limit the overall height of the air conditioning unit. *Id.* at 12:4-27; *see also id.* at 2:14-17. An exploded view of one embodiment illustrates most of the structural components:

[redacted]




FIG. 22

*Id.* at FIG. 22. In this embodiment, the duct element 184 fits onto the guiding cover 170 at one base, where it is secured with clamp 186, and at the other base it couples to the blower 2. *See id.* at 11:4-23, 12:4-27.

The following patent claims are presently at issue in this investigation, according to Dometic's briefing:

| Asserted Patent | Infringement Claims | Domestic Industry Claims |
|---|---|---|
| 8,056,351 | 18-22 | 18-22 |

*See generally* CIB at 21-53.

### D. Products at Issue

The products at issue are "certain marine air conditioning systems, components thereof, and products containing the same." 87 Fed.Reg. 76216.

[redacted]

### 1. Accused Products

Dometic accuses the following Citimarine and Mabru products (the "Accused Products") of infringing each asserted claim.

| Accused Products | | | |
|---|---|---|---|
| **Model No.** | **Product Description** | **Model No.** | **Product Description** |
| **Citimarine Products (CTM)** | | | |
| CT-6S 12VDC Kit | Marine Air Conditioner 6,000 BTU W/ 1200W Inverter | CT-12 | 12,000 BTU Marine Air Conditioner – 115V – 50/60HZ |
| CT-6 | Marine Air Conditioner 6,000 BTU – 115V – 50/60HZ | CT-12H | Marine Air Conditioner 12,000 BTU – 230V – 50/60HZ |
| CT-6H | Marine Air Conditioner 6,000 BTU – 230V – 50/60HZ | CT-16 | Marine Air Conditioner 16,000 BTU – 115V – 50/60HZ |
| CT-6HS | Marine Air Conditioner 6,000 BTU – 230V – 50/60HZ W/Soft Start | CT-16H | Marine Air Conditioner 16,000 BTU – 230V – 50/60HZ |
| CT-10 | Marine Air Conditioner 10,000 BTU – 115V – 50/60HZ | CT-25H | Marine Air Conditioner 25,000 BTU – 230V – 50/60HZ |
| CT-10H | Marine Air Conditioner 10,000 BTU – 230V – 50/60HZ | | |
| **Mabru Products** | | | |
| SC17 | Self-Contained 17000 BTU 115V 50/60HZ Marine Air Conditioner Copper Fin (Heating And Cooling) By Mabru; | SC17VFD | Marine Air Conditioner SC17VFD © 17000 BTU 230V Self-Contained By Mabru; |
| SC17 | Self-Contained 17000 BTU 230V 50/60HZ Marine Air | SC17VFD | Marine Air Conditioner SC17VFD 17000 |

[redacted]

| | | | |
|---|---|---|---|
| | Conditioner Copper Fin (Heating And Cooling) By Mabru; | | BTU 115V Self-Contained By Mabru |
| SC12 | Self-Contained 12000 BTU 230V 50/60HZ Marine Air Conditioner Copper Fin (Heating And Cooling) By Mabru; | SC12DC | Marine Air Conditioner SC 12000 BTU 12V DC (Copper) By Mabru; |
| SC07 | Self-Contained 7000 BTU 230V 50/60HZ Marine Air Conditioner Copper Fin (Heating And Cooling) By Mabru; | SC07DC | Marine Air Conditioner SC 7000 BTU 12V DC (Copper) By Mabru; |
| SC07 | Self-Contained 7000 BTU 115V 50/60HZ Marine Air Conditioner Copper Fin (Heating And Cooling) By Mabru; | SC05DC | Marine Air Conditioner SC 5000 BTU 12V DC (Copper) By Mabru |
| SC12 | Self-Contained 12000 BTU 115V 50/60HZ Marine Air Conditioner Copper Fin (Heating And Cooling) By Mabru; | | |

CIB at 10 (citing CPB at 12-13).

Dometic asserts that the CT-6 (CPX-0001) and SC07 (CPX-0002) products are representative of all Citimarine and Mabru Accused Products, respectively, and in addition to emphasizing that only certain Citimarine and Mabru products are Accused Products, Respondents dispute representativeness. *See* CIB at 10-12; RIB at 11-13; RIB at 33-34. The evidence supports Dometic's position. Liang Ming, CEO of the Shanghai Respondents, agreed that the products her companies make for Citimarine and Mabru are "structurally . . . identical except for their BTU capacity," although each retailer has different specifications. JX-0003C at 26:21-24, 35:5-36:8. Citimarine's "Installation & User Manual" appears to be the same for the entire "CT series," and Mabru's "Installation Manual" appears to be the same for the entire "SC series." *See* JX-0089 at

[redacted]

7, 9; CX-1069 at 1-3. And Mr. Nicolas Mabru, Mabru's vice president, could not think of any differences between Mabru's SC17 model and other models currently sold by Mabru. *See* JX-0008C at 13:11-12, 52:11-53:8, 61:23-62:7. Respondents' arguments against representativeness rely largely on attacking the methodology of Dometic's expert Dr. Paulus, and are unconvincing in view of the documentary evidence and lay testimony. *See* RIB at 33-34. So although Dometic relies on the SC07, not the SC17, as representative of the Mabru Accused Products, every model in the SC series is representative of every other model, and it thus follows that the SC07 is representative of all; similarly, the CT-6 is representative of all Citimarine Accused Products.

### 2. Domestic Industry Products

The domestic industry articles are those falling within the DTG and Voyager product lines, as to which Dometic has established the economic prong of the domestic industry requirement. *See* CIB at 12-15; Order No. 19 at 9-13. The physical exemplars in evidence are specifically the DTG8 (CPX-0003) for the DTG series and TX10 (CPX-0006) for the Voyager series. The evidence shows that these two exemplars are representative of their respective product lines, a fact Respondents do not dispute. *See* Tr. (Paulus) at 377:6-382:9; *see generally* RIB at 10-13, 41-46.

## II. STANDARDS OF LAW

### A. Standing

Commission Rule 210.12 states in the relevant part, "[f]or every intellectual property based complaint (regardless of the type of intellectual property involved), [the complaint must] include a showing that at least one complainant is the owner or exclusive licensee of the subject intellectual property." 19 C.F.R. § 210.12(a)(7). In determining whether this rule is met, the Commission looks to the standing requirement used by courts in patent infringement cases. *Certain Audio Processing Hardware, Software, and Products Containing the Same*, Inv. No. 337-TA-1026, Comm'n Op. at 9 (April 18, 2018) (citations omitted).

[redacted]

### B. Claim Construction

"The construction of claims is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims." *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000). Although most of the disputed claim terms were construed in an earlier order, some of the issues presented below are only resolvable with additional claim construction.

Claim construction focuses on the intrinsic evidence, which consists of the claims themselves, the specification, and the prosecution history. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *see also Markman v. Westview Instr., Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc). As the Federal Circuit in *Phillips* explained, courts must analyze each of these components to determine the "ordinary and customary meaning of a claim term" as understood by a person of ordinary skill in art at the time of the invention. 415 F.3d at 1313. "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). "Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claims terms." *Id.* at 1314; *see Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) ("In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point [ ] out

[redacted]

and distinctly claim [ ] the subject matter which the patentee regards as his invention."). The context in which a term is used in an asserted claim can be "highly instructive." *Phillips*, 415 F.3d at 1314. Additionally, other claims in the same patent, asserted or unasserted, may also provide guidance as to the meaning of a claim term. *Id.* "Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee." *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Id.* at 1316.

In addition to the claims and the specification, the prosecution history should be examined, if in evidence. *Phillips*, 415 F.3d at 1317; *see Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004). The prosecution history can "often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317; *see Chimie v. PPG Indus. Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution.").

When the intrinsic evidence does not establish the meaning of a claim, then extrinsic evidence (*i.e.*, all evidence external to the patent and the prosecution history, including dictionaries, inventor testimony, expert testimony, and learned treatises) may be considered. *Phillips*, 415 F.3d at 1317. Extrinsic evidence is generally viewed as less reliable than the patent

[redacted]

itself and its prosecution history in determining how to define claim terms. *Id.* "The court may receive extrinsic evidence to educate itself about the invention and the relevant technology, but the court may not use extrinsic evidence to arrive at a claim construction that is clearly at odds with the construction mandated by the intrinsic evidence." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 977 (Fed. Cir. 1999).

The construction of a claim term is generally guided by its ordinary meaning. However, courts may deviate from the ordinary meaning when: (1) "the intrinsic evidence shows that the patentee distinguished that term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention;" or (2) "the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history." *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1329 (Fed. Cir. 2009); *see Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 967 (Fed. Cir. 2022); *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("the specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."); *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) ("[W]here the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender."); *Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1325 (Fed. Cir. 2002) ("The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution."). Nevertheless, there is a "heavy presumption that a claim term carries its ordinary and customary meaning." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (citations omitted). The standard for deviating from the plain and ordinary meaning is "exacting" and requires "a clear and

[redacted]

unmistakable disclaimer." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366-67 (Fed. Cir. 2012); *see Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1334 (Fed. Cir. 2009) (requiring "expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope" to deviate from the ordinary meaning) (citation omitted).

### C. Infringement

"An infringement analysis entails two steps. The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing." *Markman*, 52 F.3d at 976. A patentee may prove infringement either literally or under the doctrine of equivalents. Infringement of either sort must be proven by a preponderance of the evidence. *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988). A preponderance of the evidence standard "requires proving that infringement was more likely than not to have occurred." *Warner-Lambert Co. v. Teva Pharm. USA, Inc.*, 418 F.3d 1326, 1341 n.15 (Fed. Cir. 2005).

Literal infringement is a question of fact. *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). "To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly." *Microsoft Corp. v. GeoTag, Inc.*, 817 F.3d 1305, 1313 (Fed. Cir. 2016) (quoting *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995). If any claim limitation is absent, there is no literal infringement of that claim as a matter of law. *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000).

Doctrine of equivalents is also a form of infringement. One rubric for evaluating if a claimed feature is not literally, but nonetheless equivalent to, a claimed feature is known as the function-way-result test. Under this test, the accused feature is equivalent to the claim limitation when "it performs substantially the same function in substantially the same way to obtain the same

[redacted]

result." *Duncan Parking Techs., Inc. v. IPS Grp., Inc.*, 914 F.3d 1347, 1362 (Fed. Cir. 2019) (quoting *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950)). Another is known as the insubstantial differences test, where "[a]n element in the accused device is equivalent to a claim limitation if the only differences between the two are insubstantial." *Voda v. Gordia Corp.*, 536 F.3d 1311, 1326 (Fed. Cir. 2008) (citing *Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1139 (Fed. Cir. 2004)). The Supreme Court has further instructed, "the proper time for evaluating equivalency . . . is at the time of infringement, not at the time the patent was issued." *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 37 (1997).

In addition to direct infringement, Section 271 of the Patent Act defines two categories of indirect infringement, inducement of infringement and contributory infringement. 35 U.S.C. § 271. For indirect infringement violations under Section 337, the direct infringement element may occur after importation, so long as all the other elements of indirect infringement are met at the time of importation. *See Certain Vision-Based Driver Assistance System Cameras and Components Thereof*, Inv. No. 337-TA-907, Comm'n Op. at 19 (Dec. 1, 2015) (citing *Suprema, Inc. v. Int'l Trade Comm'n*, 796 F.3d 1338, 1348 (Fed. Cir. 2015)). It is well settled that "[a]bsent direct infringement of the patent claims, there can be neither contributory infringement ... nor inducement of infringement." *Met–Coil Sys. Corp. v. Korners Unltd., Inc.*, 803 F.2d 684, 687 (Fed.Cir.1986) (citations omitted).

As to the first category, "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b); *see DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) (en banc) ("To establish liability under section 271(b), a patent holder must prove that once the defendants knew of the patent, they actively and knowingly aided and abetted another's direct infringement.") (citations omitted). "The mere knowledge of possible infringement by

[redacted]

others does not amount to inducement; specific intent and action to induce infringement must be proven." *Id.* (citations omitted). A defendant's belief regarding patent validity is not a defense to a claim of induced infringement. *Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920 (2015). A defendant's willful blindness on the question of infringement will satisfy the knowledge requirement. *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 765, 768-771 (2011). The requisite intent to induce infringement "may be established through circumstantial evidence" and "'may be inferred from all of the circumstances.'" *See Broadcom Corp. v. Qualcomm, Inc.*, 543 F.3d 683, 699 (Fed. Cir. 2008) (citing *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293 (Fed. Cir. 2006); *Water Techs. Corp. v. Claco, Ltd.*, 850 F.2d 660, 669 (Fed. Cir. 1988)).

As to the second category, "a party who sells a component with knowledge that the component is especially designed for use in a patented invention, and is not a staple article of commerce suitable for substantial noninfringing use, is liable as a contributory infringer." *Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1316 (Fed. Cir. 2010). Contributory infringement is premised upon a finding that: (1) the entity sells, offers to sell, or imports into the United States a component of a product; (2) the component has no substantial non-infringing use; (3) the component constitutes a material part of the claimed invention; (4) the entity was aware of the patent and knew that the product may be covered by a claim of the patent; and (5) the use of the component in the product directly infringes the claim. *See Certain Gaming & Entm't Consoles, Related Software, & Components Thereof*, Inv. No. 337-TA-752, Initial Determination (Remand) at 7-8 (Mar. 22, 2013) (citing 35 U.S.C. § 271(c); *Arris Group v. British Telecomm. PLC*, 639 F.3d 1368, 1376 (Fed. Cir. 2011)), *non-reviewed*, Notice (May 23, 2013). As with inducement, willful blindness on the question of infringement will satisfy the knowledge requirement. *Global-Tech*, 563 U.S. at 765, 768-771.

[redacted]

### D. Domestic Industry

In an investigation based on a claim of patent infringement, section 337 requires that an industry in the United States, relating to the articles protected by the patent, exist or be in the process of being established. 19 U.S.C. § 1337(a)(2). Under Commission precedent, the domestic industry requirement has been divided into (i) a "technical prong" (which requires articles covered by the Asserted Patent) and (ii) an "economic prong" (which requires certain levels of activity with respect to the protected articles or patent itself). *See Certain Video Game Systems and Controllers*, Inv. No. 337-TA-743, Comm'n Op. at 6-7 (April 14, 2011) ("*Video Game Systems*").

#### 1. Technical Prong

The technical prong of the domestic industry requirement is satisfied when the complainant in a patent-based section 337 investigation establishes that it is practicing or exploiting the patents at issue. *See* 19 U.S.C. §§ 1337 (a)(2), (3); *Certain Microsphere Adhesives, Process for Making Same and Prods. Containing Same, Including Self-Stick Repositionable Notes*, Inv. No. 337-TA-366, Comm'n Op. at 8 (U.S.I.T.C. Jan. 16, 1996). "In order to satisfy the technical prong of the domestic industry requirement, it is sufficient to show that the domestic industry practices any claim of that patent, not necessarily an asserted claim of that patent." *Certain Ammonium Octamolybdate Isomers*, Inv. No. 337-TA-477, Comm'n Op. at 55 (U.S.I.T.C. Aug. 28, 2003). Historically, the Commission permits the complainant's products, and those of its licensees, to be considered for technical prong purposes. *See Certain Magnetic Tape Cartridges and Components Thereof*, Inv. No. 337-TA-1058, Comm'n Op. at 28-29 (April 9, 2019).

The test for claim coverage for the purposes of the technical prong of the domestic industry requirement is the same as that for infringement. *See Certain Doxorubicin and Preparations Containing Same*, Inv. No. 337-TA-300, Initial Determination at 109 (U.S.I.T.C. May 21, 1990), *aff'd*, Views of the Commission at 22 (U.S.I.T.C. Oct. 31, 1990); *Alloc, Inc. v. Int'l Trade Comm'n*,

[redacted]

342 F.3d 1361, 1375 (Fed. Cir. 2003). "First, the claims of the patent are construed. Second, the complainant's article or process is examined to determine whether it falls within the scope of the claims." *Certain Doxorubicin and Preparations Containing Same*, Inv. No. 337-TA-300, Initial Determination at 109. As with infringement, the technical prong of the domestic industry can be satisfied either literally or under the doctrine of equivalents. *Certain Dynamic Sequential Gradient Devices and Component Parts Thereof*, Inv. No. 337-TA-335, ID at 44, Pub. No. 2575 (U.S.I.T.C. May 15, 1992). In short, the patentee must establish by a preponderance of the evidence that the domestic product practices one or more claims of the patent.

**2. Economic Prong**

The "economic prong" of the domestic industry requirement is satisfied when there exists in the United States, in connection with products practicing at least one claim of the patent at issue: (A) significant investment in plant and equipment; (B) significant employment of labor or capital; or (C) substantial investment in its exploitation, including engineering, research and development, and licensing. 19 U.S.C. § 1337(a)(3). Establishment of the "economic prong" is not dependent on any "minimum monetary expenditure" and there is no need for complainant "to define the industry itself in absolute mathematical terms." *Certain Stringed Musical Instruments and Components Thereof*, Inv. No. 337-TA-586, Comm'n Op. at 25-26 (May 16, 2008) ("*Stringed Instruments*"). However, a complainant must substantiate the significance of its activities with respect to the articles protected by the patent. *Certain Printing and Imaging Devices and Components Thereof*, Inv. No. 337-TA-690, Comm'n Op. at 30 (Feb. 17, 2011) ("*Imaging Devices*"). Further, a complainant can show that its activities are significant by showing how those activities are important to the articles protected by the patent in the context of the company's operations, the marketplace, or the industry in question. *Id.* at 27-28. That significance, however, must be shown in a quantitative context. *Lelo Inc. v. Int'l Trade Comm'n*, 786 F.3d 879, 886 (Fed.

[redacted]

Cir. 2015). The Federal Circuit noted that when the ITC first addressed this requirement, it found the word "'significant' denoted 'an assessment of the *relative* importance of the domestic activities.'" *Id.* at 883-4 (internal citation omitted) (emphasis added). In general, "[t]he purpose of the domestic industry requirement is to prevent the ITC from becoming a forum for resolving disputes brought by foreign complainants whose only connection with the United States is ownership of a U.S. patent." *Certain Battery-Powered Ride-On Toy Vehicles*, Inv. No. 337-TA-314, USITC Pub. No. 2420, Initial Determination at 21 (Aug. 1991); *see Certain Vacuum Insulated Flasks and Components Thereof*, Inv. No. 337-TA-1216, Notice at 3-4 (Oct. 21, 2021) ("Given the nature and extent of [complainant's] investments in plant and equipment as a whole, [complainant] is not a mere importer.").

**E. Invalidity**

**1. 35 U.S.C. § 101**

Section 101 states:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

35 U.S.C. § 101. To determine patent eligibility under § 101, courts apply the two-step *Alice* test and first "determine whether the claims at issue are directed to a patent-ineligible concept," and then if so, "examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice Corp. Pty. v. CLS Bank Intern.*, 573 U.S. 208, 217-18, 221 (2014). "The 'directed to' inquiry applies a stage-one filter to claims, considered in light of the specification, based on whether 'their character as a whole is directed to excluded subject matter.'" *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016) (citing *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015); *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1375 (Fed. Cir.

[redacted]

2016)). To save a patent at the second step, an inventive concept must be evident in the claims. *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151-52 (Fed. Cir. 2016).

**2. 35 U.S.C. § 102**

Pursuant to 35 U.S.C. § 102, a patent claim is invalid as anticipated if:

> (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant;
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States;

35 U.S.C. § 102 (pre-AIA). "A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention. Moreover, a prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference." *Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003) (citations omitted); *see Santarus, Inc. v. Par Pharm., Inc.*, 694 F.3d 1344, 1354 (Fed. Cir. 2012). "A century-old axiom of patent law holds that a product 'which would literally infringe if later in time anticipates if earlier.'" *Upsher-Smith Labs., Inc. v. Pamlab, L.L.C.*, 412 F.3d 1319, 1322 (Fed. Cir. 2005) (citing *Schering Corp.*, 339 F.3d at 1322). Anticipation, and all other grounds of patent invalidity, must be proved by clear and convincing evidence. *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 95, (2011).

**3. 35 U.S.C. § 103**

Section 103 of the Patent Act states:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negated by the manner in which the invention was made.

[redacted]

35 U.S.C. § 103(a) (pre-AIA). "Obviousness is a question of law based on underlying questions of fact." *Scanner Techs. Corp. v. ICOS Vision Sys. Corp. N.V.*, 528 F.3d 1365, 1379 (Fed. Cir. 2008). The underlying factual determinations include: "(1) the scope and content of the prior art, (2) the level of ordinary skill in the art, (3) the differences between the claimed invention and the prior art, and (4) objective indicia of non-obviousness." *Id.* (citing *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966)). These factual determinations are often referred to as the "*Graham* factors."

The critical inquiry in determining the differences between the claimed invention and the prior art is whether there is a reason to combine the prior art references. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418-21 (2007). In *KSR*, the Supreme Court rejected the Federal Circuit's rigid application of the teaching-suggestion-motivation test. While the Court stated that "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does," it described a more flexible analysis:

> Often, it will be necessary for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue . . . . As our precedents make clear, however, the analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ.

*Id.* at 418. Since *KSR*, the Federal Circuit has announced that, where a patent challenger contends that a patent is invalid for obviousness based on a combination of prior art references, "the burden falls on the patent challenger to show by clear and convincing evidence that a person of ordinary skill in the art would have had reason to attempt to make the composition or device . . . and would have had a reasonable expectation of success in doing so." *PharmaStem Therapeutics, Inc. v.*

[redacted]

*ViaCell, Inc.*, 491 F.3d 1342, 1360 (Fed. Cir. 2007); *see KSR*, 550 U.S. at 399 ("The proper question was whether a pedal designer of ordinary skill in the art, facing the wide range of needs created by developments in the field, would have seen an obvious benefit to upgrading Asano with a sensor."). In addition to demonstrating that a reason exists to combine prior art references, the challenger must demonstrate that the combination of prior art references discloses all of the limitations of the claims. *Velander v. Garner*, 348 F.3d 1359, 1363 (Fed. Cir. 2003) (explaining that a requirement for a finding of obviousness is that "all the elements of an invention are found in a combination of prior art references").

An obviousness determination should also include a consideration of how "secondary considerations" such as "commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." *Graham*, 338 U.S. at 17-18. "For [such] objective evidence to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention." *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995); *see Merck & Cie v. Gnosis S.P.A.*, 808 F.3d 829, 837 (Fed. Cir. 2015). "Where the offered secondary consideration actually results from something other than what is both claimed and novel in the claim, there is no nexus to the merits of the claimed invention." *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011); *see Apple Inc. v. Samsung Elecs. Co., Ltd.*, 839 F.3d 1034, 1054-1056 (Fed. Cir. 2016).

**4. 35 U.S.C. § 112**

Pursuant to 35 U.S.C. § 112, a patent claim is invalid for lack of written description if the patent's specification fails to "reasonably convey[] to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). "[T]he test requires an objective inquiry into

[redacted]

the four corners of the specification from the perspective of a person of ordinary skill in the art" (*id.*), and "the level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology" (*id.* (citing *Capon v. Eshar*, 418 F.3d 1349, 1357-58 (Fed. Cir. 2005))).

## III. OVERVIEW

As explained, Dometic initially asserted claims 1-5, 7, 11, 17, and 18-22 of the 351 Patent. *See* Complaint (EDIS Doc. ID No. 783862) at 15. Claims 1, 2, 4, 5, and 7 were found invalid, and claims 3, 11, and 17 were withdrawn. *See* Order No. 19, *aff'd with supplementation*, Comm'n Op. (Sep. 13, 2023); Order No. 30. Only claims 18 through 22 remain to be adjudicated for both infringement and DI technical prong.

Dometic's case on these claims and issues has been puzzling from the outset. Claim 1 and claim 18 are broadly similar but differ in one crucial respect: claim 1 recites a blower with a first axis defined structurally by how the fan blades rotate, while claim 18 recites a blower with a first axis defined structurally by how the blower itself rotates, and further recites a result of that rotation. *See* 351 Patent at cls. 1, 18. The differences are illustrated in Dometic's prehearing brief:

| Claim 1 | Claim 18 |
|---|---|
| **An air conditioning device for a nautical vehicle including:** | **An air conditioning device for a nautical vehicle including:** |
| **a main body; and a blower including an inlet and an outlet, the inlet being in air communication with the main body**, | **a main body; and a blower including an inlet and an outlet, the inlet being in air communication with the main body,** |
| the blower further including blades rotating therewithin about a first axis, | the blower being rotatable about first axis so that the outlet can be oriented toward a first directon [sic] and a second direction, and the first and second directions point to substantially different lateral sides of the main body, |

[redacted]

| | |
|---|---|
| **and an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet, the assembly including a guiding cover and a cylindrical duct element for maintaining the main body and the blower in air communication with one another, the duct element having a first base and a second base, and coupled to the blower at the second base, the first base of the duct element dimensioned to correspondingly fit the guiding cover, and the duct element being rotatably adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet** | **and an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet, the assembly including a guiding cover and a cylidrical [sic] duct element for maintaining the main body and the blower in air communication with one another, the duct element having a first base and a second base, and coupled to the blower at the second base, the first base of the duct element dimensioned to correspondingly fit the guiding cover, and the duct element being rotatbly [sic] adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet.** |

CPB at 40.

In Dometic's complaint, the first and second axes for claim 18 are identified, but they are not clearly shown as distinct in the Accused Products. *See* Complaint, Exs. 16, 21. The complaint even uses the same images for charting infringement of both claims by the CT-6. *Compare* Complaint, Ex. 16 at 4 *with id.* at 10. And Dometic charted the practice of the DI Products, but only for claim 1. *See* Complaint, Ex. 22. So even at the start of the investigation, it was not clear that Dometic could prove the existence of two identifiable axes in either the Accused or DI Products.

In connection with briefing the parties' initial claim construction disputes, Respondents argued that the first and second axes recited in claim 18 must be different. *See* Order No. 11 at 22. Dometic, however, argued that the axes may be "the same or different." EDIS Doc. ID No. 792266 at 18. Implicit in both sides' arguments was the understanding that there must be two identifiable axes, even if they are colinear – that is, the same – in some embodiments. And in construing the claim to not require different axes, the *Markman* Order noted that claim 18:

[redacted]

> does not recite exactly how the blower is "rotat[ed] about [the] first axis." 351 Patent at cl. 18. The specification suggests that the blower housing itself may be rotatable: "In accordance with still another aspect of the present invention, . . . [t]he blower is rotatable about an axis," without any further limitation. *Id*. at 2:43-47. This is consistent with the claim language, which does not specify rotation relative to another component, as would be expected if the blower housing had a rotatable mounting ring. The specification also implies that the blower may be rotated relative to the duct element by decoupling them: "the blower 2 and the duct element 184 are attached at a predetermined orientation." *Id*. at 12:9-10. Either way, the shape of the duct element (symmetrical vs. asymmetrical) determines whether the axes of rotation are identical or merely parallel, as shown in Figures 30A and 30B.

Order No. 11 at 25. Thus, Dometic seemingly took the position during the initial claim construction process that claim 18 required two distinct axes, and it was on notice that the claim apparently covers a blower rotatable relative to the duct element, or rotatable in itself, or otherwise satisfying the "rotat[ed] about [the] first axis" limitation of claim 18, as distinct from the "[rotatably] adjustable . . . about the second axis" duct element.

The parties eventually filed summary determination motions regarding claim 18, with Dometic's pertaining to DI technical prong (and economic prong) and Respondents' pertaining to invalidity. *See* Order No. 19 at 29-30; Order No. 20 at 3-4. At this point, Dometic seems to have changed its position regarding what limitations it needed to prove for claim 18. As the order denying this aspect of Dometic's summary determination motion observed:

> According to Dr. Paulus, the "blower being rotatable" limitation is met in part because "the axis of rotation . . . passes through the center point of the first, circular base of the duct element." Mot. Ex. G (Paulus Report) at ¶ 175. He stated he was "able to rotate the blower/cylindrical duct element about the guiding cover," that is, the axis of rotation corresponded to the center point of the duct element at the base where it fits the guiding cover. *Id*. at ¶ 176. But then when discussing the "assembly for adjusting the blower . . . about a second axis," Dr. Paulus does not identify any "second axis." In fact, the annotated photographs identifying the "assembly" on both representative models only point to "the axis," which appears to be the same "first axis" identified in analyzing the "blower being rotatable" limitation. *See id*. at ¶ 181. Similarly, in discussing the "duct element being rotatably adjustable . . . about the second axis at the first base," Dr. Paulus only identifies the same axis corresponding to the center line of the first base previously identified as the first axis. *See id*. at ¶ 190.

[redacted]

Order No. 20 at 3. Although arguably in dicta, the order added that even if the two axes need not be different, "that does not relieve Dometic from identifying two axes," which it failed to do. *Id.* (citing Order No. 11 at 26).

The order also suggested that construction of the claim language may be appropriate to establish the precise scope of the claim. *See* Order No. 20 at 4 ("the interplay between the 'blower being rotatable' and 'assembly for adjusting the blower' elements has not been construed"). The order denying in part Respondents' summary determination motion similarly pointed out that claim construction might be warranted and hinted that a blower "attached to the duct element by [] screws" may be a relevant consideration. *See* Order No. 19 at 30. As discussed below, the preferred embodiment in fact comprises a blower attached to the duct element by screws or rivets. *See* 351 Patent at FIGS. 22, 24B.

Dometic ultimately did not attempt to amend its contentions, identify screws or rivets in the DI Products in connection with blower rotation, seek further claim construction, or otherwise do anything to correct the apparent failure of proof noted in Order No. 20. Instead, in its prehearing brief it expanded the position articulated in its summary determination motion, that only a single axis of rotation is required, to the Accused Products. *See* CPB at 41-43. In their own prehearing brief, Respondents pointed out Dometic's failure of proof as to both the Accused Products and the DI Products. *See* RPB at 33-34, 46-47. Respondents' arguments were later stricken, but that, too, "does not relieve Dometic from identifying two axes." Order No. 20 at 3; *see* Tr. at 12:8-14.

For the avoidance of any doubt on this point, both sides were given the opportunity to brief the question of whether claim 18 requires two axes, and they did so. *See* CIB at 16-21; RIB at 16-24; Tr. 834:13-835:2. Dometic contends that it does not, but as explained below, this is incorrect. *See* CIB at 16-21. And Dometic not only failed to introduce evidence of two axes at the evidentiary

[redacted]

hearing, it also contends that every physical product in evidence, Accused and DI, has a "unitary structure" to the blower and duct element, "such that the duct element cannot rotate independently of the blower and vice versa." CIB at 20. As also explained below, this is true of the DI Products and the CT-6, but not of the SC07.

More to the point, Dometic's failure of proof, at least as to the DI Products, is fatal to its case. The "ordinary default rule" in Commission investigations, as in Article III courts, is that the complainants "bear the risk of failing to prove their claims." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005). This is not simply procedural; the burden of proof is "a substantive aspect of a claim." *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 199 (2014) (citations and internal quotations omitted). It is, therefore, well established that failing to show an essential element of a patent claim is satisfied by the article in suit constitutes a substantive failure of proof. *See SIMO Holdings Inc. v. Hong Kong uCloudlink Network Technology Limited*, 983 F.3d 1367, 1381 (Fed. Cir. 2021) (deposition of plaintiff's expert "lacks a simple declarative statement that the product has [the claimed] non-local calls database"); *GateArm Techs., Inc. v. Access Masters, LLC*, 861 F.App'x 465, 471 (Fed. Cir. 2021) (patentee presented no evidence that "the accused modified product's fins" were the claimed "terminating ends"); *Medtronic, Inc. v. Boston Scientific Corp*., 558 F.App'x 998, 1000 (Fed. Cir. 2014) ("The district court was unable to locate any reference to this claim's 'sense amplifier' limitation . . ..").

And that is precisely the problem here. Two axes of rotation are required under the claim language, which Dometic implicitly acknowledged for claim construction purposes. Dometic has been on notice since no later than July 18, 2023, two months before the evidentiary hearing, that a construction requiring two axes of rotation might be adopted, and it has consistently failed to identify two axes in either the Accused Products or the DI Products. *See* Order No. 20 at 3. And

[redacted]

it is not my responsibility to "scour the record for whatever other evidence may have supported [Dometic's] infringement position." *Medtronic*, 558 F.App'x at 1000. I have nonetheless done so, as explained below, and still conclude that the DI Products do not possess two axes.

Regardless, Dometic has failed to prove that the DI Products possess all essential elements of a claim of "a valid and enforceable United States patent." 19 U.S.C. § 1337(a). It is irrelevant that Respondents have been barred from arguing the lack of proof of two axes because Dometic's "lack of evidence is of [its] own making," such that "the record does not contain enough evidence to conclude that the DI products practice" any of claims 18 through 22. *See Certain Mobile Devices With Multifunction Emulators*, Inv. No. 337-TA-1170, Comm'n Op. at 25 (Jul. 27, 2021). So, although the parties' actual disputes are considered below, as well as certain issues identified from "scour[ing] the record," ultimately, there is no violation of Section 337 for the simple reason that Dometic failed to prove the existence of a domestic industry "relating to [] articles protected by the patent." *Medtronic*, 558 F.App'x at 1000; 19 U.S.C. 1337(a)(2).

## IV. IMPORTATION AND STANDING

Respondents concede that Accused Products have been imported and do not contest standing or any jurisdictional issues. *See* RIB at 7-8, 13. Accordingly, the importation requirement under 19 U.S.C. § 1337(a)(1)(B) is satisfied, and the Commission has *in rem* jurisdiction over the Accused Products. And Dometic has standing to bring suit for infringement of the 351 Patent because complainant Dometic Sweden AB owns the right, title, and interest in the 351 Patent by assignment. *See* JX-0268.

## V. U.S. PATENT NO. 8,056,351

### A. Level of Ordinary Skill in the Art

A person having ordinary skill in the art of the 351 Patent at the time of invention:

[redacted]

> [W]ould have had two or more years of relevant industry experience in the fabrication or design of nautical air conditioning units, and sufficient education to understand such air conditioning units, through university studies or otherwise, with additional experience substituting for education and vice versa.

Order No. 11 at 9. The parties do not challenge this definition (*see generally* CIB; CRB; RIB; RRB), and it is applied throughout this initial determination.

**B. Claims at Issue**

Claims 18-22 of the 351 Patent are at issue in this investigation, either through allegations of infringement or DI technical prong. *See* CIB at 3. They are reproduced below:

> 18. An air conditioning device for a nautical vehicle including:
>
> a main body; and
>
> a blower including an inlet and an outlet, the inlet being in air communication with the main body, the blower being rotatable about first axis so that the outlet can be oriented toward a first [direction] and a second direction, and the first and second directions point to substantially different lateral sides of the main body, and
>
> an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet,
>
> the assembly including a guiding cover and a [cylindrical] duct element for maintaining the main body and the blower in air communication with one another,
>
> the duct element having a first base and a second base, and coupled to the blower at the second base, the first base of the duct element dimensioned to correspondingly fit the guiding cover, and the duct element being [rotatably] adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet.
>
> 19. The air conditioning device of claim 18, wherein the first direction and the second direction point to substantially opposite directions.
>
> 20. The air conditioning device of claim 19, wherein the blower can be rotated without interference from a compressor, an evaporator or a condenser.
>
> 21. The air conditioning device of claim 18, wherein the blower is rotatable by more than 270 degrees.

[redacted]

> 22. The air conditioning device of claim 18, wherein the air conditioning device further includes a clamp element for maintaining the blower oriented with respect to the main body, and wherein only loosening of the clamp element is necessary to change orientation of the blower.

351 Patent at cls. 18-22.

### C. Claim Construction

As part of the *Markman* process, the following claim terms of the 351 Patent were construed:

| Claim Term | Construction |
|---|---|
| "assembly for adjusting the blower with respect to the main body" | not a means-plus-function limitation and is construed to have its plain and ordinary meaning. |
| "the duct element being rotatably adjustable around the guiding cover about the second axis" | "the duct element can be rotated about the second axis and relative to the guiding cover." |
| "the blower being rotatable about first axis so that the outlet can be oriented toward a first direction and a second direction" | "the blower can be rotated about a first axis so that the blower outlet can be oriented toward a first direction and toward a second direction" and the "first axis" and the "second axis" need not be different, |
| "first and second directions point to substantially different lateral sides of the main body" | "first and second directions point to substantially opposing sides of the main body with respect to a vertical plane." |

*See* Order No. 11 at 17, 21, 29. The record reveals another claim construction dispute over "the blower being rotatable about [a] first axis."

Claim 18 recites "the blower being rotatable about [a] first axis so that the outlet can be oriented toward a first direction and a second direction" (the "axis limitation"). 351 Patent at cl. 18. While this term was construed during the *Markman* process as "the blower can be rotated about a first axis so that the blower outlet can be oriented toward a first direction and toward a second direction," the construction did not address whether this term requires a different type of rotation, separate from the duct element's "[rotatable] adjust[ment] . . . about the second axis," or rotation involving a different structural component than the claimed assembly, or both. *E.g.*, Order

[redacted]

No. 11 at 26. But the *Markman* Order did identify the ambiguity of exactly how the blower can be rotated about the first axis:

> It is not as clear how the first axis fits into all this, because claim 18 does not recite exactly how the blower is "rotat[ed] about [the] first axis." 351 Patent at cl. 18. The specification suggests that the blower housing itself may be rotatable: "In accordance with still another aspect of the present invention, . . . [t]he blower is rotatable about an axis," without any further limitation. *Id.* at 2:43-47. This is consistent with the claim language, which does not specify rotation relative to another component, as would be expected if the blower housing had a rotatable mounting ring. The specification also implies that the blower may be rotated relative to the duct element by decoupling them: "the blower 2 and the duct element 184 are attached at a predetermined orientation." *Id.* at 12:9-10. Either way, the shape of the duct element (symmetrical vs. asymmetrical) determines whether the axes of rotation are identical or merely parallel, as shown in Figures 30A and 30B.

*Id.* at 25; *see* Order No. 19 at 30 (Jul. 18, 2023); Order No. 20 at 3-4 (Jul. 18, 2023). The parties were therefore directed to brief the issue. *See* Tr. at 24:21-28:25, 839:1-17, 834:13-835:5.

The parties' post-hearing briefs spell out their claim construction proposals. In short, Dometic contends that the axis limitation requires neither two types of rotation nor rotation involving a structural component different from the assembly (CIB at 16); Respondents, on the other hand, argue that "Claim 18 requires that the two types of claimed rotation be distinct from one another" (RIB at 16; *see also id.* at 17).

Dometic argues that "the claim language states the claimed blower and the claimed outlet's adjustment … occurs *because of* the assembly, namely the duct element being rotatably adjustable around the guiding cover." CIB at 17 (emphasis added). Dometic contends that "Claim 18's language states explicitly that the assembly ***alone***—specifically the rotation of the duct element—alters the orientation of the blower outlet 'towards a first direction and a second direction' by adjusting the blower (and thereby its outlet) about the main body, confirming that no structure distinct from the assembly or some second/separate mode of blower rotation is required for the blower to be 'rotatable about [a] first axis' as claimed." *Id.* at 18 (emphasis in original). Dometic's

[redacted]

argument relies mainly on the language in claim 18 focused on describing the resultant orientation of the outlet, where "oriented" or "orientation" is recited in both the assembly and blower limitations. *Id.* at 17; 351 Patent at cl. 18.

Respondents argue that "the language of claim 18 … strongly supports requiring two types of rotation." RIB at 20; RRB at 9 ("an air conditioning device that can rotate (1) the blower with respect to the duct element at the first axis and (2) the blower with respect to the shroud (or guiding cover) at the second axis"). Specifically, Respondents argue that "the differences in [claim] language indicate an intent to refer to a different type of rotation, i.e., rotation of the blower itself, as opposed to rotation of the duct element connected to the blower." *Id.* at 18. Respondents assert that the specification, given Figures 24A, 24B, 25, 30B-1, and 30B-2, supports such an interpretation. *Id*. at 20-22.

The axis limitation is construed to require a different type of rotation separate from the assembly's adjustment/rotation, and involving a structural component that may be a part of, but is identifiably distinct from, the claimed portion of the "assembly." This construction is supported by the plain language of the claims, the specification, and the prosecution history.

The relevant limitations appear in claim 18 of the 351 Patent. Claim 18, with the disputed term bolded and other relevant language italicized, provides:

> An air conditioning device for a nautical vehicle including:
>
> a main body; and
>
> a blower including an inlet and an outlet, the inlet being in air communication with the main body, **the blower being rotatable about [a] first axis so that the outlet can be oriented toward a first [direction] and a second direction**, and the first and second directions point to substantially different lateral sides of the main body, and
>
> *an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet*, the assembly including

[redacted]

> a guiding cover and a [cylindrical] duct element for maintaining the main body and the blower in air communication with one another,
>
> the duct element having a first base and a second base, and coupled to the blower at the second base, the first base of the duct element dimensioned to correspondingly fit the guiding cover, and
>
> *the duct element being [rotatably] adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet.*

351 Patent at cl. 18 (emphasis added).

First, under the plain language of the claim "the blower being rotatable" refers to a different type of rotation from the assembly's rotation, and to a distinct structural component separate from the claimed portion of the assembly. RIB at 17-20. For instance, claim 18 is directed to an "air conditioning device ... including" three separate structural elements – i.e., a main body, a blower, and an assembly. As to the claimed blower element, the claim explains the blower as "*being rotatable about [a] first axis* so that the outlet can be oriented toward a first [direction] and a second direction, and the first and second directions point to substantially different lateral sides of the main body." 351 Patent at cl. 18 (emphasis added). The blower limitation, put simply, provides that the blower is capable of rotation about a first axis (e.g., the first type of rotation) to orient the outlet.

As to the claimed "assembly" element, the claim limitation recites a guiding cover and a cylindrical duct element. The assembly's function is "adjusting the blower with respect to the main body about *a second axis so as to alter an orientation of the outlet*." 351 Patent at cl. 18 (emphasis added). The claim limitation adds that the "duct element" has "a first base and a second base" and that the duct element is "coupled to the blower at the second base." Additionally, the claim limitation provides that "the first base of the duct element [is] dimensioned to correspondingly fit the guiding cover." And based on this recited structural configuration of the assembly, the limitation elaborates on how the adjustment of the blower's outlet by the assembly

[redacted]

is accomplished: "the duct element being [rotatably] adjustable around the guiding cover about the second axis at the first base so as to *alter the orientation of the outlet*." *Id.* The plain and ordinary language "to alter" implies that the outlet has an initial orientation, which is established by some other structure or arrangement and which can be changed. Thus, the assembly limitation provides a second means of rotation, which alters the orientation of the blower's outlet.

The two modes of rotation required by the claim are further evident by comparing the axis limitation and assembly limitation language. The patent draftee described the assembly's function as "*adjusting*" the blower rather than "*rotating*" it, which suggests the operations in the two limitations might differ. This distinction between "adjusting" and "rotating" is further evident by the usage of "[rotatably] adjustable," describing the functionality associated with the claimed duct element. 351 Patent at cl. 18. The use of two different terms to describe changing the orientation of the blower outlet thus reveals that there are two different modes of changing the orientation.

Most importantly, these operations of the "blower" and the "assembly," i.e., "being rotatable" and "for adjusting the blower," respectively, are accomplished over distinctly recited axes – a "first axis" (about which the blower rotates) and a "second axis" (about which the duct element rotates relative to the guiding cover), respectively. That is, the use of the terms "first axis" and "second axis" in claim 18 distinguishes the first axis about which the "blower" may rotate from the second axis about which the "duct element" may rotate, which may or may not be colinear. These are the plain and ordinary words of the patent claim, and such differences in terminology prove that there are two distinct types of rotation.

The dependent claims of the 351 Patent also support this understanding. Claim 22 clearly pertains to the duct element/guiding cover connection, but claims 19, 20, and 21, which are directly

[redacted]

or indirectly dependent on claim 18, plainly relate to the blower's capability for rotation and not the assembly's capability:

> 19. The air conditioning device of claim 18, wherein the first direction and the second direction point to substantially opposite directions.
>
> 20. The air conditioning device of claim 19, wherein the blower *can be rotated* without interference from a compressor, an evaporator or a condenser.
>
> 21. The air conditioning device of claim 18, wherein the blower *is rotatable* by more than 270 degrees.

351 Patent at cls. 19-21 (emphasis added). Claim 19 refers to the first and second directions, which have antecedent bases relating to the blower, not to the assembly. And claims 20 and 21 confirm that the blower is rotatable without reference to the assembly – i.e., "where the blower *can be* rotated" and "the blower *is* rotatable," respectively. These claims lack language implying that the assembly's and blower's rotations are the same.

Second, this interpretation that the air conditioning device requires two rotation modes involving two structures is consistent with the specification. RIB at 20-22. The specification, with reference to Figure 22 (below), suggests that an air conditioner may have two distinct means of rotating a blower that affect the orientation of the outlet – i.e., (1) via the orientation of the blower 2 when coupling the blower 2 to the duct element 184 and (2) via rotation of the duct element 184 relative to the guiding cover 170 when the blower is coupled to the duct element.

[redacted]




FIG. 22

351 Patent at FIG. 22. The parties do not dispute the second rotation type, where rotation of the blower's outlet results from the duct element 184 rotating relative to the guiding cover 170 when the blower is coupled to the duct element. 351 Patent at 11:4-23 ("rotating the duct element 184 to obtain the desired orientation for the blower 2").

As to the first type, the specification describes a way to connect the blower to the duct element that permits rotation of the blower relative to the duct element – i.e., the blower is "attached at a predetermined orientation" relative to the duct element to limit the overall height of the air conditioning unit:

> The non-concentric cylinder shape of the duct element 184 (FIGS. 24A, 24B and 25) is designed to limit the overall height of the air conditioner 1. Since it is possible for the outlet 218 of the blower 2 to substantially increase the height of the air conditioner 1 when the outlet 218 is located near the top of the air conditioner 1, **the blower 2 and the duct element 184 are attached at a predetermined orientation** relative to one another such that the maximum height of the air conditioner 1 will be kept below a certain value despite various orientations of the blower 2. One way to do this is by attaching the blower 2 to duct element 184 so that, when axis B (FIG. 30B-1) is at its lowest relative to axis A, the blower 2 is oriented to reach its vertically longest position. As shown in FIG. 30B, the blades

[redacted]

> of the blower 2 rotate around B while the blower 2 is rotated with respect to the air conditioner 1 around A. The overall height of the air conditioner 1 with the rotatable blower 2 will change depending on how the blower 2 is fastened in relation to the duct element 184. Therefore, **the maximum height of an air conditioner 1 can be restricted by adjusting the orientation in which the blower 2 is fastened to the duct element 184.** Moreover, the conical cylinder shape of the duct element 184 and the curvature 178 of the guiding cover 170 contribute to a smoother air flow within the air conditioner 1.

351 Patent at 12:4-27 (emphasis added); *see also id.* at 2:14-17 ("the blower is installed with respect to the duct element in such a way that the maximum height of the air conditioning device is limited"). This understanding is further supported by various figures in the specification. For instance, Figures 24A and 24B illustrate the duct element 184 with six apertures 210 spaced evenly along the duct's inwardly projecting flange 208:




FIG. 24A FIG. 24B

351 Patent at FIGS. 24A, 24B. These apertures suggest six possible orientations of the blower relative to the duct element. *See also id.* at 11:1-4 ("On the blower side of the duct element 184 is an inwardly projecting flange 208 (FIGS. 24A and 24B) with apertures 210 for coupling the duct element 184 onto the blower 2."). Figure 24B, in particular, appears to show screws or rivets inserted into the apertures, presumably for attaching the blower to the duct element.

Figure 25, which shows an air conditioner without the blower attached, similarly illustrates these six apertures on the duct element, with six possible orientations of the blower when coupled to the duct element – i.e., working clockwise around the duct element, the blower could be attached

[redacted]

at orientations of approximately 2 o'clock, 4 o'clock, 6 o'clock, 8 o'clock, 10 o'clock, and 12 o'clock:




FIG. 25

351 Patent at FIG. 25. These disclosures are consistent with, and provide written description support for, the requirements of claims 18-21. The evenly spaced six apertures illustrated in Figures 22, 24A, 24B, and 25 would essentially permit the blower to rotate, although discretely, almost a full 360 degrees, without apparent interference from a compressor, evaporator, or condenser. *See* 351 Patent at FIGS. 1, 29. There might be interference from other components, particularly the "supply side cover" and "drain pan," but Figures 1 and 29 certainly show rotatability greater than 270 degrees. *Id.* at 11:41-47.

Third, the above interpretation aligns with the prosecution history. During the prosecution of the 351 Patent, claim 72, which is now claim 18, was amended by an Examiner's amendment to change the language regarding the blower from "rotation about an axis" to "about [a] first axis," and to add the assembly limitation. JX-002-244. In adding the "assembly" limitation, the amendment further specified that the guiding cover requires adjustment/rotation about a "second axis." Thus, amending the claim language during prosecution from "an axis" to a "first axis" suggests that the blower's rotation must occur over a different axis than the assembly's rotation.

[redacted]

In the face of the claim language, specification, and prosecution history, Dometic argues that, despite the differences in terminology between the axis limitation and the assembly limitation, "Claim 18's language states explicitly that the assembly ***alone***—specifically the rotation of the duct element—alters the orientation of the blower outlet 'towards a first direction and a second direction' by adjusting the blower (and thereby its outlet) about the main body." CIB at 18 (emphasis in original); *see also id*. at 17 ("First, the claim language states the claimed blower and the claimed outlet's adjustment … occurs because of the assembly, namely the duct element being rotatably adjustable around the guiding cover."). Claim 18's language does not support such an understanding, nor does Dometic identify any convincing evidence to support it. *Id.* at 17-21; CRB at 6-7. The Accused and DI Products provide context, but they are not relevant here to ascertaining claim scope. *See* CIB at 18, 20-21; *Cohesive Techs., Inv. v. Waters Corp*., 543 F.3d 1351, 1367 (Fed. Cir. 2008) (a "claim is construed in light of [the intrinsic evidence,] not in light of the accused device" (citation and quotation marks omitted)). And while the duct element, when coupled to the blower, is rotatably adjustable around the guiding cover and offers one claimed means for adjusting the blower's outlets, it does not follow that this is the only means, as the claim language shows. *See* CIB at 17-19.

Beyond the claim language, Dometic argues that the specification supports its proposed construction. CIB at 18-19. Dometic focuses particularly on the disclosure relating to the coupling of the duct element onto the blower so the two elements can rotate as a unitary structure about the guiding cover. *Id.* (citing 351 Patent at 11:1-3, 10-20); *see* CRB at 7-8. Certainly the specification discloses such an embodiment, but it also discloses keeping the "maximum height of the air conditioner . . . below a certain value" by "attaching the blower 2 to duct element 184 so that, when axis B (FIG. 30B-1) is at its lowest relative to axis A, the blower 2 is oriented to reach its

[redacted]

vertically longest position." 351 Patent at 12:11-16. If the blower can be attached to the duct element in a configuration to "reach its vertically longest position," it stands to reason that it can also be attached in a configuration to reach a different position, which would necessitate rotating the blower about axis B and then attaching it to the duct element at a different "predetermined orientation." *Id.* at 12:10. Thus, a person of ordinary skill in the art would understand that decoupling the duct element from the blower, rotating it a discrete amount, and then recoupling it is a means of rotation contemplated by the claim. *See* CIB at 18.

And even if Dometic's understanding is what the inventors desired for claim 18's scope, the claim must be construed "as written, not as the patentees wish they had written it." *Chef America, Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004). Dometic's proposed construction, in fact, would read the axis element entirely out of the claim, as well as require the blower's outlet orientation to change solely as a result of adjusting the assembly. Under Dometic's interpretation, claim 18 would effectively read (*see* RRB at 5):

> An air conditioning device for a nautical vehicle including:
>
> a main body; and
>
> a blower including an inlet and an outlet, the inlet being in air communication with the main body~~, the blower being rotatable about first axis so that the outlet can be oriented toward a first directon and a second direction, and the first and second directions point to substantially different lateral sides of the main body~~, and
>
> an assembly for adjusting the blower with respect to the main body about a<u>n</u> ~~second~~ axis so as to alter an orientation of the outlet <u>so that the outlet can be oriented toward a first direction and a second direction, and the first and second directions point to substantially different lateral sides of the main body,</u> the assembly including
>
> a guiding cover and a [cylindrical] duct element for maintaining the main body and the blower in air communication with one another,

[redacted]

> the duct element having a first base and a second base, and coupled to the blower at the second base, the first base of the duct element dimensioned to correspondingly fit the guiding cover, and
>
> the duct element being [rotatably] adjustable around the guiding cover about the ~~second~~ axis at the first base so as to alter the orientation of the outlet.

Dometic further contends that Respondents' interpretation is "estopped" because it depends on untimely arguments inconsistent with the claim construction they advanced during the *Markman* process. CRB at 4 & n.1; *see also id.* at 6 (regarding whether the axes must be different). But although Respondents principally argued during the *Markman* process that "the axes in claim 18 must be different," that is, they could not be colinear, they also argued that claim 18 could not "have only one axis of rotation." EDIS Doc. ID No. 792262 at 22-23.

The *Markman* Order found that the first and second axes "need not be different," thereby rejecting Respondents' proposed construction and largely adopting Dometic's. *See* Order No. 11 at 26. The *Markman* Order did not, however, expressly address Respondents' argument that a single identifiable axis of rotation cannot satisfy claim 18. *Id*. at 22-26. In fact, it characterized "how the first axis fits into all this" as an open question, noting that "claim 18 does not recite exactly how the blower is 'rotat[ed] about [the] first axis.'" *Id*. at 25. And the *Markman* Order further observed that "the shape of the duct element (symmetrical vs. asymmetrical) determines whether the axes of rotation are identical or merely parallel." *Id*. at 25. Implicit in the observation that the two axes may be "identical or merely parallel" is that there must be two such axes. But this was not an explicit holding, and finding that the two axes "need not be different" (which was the explicit holding) did not resolve whether only one axis is permissible.

At the hearing both sides were urged to brief this dispute in their post-hearing filings. *See* Tr. at 834:13-835:2. Accordingly, the issues the parties were asked to brief have not been addressed or ruled on before, and Respondent's interpretation is neither untimely nor inconsistent

[redacted]

with Order No. 11. *See* CRB at 4-9. And even if their current proposal is inconsistent with prior orders, a tribunal may "revisit, alter, or supplement its claim constructions" as needed. *In re Papst Licensing Digital Camera Patent Litigation*, 778 F.3d 1255, 1261 (Fed. Cir. 2015). Finally, as to the extrinsic evidence, although the testimony of Dr. Paulus and Mr. Pabisz (*see* RIB at 16-17) has been considered, it is outweighed by the intrinsic evidence.

As a result, the balance of evidence shows the axis limitation of claim 18, "the blower being rotatable about [a] first axis so that the outlet can be oriented toward a first direction and a second direction," means what it states: it requires a type of rotation distinct from the assembly's rotation, and involving a different structural component than the claimed assembly. This construction, to be sure, assigns a broad meaning to "rotatable," because the rotation of the preferred embodiment is cumbersome, but a construction that excludes the preferred embodiment is "rarely, if ever, correct." *See Vitronics*, 90 F.3d at 1583. So at minimum a structure corresponding to the preferred embodiment (as in FIG. 24B) satisfies the claim.

Lastly, the parties were asked to brief whether the requirement that "the first and second directions point to substantially different lateral sides of the main body" (the "directional limitation") can be satisfied by the claimed assembly, or must be satisfied by the structure that also satisfies the axis limitation. *See* 351 Patent at cl. 18; Tr. at 834:17-835:2, 839:1-11. Respondents expressly urge the latter. *See* RIB at 19 (arguing that the directional limitation is satisfied by "rotation of the blower about the first axis" rather than by "rotation [of the duct element] around the guiding cover"). Dometic's position, by contrast, is that only one type of rotation is needed, so its arguments unsurprisingly all presuppose that the directional limitation may be satisfied by the assembly. *E.g.*, CIB at 44-45 ("the center point of the first base will be the center point of rotation of the blower and the cylindrical duct element") (emphasis omitted).

[redacted]

Again, Dometic's proposed construction would, in essence, improperly move the directional limitation into the assembly limitation, even though the antecedent basis of "the first and second directions" is clearly "a first [direction] and a second direction," which is part of the axis limitation. *Id.* Furthermore, dependent claims 20 and 21 add the requirement that the "blower," not the assembly, must be "rotated" or "rotatable" in certain ways. *Id.* at cls. 20, 21. And although claim 19 does not recite a blower, its antecedent basis for "the first direction and the second direction" is also clearly found in the axis limitation. *Id.* at cl. 19.

So the claim language demonstrates that the directional limitation pertains to the blower, not to the assembly. Dometic presents no specific arguments on the directional limitation beyond their arguments on the axis limitation, and the remaining intrinsic evidence supports Respondents' proposed construction for the same reasons it supports Respondents' proposed construction of the axis limitation. *See* CIB at 15-21. Therefore, the directional limitation of claim 18, "the first and second directions point to substantially different lateral sides of the main body," incorporating the construction from Order No. 11, is construed as "said first and second directions resulting from rotation about said first axis point to substantially opposing sides of the main body with respect to a vertical plane."

**D. Infringement**

According to Dometic's post-hearing briefing, the use, manufacture, or sale of the Accused Products infringes claims 18-22. *See* CIB at 22-42. Of these, claim 18 is independent, and claims 19-22 each depend directly or indirectly from claim 18. For reference, claim 18 of the 351 Patent requires:

18. An air conditioning device for a nautical vehicle including:

a main body; and

[redacted]

> a blower including an inlet and an outlet, the inlet being in air communication with the main body, the blower being rotatable about [a] first axis so that the outlet can be oriented toward a first [direction] and a second direction, and the first and second directions point to substantially different lateral sides of the main body, and
>
> an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet,
>
> the assembly including a guiding cover and a [cylindrical] duct element for maintaining the main body and the blower in air communication with one another,
>
> the duct element having a first base and a second base, and coupled to the blower at the second base, the first base of the duct element dimensioned to correspondingly fit the guiding cover, and the duct element being [rotatably] adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet.

351 Patent at cl. 18. The principal disputes raised by Respondents involve the blower on the Accused Products being rotatable about a first axis (the axis limitation) and the directions to which it points being on substantially different lateral sides of the main body (the directional limitation). *See* RIB at 35-37. Respondents specifically contend that the blower on the Accused Products cannot rotate relative to the duct element, so that neither the axis limitation nor the directional limitation is satisfied. *See id*. at 35-37.

This contention was stricken, as both sides acknowledge, so Respondents have, in essence, no permissible noninfringement argument. *See* RIB at 35; CRB at 12; Tr. at 12:7-21. Nonetheless, as alluded to above, Mabru's Accused Products satisfy both limitations, while Citimarine's do not. And in view of the testimony of Dr. Paulus that the Accused Products meet the remaining limitations which are not in dispute, the Accused Products have been shown to meet them as alleged.

[redacted]

### 1. Claim 18

**a. An air conditioning device for a nautical vehicle including: a main body; and a blower including an inlet and an outlet, the inlet being in air communication with the main body**

This limitation is not disputed. *See* RIB at 35-37. Dometic offered expert opinion that each of the Accused Products are marine air conditioning devices for use in nautical vehicles, based on Dr. Paulus's examination of the Mabru SC07 and the Citimarine CT-6. Tr. (Paulus) at 410:19-412:10. Dr. Paulus also opines that the Mabru SC07 and the Citimarine CT-6 include a main body and a blower including an inlet and an outlet, the inlet being in air communication with the main body. *Id.*; *see* CX-0832;,CX-0872, CX-0906, CX-0914; CDX-005.35. Dr. Paulus cites annotated images of the Mabru SC07 and the Citimarine CT-6, indicating the main body, blower, inlet, and outlet:




CX-0832; CX-0872.

[redacted]




CX-0906; CX-0914.

Respondents do not rebut Dr. Paulus's testimony or dispute the evidence regarding these limitations. Accordingly, Dometic has proven by a preponderance of evidence that the Accused Products at issue are each "[a]n air conditioning device for a nautical vehicle including: a main body; and a blower including an inlet and an outlet, the inlet being in air communication with the main body." *See* CIB at 24-26.

**b. the blower being rotatable about [a] first axis so that the outlet can be oriented toward a first direct[i]on and a second direction, and the first and second directions point to substantially different lateral sides of the main body, and**

With respect to the Accused Products, Dometic argues that this limitation is met because "the duct element and the blower operate as a unitary structure during rotation and rotate together about the same axis to orient the direction of the outlet—i.e., the first and second axes of the Accused Products are identical and fall within the scope of Claim 18." CIB at 26; Tr. (Paulus) at 412:11-414:7, 415:1-11, 481:1-483:16 (describing how ducts of Accused Products are mated to their blowers), 481:24-482:6; CDX-005.36; JX-0195C at ¶¶ 125-130; CX-0851; CX-0876; CX-

[redacted]

1011; CX-0912. Dometic further contends that "the blower outlet of the Accused Products can be oriented toward a first direction and a second direction as claimed via rotating the blower/duct element about the same axis." CIB at 27; CX-1069.013; CX-0496; CX-0499; JX-0089.011; JX-0092.

As construed above, "the blower being rotatable about [a] first axis" requires rotation of the blower involving a structural component other than the "assembly for adjusting the blower," and the two claimed directions must "result[] from rotation about said first axis." Dometic has not shown, by a preponderance of the evidence, that the Citimarine CT-6 meets this requirement. *See* CIB at 22-35. Nor has Dometic made such a showing for the Mabru SC07. *See id*. Therefore, Dometic has not met its burden of proving that the axis and directional limitations are met in any Accused Product.

Examination of the physical and photographic evidence nonetheless shows that both limitations are met in the Mabru SC07, but not in the CT-6. In the Citimarine CT-6, the duct element is coupled to the blower by five screws:

[redacted]




DOMETIC00004505
CX-0880-001

CX-0880. As depicted, a duct element is coupled to blower, and is detached from the main body of the CT-6. The duct element has five apertures (where one is only slightly visible given the camera perspective), which are arranged in a five pointed star pattern or pentagon-like shape, with each aperture containing a screw. Measurement of the distances of the apertures from each other shows that when all five screws are removed, the blower and duct element can be rotated relative to each other, but there is no amount of rotation where all five apertures line up, such that all five screws can be used to reattach the blower and duct element at other than the original orientation. *See* CPX-0001; CX-0880. This was manually tested; when the blower is rotated approximately 60-70 degrees (in either direction), at most four of five screws can be inserted, and the greater the rotation the fewer the apertures that line up. Thus, without drilling new apertures, only one orientation of the blower relative to the duct element is possible where all five screws secure the two components.

[redacted]

And attaching the blower and duct element after rotation with fewer than the intended number of screws surely does not fall within the scope of "rotatable" about an axis. So the duct element cannot be rotated 90, 180, or 270 degrees, or any other amount, relative to the blower and then reattached, simply because the screw holes do not line up. Nor is there any other evidence of the required "rotatab[ility]." Therefore, the axis and directional limitations are not satisfied in the Citimarine CT-6.

Examination of the Mabru SC07, however, shows that the duct element is coupled to the blower by screws placed in four evenly-spaced apertures. Measurement of the distances of the apertures from each other shows that four orientations of the blower relative to the duct element are possible; the duct element can be rotated 90, 180, or 270 degrees, and then reattached, because the apertures are evenly spaced apart. This was confirmed by manual testing. *See* CPX-0002 (physical exemplar of the SC07). To be sure, the testimony on this point is equivocal, because although Dr. Paulus initially testified that the duct element and blower were attached by screws, he later agreed that they were attached by welds. *See* Tr. (Paulus) at 482:7-17. The confusion results from the insulation covering the screws:

[redacted]



CX-1012. One such screw can be seen in the photograph above on the upper right of the flat portion of the duct element, partially covered by insulation, and the remaining three are completely covered by the insulation. *See* CPX-0002. The welds appear to be how the cylindrical portion of the duct element is attached to the flat portion of the duct element, rather than how the duct element is attached to the blower.

In any event, insulation adjustment and manual disassembly confirmed that the duct element and blower can be detached, rotated 90, 180, 270, and 360 degrees, and then reattached (at each orientation) using all four screws. Moreover, although such rotation likely requires detaching the duct element from the guiding cover to gain access to the four screws, the SC07 installation manual shows that no other component interferes with rotation, by at least 90 degrees,

[redacted]

to either side of the main body with respect to a vertical plane. *See* CX-1069 at 13. Therefore, although Dometic has not proven that Mabru's Accused Products meet the axis or directional limitations, in fact those limitations are satisfied in those products.

**c. an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet, the assembly including a guiding cover and a cylindrical duct element for maintaining the main body and the blower in air communication with one another,**

This limitation is not disputed. *See generally* RIB at 35-37; CIB at 30-32. Dometic offered expert opinion that each of the Accused Products includes an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet. Tr. (Paulus) at 417:10-418:21; *see also* CDX-005.37-38; JX-0195C at ¶¶ 70-76. Respondents, moreover, admit that this feature is present. *See* JX-0387C.007-008 (admitting that the Citimarine Accused Products have an assembly for rotating the blower's orientation with respect to the main body); JX-0388C.007-008 (similar admission for the Mabru Accused Products). Additionally, Dr. Paulus identifies the assembly (Tr. (Paulus) at 414:8-417:9; JX-0195C at ¶¶ 70-76) and provides the following annotated photographs:

[redacted]




CDX-005.37 (excerpted); *see also* CX-0872; CX-0883; CX-0854; CX-0851.




CDX-005.37 (excerpted); *see also* CX-0914; CX-0913; CX-0912; JX-0089.008. Therefore, "an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet, the assembly including a guiding cover and a cylindrical duct element

[redacted]

for maintaining the main body and the blower in air communication with one another" claim limitation is met by the Accused Products.

**d. the duct element having a first base and a second base, and coupled to the blower at the second base, the first base of the duct element dimensioned to correspondingly fit the guiding cover, and**

This limitation is not disputed. Dometic offered expert opinion that the assembly of each of the Accused Products includes a duct element with a second base coupling it to the blower, and a first base dimensioned to fit the guiding cover. *See* Tr. (Paulus) at 417:10-418:21. This is visible in the annotated photographs of the Mabru SC07 and the Citimarine CT-6 above. *See id.*; CDX-005.39. Therefore, "the duct element having a first base and a second base, and coupled to the blower at the second base, the first base of the duct element dimensioned to correspondingly fit the guiding cover" claim limitation is met by the Accused Products.

**e. the duct element being rotat[a]bly adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet.**

This limitation is not disputed, and Dr. Paulus provided unrebutted testimony confirming the Accused Products have this claim element. *See* Tr. (Paulus) at 418:22-420:9; CDX-005.40; JX-0195C, ¶¶ 80-82. As shown in the same annotated images above, the duct element of the Accused Products is rotatably adjustable relative to the guiding cover and can be rotated about a second axis at the first base so as to alter the orientation of the blower outlet of the Accused Products. *See* Tr. (Paulus) at 418:22-420:9; CDX-005.40; JX- 0195C, ¶¶ 80-82; CX-0881; CX-0854; CX-0851; CX-0914; CX-0913; CX-0912. Respondents' product literature confirms their blowers are rotatably adjustable. *See, e.g.*, CX-1069 at 13 ("Adjust the air outlet by loosening the lock screw and secure the screw tightly once the air outlet is adjusted at the optimal location."); CX-1013 at 8. Therefore, the "duct element being rotat[a]bly adjustable around the guiding cover

[redacted]

about the second axis at the first base so as to alter the orientation of the outlet" claim limitation is met by the Accused Products.

### 2. Claim 19

For reference, claim 19 of the 351 Patent requires:

> 19. The air conditioning device of claim 18, wherein the first direction and the second direction point to substantially opposite directions.

351 Patent at cl.19. For this limitation, Dometic relies on the same theory, evidence, and testimony as for claim 18, combined with Dr. Paulus' testimony and photographs showing the degree to which the Accused Products can rotate. *See* CIB at 35-36; CDX-005.41. Respondents do not contest that this limitation is met. *See* RIB at 37-38. Nonetheless, because Dometic has not carried its burden to show that claim 18 is infringed, claim 19 necessarily is not infringed, and the degree of rotation required by claim 19 is produced by rotation of the duct element around the guiding cover, not by rotation of the blower relative to the duct element, as the claim requires. *See* Tr. (Paulus) at 418:22-421:7. So although it is more likely than not that the Mabru SC07 blower and duct element can be oriented so that they may be detached, rotated 180 degrees, and reattached, thus satisfying the additional element of claim 19, Dometic cites no evidence of this. And the Citimarine CT-6 blower is incapable of so rotating. Therefore, the Accused Products do not infringe claim 19.

### 3. Claim 20

For reference, claim 20 of the 351 Patent requires:

> 20. The air conditioning device of claim 19, wherein the blower can be rotated without interference from a compressor, an evaporator or a condenser.

351 Patent at cl. 20. For this limitation, Dometic relies on the same theory, evidence, and testimony as for "the blower being rotatable" limitation recited in claim 18, combined with Dr. Paulus' testimony and photographs showing no interference from the claimed components when the

[redacted]

blowers of the Accused Products rotate. *See* CIB at 36-37; CDX-005.42. Accordingly, the element added by claim 20 is satisfied by the CT-6 and SC07, although in the SC07 the blower must be "pull[ed] out some" to avoid obstruction from either a condenser or a drain. *See* Tr. (Paulus) at 422:2-424:5, 466:1-10, 468:3-13; RIB at 38-39. Nonetheless, because Dometic has not carried its burden to show that claims 18 and 19 are infringed, claim 20 necessarily is not infringed. Therefore, the Accused Products do not infringe claim 20.

#### 4. Claim 21

For reference, claim 21 of the 351 Patent requires:

> 21. The air conditioning device of claim 18, wherein the blower is rotatable by more than 270 degrees.

351 Patent at cl. 21. As Dr. Paulus testified, both representative Accused Products have blowers that are rotatable 270 degrees, although, as noted, the SC07 requires the blower to be pulled out to increase the gap between it and the main body:

[redacted]







CDX-005.43; *see* Tr. (Paulus) at 424:6-426:2.

Respondents dispute this limitation. *See* RIB at 39-40. First, they argue that the Accused Products, as sold, both include a blower outlet extension called a "duct ring" that prevents rotation around a full 270 degrees. *See id*. The 351 Patent refers to this component as a "duct collar 216":

[redacted]

CONFIDENTIAL MATERIAL OMITTED




FIG. 28

351 Patent at 11:37-39, FIG. 28. Regardless of its name, claim 21 does not recite such a component, and the specification clearly distinguishes between it and the "outlet 218 of the blower," to which it is "coupled." *See id*. The Shanghai Respondents manufacture Citimarine's products [redacted]. (*see* Tr. (Liang) at 284:2-14, 293:2-7; JX-0036C (showing Citimarine's blower design)), and [redacted] (*see* JX-0007C (Ripoll) at 264:23-265:3). So Citimarine's Accused Products are imported without a duct ring, and are therefore capable of 270 degrees of rotation upon importation, even if some are later sold after Citimarine attaches duct rings.

Mabru's Accused Products, however, are manufactured and imported with duct rings already attached. *See* JX-0018 at 1-4; JX-0020C; Tr. (Liang) at 285:2-286:6, 294:15-24. Mabru

[redacted]

does sell blowers separately that do not have duct rings, but there is otherwise insufficient evidence that Mabru's Accused Products lack them either upon importation or upon sale, even if the duct rings may be removed after sale, as in the physical exemplar of the SC07. *See* JX-008C (Mabru) at 65:10-16; CIB at 37-39; CRB at 17-19; RPX-003. And Dometic does not dispute that the duct ring on the SC07 must be removed to achieve 270 degrees of rotation. *See* CIB at 37-39; CRB at 17-19. So Respondents' point is well taken as to the Mabru SC07.

Respondents secondly argue that to the extent the Accused Products must be operable at every orientation within the claimed 270-degree range, they do not infringe because they are not so operable. *See* RIB at 40. In their prehearing brief, Respondents contended that the Accused Products were "inoperable as designed" in certain blower orientations. RPB at 38. But as Dometic correctly notes, their present, broader argument is new, and is therefore disregarded. *See* CRB at 17.

Accordingly, the element added by claim 21 (inasmuch as it involves rotation of any sort, rather than rotation of the blower relative to the duct element) is satisfied by the CT-6, but not the SC07. Nevertheless, because Dometic has not carried its burden to show that claim 18 is infringed, claim 21 necessarily is not infringed. Therefore, the Accused Products do not infringe claim 21.

**5. Claim 22**

For reference, claim 22 of the 351 Patent requires:

> 22. The air conditioning device of claim 18, wherein the air conditioning device further includes a clamp element for maintaining the blower oriented with respect to the main body, and wherein only loosening of the clamp element is necessary to change orientation of the blower.

351 Patent at cl. 22. Respondents do not dispute that Mabru's Accused Products are imported with a clamp element installed to prevent rotation of the duct element around the guiding cover. *See* RIB at 40-41; RRB at 14. And when sold the clamp element is the only component preventing

[redacted]

such rotation. *See* CX-1069 at 13; Tr. (Liang) at 296:8-20 (Mabru's Accused Products are manufactured with a bracket as well as a clamp). So for Mabru's Accused Products the additional element of claim 22 is satisfied.

For Citimarine's Accused Products, though, when sold the clamp element is in a separate package and the duct element is held in place by "two screws" and a "zip tie." CIB at 40; *see* JX-0198C at 2; Tr. (Paulus) at 455:5-20; *see also* Tr. (Paulus) at 426:10-18 (describing the unboxing process of the Citimarine unit – "the one that I inspected came with a zip tie holding the blower in place, and if you open the manual -- or actually, when you open the packaging that comes with it, it comes with the band clamp, and it comes with a manual), 428:1-429:1. Citimarine's tutorial video (CX-1010), referred to as the "CTM Marine - CT Self-Contained Marine Air Conditioner Installation Tutorial Video," demonstrates that the CT-6 comes with a band clamp, referred to as a "Hose Clamp" for blower or ducting, which is not attached to the unit as sold:




CX-1010 at 00:50. And when manufactured there is a "bracket" holding the blower in place.

[redacted]

Tr. (Liang) at 296:8-20. So there is no evidence that "only loosening" the clamp element is necessary to change blower orientation, without modification of the CT-6 by the user. 351 Patent at cl. 22. Dometic is correct that this argument, as made by Respondents, was stricken, but this does not relieve Dometic of its burden to prove direct infringement. *See* CRB at 19 (citing Order No. 28 at 5). Dometic has not done so, and has not advanced an indirect infringement argument, so the additional element of claim 22 has not been shown in the CT-6 under either theory. *See* CIB at 39-41.

Accordingly, the element added by claim 22 is satisfied by the SC07, but not the CT-6. Nonetheless, because Dometic has not carried its burden to show that claim 18 is infringed, claim 22 necessarily is not infringed. Therefore, the Accused Products do not infringe claim 22.

**E. Domestic Industry – Technical Prong**

According to Dometic's post-hearing briefing, the DI Products practice claims 18-22. *See* CIB at 42-54. Of these, claim 18 is independent, and claims 19-22 each depend directly or indirectly from claim 18. For reference, claim 18 of the 351 Patent requires:

18. An air conditioning device for a nautical vehicle including:

a main body; and

a blower including an inlet and an outlet, the inlet being in air communication with the main body, the blower being rotatable about [a] first axis so that the outlet can be oriented toward a first [direction] and a second direction, and the first and second directions point to substantially different lateral sides of the main body, and

an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet,

the assembly including a guiding cover and a [cylindrical] duct element for maintaining the main body and the blower in air communication with one another,

the duct element having a first base and a second base, and coupled to the blower at the second base, the first base of the duct element dimensioned to correspondingly fit the guiding cover, and the duct element being [rotatably]

[redacted]

> adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet.

351 Patent at cl. 18. The bulk of the physical and photographic evidence of the DI Products pertains to the DTG (represented by the DTG8), because the Voyager product line is so new that Dr. Paulus did not have an opportunity to inspect it prior to submitting his expert report. *See* Tr. (Paulus) at 379:4-19. However, he was able to confirm his opinions regarding the Voyager by examining one just prior to the hearing. *See id*. As a result, Dr. Paulus' opinions generally pertain to both DI Products, and Respondents do not dispute that the Voyager and DTG are essentially the same for purposes of analyzing DI technical prong. *See id*. at 396:19-397:10.

The principal disputes raised by Respondents, for all claims, are that the DI Products do not satisfy the axis limitation, "the blower being rotatable about [a] first axis so that the outlet can be oriented toward a first [direction] and a second direction," and that they lack a "cylindrical" duct element. *See* RIB at 41-46. Respondents acknowledge, as they must, that the first argument has been stricken. *See id*. at 45; CRB at 22-23 (citing Tr. at 12:7-24). And the second argument is meritless, because a construction that excludes the preferred embodiment is "rarely, if ever, correct," and the DI Products possess duct elements shaped like the same asymmetric truncated cones found in one of the two embodiments disclosed in the 351 Patent:

[redacted]



FIG. 24B



351 Patent at FIG. 24B; CX-0956; *Vitronics*, 90 F.3d at 1583. Therefore, the DI Products possess duct elements having shapes falling within the scope of "cylindrical."

As summarized above, though, the fact that Respondents have no meaningful rebuttal does not mean the DI Products fall entirely within the scope of claims 18-22. The evidence shows that they do not satisfy either the axis limitation or the directional limitation, and Dometic makes no effort to prove that they do. All the elements are nevertheless considered below.

**1. Claim 18**

**a. An air conditioning device for a nautical vehicle including: a main body; and a blower including an inlet and an outlet, the inlet being in air communication with the main body**

Dometic offered expert opinion that each of the DI Products are marine air conditioning devices for use in nautical vehicles, based on Dr. Paulus's examination of them. Tr. (Paulus) at 385:4-15. Dr. Paulus also opines that the DI Products contain a main body and a blower including an inlet and an outlet, the inlet being in air communication with the main body. *Id.* at 385:4-22. Accordingly, Dometic has proven by a preponderance of evidence that the DI Products at issue are

[redacted]

each "[a]n air conditioning device for a nautical vehicle including: a main body; and a blower including an inlet and an outlet, the inlet being in air communication with the main body."

**b. the blower being rotatable about [a] first axis so that the outlet can be oriented toward a first direct[i]on and a second direction, and the first and second directions point to substantially different lateral sides of the main body, and**

As with the Accused Products, Dometic argues that the axis and directional limitations are met in the DI Products because "the duct element and the blower operate as a unitary structure during rotation and rotate together about the same axis to orient the direction of the outlet—i.e., the first and second axes of the DI Products are identical and fall within the scope of Claim 18." CIB at 45. Dometic further contends that "the blower outlet of the DI Products can be oriented toward a first direction and a second direction as claimed via rotating the blower/duct element about the same axis." CIB at 46.

But the DI Products, like Citimarine's Accused Products and unlike Mabru's Accused Products, have an asymmetric five-aperture configuration for attaching the duct element to the blower:

[redacted]





CX-0880; CX-0956. Although the absolute distances between each pair of apertures in the DI Products differ from the distances in the CT-6—they are closer together in the DI Products—the relative orientations of the five apertures are clearly virtually identical.

More to the point, manual disassembly, rotation, and attempted reattachment of the screws confirmed that both representative DI Products (the DTG (CPX-0003) and Voyager (CPX-0006)) suffer from the same problem as the CT-6: only one orientation is possible where all five apertures line up so that all five screws secure the duct element to the blower. And again, as construed, "the blower being rotatable about [a] first axis" requires rotation of the blower involving a structural component other than the "assembly for adjusting the blower," and the two claimed directions must "result[] from rotation about said first axis." Dometic has not shown, by a preponderance of the evidence, that the DI Products meet either requirement. *See* CIB at 44-47. Therefore, Dometic has not met its burden of proving that the axis and directional limitations are met in the DI Products.

**c. an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet, the assembly including a guiding cover and a cylindrical**

[redacted]

**duct element for maintaining the main body and the blower in air communication with one another,**

Dometic offered expert opinion that the DI Products include an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet. Tr. (Paulus) at 387:7-388:12; *see also* CDX-005.37-38. The assembly includes a guiding cover and duct element for maintaining the main body and blower in air communication with each other:



CX-0977. Therefore, "an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet, the assembly including a guiding cover and a cylindrical duct element for maintaining the main body and the blower in air communication with one another" claim limitation is met by the DI Products.

**d. the duct element having a first base and a second base, and coupled to the blower at the second base, the first base of the duct element dimensioned to correspondingly fit the guiding cover, and**

Dometic offered expert opinion that the assembly of the DI Products includes a cylindrical duct element having a first base dimensioned to fit the guiding cover, and a second base coupled to the blower, as shown in the photograph above. *See* Tr. (Paulus) at 388:13-389:22; CDX-005.25.

[redacted]

Therefore, "the duct element having a first base and a second base, and coupled to the blower at the second base, the first base of the duct element dimensioned to correspondingly fit the guiding cover" claim limitation is met by the DI Products.

**e. the duct element being rotat[a]bly adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet.**

Dr. Paulus provided unrebutted testimony confirming the DI Products have this claim element. *See* Tr. (Paulus) at 389:23-390:18; CDX-005.26. He provides annotated images showing how the DI Products' duct element is rotatably adjustable relative to the guiding cover and can be rotated about a second axis at the first base so as to alter the orientation of the blower outlet:




CDX-005.26; CX-0967; CX-0969. Therefore, the "duct element being rotat[a]bly adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet" claim limitation is met by the DI Products.

[redacted]

### 2. Claim 19

For reference, claim 19 of the 351 Patent requires:

> 19. The air conditioning device of claim 18, wherein the first direction and the second direction point to substantially opposite directions.

351 Patent at cl.19. For this limitation, Dometic relies on the same theory, evidence, and testimony as for claim 18, combined with Dr. Paulus' testimony and photographs showing the degree to which the DI Products can rotate. *See* CIB at 51; CDX-005.27; Tr. (Paulus) at 390:19-391:18. As shown in the photograph above, the required directions are met by movement of the assembly. *See* CDX-005.27. Nonetheless, because Dometic has not carried its burden to show that claim 18 is practiced, claim 19 necessarily is not practiced, and the degree of rotation required by claim 19 is produced by rotation of the duct element around the guiding cover, not by rotation of the blower relative to the duct element, as the claim requires. Therefore, the DI Products do not practice claim 19.

### 3. Claim 20

For reference, claim 20 of the 351 Patent requires:

> 20. The air conditioning device of claim 19, wherein the blower can be rotated without interference from a compressor, an evaporator or a condenser.

351 Patent at cl. 20. For this limitation, Dometic relies on the same theory, evidence, and testimony as for claim 18, combined with Dr. Paulus' testimony and photographs showing no interference from the claimed components when the blowers of the DI Products rotate. *See* CIB at 52; CDX-005.28; Tr. (Paulus) at 391:19-392:19. The presence of this limitation was confirmed by manual rotation of the blower on the physical exemplar of the DTG (CPX-0003); the only component preventing 360 degrees of rotation was a portion of the drain pan. Nonetheless, because Dometic has not carried its burden to show that claims 18 and 19 are practiced, claim 20 necessarily is not practiced. Therefore, the DI Products do not practice claim 20.

[redacted]

#### 4. Claim 21

For reference, claim 21 of the 351 Patent requires:

> 21. The air conditioning device of claim 18, wherein the blower is rotatable by more than 270 degrees.

351 Patent at cl. 21. As Dr. Paulus testified, the DI Products have blowers that are rotatable 270 degrees, and this was confirmed by manual rotation of the blower on the physical exemplar of the DTG. *See* Tr. (Paulus) at 392:20-394:9; CDX-0005.28-.29; CPX-0003. Although Respondents make no issue of it, neither physical exemplar in evidence, of the DTG (CPX-0003) or of the Voyager (CPX-0006), possesses a duct ring. In any event, because Dometic has not carried its burden to show that claim 18 is practiced, claim 21 necessarily is not practiced. Therefore, the DI Products do not practice claim 21.

#### 5. Claim 22

For reference, claim 22 of the 351 Patent requires:

> 22. The air conditioning device of claim 18, wherein the air conditioning device further includes a clamp element for maintaining the blower oriented with respect to the main body, and wherein only loosening of the clamp element is necessary to change orientation of the blower.

351 Patent at cl. 22. As shown in the photograph above (CX-0977), the DI Products possess a clamp element, and only a clamp element, for changing orientation of the blower and maintaining that orientation. *See* CX-0977; Tr. (Paulus) at 394:10-395:22; CDX-0005.30. One of the brochures describing the DTG states this. *See* CX-0259 at 2. Accordingly, the element added by claim 22 is satisfied by the DI Products. Nonetheless, because Dometic has not carried its burden to show that claim 18 is practiced, claim 22 necessarily is not practiced. Therefore, the DI Products do not practice claim 22.

[redacted]

### F. Validity

#### 1. Prior Art

Respondents assert that three alleged prior art products anticipate the Asserted Claims: the Vector Compact, Vector Rotary, and Vector Turbo. *See generally* RIB at 48-73. All three Vector products were sold by Dometic or a predecessor in interest, and all three were or are marine air conditioning units with centrifugal blowers. *See generally* JX-0127; JX-0184; Tr. (Marciano) at 80:17-81:10. Respondents also assert obviousness over various combinations of references, and cite to products sold by Lunaire, namely, the LPSC and VBSC products, as well as U.S. Patent No. 5,848,536 ("Dodge"). *See id*. at 76-94. These, too, embodied or describe marine air conditioning units with centrifugal blowers:

Lunaire VBerth



Vector Rotary



Dodge



Vector Compact



RIB at 65 (citing JX-0190 (Lunaire VBSC); JX-0184 (Vector Rotary); JX-0288 (Dodge); JX-0191 (Vector Compact)).

The Vector Compact qualifies as prior art pursuant to pre-AIA 35 U.S.C. § 102(b), as does Dodge because it issued in 1998. *See* Order No. 19, *aff'd with supplementation*, Comm'n Op. at 11 (Sep. 13, 2023); JX-0288. The Vector Rotary and both Lunaire products were on sale years before the priority date, and so also qualify as prior art pursuant to pre-AIA 35 U.S.C. § 102(b). *See* JX-0188 (installation manual dated "6/98"); JX-0281 (brochure with a date stamp of November 18, 1985); Tr. (Marciano) at 74:9-75:8.

Whether the Vector Turbo qualifies as prior art, however, requires more thorough consideration. Dometic admitted during discovery that the Vector Turbo was the subject of an

[redacted]

offer for sale on some unspecified date prior to February 9, 2007, and Dometic's motion to amend that discovery response was denied. *See* Order No. 13 at 2. But to qualify as prior art under the on-sale provision of pre-AIA 35 U.S.C. § 102(b), a product must have been both "on sale" and "ready for patenting." *Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55, 67 (1998). Respondents do not even identify a date by which the Vector Turbo was ready for patenting, much less cite any evidence about it, and for that reason alone, they have not carried their burden on the on-sale bar. *See* RIB at 72-73; RRB at 39. The evidence does show, though, that a prototype – what Dometic called a "prebuild" – was being tested in February 2007, and the 351 Patent's provisional application (filed on February 9, 2007) includes images showing what appears to be such a prototype. *See* Tr. (Pabisz) at 160:4-161:12; CX-0464C at 1; JX-0194. This satisfies the ready-for-patenting prong of *Pfaff*. *See Pfaff*, 525 U.S. at 67-68.

So the Vector Turbo qualifies as prior art if the 351 Patent's priority date is no earlier than February 9, 2008, one year after the product was both offered for sale and ready for patenting. The 351 Patent non-provisional application, however, was filed on January 29, 2008; the Vector Turbo is, therefore, not prior art under Section 102(b), and the parties' dispute over the provisional application's adequacy is immaterial. *See* RIB at 24-27; CRB at 56-57.

Nor is the Vector Turbo prior art under pre-AIA 35 U.S.C. § 102(a). *See* RIB at 71-72. Respondents cite no persuasive evidence that "others in the United States knew of [the invention] before the February 9, 2007, invention date." *Id*. They rely, in fact, only on Dometic's admission that the Vector Turbo was offered for sale before that date, which proves some sort of disclosure by Dometic but not full-fledged knowledge by others. *See id*. That Dometic (or the inventors) disclosed the claimed invention to others at a particular time does not show that others knew of the invention before then, if for no other reason because the claimed invention necessarily must

[redacted]

have been invented, that is, conceived, before it was disclosed to others. *See In re VerHoef*, 888 F.3d 1362, 1366 (Fed. Cir. 2018) ("[c]onception is the touchstone of invention" (citation and internal quotation marks omitted)). And although the actual invention date for Section 102(a) purposes is accordingly immaterial, there is considerable testimonial and documentary evidence that it was before February 9, 2007. *See* Tr. (Marciano) at 79:23-80:2; Tr. (Pabisz) at 164:14-167:7, 176:20-177:4; CX-0464C; RIB at 70.

Lastly, it appears that Respondents rely on Dodge and the Lunaire LPSC only to show the state of the art, rather than as references in obviousness combinations. *See generally* RIB at 76-94. Respondents specifically analyze three obviousness theories: (1) the Vector Compact as a single reference; (2) the Vector Compact combined with the Vector Rotary; and (3) the Vector Compact combined with the Lunaire VBSC. *See* RIB at 80. Therefore, no combinations involving Dodge or the Lunaire LPSC have been considered. *See* CRB at 36 n.12.

**2. Anticipation**

**a. Vector Compact**

As explained above, the only difference between claim 1 and claim 18 is that in claim 1 the first axis defines the blower's fan blade rotation, while in claim 18 the first axis defines the blower's rotation, such that the blower outlet may be oriented toward certain directions. *See* 351 Patent at cls. 1, 18. As also explained, the elements that distinguish claim 18 are the axis limitation ("the blower being rotatable about [a] first axis so that the outlet can be oriented toward a first [direction] and a second direction") and the directional limitation ("the first and second directions point to substantially different lateral sides of the main body"). *Id*. There is no genuine dispute that the Vector Compact meets the other limitations of claim 18, because it anticipates claim 1. *See* Order No. 19, *aff'd with supplementation*, Comm'n Op. at 11 (Sep. 13, 2023); Tr. (Tanbour) at 596:15-597:16.

[redacted]

The principal dispute involving the Vector Compact pertains to the directional limitation. *See* CIB at 62-68. Dometic contends that the Vector Compact blower cannot rotate to substantially different lateral sides, that is, "substantially opposing sides of the main body with respect to a vertical plane." *See id.* at 62-63 (citing Order No. 11 at 29). Dometic is correct; the Vector Compact's blower cannot so rotate, as Dr. Tanbour admitted. *See* Tr. (Tanbour) at 683:19-684:19 (impeachment with deposition testimony that "the protruding pipe . . . prevents the rotation to either lateral side"); *see also* RPX-001 (VCP12K); RPX-002 (VCP18K).

Against this finding, Respondents raise two arguments. *See* RIB at 62-66. First, they note that as a matter of claim differentiation, "rotation, as opposed to rotation without interference, is required by Claim 18," whereas rotation without interference from certain components is required by claim 20. RIB at 63. This is correct, but not clearly relevant. Claim 20 is limited to rotation "without interference from a compressor, an evaporator or a condenser," so claim 18 must encompass rotation both with and without interference from those components. 351 Patent at cls. 18, 20. But the component in the Vector Compact that prevents rotation to straight upward is a pipe that is not clearly and convincingly part of one of those three claimed components. Dr. Tanbour testified at the hearing that the pipe was the "outlet of the condenser," and Dr. Paulus apparently characterized it as part of the "condenser coil," but Dr. Tanbour also described it as the "condenser coil outlet pipe," and the Vector Compact manual suggests it may just be part of the conduit connecting the condenser to the "overboard discharge." Tr. (Tanbour) at 598:17-599:3, 683:15-18; Tr. (Paulus) at 762:21-763:23; JX-0127 at 7. Inasmuch as it is a conduit to the overboard discharge, it is more like a "drain," which Dr. Paulus testified is not a compressor, evaporator, or condenser, than it is like one of the three claimed components, and Respondents' argument is beside the point. *See* Tr. (Paulus) at 423:13-17.

[redacted]

Second, Respondents argue "inherent disclosure of 360 degrees of rotation." RIB at 62. Respondents correctly cite *Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003), for the proposition that "a prior art reference may anticipate . . . if [the] missing characteristic is necessarily present, or inherent, in the single anticipating reference." *See* RRB at 32. They make no effort, however, to demonstrate that 360 degrees of rotation is "necessarily present" in the Vector Compact. *See id.* at 32-35; RIB at 62-66. Instead, they argue that "moving the obstructing components out of the way of the blower" would yield 360 degrees of rotation. RIB at 65. But if the Vector Compact needs to be modified to meet the directional limitation, that limitation cannot be "necessarily present" in the Vector Compact. Such a modification might support an obviousness finding, but it does not support inherency. *See Trintec Industries, Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1296 (Fed. Cir. 2002) ("The difference between a printer and [the claimed] photocopier may be minimal and obvious to those of skill in this art. Nevertheless, obviousness is not inherent anticipation."). Thus, the Vector Compact does not anticipate claim 18.

The axis and directional limitations present another reason why the Vector Compact does not anticipate claim 18. As found above, the blower must be rotatable separate and apart from the rotation resulting from adjusting the duct element around the guiding cover, and the rotation must be result in two specific outlet orientations. *See also* Order No. 19 at 30. Just as Dometic offers no evidence that the Accused Products and DI Products meet these limitations, Respondents offer no evidence that the Vector Compact meets them. *See* RIB at 60-66. Their only relevant point is that the elements are met in the Vector Compact to the same extent as in the Accused Products. *See id*. at 62.

[redacted]

Examination of how the blower is attached to the duct element in both admitted exemplars of the Vector Compact (RPX-001 and RPX-002) shows in any event that the axis and directional limitations are not met. In the VCP12K (RPX-001) the duct element is made of sheet metal and is coupled to the blower by four screws:



MABRU000009
RX-016.0001

RX-016. Measurement of the distances of the screws from each other shows that, without drilling new holes, only one orientation of the blower relative to the duct element is possible; the duct element cannot be rotated 90, 180, or 270 degrees and then reattached because the screw holes do not line up. The other admitted Vector Compact (VCP18K (RPX-002)) similarly has four screws at uneven distances from each other. Therefore, the axis limitation is not satisfied in the Vector Compact for the same reason it is not satisfied in the DI Products and the Citimarine Products. And because only one orientation is possible, the directional limitation is not met because the

[redacted]

orientation of the blower outlet cannot be pointed to "substantially opposing sides of the main body with respect to a vertical plane." Order No. 11 at 29.

Because the Vector Compact does not satisfy either the axis limitation or the directional limitation of claim 18, it also does not anticipate dependent claims 19 through 22. As for the specific elements added by the dependent claims, Respondents argue Claim 19 is met through inherency, which as noted is not persuasive. To be sure, manual operation shows the VCP18K (RPX-002) blower outlet is rotatable (as a result of rotating the duct element around the guiding cover) from minimally counterclockwise of straight upward to approximately 20 degrees clockwise of straight down, or about 160 degrees, and the VCP12K (RPX-001) blower outlet is rotatable slightly less, about 150 degrees, so both exceed the 130 degrees recited in the manual. *See* JX-0127 at 9. The rotation of 150 or 160 degrees is completely free of interference from any component, and qualifies as "substantially opposite directions"; Dr. Paulus' opinion to the contrary (to the extent it is relevant) is rejected as conclusory. *See* Tr. (Paulus) at 760:7-23.

So although it is a moot point, claims 19 and 20 would be met if the directional limitation could be satisfied by rotating the duct element around the guiding cover. Claim 21, however, depends from claim 18 and adds the requirement of rotatability by more than 270 degrees. *See* 351 Patent at cl. 21. Respondents again rely on inherency, which is unpersuasive, and the two admitted exemplars are plainly incapable of such rotation without completely reconfiguring multiple components of the unit. *See* RIB at 67; Tr. (Tanbour) at 691:18-22; JX-0127 at 9. Claim 22 depends from claim 18 and adds a clamp element, "wherein only loosening of the clamp element is necessary to change orientation of the blower." 351 Patent at cl. 22. Both admitted exemplars of the Vector Compact possess two screws connecting the duct element to the guiding cover, two screws connecting the drain pan to the blower, and a clamp element, and the product

[redacted]

manual refers to two "mounting ring screws" and a clamp, so rotation of the blower "with respect to the main body" requires removing at least two screws in addition to loosening a clamp element. *See* RPX-001; RPX-002; JX-0127 at 9. This element is clearly not met; Respondents argue, in essence, that a screw is a clamp element, which is simply wrong. *See* RIB at 67-68.

In sum, the Vector Compact does not anticipate claim 18 because it satisfies neither the axis limitation nor the directional limitation. Nor does it anticipate dependent claims 19-22.

**b. Vector Rotary**

The evidence pertinent to the Vector Rotary is nearly as "thin" as it was when Respondents moved for summary determination. Order No. 19 at 31. There is a two-page brochure (JX-0184) about the Vector Rotary, including what appears to be a photograph of one, an "Installation, Operation & Maintenance" manual (JX-0188) about the Vector "series," which includes depictions and descriptions of at least the Vector Rotary and one other model, and the testimony of two percipient witnesses, Mr. Marciano and Mr. Pabisz. *See* Tr. (Marciano) at 103:8-104:10; Tr. (Pabisz) at 195:3-196:24. Neither technical expert timely inspected a physical exemplar of the Vector Rotary, nor was one admitted in evidence, although both experts offered opinions based on the documents and lay testimony. *See* Tr. at 21:21-22:7; Tr. (Tanbour) at 701:11-15; Tr. (Paulus) at 805:13-16.

Dr. Tanbour opined that the Vector Rotary possessed all the features of claim 18. *See* Tr. (Tanbour) at 556:18-578:13. Mr. Marciano testified specifically about the assembly element, and his description of it matches the claim language. *See* Tr. (Marciano) at 135:6-140:25. Mr. Pabisz testified that the Vector Rotary was depicted in the Vector series manual, and that its blower could point "nearly" to the direction shown in faint lines on one image. Tr. (Pabisz) at 195:3-197:17; JX-0188 at 008. The image itself suggests that the blower outlet could be oriented to slightly clockwise of straight upward, and about 60 degrees clockwise of straight down, or about 130

[redacted]

degrees total, which is what the manual itself states. *See* JX-0188 at 008-009. Mr. Marciano admittedly testified that the blower outlet could only rotate to the "horizontal," but Mr. Pabisz' testimony is more consistent with the documentary evidence and is accepted. Tr. (Marciano) at 103:12-104:10.

So although not all features of claim 18 are disclosed in the documentary evidence, the combination of the documentary evidence and the testimony of Mssrs. Marciano and Pabisz, and of Dr. Tanbour, shows that all elements of claim 18 were present in the Vector Rotary except the axis and directional limitations. In particular, the Vector Rotary, as a prior art product, was a single reference, the evidence is sufficiently clear and convincing about its design and operation (with the exception of the axis and directional limitations, addressed below), and the weight of the evidence shows that its blower could be rotated to substantially different lateral sides of the main body, so Dometic's complaints to the contrary are rejected. *See* CIB at 69-73.

As for the axis and directional limitations, no party cites to any evidence relating to how the blower was connected to the duct element, and the documentary evidence appears to be silent on the issue. *See* JX-0188; JX-0184. Seemingly the only evidence on this point, in fact, is Mr. Marciano's testimony that the blower and the "cylindrical ring" to which it was attached (that is, the duct element) were connected "either using rivets or screws." Tr. (Marciano) at 135:6-23. Clearly, if the connection were with rivets, the blower would not have been "rotatable about [the] first axis" without damaging the product. 351 Patent at cl. 18. If the connection were with screws, the blower might have been so rotatable, but there is literally no evidence as to screw hole location, so it is impossible to determine if rotation was feasible. In sum, the axis and directional limitations have not been proven in the Vector Rotary, and Respondents' assertion that it has, at least to the same extent Dometic proved it in the Accused Products, is unpersuasive. *See* RIB at 51-52.

[redacted]

As for the specifics of the dependent claims, most of the parties' disputes are moot because, like with the Vector Compact, there is no proof of the directional limitation. Regardless, Dr. Tanbour opined that 120 degrees qualified as "substantially opposite directions" because "substantially" means "the majority of the two extremes," while Dr. Paulus opined that he lacked enough information to make a determination. Tr. (Tanbour) at 716:6-14; Tr. (Paulus) at 765:16-766:11. Dr. Tanbour's opinion is supported and reasonable, so the Vector Rotary's 130 degrees of rotation, if proven to be "resulting from rotation about said first axis," would qualify as the "substantially opposite directions" of claim 19. And the rotation is without interference from any component, so claim 20 would similarly qualify as being met. As for claim 21, Respondents appear to repeat their inherency argument, which is unpersuasive. *See* RIB at 58-59. And as for claim 22, the Vector series manual discloses a clamp element and two mounting ring screws, so this element is not met in the Vector Rotary for the same reason it is not met in the Vector Compact. *See* JX-0188 at 009.

In sum, the Vector Compact does not anticipate claim 18 because it does not satisfy the axis and directional limitations. Nor does it anticipate dependent claims 19-22.

**3. Obviousness**

As explained, neither the Vector Compact nor the Vector Rotary disclose the axis or directional limitations of claim 18, and the Lunaire VBSC similarly omits them. *See* JX-0190. The only documentary technical evidence pertaining to the Lunaire VBSC is a two-page brochure showing, and describing features of, a marine air conditioning unit. *See id*. Although the brochure states that the blower can rotate 180 degrees "from left to right," there is no disclosure of how that occurs. *Id*. at 1. And it appears Respondents cite the reference only for teaching such rotation. *See* RIB at 85-86, 89-91.

[redacted]

So no prior art reference teaches the axis or directional limitations. This is not necessarily fatal to Respondents' obviousness case, because even when the scope and content of the prior art do not include a particular claim element, that gap may be filled by "common sense." *B/E Aerospace, Inc. v. C&D Zodiac, Inc.*, 962 F.3d 1373, 1380 (Fed. Cir. 2020). As with their anticipation arguments, though, Respondents do not rely on common sense, or anything else, to fill in the missing element, and instead simply rely on Dometic's erroneous argument that there need be only one axis of rotation. *See* RIB at 79-80. This oversight is fatal to their obviousness case, because there is no evidence of record that two distinct axes of rotation, one about the guiding cover/duct element connection and one about the duct element/blower connection, with any particular resultant orientations, would have been considered by a POSITA, or that a POSITA would have been motivated to incorporate those features into a marine air conditioner. The differences between the invention of claim 18 and the prior art are therefore so significant, even given the knowledge of a skilled artisan and the relative predictability of the art, that claim 18 would not have been obvious as of January 29, 2008.

To resolve the parties' disputes, though, and in spite of their mootness, Respondents' three obviousness arguments – which mainly focus on the directional limitation – are considered. *See* RIB at 79-87. Respondents assert that the Vector Compact would have rendered claim 18 obvious (1) as a single reference, (2) in combination with the Vector Rotary, and (3) in combination with the Lunaire VBSC. *See id*. at 80-87. As explained, the Vector Compact disclosed about 150 or 160 degrees of rotation, with rotation straight upward blocked by a pipe, the Vector Rotary disclosed 130 degrees of rotation, and the Lunaire VBSC disclosed 180 degrees of rotation. Mr. Marciano testified that blower rotation to both the left and right sides would have been "common sense to those in the marine air conditioning business." Tr. (Marciano) at 146:7-17.

[redacted]

And Dr. Tanbour testified that moving certain components to permit greater rotation of the Vector Compact blower would be a "routine design decision." Tr. (Tanbour) at 691:23-692:15.

It is clear from simply looking at the images of the three products that such design choices could easily have been made to achieve rotation to both sides, assuming that the rotation was of the duct element around the guiding cover. The pipe in the Vector Compact could seemingly have been moved to a lower position, as in the Vector Rotary, or pointed in a different direction, with the result being close to 180 degrees of rotation. *Compare* JX-0184 *with* RX-016. Although additional changes might have been required, such as changing the shape of the unit's footprint and moving other components, so that the blower outlet would not have been blocked by, say, the condenser, such design choices would surely have been within the skill of a POSITA. A POSITA would thus likely have had a reasonable expectation of success "while still maintaining the [same] size" of the unit. RIB at 85. One example of such additional changes is taught by the Lunaire VBSC, where the other components are placed such that the blower is completely unobstructed by any component other than the drain pan. *See* JX-0190. So the Vector Compact, combined with either the knowledge of one skilled in the art, or the example of the Vector Rotary component configuration, or a variation of the Lunaire VBSC component configuration, would have been sufficient for a POSITA to successfully achieve the directional limitation. And Mr. Marciano's testimony shows that a POSITA would have been motivated to do so. Tr. (Marciano) at 146:7-17.

Therefore, given the scope and content of the prior art, the knowledge of a POSITA, and the differences between the prior art and the claimed invention, it would have been obvious to modify the Vector Compact to achieve the rotations recited in claims 18, 19, and 20 (again, assuming the rotations involved the duct element around the guiding cover). The same cannot be said for claim 21, however, because Respondents offer no evidence that a skilled artisan would

[redacted]

have been motivated to modify the Vector Compact to achieve greater than 270 degrees of rotation. *See* RIB at 91-92. Certainly rotation to the left and right was an advantage a skilled artisan would have been motivated to attempt, but Dometic's internal documents suggest that there was no industry demand for a more extreme design. *See* Tr. (Pabisz) at 177:5-178:23; JX-0153C at 3-7. Dr. Tanbour testified similarly that "more rotation for the blower is desired by the customer," but it is not clear that "more rotation" would have involved rotation in excess of 270 degrees. Tr. (Tanbour) at 625:17-626:4, 629:23-631:2. And given the design of all the prior art products, which each possessed a drain pan that blocked rotation to some extent, likely the only way to achieve 270 degrees would have been to shrink the drain pan so that it was not under the blower at all, as in the DI Products. *See* CX-0734.3; CPX-0003. And shrinking the drain pan would seem to present a disadvantage by potentially causing uncontrolled drips from the blower or duct element, such that a skilled artisan would not have been motivated to do so.

The obviousness of claim 22 has similarly not been proven. Dr. Tanbour testified, in sum, that screws and a clamp are interchangeable: "The two mounting screws are what is holding the blower to the unit. If a POSITA can do that without the clamp, then he can also use just the . . . hose clamp." Tr. (Tanbour) at 654:3-14. Dr. Tanbour's opinion is undermined by the fact that there is no example in evidence of a marine air conditioner configured that way. As explained, the Vector Compact and Vector Rotary used both screws and a clamp, and it is entirely unclear how the blower was connected in the Lunaire VBSC. *See* JX-0190. As with the axis and directional limitations, it is possible that common sense might fill the gap in the prior art, but more evidence is needed to understand why a skilled artisan would have been motivated to limit the attachment hardware to just a clamp, and with a reasonable expectation of success.

[redacted]

In sum, a prima facie case of obviousness of claims 18-22 has not been demonstrated over the Vector Compact alone, or the Vector Compact in combination with either the Vector Rotary or the Lunaire VBSC. And as explained, the DI Products do not embody any of those claims, so there is no nexus between the claims and the objective indicia of non-obviousness. *See* CIB at 88-100. Dometic's evidence of such indicia is impressive and unrefuted, to be sure, but while it may have been relevant to claim 1 and its dependent claims, it has no bearing on claims 18-22. *See id.*; Order No. 26 at 1-3 (striking most of Respondents' case rebutting objective indicia of non-obviousness). So in view of the totality of the evidence, the obviousness of claims 18-22 has not been shown.

**4. 35 U.S.C. § 101**

Respondents contend that "claims 18-21 are ineligible for patent protection because each claim generally recites elements of marine air conditioners known in the art at the time in the patent application in addition to the abstract idea of permitting a specified amount of rotation." RIB at 103; *see also id.* at 104 (providing identification of the specified rotation amount in the challenged claims). Specifically, Respondents argue that "all of the elements of claims 18-21 except for the functional, rotation-related limitations have been found present in the popular prior art product that the inventors' design team sought to replace, the Vector Compact." *Id.* at 103. Respondents further contend that claims 18-21 merely set forth "the goal of permitting more rotation without claiming the solution that permits achievement of that goal." *Id.* at 104. Dometic mainly argues in response that "absent in Respondents' initial brief is any application or analysis of the two steps required by the *Mayo/Alice* caselaw." CRB at 49; *see also id.* at 50-51.

"Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor." 35 U.S.C. § 101. Implicit in this provision is the principle that "abstract ideas are not patentable."

[redacted]

*Alice*, 573 U.S. at 216. The Federal Circuit has made clear that "[e]ven a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 769 (Fed. Cir. 2019). As a result, even claims directed to extensive structure are invalid as abstract under *Alice* if "what is claimed is simply a generic environment in which to carry out the abstract idea." *Yu v. Apple Inc.*, 1 F.4th 1040, 1043-44 (Fed. Cir. 2021) (citing *In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016)).

Courts apply the two-step *Alice* test to evaluate Section 101, and first "determine whether the claims at issue are directed to a patent-ineligible concept," and then if so, "examine the elements of [each] claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 217-18, 221. The first step inquiry focuses on whether the character of the claims "'as a whole is directed to excluded subject matter.'" *Enfish*, 822 F.3d at 1335 (citing *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015); *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1375 (Fed. Cir. 2016)). The second step inquiry focuses on whether the elements of a claim, individually and as an "ordered combination," involve more than "well-understood, routine, and conventional activities previously known to the industry." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367 (Fed. Cir. 2018).

The first step in the *Alice* analysis requires an examination to "determine whether the claims at issue are directed to a patent-ineligible concept." *Alice*, 573 U.S. at 217. Respondents argue that the claims are directed to "marine air conditioners known in the art at the time in the patent application in addition to the abstract idea of permitting a specified amount of rotation." RIB at 103; RRB at 57 ("Here, the patentees did not claim their design, but rather merely claimed

[redacted]

generic components of an air conditioning device and the abstract idea of achieving varying amounts of rotation."), ("The abstract nature of the allegedly novel, increased rotation is broadly claimed, and constitutes an abstract idea under *Alice* step one"). This is incorrect.

Considered as a whole, and in view of the specification, the asserted claims are not directed to such an abstract idea. Rather, the asserted claims are directed to marine air conditioning units that include two separate modes of rotation that permit the positioning and adjustment of the blower's outlet. Setting aside the conventional nautical marine air conditioning components identified by Respondents (RIB at 103-104), claim 18 as a whole focuses first on the ability of the blower to rotate about a first axis so that the outlet can be oriented towards a first direction and a second direction. 351 Patent at cl. 18. And this requires the capability of positioning the blower's outlet, separate from the claimed "assembly." 351 Patent at cl. 18. Claim 18 further requires that the "first and second direction point to substantially different lateral sides of the main body," and that the assembly permit "alter[ing] the orientation of the outlet" by rotatable adjustment of the duct element around the guiding cover. *Id.* In other words, claim 18 and dependent claims 19-21 are not merely directed to a specified amount of rotation for a blower's outlet in marine air conditioners, but also to two modes for adjusting and orienting that outlet.

Including two modes of adjusting and orienting the blowers' outlet differentiates the claimed invention from the mere idea of a specified amount of rotation. The ability of the blower to rotate about two axes allows the maximum height of the marine air conditioner to be kept low, where the axes are different because the duct element is asymmetric. *See* 351 Patent at 12:4-27 (explaining that the blower and the duct element may be attached at a predetermined orientation relative to one another such that the maximum height of the air conditioner will be kept below a certain height despite various orientations of the blower). This, in turn, permits the air conditioning

[redacted]

unit to be easily used in situations where the unit "must be installed in limited space obscured by surrounding objects." *Id.* at 1:25-29. So the claim as a whole is directed to a marine air conditioner with a blower having two axes of rotation, with the practical benefit of permitting placement of such a marine air conditioner in a tight spot.

Therefore, the asserted claims have not been shown to be directed to patent ineligible subject matter. However, even continuing to step two of *Alice*, which requires examination of claim elements, both individually and as an ordered combination, to determine whether the claim contains an inventive concept, Respondents' analysis falls short.

This is because the Respondents have not addressed the claimed combination of elements, analyzing instead only individual elements. *See* RIB at 104-106; RRB at 58 ("[N]o recited claim element permits more rotation than the known, industry standard prior art, Vector Compact."). It is the combination of elements, however, particularly claim 18's recitation of two modes of rotation for the blower's outlet, that provide a solution to the technical problem identified above regarding installation in tight spaces, and that dictate how the rotation occurs structurally. And two modes of rotation in a marine air conditioning unit, which does not appear to be well-known or conventional and which clearly differentiates the asserted claims from the prior art, was not addressed by Respondents as a potential inventive concept.

Respondents, to be sure, correctly point out that Claim 18 does not necessarily achieve the practical benefit touted in the specification because it has been construed so that the axes of rotation may the same, that is, co-linear, which is equivalent to a single axis for purposes of blower orientation. *See* RIB at 105 ("the features that allegedly permit the claimed, novel rotation are not part of the claims"). So claim 18 is arguably overbroad. And each dependent claim (except claim 22) further recites a result with no additional structure for achieving it, that is, "a goal without a

[redacted]

solution," which is problematic under *Alice*. *Id*. at 102 (citing *American Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1292 (Fed. Cir. 2020)).

But "as a whole" each claim is sufficiently concrete because the bulk of claim 18, and of the claims depending from it, are structural. Only a single element of claim 18 is directed to a result, and that result – pointing to different sides of a vertical plane – is not unduly abstract. Certainly it is not as abstract as the objectional element of *Yu v. Apple Inc*., 1 F.4th 1040 (Fed. Cir. 2021), on which Respondents rely. *See* RRB at 55-56; RIB at 106-107. In *Yu*, the challenged claim 1 recited a digital camera possessing certain specific components, as well as a processor to "produce[] a resultant digital image from said first digital image enhanced with said second digital image," with no limitation on how to perform the enhancement. 1 F.4th at 1042. This element rendered the claim abstract under step one of *Alice*: "claim 1's solution to [the problems outlined in the specification] is the abstract idea itself – to take one image and 'enhance' it with another." *Id*. at 1044. That the rest of the claim recited several concrete elements did not save the claim under step two of *Alice*, because those elements were "well-known," "conventional," and "perform[ed] only their basic functions." *Id*. at 1043.

Here, by contrast, Respondents have not established that claim 18 "as a whole" is directed to an abstract idea, because Respondents' analysis omits any discussion establishing that the two modes of rotation recited in claim 18 constitute such an abstract idea, or otherwise contribute to the abstractness of claim 18. *See* RIB at 104 ("the only alleged point of novelty . . . is the ability to orient the blower outlet to substantially different lateral sides of the main body"). Unlike in *Yu*, claim 18 recites two concrete structures (a duct element rotatable relative to a guiding cover and a blower rotatable relative to the duct element) for achieving the claimed result (rotation to either side of a vertical plane). And although dependent claims 19-21 do recite results rather than

[redacted]

structures for achieving those results, even considering these claimed results, those claims as a whole cover concrete structures seemingly capable of achieving those results.

Moreover, even if Respondents had shown that step one of *Alice* was satisfied for claim 18, Respondents have not shown that two separate modes of blower rotation in marine air conditioning units was well-known and conventional, let alone that the conventional prior art marine air conditioners included the feature of "the blower being rotatable about [a] first axis so that the outlet can be oriented toward a first direct[i]on and a second direction." 351 Patent at cl. 18; *see* RRB at 56. Nor are the asserted claims so broad as to preempt all uses of blower rotation in marine air conditioning units, because many other products can coexist without infringing the asserted claims, if they only contain one mode of rotation relative to an axis. RIB at 106-107.

Accordingly, Respondents have not clearly and convincingly shown that claims 18-21 are invalid under 35 U.S.C. § 101.

**5. 35 U.S.C. § 112 Indefiniteness**

Respondents assert that the directional limitation of claim 18, "the first and second directions point to substantially different lateral sides of the main body," renders the claim indefinite. *See* RIB at 108-10. As explained in Order No. 11, "the specification defines 'lateral sides' as 'opposing sides with respect to a vertical plane such as left and right,'" and the term was accordingly construed to mean "first and second directions point to substantially opposing sides of the main body with respect to a vertical plane." Order No. 11 at 26-29 (citing 351 Patent at 11:52–55).

So construed, there is almost no evidence that the term "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus,* 134 S. Ct. at 2124. Respondents' expert did not opine on this topic in his expert report (*see generally* JX-0180C) or at his deposition (*see generally* JX-0178C), and at the hearing he opined that the limitation was

[redacted]

met by the Vector Rotary (Tr. (Tanbour) at 570:22-571:13), which suggests he understood the scope of the invention with reasonable certainty. To be sure, Dr. Paulus disagreed with Dr. Tanbour regarding whether the Vector Rotary met the limitation, and testified that he did not know where the "threshold" for satisfying the limitation "is going to be." Tr. (Paulus) at 793:23-794:13. But he also explained that the blower outlet "would have to be going to the side, at least some way," to meet the limitation, which is consistent with the claim language as construed. *Id*. Taken as a whole, such testimony demonstrates that a hypothetical person of ordinary skill would know the scope of the claim with reasonable certainty. And the inventors' views on the scope of the claim, which were different from that of Dr. Paulus and both from each other, carry little weight in evaluating indefiniteness. *See* RIB at 109 (citing Tr. (Marciano) at 111:16-112:3; Tr. (Pabisz) at 199:5-14).

Therefore, Respondents have not carried their burden of proving claim 18 indefinite.

## VI. DOMESTIC INDUSTRY - ECONOMIC PRONG

Dometic moved for summary determination that the economic prong is met without substantive opposition from Respondents. As noted above, the motion was granted in part, determining that Dometic met the requirements of subsection (C) of the economic prong of domestic industry requirement based on substantial investments in the exploitation of the 351 Patent through research and development. Order No. 23. On August 28, 2023, the Commission determined not to review Order No. 23. EDIS Doc. ID 803394. The parties presented no further economic prong argument. *See* generally CIB at 114-115.

Accordingly, for the purposes of this investigation, Dometic has satisfied the economic prong of the domestic industry requirement for the 351 Patent under subsection (C)..

## VII. CONCLUSIONS OF LAW

No violation of Section 337 by the Accused Products has been proven. Specifically:

[redacted]

1. The importation requirement of Section 337 is satisfied for all Respondents.
2. Dometic has not proven infringement of any claim of U.S. Patent No. 8,056,351.
3. Respondents have not proven the invalidity of claims 18-22 of U.S. Patent No. 8,056,351.
4. Dometic has not proven the existence of articles protected by any claim of U.S. Patent No. 8,056,351.
5. There is no violation of section 337 with respect to U.S. Patent No. 8,056,351.

## VIII. RECOMMENDED DETERMINATION ON REMEDY AND BOND

The Commission's Rules provide that subsequent to an initial determination on the question of violation of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, the administrative law judge shall issue a recommended determination concerning the appropriate remedy in the event that the Commission finds a violation of section 337, and the amount of bond to be posted by respondent during Presidential review of the Commission action under section 337(j). *See* 19 C.F.R. § 210.42(a)(1)(ii).

The Commission has broad discretion in selecting the form, scope, and extent of the remedy in a section 337 proceeding. *Viscofan, S.A. v. Int'l Trade Comm'n*, 787 F.2d 544, 548 (Fed. Cir. 1986). Under Section 337(d)(1), if the Commission determines as a result of an investigation that there is a violation of section 337, the Commission is authorized to enter either a limited or a general exclusion order. 19 U.S.C. § 1337(d)(1). A limited exclusion order instructs the U.S. Customs and Border Protection ("CBP") to exclude from entry all articles that are covered by the patent at issue and that originate from a named respondent in the investigation. A general exclusion order instructs the CBP to exclude from entry all articles that are covered by the patent at issue, without regard to source. *Certain Purple Protective Gloves*, Inv. No. 337-TA-500, Comm'n Op. at 5 (Dec. 22, 2004). Under section 337(f)(1), the Commission may issue a cease

[redacted]

and desist order in addition to, or instead of, an exclusion order. 19 U.S.C. § 1337(f)(1). The Commission generally issues a cease and desist order directed to a domestic respondent when there is a "commercially significant" amount of infringing, imported product in the United States that could be sold, thereby undercutting the remedy provided by an exclusion order. *See Certain Crystalline Cefadroxil Monohydrate*, Inv. No. 337-TA-293, USITC Pub. 2391, Comm'n Op. on Remedy, the Public Interest and Bonding at 37-42 (June 1991); *Certain Condensers, Parts Thereof and Prods. Containing Same, Including Air Conditioners for Automobiles*, Inv. No. 337-TA-334 (Remand), Comm'n Op. at 26-28 (Sept. 10, 1997).

Additionally, during the 60-day period of Presidential review under 19 U.S.C. § 1337(j), "articles directed to be excluded from entry under subsection (d) . . . shall . . . be entitled to entry under bond prescribed by the Secretary in an amount determined by the Commission to be sufficient to protect the complainant from any injury." *See* 19 U.S.C. § 1337(j)(3). "The Commission typically sets the bond based on the price differential between the imported infringing product and the domestic industry article or based on a reasonable royalty. However, where the available pricing or royalty information is inadequate, the bond may be set at one hundred (100) percent of the entered value of the infringing product." *Certain Industrial Automation Systems and Components Thereof Including Control Systems, Controllers, Visualization Hardware, Motion and Motor Control Systems, Networking Equipment, Safety Devices, and Power Supplies*, Inv. No. 337-TA-1074, Comm'n Op. at 13 (Apr. 23, 2019) ("*Automation Systems*") (public version) (citation omitted).

**A. Limited Exclusion Order**

Respondents do not expressly dispute the propriety of a limited exclusion order, but do request three limitations on such an order: (1) the order should state that it "does not cover" non-

[redacted]

infringing articles; (2) it should contain a certification provision; and (3) it should contain a service and repair exception and should exclude replacement products and parts. *See* RIB at 110-13. Dometic opposes a certification provision because there are no redesigned products and the "scope of products" subject to an exclusion order is allegedly clear. CIB at 116. But certification provisions are a "general practice," and are issued for the benefit of U.S. Customs and Border Protection, which may accept them or not, as it sees fit. *Certain Plant-Derived Serum Albumins ("rHSA") and Products Containing the Same*, Inv. No. 337-TA-1238, Comm'n Op. at 62-63 (October 11, 2022) ("*Plant-Derived Serum Albumins*"). And service, repair, and replacement exceptions are properly evaluated as part of the public interest analysis, which has not been delegated here. *See Certain Wearable Electronic Devices with ECG Functionality and Components Thereof*, Inv. No. 337-TA-1266, Comm'n Op. at 50 (Jan. 20, 2023); 87 Fed. Reg. 76216 (Dec. 13, 2022) ("*Wearable Electronic Devices*").

As for an exclusion order identifying non-infringing articles, or otherwise stating what it does not cover, such a provision does not appear to be standard. *E.g.*, *Certain Composite Aerogel Insulation Materials and Methods for Manufacturing the Same*, Inv. No. 337-TA-1003, Comm'n Op. at 64 (Feb. 22, 2018). Certainly Respondents cite no authority supporting such a carve-out. *See* RIB at 110-11; RRB at 59-60. Therefore, it is recommended that in the event a limited exclusion order issues, it should include the Commission's standard certification provision, and should not identify non-infringing articles; no recommendation is made regarding service, repair, and replacement.

**B. Cease and Desist Order**

Complainants bear the burden to prove cease and desist orders are warranted. *Certain Microfluidic Devices*, Inv. No. 337-TA-1068, Comm'n Op. at 23 (Jan. 10, 2020). Such orders "are

[redacted]



generally issued when, with respect to the imported infringing products, respondents maintain commercially significant inventories in the United States or have significant domestic operations that could undercut the remedy provided by an exclusion order." *Id.* at 22-23 (citations omitted). Respondents assert that they have no significant domestic operations, but do not expressly contest the existence of a commercially significant inventory of accused products held by Citimarine and Mabru. *See* RIB at 113-14. The unrebutted evidence from Dometic's expert Mr. LaMotta shows that in 2022 Citimarine maintained an inventory of one accused product, the CT-6SDC, equivalent to [redacted], and Mabru maintained an inventory of two accused products, the SC17 230V and SC17VFD 230V, respectively equivalent to [redacted]. *See* JX-0239C, JX-0240C. Mr. LaMotta opined, again without rebuttal, that such inventories are commercially significant, and he testified that both respondents continued to maintain comparable inventories as recently as [redacted]. Tr. (LaMotta) at 311:10-313:7, 314:22-316:9.

Other than their contention that they lack significant domestic operations, which is beside the point in view of their commercially significant inventories, Respondents' principal arguments regarding cease and desist orders are that they should not apply to the Shanghai Respondents and that they should include certification provisions. *See* RIB at 113-14; RRB at 60. In fact there is no evidence the Shanghai respondents maintain any inventory in the U.S. at all, and Dometic does not even explicitly seek cease and desist orders against them. *See* CIB at 118-19. As for certification provisions, Respondents cite no authority supporting them, and cease and desist orders apparently commonly include reporting and record-keeping requirements that render certification redundant. *E.g.*, EDIS Doc. ID No. 786804 at 4-6 (cease and desist order in *Wearable Electronic Devices*); EDIS Doc. ID No. 779997 at 4-6 (cease and desist order in *Plant-Derived*

[redacted]

*Serum Albumins*). Therefore, it is recommended that, in the event a violation by Citimarine or Mabru is found, a cease and desist order should issue against the respondent found to be in violation, and in any case no cease and desist order should issue against either of the Shanghai Respondents.

**C. Bond**

"The complainant bears the burden of establishing the need for a bond" during the Presidential Review period. *See Robotic Vacuums*, Inv. No. 337-TA-1057, Comm'n Op. at 68. The amount of the bond is generally set "to be sufficient to protect the complainant from any injury." 19 U.S.C. § 1337(e)(1), (j3). "The Commission has set bond amounts based on the price difference between the infringing imports and the domestic industry products or on a reasonable royalty applicable to the infringing products." *Certain Non-Volatile Memory Devices and Products Containing the Same,* Inv. No. 337-TA-1046, Comm'n Op. at 67 (Oct. 26, 2018) (EDIS Doc. ID 659979).

Dometic seeks a 100% bond. *See* CIB at 119-120 (citing *Certain Balanced Armature Devices, Prod. Containing Same, & Components Thereof*, Inv. No. 337-TA-1186, Comm'n Op. (Oct. 29, 2021) ("*Balanced Armature Devices*")). Dometic contends that "[a] price differential is impractical" because "[t]here are hundreds of DI Product SKUs, 23 Mabru Accused Products SKUs, and 22 Citimarine Accused Products SKUs—which have different BTUs, amperages, and other factors that impact pricing," so "it is infeasible to set a single bond amount based on a price comparison." *Id.* at 119 (citing Tr. (Celauro) at 222:19-223:23; Tr. (LaMotta) at 318:6-320:13; CDX-006C.13; JX-0210C, ¶ 172). Dometic argues that Respondents' products directly compete with its products and that the evidence shows Respondents' products are offered at a "significantly

[redacted]

lower price." *Id.* at 119-120 (citing JX-0325.005 at 16; JX-0324.004-5; JX-0007C.081-81; JX-008C.039; Tr. (Celauro) at 213:10-17; CX-0186; CCX-1090C.001; CX-1192C, CX-0182C).

Respondents argue the bond should be set at zero because "there is no evidence in the record to support imposition of any specific bond amount." RIB at 114.

Even assuming that Citimarine and Mabru compete directly with Dometic and undercut its prices – and there is some evidence of this – Dometic has offered essentially no quantitative analysis supporting any particular bond. *See* CIB at 119-20; Tr. (LaMotta) at 318:3-320:16. Mr. LaMotta's price differential analysis was stricken (*see* Order No. 18 at 4-5) and Dometic points to no evidence relevant to royalties (*see* CIB at 119-20). Admittedly, a bond of 100% may be appropriate where it is "impractical to calculate the price differential" and the complainant otherwise carries its burden to prove such a bond. *See Balanced Armature Devices* at 41. But where, as here, the complainant has not "met its burden" of justifying a 100% bond, no bond is justified. *Id.* And in contrast to the other authority on which Dometic relies, the appropriateness of a 100% bond is contested here. *See* CIB at 120 (citing *Certain Powered Cover Plates*, Inv. No. 337-TA-1124, Comm'n Op. at 31 (July 10, 2020)).

Therefore, it is recommended that no bond should be imposed.

## IX. INITIAL DETERMINATION AND ORDER

Based on the foregoing,[1] it is my Initial Determination that there is no violation of Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain

[1] The failure to discuss any matter raised by the parties or any portion of the record herein does not indicate that such matter was not considered. Rather, any such matter(s) or portion(s) of the record has/have been determined to be irrelevant, immaterial, or meritless. Arguments made in briefs which were otherwise unsupported by record evidence or legal precedent have been accorded no weight.

[redacted]

marine air conditioning systems, components thereof, and products containing the same, with the asserted claims of U.S. Patent No. 8,056,351.

The undersigned hereby certifies to the Commission this Initial Determination, together with the record of the hearing in this investigation consisting of the following: the transcript of the evidentiary hearing, with appropriate corrections as may hereafter be ordered; and the exhibits accepted into evidence in this investigation.[2]

Pursuant to 19 C.F.R. § 210.42(h), this Initial Determination shall become the determination of the Commission sixty (60) days after the date of service of the Initial Determination, unless a party files a petition for review of the Initial Determination within twelve (12) days after service of the Initial Determination pursuant to 19 C.F.R. § 210.43(a) or the Commission, pursuant to 19 C.F.R. § 210.44, orders on its own motion, a review of the Initial Determination or certain issues therein. Any issue or argument not raised in a petition for review, or response thereto, will be deemed to have been abandoned and may be disregarded by the Commission in reviewing the Initial Determination pursuant to 19 C.F.R. § 210.43(b) and (c).

[2] The pleadings of the parties filed with the Secretary need not be certified as they are already in the Commission's possession in accordance with Commission rules.

[redacted]

**<u>Confidentiality Notice:</u>**

This Initial Determination is being issued as confidential, and a public version will be issued pursuant to Commission Rule 210.5(f). Within seven (7) days of the date of this Initial Determination, the parties shall jointly submit: (1) a proposed public version of this opinion with any proposed redactions bracketed in red; and (2) a written justification for any proposed redactions specifically explaining why the piece of information sought to be redacted is confidential and why disclosure of the information would be likely to cause substantial harm or likely to have the effect of impairing the Commission's ability to obtain such information as is necessary to perform its statutory functions.[3]

**SO ORDERED.**



Cameron Elliot
Administrative Law Judge

[3] Under Commission Rules 210.5 and 201.6(a), confidential business information includes: information which concerns or relates to the trade secrets, processes, operations, style of works, or apparatus, or to the production, sales, shipments, purchases, transfers, identification of customers, inventories, or amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or other organization, or other information of commercial value, the disclosure of which is likely to have the effect of either impairing the Commission's ability to obtain such information as is necessary to perform its statutory functions, or causing substantial harm to the competitive position of the person, firm, partnership, corporation, or other organization from which the information was obtained, unless the Commission is required by law to disclose such information. *See* 19 C.F.R. § 201.6(a). Thus, to constitute confidential business information the disclosure of the information sought to be designated confidential must likely have the effect of either: (1) impairing the Commission's ability to obtain such information as is necessary to perform its statutory functions; or (2) causing substantial harm to the competitive position of the person, firm, partnership, corporation, or other organization from which the information was obtained.

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C.**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN MARINE AIR CONDITIONING SYSTEMS, COMPONENTS THEREOF, AND PRODUCTS CONTAINING THE SAME** | **Investigation No. 337-TA-1346** |

**NOTICE OF A COMMISSION DETERMINATION TO REVIEW AND, ON REVIEW, TO AFFIRM AN INITIAL DETERMINATION GRANTING SUMMARY DETERMINATION OF INVALIDITY**

**AGENCY**: U.S. International Trade Commission.

**ACTION**: Notice.

**SUMMARY**: Notice is hereby given that the U.S. International Trade Commission has determined to review and, on review, to affirm the presiding administrative law judge's ("ALJ") initial determination ("ID") (Order No. 19) granting in part summary determination of invalidity, and on review, to supplement the ID's finding that claims 1, 2, 4, 5, and 7 of U.S. Patent No. 8,056,351 ("the '351 patent") are invalid under 35 U.S.C. 102(b).

**FOR FURTHER INFORMATION CONTACT**: Paul Lall, Office of the General Counsel, U.S. International Trade Commission, 500 E Street, S.W., Washington, D.C. 20436, telephone (202) 205-2043. Copies of non-confidential documents filed in connection with this investigation may be viewed on the Commission's electronic docket (EDIS) at *https://edis.usitc.gov*. For help accessing EDIS, please email *EDIS3Help@usitc.gov*. General information concerning the Commission may also be obtained by accessing its Internet server at *https://www.usitc.gov*. Hearing-impaired persons are advised that information on this matter can be obtained by contacting the Commission's TDD terminal, telephone (202) 205-1810.

**SUPPLEMENTARY INFORMATION**: On December 13, 2022, the Commission instituted this investigation based on a complaint, as supplemented, filed on behalf of Dometic Corporation of Rosemont, Illinois and Dometic Sweden AB of Solna, Sweden (collectively, "Dometic"). 87 FR 76216-17 (Dec. 13, 2022) ("Notice of Investigation"). The complaint alleges violations of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, based upon the importation into the United States, the sale for importation, and the sale within the United States after importation of certain marine air conditioning systems, components thereof, and products containing the same by reason of the infringement of certain claims of the '351 patent. *Id.* The complaint further alleges that a domestic industry exists. *Id.* The Notice of Investigation named four (4) respondents: (1) Shanghai Hopewell Industrial Co. Ltd. of Shanghai, China; (2) Shanghai Hehe Industrial Co. Ltd. of Shanghai, China; (3) CitiMarine, L.L.C. of Doral,

Florida; and (4) Mabru Power Systems, Inc. of Dania Beach, Florida (collectively, "Respondents"). *Id.* The Office of Unfair Import Investigations is not participating in this investigation.

On June 12, 2023, Respondents filed a motion and supporting memorandum for summary determination of invalidity based on anticipation and/or obviousness for claims 1-5, 7, and 18-22 of the '351 Patent. On June 22, 2023, Dometic filed an opposition.

On July 18, 2023, the ALJ issued the subject ID (Order No. 19) pursuant to Commission Rule 210.18(b) (19 CFR 210.18), granting in part Respondents' Motion. More specifically, the ID finds that the "Vector Compact" marine air-conditioner (also called the "VCP12K product") qualifies as prior art "at least based on the on-sale provision" of 35 USC 102(b) and that it anticipates claims 1, 2, 4, 5, and 7 of the '351 Patent. *See* ID at 9-29.

On July 25, 2023, Dometic filed a petition for review of the ID, and on August 1, 2023, Respondents filed an opposition to Dometic's petition. On August 9, 2023, Dometic filed a motion with the Commission seeking leave to file a reply in support of their petition for review, and on August 11, 2023, Respondents filed an opposition to Dometic's motion for leave.

Having examined the record of this investigation, including the parties' submissions, the Commission has determined to review the subject ID and, on review, to affirm with supplementation the ID's finding that claims 1, 2, 4, 5, and 7 of the '351 patent are invalid as anticipated under 35 USC 102(b). The Commission has also determined to deny Complainants' motion for leave to file a reply. Concurrent with this notice, the Commission has issued an opinion further explaining its determination.

The Commission vote for this determination took place on September 13, 2023.

The authority for the Commission's determination is contained in section 337 of the Tariff Act of 1930, as amended (19 U.S.C. 1337), and in Part 210 of the Commission's Rules of Practice and Procedure (19 CFR Part 210).

By order of the Commission.

Lisa R. Barton
Secretary to the Commission

Issued: September 13, 2023

**PUBLIC VERSION**

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C.**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN MARINE AIR CONDITIONING SYSTEMS, COMPONENTS THEREOF, AND PRODUCTS CONTAINING THE SAME** | **Investigation No. 337-TA-1346** |

## COMMISSION OPINION

## I. INTRODUCTION

On July 18, 2023, the presiding administrative law judge ("ALJ") issued an initial determination ("ID") (Order No. 19) in the above-identified investigation, granting in part Respondents' motion for summary determination of invalidity. Having examined the ID and the record of this investigation, the Commission has determined to (1) review the ID's finding that the Vector Compact product anticipates claims 1, 2, 4, 5, and 7 of U.S. Patent No. 8,056,351 ("the '351 patent") under 35 U.S.C. § 102(b), and (2) on review, affirm and supplement this finding as set forth below. The Commission adopts the findings of the ID that are not inconsistent with this determination. The Commission has also determined to deny the Complainants' motion for motion for leave to file a reply in support of their petition for review.

## II. PROCEDURAL HISTORY

On December 13, 2022, the Commission instituted this investigation based on a complaint, as supplemented, filed on behalf of Dometic Corporation of Rosemont, Illinois and Dometic Sweden AB of Solna, Sweden (collectively, "Dometic"). 87 Fed. Reg. 76216-17 (Dec. 13, 2022). The complaint alleges violations of section 337 of the Tariff Act of 1930, as

**PUBLIC VERSION**

amended, 19 U.S.C. § 1337, based upon the importation into the United States, the sale for importation, and the sale within the United States after importation of certain marine air conditioning systems, components thereof, and products containing the same by reason of the infringement of claims 1-5, 7, 11, and 17-22 of the ’351 patent. *Id.* at 76216. The complaint further alleges that a domestic industry exists. *Id.* The notice of investigation named four (4) respondents: (1) Shanghai Hopewell Industrial Co. Ltd. of Shanghai, China; (2) Shanghai Hehe Industrial Co. Ltd. of Shanghai, China; (3) CitiMarine, L.L.C. of Doral, Florida; and (4) Mabru Power Systems, Inc. of Dania Beach, Florida (collectively, “Respondents”). *Id.*

On May 1, 2023, the presiding ALJ issued an order construing certain terms of the asserted claims. *See* Order No. 11 (May 1, 2023) (the “*Markman* Order”).

On June 12, 2023, Respondents filed a motion and supporting memorandum for summary determination of invalidity based on anticipation and/or obviousness as to claims 1-5, 7, and 18-22 of the ’351 Patent.[1] On June 22, 2023, Dometic filed an opposition.[2]

On July 18, 2023, the ALJ issued the subject ID (Order No. 19) pursuant to Commission Rule 210.18(b) (19 C.F.R. § 210.18), granting in part Respondents’ motion. *See* ID at 1, 33. More specifically, the subject ID finds that the “Vector Compact” marine air-conditioner (also called the “VCP12K product”) qualifies as prior art “at least based on the on-sale provision” of 35 U.S.C. § 102(b), and that it anticipates claims 1, 2, 4, 5 and 7 of the ’351 Patent. *See* ID at 9-29.

---

[1] Respondents’ Motion for Summary Determination of No Violation of 19 U.S.C. § 1337 Based on Invalidity and/or Lack of Technical Prong (June 12, 2023) (“Resp. Mot.”).

[2] Complainants’ Opposition to Respondents’ Motion for Summary Determination of No Violation of 19 U.S.C. § 1337 Based on Invalidity and/or Lack of Technical Prong (June 22, 2023) (“Compl. Opp.”).

On July 25, 2023, Dometic filed a petition for review of the ID with the Commission.[3] On August 1, 2023, Respondents filed an opposition to Dometic's petition.[4]

On August 9, 2023, Dometic filed a motion with the Commission seeking leave to file a reply in support of their petition for review,[5] and on August 11, 2023, Respondents filed an opposition to Dometic's motion for leave.[6] The Commission has determined to deny Dometic's motion for leave to file a reply in support of their petition for review because the Commission's rules do not contemplate such filings and Dometic does not raise any issue unique to Respondents' opposition that might warrant granting the motion for leave.

## I. THE '351 PATENT

The '351 Patent, entitled "Blower for Marine Air Conditioner," issued on November 15, 2011, from U.S. Patent Application No. 12/021,328, filed January 29, 2008, which claims priority to U.S. Provisional Patent Application No. 60/889,120, filed February 9, 2007. *See* Compl., Ex. 1 ('351 Patent) cover at [54], [45], [21], [22], and [60]. The named inventors are Frank Marciano and Ronald Pabisz. The '351 Patent describes an adjustable, nautical air conditioning system that allows for "easy installation" in "situations where it must be installed in limited space obstructed by surrounding objects." Compl., Ex. 1 ('351 Patent) at 1:27-28.

---

[3] Complainants' Petition for Review of Order No. 19 Granting Summary Determination that Claims 1, 2, 4, 5, and 7 of the '351 Patent are Invalid (July 25, 2023) ("Compl. Pet.").

[4] Respondents' Opposition to Complainants' Petition for Review of Order No. 19 (July 25, 2023) ("Resp. Pet. Opp.").

[5] Complainants' Motion for Leave to File Reply in Support of Petition for Review of Order No. 19 (August 9, 2023).

[6] Respondents' Opposition to Complainants' Motion for Leave to File Reply in Support of Petition for Review of Order No. 19 (August 11, 2023).

**PUBLIC VERSION**




FIG. 1

*Id.* at Fig. 1.

Specifically, the ’351 Patent discloses a marine air conditioning system for a nautical vehicle that includes a main body, a blower, and an assembly. *Id.* at 1:35-37. The blower includes an outlet and an inlet that is in air communication with the main body, and further includes blades rotating therewithin about a first axis. *Id.* at 1:37-40. The assembly is for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the blower outlet. *Id.* at 1:40-42. The assembly includes “a guiding cover,” as well as “a cylindrical duct element” that allows air to flow from the system’s main body to the blower. *See id.* at 1:51-53. The duct element has a first and a second base and is “rotatably adjustable around the guiding cover” at its first base and coupled to the blower at its second base. *See id.* at 1:53-58. Figures 22 and 23 of the ’351 Patent respectively illustrate “an exploded view of an assembly for connecting the blower to the air conditioner” and “an isolated view of a guide cover of the assembly”:

**PUBLIC VERSION**




FIG. 22




FIG. 23

*Id.* at 5:39-41; Figs. 22 and 23.

According to the ’351 Patent, in one embodiment:

> [A] guiding cover **170** is fastened to a blower side of the evaporator **20** and is a cover-like element that is placed on the top of the evaporator **20**. The guiding cover **170** (FIG. 23) includes a flat section **172** with a circular opening **174** for directing air to the adjacent

> blower **2** and has a cylindrical section **176** extending from the opening **174**. . . . [A] fan duct transition or a duct element **184** is placed between the guiding cover **170** and the blower **2** by clamping it around the cylindrical section **176** of the guiding cover **170** with a band clamp or a clamp element **186** whose perimeter is controllable through an adjustment screw **188** [*see* FIG. 26] that can tighten or-loosen.

*Id.* at 9:66-10:21. The "duct element" is further depicted in Figures 24A and 24B:




FIG. 24A FIG. 24B

The'351 Patent explains how this "duct element" and the attached blower are rotatably adjustable:

> The blower **2** is coupled to the evaporator **20** by fastening the duct element **184** onto the blower **2** by loosely screwing the transition bracket **212** over the guiding cover **170**, inserting the outwardly projecting flange **196** adjacent to the arrow **206** into the transition bracket **212**, passing the first engaging elements **198** [*see* FIG. 25] through the pass portions **204**, rotating the duct element **184** to obtain the desired orientation for the blower **2**, clamping the duct element **184** onto the guiding cover **170** using the clamp element **186** and tightening the screws of the transition bracket **212**.

*Id.* at 11:10-21.

Asserted independent claim 1 of the '351 patent recites:

1. An air conditioning device for a nautical vehicle including:

> a main body; and
>
> a blower including an inlet and an outlet, the inlet being in air communication with the main body, the blower further including blades rotating therewithin about a first axis, and
>
> an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet, the assembly including a guiding cover and a cylindrical duct element for maintaining the main body and the blower in air communication with one another, the duct element having a first base and a second base, and coupled to the blower at the second base, the first base of the duct element dimensioned to correspondingly fit the guiding cover, and the duct element being rotatably adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet.

*Id.* at 12:52-13:3. Claims 2, 4, 5, and 7 each depend on claim 1 and add the following limitations:

> 2. The air conditioning device of claim 1, wherein the first and second axes are substantially parallel.
>
> 4. The air conditioning device of claim 1, wherein the blower is a centrifugal fan.
>
> 5. The air conditioning device of claim 1, the bases being circular and the duct element being slidingly adjustable around the guiding cover about the second axis.
>
> 7. The air conditioning device of claim 1, the first and second bases having unequal surface areas.

*Id.* at 13:4-13:18.

## II. LEGAL STANDARDS

### *A. Legal Standard for Review*

The Commission may review an ID either upon petition by one of the parties or on its own motion. *See* 19 C.F.R. §§ 210.43 & 210.44. The Commission shall grant a petition for review, in whole or in part, where it appears:

> (i) that a finding or conclusion of material fact is clearly erroneous.
>
> (ii) that a legal conclusion is erroneous, without governing precedent, rule or law, or constitutes an abuse of discretion; or
>
> (iii) that the determination is one affecting Commission policy.

19 C.F.R. § 210.43(b)(1) & (d)(2). The Commission's review encompasses the issues for which

at least one participating Commissioner has voted for review. *See* 19 C.F.R. § 210.43(d)(3). Any issue that is not raised in a petition for review is deemed to have been abandoned by the petitioning party and may be disregarded by the Commission, unless the Commission chooses to review the issue on its own initiative. *See* 19 C.F.R. § 210.43(b)(2).

On review, Commission Rule 210.45(c) provides that "the Commission may affirm, reverse, modify, set aside or remand for further proceedings, in whole or in part, the initial determination of the administrative law judge" and that "[t]he Commission also may make any findings or conclusions that in its judgment are proper based on the record in the proceeding." *See* 19 C.F.R. § 210.45(c). In addition, as explained in *Certain Polyethylene Terephthalate Yarn and Products Containing Same*, "[o]nce the Commission determines to review an initial determination, the Commission reviews the determination under a *de novo* standard." Inv. No. 337-TA-457, Comm'n Op., 2002 WL 1349938, *5 (June 18, 2002) (citations omitted). This is "consistent with the Administrative Procedure Act which provides that once an initial agency decision is taken up for review, 'the agency has all the powers which it would have in making the initial decision except as it may limit the issues on notice or by rule.'" *Id.* (citing 5 U.S.C. § 557(b)).

### *B. Legal Standard for Summary Determination*

Under Commission Rule 210.18, summary determination "shall be rendered if pleadings and any depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a summary determination as a matter of law." 19 C.F.R. § 210.18(b). The standards for summary judgment in district courts apply to summary determinations before the Commission. *See Amgen Inc. v. ITC*, 565 F.3d 846, 849 (Fed. Cir. 2009). "[I]n deciding a motion for summary judgment, 'the evidence of the nonmovant is to be believed, and all

justifiable inferences are to be drawn in his favor.'" *Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1377 (Fed. Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "The summary judgment movant has the initial responsibility of identifying the legal basis of its motion, and of pointing to those portions of the record that it believes demonstrate the absence of a genuine issue of material fact." *Novartis Corp, v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

### *C. Invalidity - Anticipation*

It is the Respondents' burden to prove invalidity by clear and convincing evidence. *See Microsoft Corp. v. i4i Ltd.*, 564 U.S. 91, 100-114 (2011); *see also SRAM Corp. v. AD-II Eng'g, Inc.*, 465 F.3d 1351, 1357 (Fed. Cir. 2006) ("Under the patent statutes, a patent enjoys a presumption of validity, *see* 35 U.S.C. § 282, which can be overcome only through facts supported by clear and convincing evidence . . . .").

Pursuant to 35 U.S.C. § 102,[7] a patent claim is invalid as anticipated if "the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States. . . ." 35 U.S.C. § 102(b) (pre-AIA). "A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention. Moreover, a prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference." *Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003) (citations omitted).

[7] The application for the '351 patent was filed prior to March 16, 2013, and is therefore subject to the pre-America Invents Act ("AIA") version of 35 U.S.C. § 102.

Under 35 U.S.C. § 102(b), "[t]he 'invention' which has been offered for sale [or in public use] must, of course, be something within the scope of the claim." *Scale Inc. v. Retec/Tetra L.L.C.*, 178 F.3d 1378, 1383 (Fed. Cir. 1999) (citing *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 607 (1950) (a claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using, or selling the protected invention)). Accordingly, the § 102(b) analysis must determine "whether the subject of the barring activity [meets] each of the limitations of the claim, and thus [is] an embodiment of the claimed invention." *Id.*

## III. DISCUSSION AND ANALYSIS

### *A. The ID*

In their Motion, Respondents submitted photographs of a marine air conditioning system called the "Vector Compact" (Model No. VCP12K)[8] that Dometic manufactured in 2002 and of an owner's manual for it. *See* ID at 9-10 (citing Mot. Ex. 1 at 1; Mot. Exs. 4-5). For example, the ID indicated that Respondents provided the following "photo of this VCP12K unit":

[8] As indicated in the ID, the submitted "owner's manual for the Vector Compact, describe[ed] multiple models including the VCP12K . . ." *See* ID at 10 (citing Mot. Ex. 5).

**PUBLIC VERSION**



*Id.* at 9-10 (citing Mot. Ex. 4 at MABRU000007). Respondents also submitted a YouTube video, entitled "blower mabru vs dometic,"[9] that was uploaded on December 12, 2022. *Id.* at 10 (citing Mot. Ex. 16). Respondents argued that the Vector Compact was first sold by Dometic in the United States in the late 1990s. *See id*. at 9. Noting that Dometic did not argue otherwise, the ID concludes that the Vector Compact constitutes prior art to the asserted patents "at least based on the on-sale provision of Section 102(b)." *Id.* at 10. Dometic does not dispute this finding in its petition for review.

Examining the owner's manual, photographs, and video of the Vector Compact,[10] the ID

---

[9] Viewable at: https://www.youtube.com/watch?v=BcqBvxVCN7I.

[10] The ID treated the owner's manual, photographs, and YouTube video as descriptive of the Vector Compact:

> Although the relevant portion of the YouTube video shows the operation of a VCD10K12 rather than a VCP12K, no material differences between the two products are apparent from the images and video. See Mot. Ex. 16 (MABRU000065) at 4:11 (showing the label on the product that indicates VCD10K12). And the owner's manual has descriptions and figures that are similarly consistent with the photographs and video. The owner's manual does, however, show variances in dimensions between the various products. Mot. Ex. 5 at 20. For example, the VCP12K has a different height than the VCP10K, which suggests the possibility of a difference in the degrees of rotation

concludes that "Respondents have shown by clear and convincing evidence that the Vector Compact anticipates claim 1 of the 351 Patent." *Id.* at 26. More specifically, the ID finds that the Vector Compact meets every limitation set out in claim 1 of the '351 Patent, including the claimed "guiding cover." *Id.* at 11-25. The ID also finds that the Vector Compact has a "duct element being rotatably adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet." *Id.* at 25. Dometic argued before the ALJ that the "method of rotation" in the Vector Compact does not meet this claim limitation. *Id.* (citing Compl. Opp. at 11 (citing Mot. Ex. 7 at 76:12-17)). The ID rejects this argument, explaining that "[t]he evidence cited . . . at most shows that the range of rotation was restricted, which does not cast doubt on the presence of the limitation." *Id.* (citing Resp. Mot. Ex. 7 (Pabisz Dep. Tr.) at 76:8-77:13). Notably, the Vector Compact manual states that the blower assembly can rotate the blower up to 130 degrees. *See id.* at 13 (citing Mot. Ex. 5 at MABRU000021). In addition, one of the named inventors of the '351 Patent, Ronald Pabisz, admitted that the Vector Compact could rotate. *Id.* (citing Mot. Ex. 7 (Pabisz Dep. Tr.) at 68:6-12).

### *B. Dometic's Petition for Review*

Dometic argues that the Vector Compact does not anticipate claims 1, 2, 4, 5 and 7 because it does not have a "guiding cover" as set out in each of the claims. Dometic Pet. at 32-

---

> between these units. Id.; Ex. 7 (Pabisz Dep. Tr.) at 66:11-71:3 (the different-sized Vector Compact models are "similar" in their design). This potentially makes a difference with respect to claims 18-22, as explained below, but would not seem to make a difference for claims 1-5 and 7. The owner's manual, photographs, and video are therefore treated as descriptive of the Vector Compact except where noted.

ID at 10-11.

35.[11] More specifically, Dometic contends that the ID: (1) improperly determines that a "mere cylindrical protrusion" extending from the main body constitutes a "guiding cover" (*id*. at 25); and (2) erroneously finds that the Vector Compact contains a "guiding cover" when this term is defined as a "cover-like element that includes a flat section with a circular opening for directing air to the adjacent blower and has a cylindrical section extending from the opening" (*id.* at 36).

Dometic also argues that "the ALJ failed to recognize, or even address, the fact that the Dodge patent [U.S. Patent No. 5,848,536[12]], which is cumulative of the Vector Compact, was in front of the Examiner during prosecution of the application for the '351 Patent, and that the claims were specifically amended to overcome the Dodge prior art. . . ." *Id*. at 39-40. According to Dometic, "the Examiner allowed the Asserted Claims, as amended, in part because of the determination that Dodge does not disclose the claimed assembly and guiding cover." *Id*. at 40.

### *C. Respondents' Opposition to Complainants' Petition*

Respondents argue that the ID correctly concludes that the Vector Compact has the claimed "guiding cover." *See* Resp. Pet. Opp. at 2. Respondents note that the ALJ accepted Dometic's argument that the guiding cover should be construed as a "cover-like element that includes a flat section with a circular opening for directing [air] to the adjacent blower and has a cylindrical section extending from the opening," and the ID still finds that the Vector Compact meets this limitation. *Id.* at 2-3.

With respect to the Dodge patent, Respondents do not dispute that the applicants overcame this reference during prosecution of the '351 Patent. *See* Resp. Pet. Opp. at 10-11.

---

[11] Notably, Dometic's petition does not seek review of the ID's finding that that the Vector Compact discloses the additional limitations in dependent claims 2, 4, 5, and 7. Accordingly, we adopt the ID's findings concerning those claims and do not address them further.

[12] Complainants' Opening Claim Construction Brief (Mar. 10, 2023), Ex. J.

However, Respondents argue, the disclosure in the Dodge Patent is entirely different than the connection between the main body and the blower of the Vector Compact. *See* Resp. Pet. Opp. at 10; *see also id.* at 11 (". . . Complainants were well aware that the product depicted in the Dodge patent is *not* the Vector Compact, and that it does *not* employ the same mechanism for connecting the blower to the main body, nor rotating the blower in relation thereto.") (emphasis in original). According to Respondents, "the Dodge patent fails to disclose the precise elements relied upon by the ALJ in concluding that the Vector Compact disclosed the connection assembly that Complainants argue distinguishes the '351 Patent claims (and the allegedly novel assembly) from the Dodge patent." *Id.* at 10.

### *D. Analysis*

The Commission affirms and adopts the ID's finding(s) that Respondents have shown by clear and convincing evidence that the Vector Compact discloses the limitations of asserted independent claim 1, including the claimed "assembly" as well as the claimed "guiding cover," for the reasons set forth in the ID. *See* ID at 11-26. The Commission also affirms and adopts the ID's findings that the Vector Compact discloses the additional limitations in dependent claims 2, 4, 5, and 7—findings for which Complainants do not seek review. *See* ID at 26-29; *see also supra*, at 12 n.12. The Commission further supplements the above finding(s) as set forth below.

Regarding the prosecution history of the '351 Patent, Dometic contends that the ID "failed to recognize, or even address, the fact that the Dodge patent, which is cumulative of the Vector Compact, was in front of the Examiner during prosecution of the application for the '351 Patent, and that the claims were specifically amended to overcome the Dodge prior art." Compl. Pet. at 39-40. More specifically, Dometic argues that the claims were allowed "because of the determination that Dodge does not disclose the claimed assembly and guiding cover." *Id.* This

**PUBLIC VERSION**

argument is meritless as it inaccurately describes the prosecution history concerning the Dodge patent, which was discussed by the ALJ in the *Markman* Order.

The Dodge Patent discloses rotation of a "conventional blower" relative to a "condenser/evaporator shroud" by unscrewing a "mounting plate" and reconnecting it. *See* Dodge Patent at 5:9-20. The specification explains:

> The conventional blower 17 is powered by conventional electric motor 18, to discharge cooled air through the duct ring 19. For flexibility and ease of installation the blower 17 is preferably mounted so that the duct ring 19 may be oriented either vertically--as illustrated in solid line in FIGS. 1-4--or horizontally--as illustrated in dotted line in FIG. 3. The orientation of the blower 17 is changed merely by unscrewing screws 33, rotating the square mounting plate 34 supporting the blower housing 17 ninety degrees about an axis through the motor 18 (which is coaxial with the fan shaft of blower 17), and reconnecting the square plate to the condenser/evaporator shroud 35 using the screws 33.

*Id.*

Although the ID does not discuss the Dodge patent, the ALJ considered this reference during the claim construction proceedings in this investigation. *See Markman* Order at 18-21. In their claim construction brief, Respondents argued that the limitation "the duct element being rotatably adjustable around the guiding cover" recited in claim 1 should be limited to require avoiding rotation facilitated by "partial disassembly" of the blower from the main body of the unit, citing an amendment made during prosecution to overcome the Dodge Patent:

> [D]uring prosecution, the applicants distinguished the claimed "assembly" from one that required the removal and replacement of screws. Specifically, the examiner found that Dodge disclosed changing the orientation of a blower by removing screws from a square mounting plate and rotating the plate. In response, Dometic amended its claims to include the rotatable assembly. Thus, the prosecution history demonstrates that one in the art would know and understand that the rotation of a blower could be achieved by partially disassembling the unit, rearranging the components, and reassembling in a different configuration. But one of ordinary skill in the art would, then, understand that ***the present invention***

**PUBLIC VERSION**

> ***was allowed because it avoided this type of partial disassembly***.[13]

In contrast, Dometic argued for a broader construction of that limitation that focused on the rotation of the blower relative to the main body and the rotatable adjustability of the duct element:

> While applicants ***did*** distinguish the claimed assembly from the disclosures of certain cited art such as *Dodge*, they did so by arguing that the cited art failed to disclose, *inter alia*: (i) a nautical air conditioner with the novel structural features of the assembly—*e.g.*, the guiding cover and cylindrical duct element—that independently permits rotation of the blower with respect to the main body; and (ii) the duct element being rotatably adjustable around the guiding cover.[14]

The ALJ agreed with Dometic and adopted a broad construction of the claim language in question, *i.e.*, "the duct element being rotatably adjustable around the guiding cover." *Markman* Order at 21. More particularly, the ALJ found both that "[t]he term 'rotatably adjustable' means 'can be rotated,' without further limitation," (*id.* at 18) and that "'the duct element being rotatably adjustable around the guiding cover about the second axis' means 'the duct element can be rotated about the second axis and relative to the guiding cover.'" *Id.* at 21. The ALJ found that its construction of "rotatably adjustable" was "supported by the plain language of the claims, the specification, and the prosecution history." *See id.* at 18.

In rejecting Respondents' more narrow proposed construction, the ALJ indicated that disassembly is not recited in the claim language of the '351 Patent, and the claims dependent upon claim 1 indicate that "disassembly is irrelevant to the scope of claim 1." *Markman* Order at 18-19. More specifically, the ALJ explained:

> As for the claim language, the manner of adjustment (i.e., "partial disassembly") is not recited. Moreover, claim 5, which depends from

[13] Respondents' Opening Claim Construction Brief (Mar. 10, 2023), at 20 (emphasis added).

[14] Complainants' Opening Claim Construction Brief (Mar. 10, 2023), at 15 (emphasis in original).

> claim 1, provides "the bases being circular and the duct element being ***slidingly adjustable around*** the guiding cover about the second axis," while claim 6, which also depends from claim 1, provides "the bases being non-circular and the duct element being ***non-slidingly adjustable*** around the guiding cover about the second axis." Id. at cls. 5, 6 (emphasis added). That the duct element may be adjustable both by sliding, which may not require disassembly, and "non-slidingly," which may involve disassembly, indicates that disassembly is irrelevant to the scope of claim 1.

*Id*. (emphasis in original).

The ALJ also explained that the claim language could not be interpreted as avoiding "partial disassembly" because "one embodiment [in the specification] may require complete removal of the duct element from the guiding cover." *Markman* Order at 19 (quoting '351 Patent at 12:27-40 ("it may be necessary to adjust the orientation of the blower 2 after ***completely removing*** the duct element 184 from the guiding cover 170") (emphasis in original)). Moreover, regarding the prosecution history and amendments made to overcome a prior art rejection including the Dodge Patent, the ALJ noted that "disassembly was not even referenced in the applicants' response to the Office Action." *See id.* at 19-20. According to the ALJ, "a fair reading of the prosecution history is that claim 1 was allowed because it added the ability to adjust the orientation of the duct element by rotating it around the guiding cover, because neither Dodge nor Weiland disclosed a 'movable' duct element." *Id*.

Notwithstanding Domestic's prior characterization of the prosecution history, Dometic now asserts that "the Examiner allowed the Asserted Claims, as amended, in part because of the determination that Dodge does not disclose the claimed assembly and guiding cover." Compl. Pet. at 40. This is incorrect. As the ALJ noted in the *Markman* Order, the applicants' amendment of the pending claim (later issued as claim 1) to overcome Dodge concerned the rotation of the movable duct element. *See Markman* Order at 20. We therefore agree with the ALJ that a fair reading of the prosecution history is that claim 1 was allowed because the

amendment added the ability to adjust the orientation of a duct element by rotating it around a guiding cover, as neither Dodge nor Weiland disclosed a "movable" duct element. *See Markman* Order at 20. The Vector Compact, however, does have a duct element that can rotate around the "guiding cover," *i.e.*, a "movable" duct element. *See* ID at 24-25; *see also* Markman Order at 20.

We also agree with Respondents that the Vector Compact is not cumulative of the disclosure in the Dodge patent, (*see* Resp. Pet. Opp. at 10) and that the "differences between the disclosure in Dodge and the Vector Compact product are sufficient to reject Complainants arguments that the ALJ erred in failing to specifically address the Dodge patent in analyzing anticipation by the Vector Compact product." *See* Resp. Pet. Opp. at 12. Furthermore, as Respondents noted in their motion and in their opposition to Complainants' petition, Mr. Pabisz, one of the named inventors, testified in his deposition that the Dodge patent depicts a different product than Vector Compact, one that has a different connection between the main body and the blower. *See id*. at 10-11 (citing Resp. Mot. Ex. 7 (Pabisz Dep. Tr.) at 112:13-114:10; 114:17-115:13).

Accordingly, the Commission finds that the aforementioned Dodge patent and the amendment applicants made during prosecution of the '351 Patent do not impact the ID's conclusion that the Vector Compact has a moveable "duct element" that can rotate around the "guiding cover" as set out in claim 1. *See* ID at 24-25; *see also* Markman Order at 20.

## IV. CONCLUSION

For the reasons discussed above, the Commission (1) has determined to review the ID's finding that the Vector Compact anticipates claims 1, 2, 4, 5, and 7 of the '351 Patent under 35 U.S.C. § 102(b) and (2) on review, affirm and supplement this finding as discussed above. The

**PUBLIC VERSION**

Commission has also determined to deny Dometic's motion for leave to file a reply in support of its petition for review.

By order of the Commission.

Lisa R. Barton
Secretary to the Commission

Issued: March 28, 2024

[redacted]

**UNITED STATES INTERNATIONAL TRADE COMMISSION**

**Washington, D.C.**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN MARINE AIR CONDITIONING SYSTEMS, COMPONENTS THEREOF, AND PRODUCTS CONTAINING THE SAME** | **Inv. No. 337-TA-1346** |

**ORDER NO. 19: INITIAL DETERMINATION GRANTING-IN-PART RESPONDENTS' MOTION FOR SUMMARY DETERMINATION**

(July 18, 2023)

On June 12, 2023, Respondents Citimarine, L.L.C., Mabru Power Systems, Inc., Shanghai Hopewell Industrial Co., Ltd., and Shanghai Hehe Industrial Co., Ltd. (collectively, "Respondents") moved (1346-009), with a supporting memorandum ("Mem."), for summary determination of invalidity based on anticipation and/or obviousness for claims 1-5, 7, and 18-22 of U.S. Patent No. 8,056,351 ("the 351 Patent"). Respondents' motion also seeks a finding of no violation of Section 337 and termination of the Investigation in its entirety. On June 22, 2023, complainant Dometic ("Dometic") filed its opposition ("Opp'n").

For the reasons detailed below, the motion is GRANTED-IN-PART.

## I. STANDARDS OF LAW

### A. Summary Determination

Commission Rule 210.18 governing summary determination states, in pertinent part:

> The determination sought by the moving party shall be rendered if pleadings and any depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a summary determination as a matter of law.

[redacted]

19 C.F.R. § 210.18(b). The Commission has analogized summary determination to summary judgment, in which "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Certain Carburetors and Products Containing Such Carburetors*, Inv. No. 337-TA-1123, Comm'n Op. at 5–6 (Oct. 28, 2019) ("*Carburetors*") (citing *Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1377 (Fed. Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986))). When the moving party bears the burden of proof on a particular issue, the moving party must show that there is no genuine issue of material fact as to every element. *See Meyers v. Asics Corp.*, 974 F.2d 1304, 1307 (Fed. Cir. 1992). When the nonmoving party bears the burden of proof on a particular issue, the moving party must show that the nonmoving party failed to produce evidence on an essential element of its claim or defense. *See Eli Lilly and Co. v. Barr Labs.*, Inc., 251 F.3d 955, 962 (Fed. Cir. 2001). A party moving for summary determination must identify the legal basis of its motion and must point to those portions of the record that show the lack of a genuine issue of material fact. *Carburetors*, Inv. No. 337-TA-1123, Comm'n Op. at 6 (citing *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986))).

**B. Invalidity**

It is the respondents' burden to prove invalidity, and the burden of proof never shifts to the patentee to prove validity. *Scanner Techs. Corp. v. ICOS Vision Sys. Corp. N.V.*, 528 F.3d 1365, 1380 (Fed. Cir. 2008). "Under the patent statutes, a patent enjoys a presumption of validity, *see* 35 U.S.C. § 282, which can be overcome only through facts supported by clear and convincing evidence . . . ." *SRAM Corp. v. AD-II Eng'g, Inc.*, 465 F.3d 1351, 1357 (Fed. Cir. 2006); *see also Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 100-114 (2011) (upholding the "clear and convincing" standard for invalidity).

[redacted]

The clear and convincing evidence standard placed on the party asserting an invalidity defense requires a level of proof beyond the preponderance of the evidence. Although not susceptible to precise definition, "clear and convincing" evidence has been described as evidence that produces in the mind of the trier of fact "an abiding conviction that the truth of a factual contention is 'highly probable.'" *Price v. Symsek*, 988 F.2d 1187, 1191 (Fed. Cir. 1993) (quoting *Buildex, Inc. v. Kason Indus., Inc.,* 849 F.2d 1461, 1463 (Fed. Cir. 1988)).

**1. Anticipation**

Pursuant to pre-AIA 35 U.S.C. § 102, a patent claim is invalid as anticipated if:

> (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

35 U.S.C. § 102 (pre-AIA). "A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention. Moreover, a prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference." *Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003) (citations omitted). "A century-old axiom of patent law holds that a product 'which would literally infringe if later in time anticipates if earlier.'" *Upsher-Smith Labs., Inc. v. Pamlab, L.L.C.*, 412 F.3d 1319, 1322 (Fed. Cir. 2005) (quoting *Schering Corp.*, 339 F.3d at 1322). Anticipation, and all other grounds of patent invalidity, must be proved by clear and convincing evidence. *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 95, (2011).

**2. Obviousness**

Section 103 of the pre-AIA Patent Act states:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject

[redacted]

> matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negated by the manner in which the invention was made.

35 U.S.C. § 103(a) (pre-AIA). "Obviousness is a question of law based on underlying questions of fact." *Scanner Techs.*, 528 F.3d at 1379. The underlying factual determinations include: "(1) the scope and content of the prior art, (2) the level of ordinary skill in the art, (3) the differences between the claimed invention and the prior art, and (4) objective indicia of non-obviousness." *Id.* at 1380 (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)). These factual determinations are often referred to as the "*Graham* factors."

A relevant inquiry in determining the differences between the claimed invention and the prior art is whether there is a reason to combine the prior art references. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418-21 (2007). In *KSR*, the Supreme Court rejected the Federal Circuit's rigid application of the teaching-suggestion-motivation test. While the Court stated that "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does," it described a more flexible analysis:

> Often, it will be necessary for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue . . . . As our precedents make clear, however, the analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ.

*Id.* at 418.

Applying *KSR*, the Federal Circuit has held that, where a patent challenger contends that a patent is invalid for obviousness based on a combination of prior art references, "the burden falls on

[redacted]

the patent challenger to show by clear and convincing evidence that a person of ordinary skill in the art would have had reason to attempt to make the composition or device . . . and would have had a reasonable expectation of success in doing so." *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1360 (Fed. Cir. 2007).

In addition to demonstrating that a reason exists to combine prior art references, the challenger must demonstrate that the combination of prior art references discloses all of the limitations of the claims. *Hearing Components, Inc. v. Shure Inc.*, 600 F.3d 1357, 1373-1374 (Fed. Cir. 2010), *abrogated on other grounds by Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898 (2014) (upholding finding of non-obviousness based on substantial evidence that the asserted combination of references failed to disclose a claim limitation); *Velander v. Garner*, 348 F.3d 1359, 1363 (Fed. Cir. 2003) (explaining that a requirement for a finding of obviousness is that "all the elements of an invention are found in a combination of prior art references").

An obviousness determination should also include a consideration of "secondary considerations," that is, "commercial success, long felt but unsolved needs, failure of others, etc.," which shed light on "the circumstances surrounding the origin of the subject matter sought to be patented." *Graham*, 338 U.S. at 17-18. "For [such] objective evidence to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention." *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995); *see Merck & Cie v. Gnosis S.P.A.*, 808 F.3d 829, 837 (Fed. Cir. 2015). "Where the offered secondary consideration actually results from something other than what is both claimed and novel in the claim, there is no nexus to the merits of the claimed invention." *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011); *see Apple Inc. v. Samsung Elecs. Co., Ltd.*, 839 F.3d 1034, 1054-1056 (Fed. Cir. 2016)

[redacted]

## II. BACKGROUND

The asserted patent in this investigation is U.S. Patent No. 8,056,351, and Dometic asserts claims 1-5, 7, and 18-22.[1] *See, e.g.*, Joint Initial Case-Narrowing Disclosure (May 17, 2023) (Doc. ID 796693) at 1. The 351 Patent, titled "Blower for Marine Air Conditioner," issued on November 15, 2011 to Frank Marciano and Ronald Pabisz from U.S. Application No. 12/021,328, filed January 29, 2008. 351 Patent at cover. The 351 Patent reports an assignment on its face to Dometic Corporation and claims priority to provisional application no. 60/889,120, filed on February 9, 2007. *Id.*

The 351 Patent discloses that "[t]he installation of an air conditioning system in a nautical vehicle must make use of the limited space available in the vehicle." 351 Patent at 1:19-21. It explains that a system was needed to "eliminate problems and shortcomings of conventional air conditioning systems." 351 Patent at 1:32-34. The 351 Patent describes a nautical air conditioner with an assembly including a guiding cover and rotatably adjustable duct element, where the assembly independently enables rotation of the blower "with respect to the main body about a second axis so as to alter an orientation of the outlet." 351 Patent at 1:41-43. Figures 1 and 29, reproduced below, illustrate "an example embodiment of an air conditioner with a blower incorporating aspects of the present invention" (*id.* at 5:3-5), where "FIG. 29 is a perspective view of the air conditioner with the blower oriented differently from FIG. 1" (*id.* at 5:52-53).

---

[1] Claims no longer asserted may be withdrawn by a motion to terminate pursuant to 19 C.F.R. § 210.21(a)(1).

[redacted]




FIG. 1



FIG. 29

*Id.* at Figs. 1, 29.

The 351 Patent has 23 claims. The asserted claims read as follows:

1. An air conditioning device for a nautical vehicle including:

a main body; and

a blower including an inlet and an outlet, the inlet being in air communication with the main body, the blower further including blades rotating therewithin about a first axis, and

an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet, the assembly including a guiding cover and a cylindrical duct element for maintaining the main body and the blower in air communication with one another, the duct element having a first base and a second base, and coupled to the blower at the second base, the first base of the duct element dimensioned to correspondingly fit the guiding cover, and the duct element being rotatably adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet.

2. The air conditioning device of claim 1, wherein the first and second axes are substantially parallel.

3. The air conditioning device of claim 2, wherein the first and second axes are identical.

4. The air conditioning device of claim 1, wherein the blower is a centrifugal fan.

5. The air conditioning device of claim 1, the bases being circular and the duct element being slidingly adjustable around the guiding cover about the second axis.

[redacted]

7. The air conditioning device of claim 1, the first and second bases having unequal surface areas.

18. An air conditioning device for a nautical vehicle including:

a main body; and

a blower including an inlet and an outlet, the inlet being in air communication with the main body, the blower being rotatable about first axis so that the outlet can be oriented toward a first [direction] and a second direction, and the first and second directions point to substantially different lateral sides of the main body, and

an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet, the assembly including a guiding cover and a [cylindrical] duct element for maintaining the main body and the blower in air communication with one another, the duct element having a first base and a second base, and coupled to the blower at the second base, the first base of the duct element dimensioned to correspondingly fit the guiding cover, and the duct element being [rotatably] adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet.

19. The air conditioning device of claim 18, wherein the first direction and the second direction point to substantially opposite directions.

20. The air conditioning device of claim 19, wherein the blower can be rotated without interference from a compressor, an evaporator or a condenser.

21. The air conditioning device of claim 18, wherein the blower is rotatable by more than 270 degrees.

22. The air conditioning device of claim 18, wherein the air conditioning device further includes a clamp element for maintaining the blower oriented with respect to the main body, and wherein only loosening of the clamp element is necessary to change orientation of the blower.

## III. DISCUSSION

Respondents present three bases for summary determination of invalidity of the 351 Patent. Mem. at 1; *see also id.* at 12-49. First, Respondents contend that the asserted claims of the 351 Patent are "invalid as anticipated under 35 U.S.C. § 102 by two prior marine air conditioners sold by Dometic (or entities it acquired), Vector Compact and Vector Rotary." *Id.* at 1. Second, Respondents contend that "any claim not found anticipated is invalid under 35 U.S.C. § 103 as obvious based on one or more combinations of Vector Compact, Vector Rotary, U.S. Patent No.

[redacted]

5,848,536, and the Lunaire Marine branded VBerth, Self-Contained VBSC product." *Id.* Third, Respondents contend that if "Dometic can succeed in demonstrating a technical domestic industry, the Asserted Patent is invalid as anticipated by Vector Turbo." *Id.*

**A. Anticipation**

Respondents contend that Dometic's Vector Compact and/or Vector Rotary products invalidate all asserted claims of the 351 Patent. Mem. at 12. Respondents further argue that "there is no dispute that Vector Compact and Vector Rotary are prior art based on any priority date under 35 U.S.C.§ 102(a) and (b)." *Id.*

**1. Vector Compact Product/VCP12K**

Respondents allege that "[t]he Asserted Claims of the '351 Patent are anticipated by Vector Compact as set forth in Exhibit 1 (Claim Chart for Model No. VCP12K)." Mem. at 13. Respondents state that the "Vector Compact [product] was first sold in the late 1990s." *Id.* at 12; *see also* Mot. Ex. 5 at MABRU000015 (showing publication date as early as 1998); Mot. Ex. 7 (Pabisz Dep. Tr.) at 168:17-20. Respondents note that "the specific unit shown [in its Motion] is Model No. VCP12K, Serial No. J2-M23857, and was manufactured in 2002." Mot. Ex. 1 at 1. Respondents provided a photo of this VCP12K unit:



[redacted]

Mot. Ex. 4 at MABRU000007. Dometic does not expressly dispute that the Vector Compact qualifies as prior art. *See* Opp'n at 6-7. Thus, the Vector Compact/VCP12K product constitutes prior art to the asserted patents at least based on the on-sale provision of Section 102(b).

Three important sources of evidence regarding the Vector Compact are photographs of the VCP12K (Mot. Ex. 4), an owner's manual for the Vector Compact, describing multiple models including the VCP12K (Mot. Ex. 5), and a YouTube video, titled "blower mabru vs dometic," that was uploaded on December 12, 2022, runs a little over six minutes, and may be viewed at https://www.youtube.com/watch?v=BcqBvxVCN7I (Mot. Ex. 16). Respondents contend that "all of the Vector Compact models operate in the same way" because "Dometic has confirmed that all Vector Compact products are similar in structure and operation." Mem. at 13 (citing Mot. Ex. 7 (Pabisz Dep. Tr.) at 66:11-71:3). Based on this premise, Respondents contend that "product literature for any one particular model appropriately describes operation of all Vector Compact products." *Id.* Dometic does not expressly dispute this. *See generally* Opp'n.

Although the relevant portion of the YouTube video shows the operation of a VCD10K12 rather than a VCP12K, no material differences between the two products are apparent from the images and video. *See* Mot. Ex. 16 (MABRU000065) at 4:11 (showing the label on the product that indicates VCD10K12). And the owner's manual has descriptions and figures that are similarly consistent with the photographs and video. The owner's manual does, however, show variances in dimensions between the various products. Mot. Ex. 5 at 20. For example, the VCP12K has a different height than the VCP10K, which suggests the possibility of a difference in the degrees of rotation between these units. *Id.*; Ex. 7 (Pabisz Dep. Tr.) at 66:11-71:3 (the different-sized Vector Compact models are "similar" in their design). This potentially makes a difference with respect to claims 18-22, as explained below, but would not seem to make a difference for claims 1-5 and 7.

[redacted]

The owner's manual, photographs, and video are therefore treated as descriptive of the Vector Compact except where noted.

**a. Claim 1**

**i. An air conditioning device for a nautical vehicle including: a main body; and a blower including an inlet and an outlet, the inlet being in air communication with the main body, the blower further including blades rotating therewithin about a first axis, and**

Dometic admits that the VCP12K is "an air conditioning device for a nautical vehicle including: a main body; and a blower including an inlet and an outlet, the inlet being in air communication with the main body, the blower further including blades rotating therewithin about a first axis." *See* Mot. Ex. 2 at 10 (RFA No. 6), 12 (RFA No. 8), 14 (RFA No. 10). Nonetheless, analysis of these undisputed elements is helpful in understanding why the VCP12K has other claimed elements, including a guiding cover. The Vector Compact manual states, "Congratulations on the purchase of your *Marine* Air Systems' VECTOR COMPACT® *air conditioner*." Mot. Ex. 5 at MABRU000015 (emphasis added). Respondents cite annotated images of the VCP12K product, indicating the main body, blower, inlet, and outlet:







Mot. Ex. 4 at MABRU000007; Mot. Ex. 4 at MABRU000009. Respondents also cite an annotated image of the VCP12K and an annotated design drawing of the Vector Compact, both indicating the blower inlet is in air communication with the main body:

[redacted]







Mot. Ex. 4 at MABRU000011; Mot. Ex. 5 at MABRU000020. Respondents further cite an annotated image of the VCP12K and an annotated design drawing of the Vector Compact, both indicating fan blades rotating within the blower about an axis:







Mot. Ex. 4 at MABRU000009; Mot. Ex. 5 at MABRU000020.

[redacted]

Respondents have therefore shown that the VCP12K is "[a]n air conditioning device for a nautical vehicle" that includes "a main body; and a blower including an inlet and an outlet, the inlet being in air communication with the main body, the blower further including blades rotating therewithin about a first axis," as in claim 1.

**ii. an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet, the assembly including a guiding cover and a cylindrical duct element for maintaining the main body and the blower in air communication with one another,**

Respondents argue that the "Vector Compact satisfies this limitation because it includes a cylindrical duct element that can be rotated around a guiding cover (on the inside of the cover) about the second axis (i.e., the blower/guiding cover axis)." Mem. at 13-14; Mot. Ex. 1 at 6-7. The Vector Compact manual states that the blower assembly can rotate the blower up to 130 degrees. *See* Mot. Ex. 5 at MABRU000021. Dometic's witness, Mr. Ronald Pabisz, admitted the Vector Compact could rotate. *See* Ex. 7 (Pabisz Dep. Tr.) at 68:6-12. The Vector Compact manual, moreover, illustrates the rotational capability of the Vector Compact unit, resulting in an alteration of the orientation of the outlet:




Mot. Ex. 5 at MABRU000020.

[redacted]

Respondents also argue that the Vector Compact includes the recited "assembly including a guiding cover and a cylindrical duct element." Respondents identify the "assembly for adjusting the blower" on the VPC12K in the annotated photograph below, which shows two labeled components, a "guiding cover" (discussed below) and a silver "cylindrical duct element." Mem. at 14-15 (citing Mot. Exs. 4-5); *see also* Mot. Ex. 1 at 6. Based on the various photographs, including the annotated photograph below, the duct element is cylindrical. *See id*. (citing Mot. Exs. 4-5); *see also* Mot. Ex. 7 (Pabisz Dep. Tr.) at 69:7-17 (admitting that the Vector Compact duct element was cylindrical). Dometic does not expressly dispute the presence of the duct element. *See* Opp'n at 7-11.

Turning to the "guiding cover" limitation, Respondents argue that the Vector Compact product teaches this limitation to one of ordinary skill in the art in three ways. First, Respondents, based on the annotated picture below, identify a protruding ring from the body as the "guiding cover." Mem. at 14-15 (citing Mot. Ex. 4); *see also* Mot. Ex. 1 at 6.

[redacted]




Mot. Ex. 4 at MABRU000011. Respondents suggest that this mapping tracks the application of the term in Dometic's final contentions on infringement. Mem. 16 (citing Mot. Exs. 15, 16). In those contentions, Dometic only pointed "to the cylindrical extension as the guiding cover" (Mem. at 16), as shown:

[redacted]




Mot. Ex.15 at Appx. A, p. 6.

Second, Respondents argue that the Vector Compact discloses a guiding cover within the definition proposed by Dometic for purposes of opposing the present motion, where the "guiding cover" is "a 'cover-like element' that includes a 'flat section with a circular opening for directing to the adjacent blower and has a cylindrical section extending from the opening.'" Mem. at 17 (citing Ex. 14 (Paulus Rebuttal Report) at ¶¶ 51-52). Respondents argue that the Vector Compact includes a guiding cover that meets this definition: (1) the Vector Compact includes a metal cover-like element (also known as a "shroud") that covers the evaporator of the unit; (2) it has a circular opening for directing air to the adjacent blower; and (3) it has a cylindrical section extending from

[redacted]

the opening. Mem. at 14-15 (citing Mot. Ex. 4). Respondents have annotated a photograph to illustrate this point:




Ex. 4 at MABRU000011 (notations added).

Third, Respondents argue that "to the extent Complainants argue that the entirety of the metal cover of [the] Vector Compact cannot constitute the guiding cover, the front portion of the

[redacted]

shroud is a flat portion, has a circular opening, and includes a cylindrical section extending from the opening." Mem. at 15.

Finally, it is clear from the photographs above that "the Vector Compact duct element (the silver cylindrical element) and the cylindrical extension protruding from the cover over the main body" fit together so as to "keep the blower and main body in air communication." Mem. at 14. And Dometic admits that the Vector Compact has a blower in air communication with the main body. *See* Mot. Ex. 2 at 12 (RFA No. 8).

All features of this limitation are accordingly present in the Vector Compact. Dometic's principal dispute over this finding involves the guiding cover. Dometic's own witness testified that the Vector Compact has a cylindrical protrusion that "constitutes a sheet metal ring that could mate with the ring attached to the blower." Opp'n at 7 (Ex. 7 (Pabisz) at 129:13-130:9). Dometic contends, however, that "a 'guiding cover' is much more than a 'cylindrical protrusion from the main body,' and Respondents' inability to apply the proper scope of the claim term to the references cited in their MSD is fatal to their invalidity analysis." *Id.* at 8. In particular, Dometic argues that the "guiding cover," as a "fan plate," "is a 'cover-like element' that includes a 'flat section with a circular opening for directing to the adjacent blower and has a cylindrical section extending from the opening.'" *Id.* at 7 (citing 351 Patent at 9:66-10:5).

A structure like what Dometic describes is an embodiment disclosed in the 351 Patent:

> As shown in FIGS. 1 and 22-23, a fan duct plate or a guiding cover 170 is fastened to a blower side of the evaporator 20 and is a cover-like element that is placed on the top of the evaporator 20. The guiding cover 170 (FIG. 23) includes a flat section 172 with a circular opening 174 for directing air to the adjacent blower 2 and has a cylindrical section 176 extending from the opening 174.

351 Patent at 10:66-11:6. But such a structure is precisely what the Vector Compact has, as Respondents explain. *See* Mem. at 17. To be sure, the Vector Compact includes more than just a

[redacted]

flat section, a circular opening, and a cylindrical protrusion from the opening; the flat section is part of a larger housing (or shroud) that encloses other air conditioner components. But this makes no difference, because the Vector Compact otherwise possesses the same embodiment of the guiding cover disclosed in the 351 Patent and therefore within the scope of the claim language.

And other embodiments are possible, as the 351 Patent explicitly states: "[t]hese illustrated examples are not intended to be limitations on the present invention." *Id.* at 6:1-4. Indeed, Respondents correctly note that Dometic itself only clearly identifies a cylindrical protrusion as the "guiding cover" in its final infringement contentions:







Mot. Ex. 15 at Appendix A, 5-6;

[redacted]







Mot. Ex. 15 at Appendix A, 7, 9 (respectively). And the Vector Compact plainly has such a cylindrical protrusion. So the Vector Compact has a "guiding cover," whether that element is interpreted as the combination of a flat section, circular opening, and cylindrical protrusion, or as just a cylindrical protrusion. There is thus no claim construction dispute that presently requires resolution, and Dometic's suggestion that Respondents have not identified the correct construction is beside the point. *See* Opp'n at 8-9.

Dometic's other arguments are unpersuasive. It implies that the material comprising the guiding cover, namely, sheet metal versus stamped metal, makes a difference, but the language of the claim is agnostic regarding the construction material. *See* Opp'n at 7. Similarly, the claim does not require any particular performance metric for rotatability, so even assuming rotation around a stamped metal protrusion is easier than rotation around a sheet metal protrusion, the claim language is satisfied. *See id.*

Dometic also contends that Respondents changed their position on what constitutes the guiding cover, that is, that Respondents' second theory, that it is a combination of a flat section, circular opening, and cylindrical protrusion, is "new." *Id.* at 7-8. Admittedly, Respondents' expert, Dr. Emadeddin Y. Tanbour, opined that the cylindrical protrusion was the guiding cover. *See* Opp'n Ex. B at ¶ 41. However, he qualified that opinion by stating it was "to the extent that element is

[redacted]

deemed satisfied by" one of the accused products. *Id.* And as noted, Dometic's infringement contentions only clearly identified the cylindrical protrusion as the guiding cover. Moreover, Respondents' invalidity contentions point to the cylindrical protrusion as the guiding cover, but the guiding cover is plainly attached to other components. *See* Opp'n Ex. H at Attachment A, p. 3. That is, it is not clear from Respondents' contentions that only the protrusion is identified as the guiding cover, so it is similarly unclear that Respondents' second theory regarding the guiding cover is new.

Dometic further takes issue with Respondents calling the component from which the cylindrical protrusion juts a "shroud" (Mem. at 17), because a shroud and a guiding cover are different structures, and because Respondents previously identified the shroud as part of the main body rather than part of the assembly. *See* Opp'n at 7-8. But it is undisputed that the Vector Compact has a main body in air communication with the blower inlet, and the shroud identified by Respondents includes a flat section and has a circular opening and cylindrical protrusion, that is, a guiding cover. *See* Mem. at 17. Labelling the structure to which the guiding cover is attached a "shroud" does not change the nature of the structure, and Mr. Pabisz even testified that the "crux of the patent" was two rotational axes, one of which permits "rotation relative to the shroud." Mot. Ex. 7 (Pabisz Dep. Tr.) at 184:9-19. Furthermore, the 351 Patent identifies the main body as the "drain pan 100 and what is mounted above it" (351 Patent at 11:25-26), which includes any shroud or shroud-like housing as well as other air conditioner components (*id.* at 4:35-46, Fig. 1). So there is nothing inconsistent about identifying most of the shroud as part of the main body and simultaneously identifying the flat section/circular opening/cylindrical protrusion part of the shroud as the guiding cover; nothing in the claim language requires that they be entirely separate structures.

Dometic next argues that Dr. Tanbour's declaration in support of the present motion (Mot. Ex. 20) and deposition testimony raise genuine issues of material fact. *See* Opp'n at 9. But

[redacted]

determination of whether the Vector Compact has a guiding cover can be (and has been) made based on photographs, figures, and the YouTube video, among other evidence, with no expert evidence clearly necessary. In fact, Dr. Tanbour's declaration has not been considered in examining the Vector Compact for the presence of a guiding cover, and nothing in his deposition transcript raises a genuine issue of material fact on that point.

Dometic's own expert evidence and the testimony of Mr. Pabisz have been considered, but they also do not raise a genuine issue of material fact. *See* Opp'n at 8-10. Mr. Pabisz testified that the cylindrical protrusion was a "mating ring" rather than a guiding cover or part of a guiding cover, but his description of how it connects to the ring attached to the blower and how adjusting the two rings allows the blower to change orientation is entirely consistent with the photographic, video, and documentary evidence. *See* Mot. Ex. 7 (Pabisz Dep. Tr.) at 127:20-131:18, 182:20-184:19. Dr. Paulus opined that the guiding cover is absent from the Vector Compact because its "mating ring" is made of sheet metal rather than stamped metal, and because the flat section is not attached to the evaporator by screws. *See* Mot. Ex. 14 (Paulus Rebuttal Report) at ¶¶ 166-67. As explained above, though, claim 1 requires no particular construction material, and there is nothing in the claim language requiring any particular method of attaching the guiding cover to any other component (other than the duct element).

Therefore, the Vector Compact includes "an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet, the assembly including a guiding cover and a cylindrical duct element for maintaining the main body and the blower in air communication with one another," as in claim 1.

[redacted]

**iii. the duct element having a first base and a second base, and coupled to the blower at the second base,**

Dometic admits that the VCP12K has a "duct element having a first base and a second base." *See* Mot. Ex. 2 at 66-67 (RFA No. 20). This feature, and how it is coupled to the blower at the second base, is shown in the annotated image below:




Mot. Ex. 4 at MABRU000009. Respondents have therefore shown that the VCP12K comprises "the duct element having a first base and a second base, and coupled to the blower at the second base," as in claim 1.

[redacted]

iv. **the first base of the duct element dimensioned to correspondingly fit the guiding cover, and the duct element being rotatably adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet.**

Annotated images of the VCP12K show "the first base of the duct element" is "dimensioned to correspondingly fit" the cylindrical protrusion (i.e., the "guiding cover" or the cylindrical protrusion portion of the "guiding cover"):




Mot. Ex. 4 at MABRU000011 (notations added). Dometic's witness, Mr. Pabisz, stated that the cylindrical protrusion on the VCP12K could mate with the ring attached to the blower:

[redacted]

Q In the portion of the body of the air conditioner, the cylindrical piece that that fits into, do you see that, that portion?

MR. KAMPS: Object to the form.

A I see that - the ring that that mates to on the air conditioner, yes.

Q And is it your understanding that that goes on the inside of that ring?

A Yes.

Mot. Ex. 7 (Pabisz Dep. Tr.) at 129:13-130:9; *see also* Opp'n at 7. Mr. Pabisz also stated that "the Vector Compact units, yes, had a blower that could orient the discharge of the blower differently." Mot. Ex. 7 at 68:6-12. And the Vector Compact literature describes how the blower is rotatable by releasing a clamp and mounting ring screws. *See* Mot. Ex. 5 at MABRU000021. Both the fitting and rotatability limitations are clearly visible in the YouTube video. *See* Mot. Ex. 16 (MABRU000065).

The "duct element being rotatably adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet" is therefore present in the Vector Compact. Dometic nevertheless disputes the presence of this limitation on two grounds. First, it again disputes the presence of the guiding cover, but as explained above Dometic's position is rejected. Second, it complains that the "method of rotation" does not meet the limitation. *See* Opp'n at 11 (citing Mot. Ex. 7 at 76:12-17). The evidence cited, however, at most shows that the range of rotation was restricted, which does not cast doubt on the presence of the limitation. *See* Mot. Ex. 7 at 76:8-77:13 ("the blower could not rotate, could not move in the opposite direction"). Respondents have accordingly shown that the Vector Compact comprises "the first base of the duct element dimensioned to correspondingly fit the guiding cover, and the duct element being rotatably adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet," as in claim 1.

[redacted]

In sum, Respondents have shown by clear and convincing evidence that the Vector Compact anticipates claim 1 of the 351 Patent.

**b. Claim 2. The air conditioning device of claim 1, wherein the first and second axes are substantially parallel.**

Claim 2 depends from claim 1 and additionally requires that "the first and second axes are substantially parallel." Respondents contend that the "Vector Compact's fan blades (which rotate about the first axis) and blower (which rotates about the second axis) both rotate through axes that are parallel to the ground, and therefore each other." Mem. at 19-20. This is clearly seen in photographs of the VCP12K:




Ex. 4 at MABRU000009. This is also evident in the Vector Compact manual:

[redacted]




Ex. 5 at MABRU000020; *see also* Mot. Ex. 1 at 14.

Respondents have accordingly shown that the Vector Compact discloses "wherein the first and second axes are substantially parallel," as in claim 2, and therefore anticipates claim 2.

**c. Claim 3. The air conditioning device of claim 2, wherein the first and second axes are identical.**

Respondents contend that this limitation is satisfied because the Vector Compact products are "marked with the Dodge Patent." Mem. at 20; Mot. Ex. 1 at 15 (citing Ex. 6 (Dodge) at 5:15-20). Specifically, "[t]he concept of identical axes was, therefore, disclosed by the Vector Compact products by virtue of them being marked with Dodge." *Id.* Whatever "concept" may have been disclosed, however, the Vector Compact itself does not embody identical axes, as Respondents concede: "the axis of rotation for the fan blades is *offset* from the axis of rotation of the blower." *Id.* at 20 (emphasis added). Accordingly, genuine issues of material fact prevent summary determination that claim 3 is anticipated by the Vector Compact.

[redacted]

**d. Claim 4. The air conditioning device of claim 1, wherein the blower is a centrifugal fan.**

Dometic admits that the VCP12K has such a centrifugal fan for a blower. Mot. Ex. 3 at 54 (RFA No. 56). Respondents have accordingly shown that the Vector Compact discloses "wherein the blower is a centrifugal fan," as in claim 4, and therefore anticipates claim 4.

**e. Claim 5. The air conditioning device of claim 1, the bases being circular and the duct element being slidingly adjustable around the guiding cover about the second axis.**

Dometic admits that the duct element's bases are circular, and Respondents contend that this limitation is otherwise satisfied because "the duct element can be slidingly adjusted around (as that term has been construed by the ALJ in Order No. 11) the guiding cover about the second axis (i.e., the blower/guiding cover axis)." Mem. at 21; Mot. Ex. 3 at 55 (RFA No. 58). The sliding adjustment about the guiding cover axis is plainly visible in the YouTube video. *See* Mot. Ex. 16 (MABRU000065) at 3:50 (showing the Vector Compact duct element, which is coupled to the blower, being slidingly adjusted around the guiding cover). Dometic challenges the presence of this limitation (although referring to it as "claim 7") on multiple grounds, including that there is no guiding cover. *See* Opp'n at 11 n.10. As explained, the Vector Compact has a guiding cover, and Dometic's points are otherwise refuted by the YouTube video. Respondents have accordingly shown that the Vector Compact discloses "the bases being circular and the duct element being slidingly adjustable around the guiding cover about the second axis," as in claim 5, and therefore anticipates claim 5.

**f. Claim 7. The air conditioning device of claim 1, the first and second bases having unequal surface areas.**

Dometic admits that the VCP12K's first and second bases have unequal surface areas. Mot. Ex. 3 at 66-67 (RFA No. 62). Respondents have accordingly shown that the Vector Compact

[redacted]

discloses "the first and second bases having unequal surface areas," as in claim 7, and therefore anticipates claim 7.

**g. Claims 18-22**

Claim 18, from which claims 19-22 depend, requires the blower to be "rotatable" about a first axis so that the blower outlet can be oriented toward a first direction and toward a second direction. *See* Order No. 11 at 26. The principal dispute between the parties is over the next limitation, which has been construed as "the first and second directions point to substantially opposing sides of the main body with respect to a vertical plane." *See id*. at 29; Opp'n at 12-16.

Respondents contend that this limitation is satisfied because "[t]he Vector Compact blower is capable of rotating to any position relative to the main body, but for interference from certain components of the product." Mem. at 23 (citing Ex. 16 (MABRU000065) at 4:00-5:00 (showing that rotation is hindered by interference from the condensing pipe and the drain pan)). In fact, it is one component in particular – a condenser coil outlet or condensing pipe – that stops rotation of the blower outlet past the vertical. *See* Mot. Ex. 5 (MABRU000016, MABRU000020); Mot. Ex. 7 at 4:09-4:19. This component is clearly important and structural, because it connects to an overboard discharge. *See* Mot. Ex. 5 (MABRU000019). Respondents state, "even if rotation without inference were required, the Vector Compact inherently discloses" this limitation because a person of ordinary skill in the art would understand that those "interfering components could readily be moved or spaced further apart to prevent interference." Mem. at 23 (citing Ex. 7 (Pabisz Dep. Tr.) at 192:11-195:3). There is at least a genuine issue of material fact regarding how "readily" a condenser coil outlet could be moved such that the blower would be considered sufficiently "rotatable." It is also possible that a different model of the Vector Compact with different dimensions from the VCP12K or VCD10K12 might be sufficiently "rotatable," but that is not evident from the owner's manual,

[redacted]

photographs, or YouTube video. And in any event, considerations of interfering components and their ability to be moved or spaced apart are more properly part of an obviousness argument.

There is another issue that the parties do not address but that Order No. 11 alluded to – whether the "blower being rotatable about [a] first axis" requires some structure distinct from the "assembly for adjusting the blower with respect to the main body," and if so, how that is satisfied in the Vector Compact. *See* Order No. 11 at 25. Inasmuch as this presents a claim construction question, no claim construction has been conducted, although Order No. 11 included some apparently relevant observations:

> [C]laim 18 does not recite exactly how the blower is "rotat[ed] about [the] first axis." 351 Patent at cl. 18. The specification suggests that the blower housing itself may be rotatable: "In accordance with still another aspect of the present invention, . . . [t]he blower is rotatable about an axis," without any further limitation. *Id*. at 2:43-47. This is consistent with the claim language, which does not specify rotation relative to another component, as would be expected if the blower housing had a rotatable mounting ring. The specification also implies that the blower may be rotated relative to the duct element by decoupling them: "the blower 2 and the duct element 184 are attached at a predetermined orientation." *Id*. at 12:9-10.

*Id*. As shown in the photographs, the VCP12K blower appears to be attached to the duct element by four screws. *See, e.g.*, Mot. Ex. 4 at MABRU000009. Whether this attachment method permits rotation is unclear, however, and, again, it is unclear whether such rotation is even required by the claim language. The parties have not addressed this question in any event.

Therefore, genuine issues of material fact preclude summary determination that claim 18 is anticipated by the Vector Compact. And because claims 19 through 22 depend directly or indirectly from claim 18, triable issues remain as to all five of these claims.

**2. Vector Rotary Product**

Respondents argue that the Vector Rotary product anticipates the Asserted Claims. Mem. at 1, 24-27. Respondents rely on Vector Rotary product literature (Mot. Exs. 9, 17) and the

[redacted]

deposition testimony of Mr. Pabisz, one of the inventors of the 351 Patent (Mot. Ex. 7). Mem. at 24-27. Respondents assert that "many of the elements of the Asserted Claims are disclosed in Vector Rotary for the same reasons they are disclosed in Vector Compact." *Id.* at 25.

There exists, however, a critical issue regarding the similarity between these products. Respondents apparently assume that the Vector Compact is representative of the Vector Rotary. *See* Mem. at 24-25. The deposition testimony of Mr. Pabisz could be evidence that these products share the "same connection," but they are still different products. Mot. Ex. 7 (Pabisz Dep. Tr.) at 168:2-7. Mr. Pabisz's testimony also does not consider other elements between the two products beyond the "connection." And the documentary evidence is thin, consisting of a two-page brochure with little detail (Mot. Ex. 17), and a more detailed manual that pertains to the "Vector Series" but not expressly to the Vector Rotary (Mot. Ex. 9).

Accordingly, viewing such evidence in the light most favorable to Dometic, material facts remain in dispute. Therefore, summary determination that the Vector Rotary anticipates the asserted claims is inappropriate.

**3. Vector Turbo Product**

Respondents contend that "the Vector Turbo product is prior art to the Asserted Patent by virtue of being sold more than one year prior to the application date of the Asserted Patent." Mem. at 41. In particular, Respondents argue that Dometic (1) "admitted sale of the Vector Turbo product before 2007" and (2) "admitted an offer for sale thereof before February 9, 2007." *Id.* at 46.

Genuine issues of material fact exist over the prior art status of the Vector Turbo. Dometic's third supplement to Respondents' Interrogatory No. 15, dated March 20, 2023, stated that the Vector Turbo was "sold prior to 2007." Mot. Ex. 13 at 92. But Dometic's fourth supplement, dated May 5, 2023, withdrew that answer and instead identified the Vector Turbo as "sold and/or offered for

[redacted]

sale" after "April 31, 2007." *Id.* at 92-93. And Dometic admitted, in response to Respondents' Request for Admission No. 37, only that the Vector Turbo was offered for sale before February 9, 2007. *See* Mot. Ex. 3 at 7-8; Order No. 13.

Viewed in a light most favorable to Dometic, such evidence is sufficient to raise a triable issue as to whether the Vector Turbo qualifies as prior art under 35 U.S.C. § 102(b) (pre-AIA). Even assuming the priority date of the 351 Patent is January 29, 2008, an offer for sale before February 9, 2007 is not clear and convincing evidence of an offer for sale before January 29, 2007. There is therefore no need at present to determine the patent's priority date, or who has the burden of proving it. *See* Mem. at 45, n.11. Lastly, Respondents suggest that the Vector Turbo is prior art under Section 102(a) because, by offering it for sale prior to February 9, 2007, it became "known . . . by others in this country" before the priority date. *See* Mem. at 49. Respondents misstate the law; Section 102(a) requires knowledge by others in this country not before the priority date, but "before the invention thereof by the applicant for patent," which necessarily occurs no later than the priority date. 35 U.S.C. § 102(a) (pre-AIA).

**B. Obviousness and Other Issues**

Respondents assert that every claim of the 351 Patent is also invalid due to obviousness. *See* Mem. at 29-39. Triable issues of fact exist, however, regarding at least two issues: motivation to combine and objective indicia of non-obviousness. For instance, Dometic's expert, Dr. Paulus, observes that "throughout the evolution of Dometic's products (until that of the claimed invention) rotatability was decreasing in certain material respects, rather than increasing, and the size of the units was also decreasing dramatically." Mot. Ex. 14 at ¶ 235 (emphasis omitted). Viewing this in the light most favorable to Dometic, a skilled artisan would not have had a reasonable expectation of success in combining elements of the prior art, because doing so would have yielded less, not

[redacted]

more, "rotatability." And the commercial success of the domestic industry products, which Dr. Paulus opines are embodiments of several claims of the 351 Patent, is alone sufficient to raise a genuine issue of material fact regarding obviousness. *See* Mot. Ex. 14 at ¶ 254; Opp'n Ex. C at ¶¶ 183-86.

Lastly, because the present motion is granted only in part, and otherwise finds genuine issues of material fact, neither granting summary determination regarding domestic industry technical prong nor terminating the investigation is appropriate. *See* Mem. at 49.

## IV. CONCLUSION

It is therefore my Initial Determination to GRANT-IN-PART Respondent's motion for summary determination (1346-009) as outlined above.

Within seven days of the date of this document, the parties shall submit to the Office of the Administrative Law Judges a joint statement as to whether or not they seek to have any portion of this document deleted from the public version. If the parties do seek to have portions of this document deleted from the public version, they must submit to this office a copy of this document with red brackets indicating the portion or portions asserted to contain confidential business information. The submission may be made by email and/or hard copy by the aforementioned date and need not be filed with the Commission Secretary.

This Initial Determination, along with any supporting documentation, is hereby certified to the Commission. Pursuant to 19 C.F.R. § 210.42(h), this Initial Determination shall become the determination of the Commission unless a party files a petition for review of the Initial Determination pursuant to 19 C.F.R. § 210.43(a), or the Commission, pursuant to 19 C.F.R. § 210.44, orders, on its own motion, a review of the Initial Determination or certain issues herein. Any issue or argument not raised in a petition for review, or response thereto, will be deemed

[redacted]

to have been abandoned and may be disregarded by the Commission in reviewing the initial determination pursuant to 19 C.F.R. §§ 210.43(b) and (c).

**SO ORDERED.**

Cameron Elliot
Administrative Law Judge

US008056351B2

(12) **United States Patent**
**Marciano et al.**

(10) **Patent No.: US 8,056,351 B2**
(45) **Date of Patent: Nov. 15, 2011**

(54) **BLOWER FOR MARINE AIR CONDITIONER**

(75) Inventors: **Frank Marciano**, Boca Raton, FL (US); **Ronald Pabisz**, Boynton Beach, FL (US)

(73) Assignee: **Dometic Corporation**, Elkhart, IN (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 853 days.

(21) Appl. No.: **12/021,328**

(22) Filed: **Jan. 29, 2008**

(65) **Prior Publication Data**

US 2008/0190120 A1 Aug. 14, 2008

**Related U.S. Application Data**

(60) Provisional application No. 60/889,120, filed on Feb. 9, 2007.

(51) **Int. Cl.**
***B63B 25/26*** (2006.01)
***B60H 1/32*** (2006.01)

(52) **U.S. Cl.** .......................................... **62/240**; 62/239

(58) **Field of Classification Search** ................. 62/238.6, 62/286, 298, 427, 239–240, 259.1; 285/243, 285/365, 366, 407, 410, 411, 424
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2,185,387 | A * | 1/1940 | Welland et al. | 62/427 |
| 3,364,989 | A * | 1/1968 | Marsteller | 165/122 |
| 3,760,601 | A * | 9/1973 | Bunten | 62/240 |
| 3,888,090 | A * | 6/1975 | Meyer | 62/240 |
| 4,437,320 | A * | 3/1984 | Eklund | 62/236 |
| 4,930,815 | A * | 6/1990 | Tuggler, Jr. | 285/142.1 |
| 5,444,900 | A * | 8/1995 | Shawhan et al. | 27/19 |
| 5,848,536 | A * | 12/1998 | Dodge et al. | 62/240 |
| 6,101,829 | A * | 8/2000 | Robinson | 62/259.1 |
| 2005/0092016 | A1* | 5/2005 | Ozaki | 62/419 |
| 2005/0236013 | A1* | 10/2005 | Huston et al. | 134/1 |

* cited by examiner

*Primary Examiner* — Frantz Jules
*Assistant Examiner* — Emmanuel Duke
(74) *Attorney, Agent, or Firm* — Pearne & Gordon LLP

(57) **ABSTRACT**

An air conditioning system for a nautical vehicle includes a main body including an assembly, and a blower including an inlet and an outlet, the inlet being in air communication with the main body, the blower further including blades rotating therewithin about a first axis, the assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet. The assembly includes a guiding cover and a cylindrical duct element for maintaining the main body and the blower in air communication with one another. The duct element has a first base and a second base, and is coupled to the blower at the second base. The first base of the duct element is dimensioned to correspondingly fit the guiding cover, and the duct element is rotatably adjustable around the guiding cover about the second axis at the first base.

**23 Claims, 30 Drawing Sheets**






FIG. 1




FIG. 2




FIG. 3




FIG. 4




FIG. 5




FIG. 6




FIG. 7




FIG. 8



FIG. 9




FIG. 10




FIG. 11

Case: 24-1796 Document: 27 Page: 344 Filed: 10/30/2024






FIG. 12




FIG. 13




FIG. 14




FIG. 15B




FIG. 15A




FIG. 16




FIG. 17




FIG. 19




FIG. 18




FIG. 20




FIG. 21




FIG. 22




FIG. 23




FIG. 24B




FIG. 24A




FIG. 25




FIG. 26




FIG. 27




FIG. 28



FIG. 29




FIG. 30A-2




FIG. 30B-2




FIG. 30A-1




FIG. 30B-1




FIG. 30C-2




FIG. 30C-1




FIG. 30D

# BLOWER FOR MARINE AIR CONDITIONER

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of U.S. Provisional Application No. 60/889,120, filed Feb. 9, 2007, the entire disclosure of which is hereby incorporated herein by reference.

## FIELD OF THE INVENTION

The present invention relates generally to air conditioners and, more particularly, to air conditioners for nautical vehicles.

## BACKGROUND OF THE INVENTION

The installation of an air conditioning system in a nautical vehicle must make use of the limited space available in the vehicle. Generally, the installation location will be determined based on factors, such as plumbing or ductwork surrounding the system, and the manner in which the system is installed such as orientation and room for placement. An air conditioning system equipped with features that allow for easy installation is necessary for situations where it must be installed in limited space obstructed by surrounding objects.

## SUMMARY OF THE INVENTION

Accordingly, it is an aspect of the present invention to eliminate problems and shortcomings of conventional air conditioning systems in nautical vehicles.

In accordance with one aspect of the present invention, an air conditioning system for a nautical vehicle includes a main body, a blower and an assembly. The blower includes an inlet and an outlet, and the inlet is in air communication with the main body. The blower further includes blades rotating therewithin about a first axis, and the assembly is for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet.

In accordance with another aspect of the present invention, the first and second axes are substantially parallel.

In accordance with still another aspect of the present invention, the first and second axes are identical.

In accordance with still another aspect of the present invention, the blower is a centrifugal fan.

In accordance with still another aspect of the present invention, the assembly includes a guiding cover and a cylindrical duct element for maintaining the main body and the blower in air communication with one another. The duct element has a first base and a second base, and is coupled to the blower at the second base. The first base of the duct element is dimensioned to correspondingly fit the guiding cover. The duct element is rotatably adjustable around the guiding cover about the second axis at the first base.

In accordance with still another aspect of the present invention, the bases are circular and the duct element is slidingly adjustable around the guiding cover about the second axis.

In accordance with still another aspect of the present invention, the bases are non-circular and the duct element is non-slidingly adjustable around the guiding cover about the second axis.

In accordance with still another aspect of the present invention, the first and second bases have unequal surface areas.



In accordance with still another aspect of the present invention, the duct element is substantially tapered toward the blower.

In accordance with still another aspect of the present invention, the duct element can be axially divided into a tapered portion and a non-tapered portion, and a clamp element is placed around the non-tapered portion.

In accordance with still another aspect of the present invention, the clamp element is configured to have a variable perimeter for fastening the duct element to the guiding cover.

In accordance with still another aspect of the present invention, the orientation of the blower is altered by loosening and tightening of the clamp element.

In accordance with still another aspect of the present invention, the blower is installed with respect to the duct element in such a way that the maximum height of the air conditioning device is limited.

In accordance with still another aspect of the present invention, the non-tapered portion includes peripherally scattered indents to accommodate elastic deformation of the non-tapered portion when the clamp element is placed.

In accordance with still another aspect of the present invention, the duct element includes an outwardly projecting flange at the first base. The flange includes a peripherally located pass portion, and the main body further includes a first engaging element and a second engaging element. The flange of the duct element is removably held by the first and second engaging elements, and the duct element is removed by rotating the duct element so that one of the engaging elements can pass through the pass portion.

In accordance with still another aspect of the present invention, the duct element includes protrusions that are located peripherally on the non-tapered portion so that the clamp element can be secured between the flange and the projections.

In accordance with still another aspect of the present invention, the pass portion allows removal of the duct element from the main body only at a predetermined orientation of the duct element.

In accordance with still another aspect of the present invention, the predetermined orientation is indicated by the alignment of a first marking and a second marking.

In accordance with still another aspect of the present invention, an air conditioning device for a nautical vehicle includes a main body and a blower. The blower includes an inlet and an outlet, and the inlet is in air communication with the main body. The blower is rotatable about an axis so that the outlet can be oriented toward a first direction and a second direction. The first and second directions point to substantially different lateral sides of the main body.

In accordance with still another aspect of the present invention, the first direction and the second direction point to substantially opposite directions.

In accordance with still another aspect of the present invention, the blower can be rotated without interference from the compressor, the evaporator and the condenser.

In accordance with still another aspect of the present invention, the blower is rotatable by more than 270 degrees.

In accordance with still another aspect of the present invention, the air conditioning device further includes a clamp element for maintaining the blower oriented with respect to the main body, and only loosening and tightening of the clamp element is necessary to change orientation of the blower.

In accordance with still another aspect of the present invention, a method of installing an air conditioning device is provided. The air conditioning device includes a main body,

the blower and a clamp element. The blower includes an outlet and is rotatable about an axis. The method includes the steps of orienting the outlet of the blower to a desired direction by hand through rotation about the axis, and tightening the clamp element to maintain the blower oriented with respect to the main body.

In accordance with still another aspect of the present invention, a method of adjusting an air conditioning device is provided. The air conditioning device includes a main body, the blower and a clamp element. The blower includes an outlet and is rotatable about an axis. The method includes the steps of loosening the clamp element, orienting the outlet of the blower to a desired direction by hand through rotation about the axis, and tightening the clamp element to maintain the blower oriented with respect to the main body.

In accordance with still another aspect of the present invention, a drain pan for an air conditioning system includes an integral base portion, an integral wall portion and a drainage area. The integral base portion has a mounting surface defining a first elevation. The integral wall portion encircles the base portion peripherally. The drainage area includes a dimple and a receptacle. The dimple is located peripherally on the base portion and defines a second elevation. The receptacle is located externally on the wall portion near the dimple and is adapted to be perforated by a drain fitting thereby allowing access to the dimple. The first elevation is above the second elevation.

In accordance with still another aspect of the present invention, the base portion further includes a trough adapted to route condensate to the drainage area and the trough defines a third elevation. The third elevation is above the second elevation but below the first elevation.

In accordance with still another aspect of the present invention, the drain pan includes multiple drainage areas only one receptacle of which is perforated to channel condensate flow to the selected drainage area.

In accordance with still another aspect of the present invention, the receptacle includes a tapered portion allowing threaded connection for the drain fitting.

In accordance with still another aspect of the present invention, the base portion is sloped downward to channel condensate into the trough.

In accordance with still another aspect of the present invention, the drain pan is formed by molding.

In accordance with still another aspect of the present invention, the receptacle is perforated by knocking out a part of the wall portion using the drain fitting.

In accordance with still another aspect of the present invention, an air conditioning system includes a drain pan, a compressor, an evaporator, a condenser defined by a loop of coil and a blower. The evaporator and the condenser are mounted in a substantially vertical manner.

In accordance with still another aspect of the present invention, the air conditioning system further includes a reversing valve located at least partially within the loop.

In accordance with still another aspect of the present invention, the condenser and the evaporator are mounted next to one another, and the evaporator includes end plates for securing the condenser to the evaporator.

In accordance with still another aspect of the present invention, the drain pan includes an integral pedestal on which the condenser can be fittingly placed.

In accordance with still another aspect of the present invention, the drain pan includes posts projecting from the drain pan to fittingly place the evaporator thereby stabilizing the vertical mounting of the evaporator.

In accordance with still another aspect of the present invention, the compressor occupies a first mounting area above the drain pan, the evaporator occupies a second mounting area above the drain pan, the condenser occupies a third mounting area above the drain pan, and the drain pan is dimensionally limited so as to substantially span only the first, second and third mounting areas.

In accordance with still another aspect of the present invention, the compressor is mounted to the drain pan through a vibration-reducing mounting assembly.

In accordance with still another aspect of the present invention, an aperture for the mounting assembly includes a rib to prevent a hex cap screw of the mounting assembly from falling out.

In accordance with still another aspect of the present invention, the drain pan includes an integral foot for maintaining balance.

In accordance with still another aspect of the present invention, the drain pan includes an integral handle for transporting the drain pan.

In accordance with still another aspect of the present invention, the drain pan includes apertures for resting pads adapted to reduce vibration from the system.

In accordance with still another aspect of the present invention, the drain pan includes a wall portion and is held in place on a surface through mounting clip assemblies engaging the wall portion and movable around the perimeter of the drain pan.

In accordance with still another aspect of the present invention, the mounting clip assemblies comprise an engaging clip and a support.

In accordance with still another aspect of the present invention, the base has vibration absorbing means.

In accordance with still another aspect of the present invention, an air conditioning system includes a drain pan, a compressor, an evaporator, a condenser, a blower and a shroud structure. The compressor occupies a first mounting area. The evaporator has an inlet and an outlet and occupies a second mounting area. The condenser is defined by a loop of coil and is located adjacent the inlet. The condenser occupies a third mounting area. The blower is located adjacent the outlet. The shroud structure houses the compressor, the evaporator and the condenser. The shroud structure includes an opening adjacent the condenser so that air enters the inlet after passing substantially through the loop.

In accordance with still another aspect of the present invention, the shroud structure comprises a first cover, a second cover and a third cover, a first cover houses the evaporator and the condenser, a second cover houses a part of the compressor, and a third cover houses the rest of the compressor.

In accordance with still another aspect of the present invention, the first cover is configured as a return air plenum.

In accordance with still another aspect of the present invention, the second cover and the third cover include noise-reducing means.

In accordance with still another aspect of the present invention, the condenser is a tube-in-tube structure, an outer tube channeling refrigerant and an inner tube channeling water, and the shroud structure is shaped to accommodate incoming and outgoing water tubes in fluid communication with the condenser.

## BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing and other aspects of the present invention will become apparent to those skilled in the art to which the

present invention relates upon reading the following description with reference to the accompanying drawings, in which:

FIG. **1** is a first perspective view of an example embodiment of an air conditioner with a blower incorporating aspects of the present invention.

FIG. **2** is a second perspective view of the air conditioner.

FIG. **3** is a front view of the air conditioner without covers.

FIG. **4** is a perspective view of the air conditioner without the covers.

FIG. **5** is a perspective view of the covers.

FIG. **6** is a first perspective view of a drain pan.

FIG. **7** is a second perspective view of the drain pan.

FIG. **8** is a top view of the drain pan indicating mounting areas for air conditioner components.

FIG. **9** is a top view of the air conditioner without the covers.

FIG. **10** is a top view of the air conditioner with the covers.

FIG. **11** is a sectional view of the drain pan along line **11** of FIG. **8**.

FIG. **12** is a close-up view of a receptacle of the drain pan.

FIG. **13** is a close-up view of a drain fitting inserted in a receptacle of the drain pan.

FIG. **14** is a close-up view of a dimple and a backing wall of the drain pan.

FIG. **15**A is a close-up view of a resting pad.

FIG. **15**B is a close-up view of a mounting clip assembly engaging a wall portion of the drain pan.

FIG. **16** is a close-up view of a pedestal of the drain pan.

FIG. **17** is a view of a condenser and an evaporator mounted substantially vertically on the drain pan.

FIG. **18** is an exploded view of a mounting assembly for a compressor.

FIG. **19** is a sectional view of the drain pan through an aperture for a hex screw of the mounting assembly showing a rib.

FIG. **20** is a perspective view of the compressor mounted on the drain pan using the mounting assembly.

FIG. **21** is a view of the evaporator with end plates.

FIG. **22** is an exploded view of an assembly for connecting the blower to the air conditioner.

FIG. **23** is an isolated view of a guide cover of the assembly.

FIG. **24**A is a front perspective view of a duct element of the assembly.

FIG. **24**B is a rear perspective view of the duct element of the assembly.

FIG. **25** is a rear view of the air conditioner without the blower showing the duct element on the guide cover.

FIG. **26** is a view of a clamp element of the assembly.

FIG. **27** is a view of a transition bracket of the assembly.

FIG. **28** is a view of the blower and a duct collar removed from the blower.

FIG. **29** is a perspective view of the air conditioner with the blower oriented differently from FIG. **1**.

FIGS. **30**A-**1** and **30**A-**2** are schematic illustrations of a first example embodiment of the duct element.

FIGS. **30**B-**1** and **30**B-**2** are schematic illustrations of a second example embodiment of the duct element.

FIGS. **30***c*-**1** and FIGS. **30**C-**2** are schematic illustrations of a third example embodiment of the duct element.

FIG. **30**D is a schematic illustration of a first axis and a second axis in non-parallel relation to one another.

## DETAILED DESCRIPTION OF EXAMPLE EMBODIMENTS

Example embodiments that incorporate one or more aspects of the present invention are described and illustrated in the drawings. These illustrated examples are not intended to be limitations on the present invention. For example, one or more aspects of the present invention can be utilized in other embodiments and even other types of systems.

The terms "air conditioner" or "air conditioning" will be used to encompass any treatment of air including heating and cooling and may include heat pumps but also other HVAC systems. Air conditioning is also meant to encompass both indoor air conditioning, which is limited to the air conditioning of an enclosed area and outdoor air conditioning, which occurs in the open air. Moreover, the present invention is primarily designed for use in a nautical vehicle but obvious alterations are within the scope of the present invention and will have use in other applications such as conventional vehicles, recreational vehicles, aircrafts or other means of transportation and also in means of habitation.

FIGS. **1**-**2** show an air conditioner **1** according to an embodiment of the present invention. In this embodiment, the exterior of the air conditioner primarily comprises a drain pan **100** or base pan, a blower **2**, and a shroud structure (FIG. **5**) composed of a supply side cover **10**, a return side cover **12** and a heat exchanger cover **14**. The interior of the air conditioner **1** primarily comprises a compressor **16**, a condenser **18**, an evaporator **20** and a reversing valve **22** as shown in FIGS. **3**-**4**.

This embodiment shows a self-contained type air conditioner in which the major components of a refrigeration cycle are present. However, alternative embodiments may leave out some of these major components and still come within the scope of the present invention. For example, it is possible to install the compressor and the condenser at a remote location and to simply have an embodiment in which only the blower and the evaporator are present among the major components of a refrigerating cycle with the dimensions of the drain pan **100** reduced accordingly.

The covers **10**, **12** and **14** of the air conditioner **1** are easily removable for access to the components, and the heat exchanger cover **14** encloses the evaporator **20** and the condenser **18** while the supply side cover **10** and the return side cover **12** enclose the compressor **16** (FIGS. **1**-**2**). The covers **10**, **12**, **14**, shown in their removed state in FIG. **5**, are molded to suit the shape of the components of the air conditioner and to reduce or minimize the volume of the air conditioner. In this embodiment, the heat exchanger cover **14** is substantially rectilinear but it may instead have curved surfaces similar to the supply side cover **10** and the return side cover **12**. The heat exchanger cover **14** includes an inlet **15** that is in air communication with a return air duct (not shown) that channels air to the air conditioner **1**. In this manner, the heat exchanger cover **14** can operate as a return air plenum. The heat exchanger cover **14** is substantially hexahedral and is composed of three orthogonally adjacent surfaces. The heat exchanger cover **14** does not enclose the supply air side, near which the blower **2** is located, to accommodate for the presence of the blower **2** and to allow removal of the heat exchanger cover **14** without detachment the blower **2**. The paths of water tubes **24**, **26** (FIG. **2**), which are in fluid communication with the condenser **18** and channel water to and from an external water source, are accommodated through indented portions **28** of the heat exchanger cover **14** and depressions **30** on the return side cover **12**, as shown in FIGS. **2** and **5**. The molded shape of the return side cover **12** and the supply side cover **10** are configured to correspond to the shape of compressor **16**. In particular, bulging portions **32** (FIGS. **2** and **5**) of the return side cover **12** and the supply side cover **10** accommodate an accumulator **34** (FIGS. **3** and **4**) of the compressor **16** whose location with respect to the compressor **16** can change depending on the type or brand of compressor **16** used.

Accordingly, the return side cover **12** and the supply side cover **10** can accommodate various types of compressor models within a compact space. Furthermore, as will be discussed later and shown in FIGS. **1** and **5**, the supply side cover **10** is shaped to accommodate and reduce interference with the rotation of the blower **2**.

The shroud structure may include noise-reducing means to reduce noise emanating from the air conditioning components such as the compressor **16**. In this embodiment, the supply side cover **10** and the return side cover **12** may include such noise-reducing means. The noise-reducing means can comprise a particular type of paint, foam, padding or the like applied on the interior of the covers **10** or **12**.

The shapes or number of covers in this embodiment should not be deemed as limitations, and variations in the covers are also encompassed by the present invention. For example, it may be possible to have one integral cover instead of the three used in this embodiment and the covers could either be substantially rectilinear or curved.

FIGS. **6-8** show a molded drain pan **100** from which the air conditioning components have been removed. The drain pan **100** can be made of corrosion-resistant material such as composites and is molded to include features for accommodating the components described below. The overall footprint of the drain pan **100** can have various shapes and, in the present embodiment, takes on a key-like shape with a substantially circular portion **102** and a substantially rectangular portion **104**, as shown in FIG. **8**. As shown in FIGS. **9-10**, the footprint of the drain pan **100** is designed to take up as little area as possible and offer versatility in installation while providing a foundation for the air conditioning components. A base portion of the drain pan **100** includes a mounting surface **108** while an integral, vertical wall portion **110** of the drain pan **100** substantially delineates its area and is molded to include tapered and threaded receptacles **112** (FIGS. **6**, **7** and **12**). As shown in FIGS. **12-13**, the receptacles **112** are located on the external side of the wall portion **110** and have a thin backing wall **114** that becomes perforated when drain fittings **116** are screwed into thereby forming drainage areas **118**. For example, the thin backing wall **114** can be configured so as to be easily knocked out from the vertical wall portion **110** when pressure is applied by inserting the drain fitting **116** or by using a tool. In this way, a user can install the drain fittings **116** at selected locations suitable to the drainage plumbing around the air conditioner **1** and can leave out any drain fitting **116** or equivalent structure that hinders with surrounding structures. Thus, the user need not utilize all of the receptacles **112**. As a result, the air conditioner **1** can be oriented in any direction and still establish fluid communication with the surrounding drainage plumbing with gravity driven flow.

As seen in FIGS. **11** and **14**, the mounting surface **108** of the drain pan **100** is sloped so that condensate water will be channeled from the mounting surface **108** to a trough **120** and then out to the drainage areas **118**. In this embodiment, the trough **120** is level so that water can flow to any of the drainage areas **118**. As shown in FIG. **14**, the trough **120** terminates at the drainage areas **118** with dimples **122** which are substantially semi-cylindrical in shape and are located adjacent to backing wall **114**. The dimples **122** accept the drain fittings **116** after they punch a hole in the receptacle **112** via screw-in (FIG. **13**). In descending order of elevation, the mounting surface **108** is the highest, then the trough **120** and the dimple **122** as shown in FIG. **14**. As seen in FIG. **11**, the mounting surface **108** may be sloped downward to direct condensate into the trough **120**. The drain fittings **116** can be of any material that is corrosion-resistant and sufficiently rigid to accomplish perforation of the receptacles **112**. The dimples **122** allow the drain fittings **116** to be installed lower than conventional drain fittings which conventionally have to be above the mounting surface **108** of the drain pan **100** in order to accommodate a nut (not shown) engaging the drain fitting **116**. The lower position of the drain fittings **116** contributes to quicker disposal of collected water and results in fewer components being in contact with water or the components being in contact with water for a shorter duration because the amount of water in the drain pan **100** is minimized. The drain pan **100** may accomplish drainage using variations in arrangement, number, and shape of features such as the trough **120**, the drainage areas **118**, the slope of the mounting surface **108** or the footprint of the drain pan **100**.

In this embodiment, the drain pan **100** is further molded to include a plurality of apertures **124** (FIGS. **6-7**) for accepting resting pads **125** (FIG. **15**). The resting pad **125** in the present embodiment is a grommet that is substantially shaped like a bolt and is made of elastic material such as rubber. As shown in FIG. **15**, a base section **126** of the resting pad **125** supports the drain pan **100** above an installation surface after assembly and has a hollow section in the middle to isolate the air conditioner. The purpose of the resting pads **125** is to dampen the vibration that is caused by the compressor **16** and the blower **2** and that can be transmitted through the drain pan **100** and the installation surface. A rod section **128** of the resting pad **125** has a conical section **130** that will deform as the resting pad **125** is inserted from underneath the drain pan **100** and will prevent the resting pad **125** from falling out after insertion.

As shown in FIGS. **1**, **6** and **8**, the drain pan **100** may also be molded to include a foot **131** for an additional resting pad **125** outside the wall portion **110** of the drain pan **100** and below the blower **2** in order to counter possible imbalance created by the weight of the blower **2**. The air conditioner **1** can be further stabilized above the installation surface using mounting clip assemblies (FIGS. **1** and **15**B) that engage the drain pan **100** while being affixed to the installation surface by way of screws. The mounting clip assemblies may comprise an engaging clip **132** and a support **133**. The support **133** may include a vibration absorbing means, made of elastic material such as rubber, and a cylindrical sleeve, made of rigid material such as metal. The sleeve is found within the vibration absorbing means and limits the extent of compression by the vibration absorbing means. The mounting clip assemblies may be moved along the vertical wall portion **110** to any spot on the perimeter of the drain pan **100** in order to place the mounting clip assembly above an appropriate installation surface such as one that is sufficiently rigid.

The drain pan **100** may further be molded to accommodate the mounting of the air conditioning components. As shown in FIGS. **6-7** and **17**, in this embodiment, the drain pan **100** includes four posts **134** integrally projecting from the drain pan **100** and partly delineating a perimeter in which the evaporator **20** with corresponding dimensions can be placed. The posts **134** also include apertures **136** for fastening the evaporator **20** or neighboring parts to the drain pan **100** via means such as screws. The posts **134** help stabilize the vertical mounting of the evaporator **20**. Adjacent to the posts **134**, the drain pan **100** is molded to include an integral pedestal **138** (FIGS. **16-17**) that holds loops **140** of a tubular element that comprises the condenser **18**. As shown in FIG. **17**, once the condenser **18** is placed on the pedestal **138**, a condenser bracket **142** is placed over the loops **140** and is fastened onto the pedestal **138** via screws to hold the condenser **18** in place. In this embodiment, the width of the evaporator **20** is similar to the width of condenser **18**. In such a case, the evaporator **20** may be equipped with plates **144** at its ends that include

apertures **146** for condenser straps **148** to grip the loops **140** and additionally stabilize the condenser **18**, as shown in FIG. **17**.

As shown in FIGS. **8** and **20**, the drain pan **100** further includes holes **150** for mounting assemblies **152** (FIG. **18**) that support the compressor. The holes **150** of the drain pan **100** may include a rib **154** (FIG. **19**) to prevent a hex cap screw **164** from falling out of the hole **150** during assembly. The rib **154** allows a user to carry the drain pan **100** around with the hex cap screw **164** inserted in the holes **150**. As shown in FIG. **18**, the mounting assembly **152** may be comprised of, for example, the hex cap screw **164**, an O-ring **163**, a tube **158**, a grommet **160**, a washer **162** and a nut **156** and fastens one of the feet of the compressor **16** to the drain pan **100**. The O-ring **163** creates a water tight seal between the drain pan **100** and the hex cap screw **164**. FIG. **20** shows the compressor **16** mounted on the drain pan **100** using the mounting assembly **152**. As shown in FIG. **4**, the drain pan **100** may further be molded to include a handle **166** to aid in transporting the air conditioner **1** where the covers have been removed.

The major components of the air conditioner **1** mounted on the drain pan **100** will be discussed in the following. As shown in FIGS. **3-4**, the compressor **16** has a longitudinal axis that is substantially vertical contributing to the small footprint of the drain pan **100**. The accumulator **34** is oriented in a way that its longitudinal axis is parallel to that of the compressor **16** also contributing the small footprint of the drain pan **100**. The drain pan **100** is designed so that the accumulator **34** is substantially included in the space above the substantially circular portion **102** (FIGS. **9-10**) of the footprint despite variations in the arrangement of the accumulator **34**. The condenser **18** is made up of two coaxial tubes or coils (FIGS. **4** and **17**). In such a tube-in-tube structure, an outer tube channels a refrigerant medium and is in fluid communication with the other components of the air conditioner **1**. The inner tube (not shown) has a water outlet and a water inlet respectively connecting to outlet tube and inlet tube for circulating water from a body of water neighboring the nautical vehicle by means of a pump (not shown). The coaxial tubes form the loops whose dimensions are such that the condenser will closely fit between the plates **144** of the evaporator **20** (FIG. **17**), and a reversing valve **22** (FIGS. **3-4**) can be placed substantially within the loops **140** further contributing to a compact design of the air conditioner I by keeping the reversing valve **22** within the space above the footprint of the drain pan **100** (FIG. **9**).

As shown in FIG. **21**, in the present embodiment, the evaporator **20** is a bank of conduit in fluid communication with the outer tube (not shown) of the condenser **18** and is formed by routing the conduit multiple times through a set of parallel fins. The fins are placed between the plates and bent segments of the conduit protrude from the plates **144**. In this embodiment, the plates **144** are similar in length but wider compared to the fins. The fins are positioned about the plates **144** so as to allow room for a filter **168** (FIG. **22**) to be inserted between the plates **144** and the fins on a condenser side of the evaporator **20**.

As shown in FIG. **8**, the drain pan **100** can substantially be divided into a first mounting area **108***a* for the compressor, a second mounting area **108***b* for the evaporator, and a third mounting area **108***c* for the condenser. Thus, the drain pan **100** will be dimensionally limited to substantially span only the first, second, and third mounting areas **108***a*, **108***b*, and **108***c*. Moreover, the components are vertically mounted so as to minimize the mounting areas.

As shown in FIGS. **1** and **22-23**, a fan duct plate or a guiding cover **170** is fastened to a blower side of the evaporator **20** and is a cover-like element that is placed on the top of the evaporator **20**. The guiding cover **170** (FIG. **23**) includes a flat section **172** with a circular opening **174** for directing air to the adjacent blower **2** and has a cylindrical section **176** extending from the opening **174**. A curvature **178** is formed at the intersection of the flat section **172** and the cylindrical section **176** so that the flat section **172** is bent toward the blower **2** along the circumference of the opening **174** contributing to a smoother air flow. The flat section **172** further includes slots **179** at the bottom that mate with projections **180** (FIG. **20**) on the drain pan **100**. As shown in FIG. **1**, the guiding cover **170** also includes apertures **182** for fastening it onto the plates **144** of the evaporator **20** and the posts **134** of the drain pan **100** by means of screws.



As shown in FIGS. **22** and **25**, a fan duct transition or a duct element **184** is placed between the guiding cover **170** and the blower **2** by clamping it around the cylindrical section **176** of the guiding cover **170** with a band clamp or a clamp element **186** whose perimeter is controllable through an adjustment screw **188** that can tighten or-loosen. In the present embodiment, the clamp element **186** (FIG. **26**) is metallic but it may be non-metallic. The duct element **184** (FIGS. **24**A and **24**B) in the present embodiment can be substantially described as a conical cylinder in which the two parallel surfaces or bases **190**, **192** are circles of different diameters and different center axes as shown in FIGS. **24**A and **30**B. On the evaporator side of the duct element **184** is a non-tapered, cylindrical portion **194** which mates with the cylindrical section **176** of the guiding cover **170**. The cylindrical portion **194** ends with an outwardly projecting flange **196** that rests against the guiding cover **170** and helps prevent separation of the duct element **184** from the guiding cover **170** after the clamp element **186** is placed around the cylindrical portion **194**. The curvature **178** in the perimeter of the opening **174** of the guiding cover **170** is shaped to correspond to the part of the duct element **184** that abuts the guiding cover **170**.

As shown in FIG. **25**, the outwardly projecting flange **196** also interacts with first engaging elements **198** (FIGS. **6** and **25**) on the vertical wall portion **110** of the drain pan **100** to secure the lower part of the duct element **184** between the first engaging elements **198** and the guiding cover **170** and to prevent the duct element **184** from falling off of the guiding cover **170** easily. As shown in FIGS. **24**A and **24**B, the cylindrical portion **194** has a plurality of indentations **200** scattered around the perimeter which allow for elastic deformation of the cylindrical portion **194** when the clamp element **186** is placed. There are radially outward protrusions **202** (FIG. **24**B) adjacent to the depression of the indentations **200** that keep the clamp element **186** in place after it is tightened around the cylindrical portion **194**. The outwardly projecting flange **196** also includes peripherally located, elongate pass portions **204** whose shapes correspond with those of first engaging elements **198** (FIGS. **24**A-**24**B and **25**). The pass portions **204** are found on the duct element **184** radially opposite a first marking **206**. The first marking **206** may be a raised portion in the shape of an arrow on the duct element **184**. When the first marking **206** is rotated to its highest position so that the arrow is opposite a second marking **213**, the first engaging elements **198** can pass through the pass portions **204** thereby helping the mounting and demounting of the duct element **184** onto the guiding cover **170**, as shown in FIG. **25**. The second marking **213** may be a V-shaped notch (FIG. **27**) on a transition bracket **212**. The removal of the duct element **184** from the guiding cover **170** is made possible only at this position of the duct element **184**.

On the blower side of the duct element **184** is an inwardly projecting flange **208** (FIGS. **24**A and **24**B) with apertures **210** for coupling the duct element **184** onto the blower **2**.

As shown in FIGS. **22**, **25**, **27** and **29**, the transition bracket or a second engaging element **212** (FIG. **27**) is fastened to the guiding cover **170** and covers a part of the top of the guiding cover **170** and a part of the outwardly projecting flange **196** in order to secure the blower **2** to the guiding cover **170** and prevent the blower **2** from falling off when the orientation of the blower **2** is rotatably adjusted. The blower **2** is coupled to the evaporator **20** by fastening the duct element **184** onto the blower **2** by loosely screwing the transition bracket **212** over the guiding cover **170**, inserting the outwardly projecting flange **196** adjacent to the arrow **206** into the transition bracket **212**, passing the first engaging elements **198** through the pass portions **204**, rotating the duct element **184** to obtain the desired orientation for the blower **2**, clamping the duct element **184** onto the guiding cover **170** using the clamp element **186** and tightening the screws of the transition bracket **212**. A different embodiment of the transition bracket **212** may be configured to pass through the pass portion **204** rather than the first engaging element **198**.

In FIG. **1**, the air conditioner **1** can largely be divided into a main body **4** and the blower **2**. The main body **4** comprises the drain pan **100** and what is mounted above it. In this embodiment, the blower **2** (FIG. **28**) is a centrifugal fan but other types of fans, such as an axial fan with an air outlet oriented to a certain direction, or any other air moving devices are also contemplated with this invention. As shown in FIGS. **30**A-**1** through **30**B-**2**, the blades **214** of the blower **2** rotate about a first axis B while the blower **2** itself can be rotated about a second axis A with respect to the main body **4**. These first and second axes B and A are substantially parallel and spaced apart (FIG. **30**B) in the present embodiment but, in other embodiments, they may be non-parallel (FIG. **30**D) or identical (FIG. **30**A). As shown in FIG. **28**, a duct collar **216** is coupled to an outlet **218** of the blower **2** and can further connect with a plenum attachment (not shown). FIG. **28** also shows an inlet **219** of the blower **2**.

As shown in FIGS. **1** and **29**, by rotating the blower **2** and the duct element **184**, the orientation of the outlet **218** of the blower **2** of the present invention can be altered and can vary by more than **270** degrees. In particular, FIG. **1** shows that the blower **2** can be rotated toward the compressor **16** until the outlet **218** is obstructed by a bulging portion of the supply side cover **10** near the drain pan **100**. The rotation of the blower **2** is not hindered by the air conditioning components and, in this embodiment, the compressor **16**. As a result, the blower **2** can easily be connected with ducts approaching the air conditioner **1** from various angles, such as from either lateral side (FIG. I or FIG. **29**) or top of the air conditioner **1**. The lateral sides refer to opposing sides with respect to a vertical plane such as left and right. When the blower **2** is rotated from one direction to another direction about the second axis A, the directions may point to two different lateral sides such as the left and right of the air conditioner **1**. However, the two directions are not necessarily opposite one another. For example, the two directions may form a 90-degree angle, one pointing to the left of a vertical plane and the other pointing to the right of a vertical plane in FIGS. **1** and **29**, and these are deemed point to substantially different lateral sides of the air conditioner **1** although not in opposite directions.

The orientation of the outlet **218** of the blower can be altered simply by loosening the clamp element **186**, rotating the duct element **184** to the desired orientation and tightening the clamp element **186**. The rotation of the blower duct element **184** occurs continuously without interference or break. Thus, the orientation of the outlet **218** can be easily altered in a matter of seconds.



The non-concentric cylinder shape of the duct element **184** (FIGS. **24**A, **24**B and **25**) is designed to limit the overall height of the air conditioner **1**. Since it is possible for the outlet **218** of the blower **2** to substantially increase the height of the air conditioner **1** when the outlet **218** is located near the top of the air conditioner **1**, the blower **2** and the duct element **184** are attached at a predetermined orientation relative to one another such that the maximum height of the air conditioner **1** will be kept below a certain value despite various orientations of the blower **2**. One way to do this is by attaching the blower **2** to duct element **184** so that, when axis B (FIG. **30**B-**1**) is at its lowest relative to axis A, the blower **2** is oriented to reach its vertically longest position. As shown in FIG. **30**B, the blades of the blower **2** rotate around B while the blower **2** is rotated with respect to the air conditioner **1** around A. The overall height of the air conditioner **1** with the rotatable blower **2** will change depending on how the blower **2** is fastened in relation to the duct element **184**. Therefore, the maximum height of an air conditioner **1** can be restricted by adjusting the orientation in which the blower **2** is fastened to the duct element **184**. Moreover, the conical cylinder shape of the duct element **184** and the curvature **178** of the guiding cover **170** contribute to a smoother air flow within the air conditioner **1**.

In the present embodiment, the adjustment of the blower orientation occurs through a sliding mechanism. However, it is possible for the parallel surfaces or bases **190**, **192** of the duct element **184** to be non-circular and, for example, may be polygonal (FIG. **30**C). In that case, the adjustment of the duct element **184** around the guiding cover **170** may not occur through sliding. For example, it may be necessary to adjust the orientation of the blower **2** after completely removing the duct element **184** from the guiding cover **170**. Moreover, in such case, the clamp element **186** will not be circular either and, for example, may be polygonal. Furthermore, it is also possible for the duct element **184** to be non-tapered or for the bases **190**, **192** of the duct element **184** to be concentric.

The covers for the air conditioner **1** can be placed after all of the interior components are mounted and operatively connected, and can be easily removed to allow access for servicing of components.

The invention has been described with reference to the example embodiments described above. Modifications and alterations will occur to others upon a reading and understanding of this specification. Example embodiments incorporating one or more aspects of the invention are intended to include all such modifications and alterations.

What is claimed is:

**1**. An air conditioning device for a nautical vehicle including:

a main body; and

a blower including an inlet and an outlet, the inlet being in air communication with the main body, the blower further including blades rotating therewithin about a first axis, and

an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet, the assembly including a guiding cover and a cylindrical duct element for maintaining the main body and the blower in air communication with one another, the duct element having a first base and a second base, and coupled to the blower at the second base, the first base of the duct element dimensioned to correspondingly fit the guiding cover, and the duct element

being rotatably adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet.

**2**. The air conditioning device of claim **1**, wherein the first and second axes are substantially parallel.

**3**. The air conditioning device of claim **2**, wherein the first and second axes are identical.

**4**. The air conditioning device of claim **1**, wherein the blower is a centrifugal fan.

**5**. The air conditioning device of claim **1**, the bases being circular and the duct element being slidingly adjustable around the guiding cover about the second axis.

**6**. The air condidioning device of claim **1**, the bases being non-circular and the duct element being non-slidingly adjustable around the guiding cover about the second axis.

**7**. The air conditioning device of claim **1**, the first and second bases having unequal surface areas.

**8**. The air conditioning device of claim **7**, the duct element being substantially tapered toward the blower.

**9**. The air conditioning device of claim **1**, wherein the duct element can be axially divided into a tapered portion and a non-tapered portion, and a clamp element is placed around the non-tapered portion.

**10**. The air conditioning device of claim **9**, wherein the clamp element is configured to have a variable perimeter for fastening the duct element to the guiding cover.

**11**. The air conditioning device of claim **9**, wherein the orientation of the blower is altered by loosening and tightening of the clamp element.

**12**. The air conditioning device of claim **9**, wherein the non-tapered portion includes peripherally scattered indents to accommodate elastic deformation of the non-tapered portion when the clamp element is placed.

**13**. The air conditioning device of claim **9**, the duct element including an outwardly projecting flange at the first base, the flange including a peripherally located pass portion, and the main body further including a first engaging element and a second engaging element,

wherein the flange of the duct element is removably held by the first and second engaging elements, and

wherein the duct element is removed by rotating the duct element so that one of the engaging elements can pass through the pass portion.

**14**. The air conditioning device of claim **13**, wherein the duct element includes protrusions that are located peripherally on the non-tapered portion so that the clamp element can be secured between the flange and the projections.

**15**. The air conditioning device of claim **13**, the pass portion allowing removal of the duct element from the main body only at a predetermined orientation of the duct element.

**16**. The air conditioning device of claim **15**, wherein the predetermined orientation is indicated by the alignment of a first marking and a second marking.



**17**. The air conditioning device of claim **1**, wherein the blower is installed with respect to the duct element so that the maximum height of the air conditioning device is limited.

**18**. An air conditioning device for a nautical vehicle including: a main body; and a blower including an inlet and an outlet, the inlet being in air communication with the main body, the blower being rotatable about first axis so that the outlet can be oriented toward a first directon and a second direction, and the first and second directions point to substantially different lateral sides of the main body, and an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet, the assembly including a guiding cover and a cylidrical duct element for maintaining the main body and the blower in air communication with one another, the duct element having a first base and a second base, and coupled to the blower at the second base, the first base of the duct element dimensioned to correspondingly fit the guiding cover, and the duct element being rotatbly adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet.

**19**. The air conditioning device of claim **18**, wherein the first direction and the second direction point to substantially opposite directions.

**20**. The air conditioning device of claim **19**, wherein the blower can be rotated without interference from a compressor, an evaporator or a condenser.

**21**. The air conditioning device of claim **18**, wherein the blower is rotatable by more than 270 degrees.

**22**. The air conditioning device of claim **18**, wherein the air conditioning device further includes a clamp element for maintaining the blower oriented with respect to the main body, and wherein only loosening of the clamp element is necessary to change orientation of the blower.

**23**. A method for installing an air conditioning device for a nautical vehicle: the air conditioning device including a main body; a blower including an inlet and an outlet, the inlet being in air communication with the main body, the blower further including blades rotating there within about a first axis, the method including the steps of: providing a clamp element; providing an assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet, the assembly including a guiding cover and a cylindrical duct element for maintaining the main body and the blower in air communication with one another, the duct element having a first base and a second base, and coupled to the blower at the second base, the first base of the duct element dimensioned to correspondingly fit the guiding cover, and the duct element being rotatably adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet; orienting the outlet of the blower to a desired direction by hand through rotation about the second axis; and tightening the clamp element to maintain the blower oriented with respect to the main body.

* * * * *

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2024-1796

**Short Case Caption:** Dometic Corp. v. ITC

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 13,972 words.

☐ the filing has been prepared using a monospaced typeface and includes __________ lines of text.

☐ the filing contains __________ pages / __________ words / __________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. __________).

Date: 10/30/2024

Signature: /s/ Stephen R. Howe

Name: Stephen R. Howe

Save for Filing