NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**DOMETIC CORP., DOMETIC SWEDEN AB,**
*Appellants*

**v.**

**INTERNATIONAL TRADE COMMISSION,**
*Appellee*

**CITIMARINE, L.L.C., MABRU POWER SYSTEMS, INC., SHANGHAI HOPEWELL INDUSTRIAL CO. LTD., SHANGHAI HEHE INDUSTRIAL CO. LTD.,**
*Intervenors*

---

2024-1796

---

Appeal from the United States International Trade Commission in Investigation No. 337-TA-1346.

---

Decided: April 6, 2026

---

STEPHEN REID HOWE, Husch Blackwell LLP, Milwaukee, WI, argued for appellants. Also represented by AVERY HITCHCOCK; KARA RENEE FUSSNER, St. Louis, MO; BEAU JACKSON, Kansas City, MO; MATTHEW KAMPS, Chicago, IL.

NAMO KIM, Office of the General Counsel, United

States International Trade Commission, Washington, DC, argued for appellee. Also represented by AMANDA PITCHER FISHEROW.

PAUL M. BARTKOWSKI, Bartkowski PLLC, McLean, VA, argued for all intervenors. Also represented by THOMAS RICHARD BURNS, JR. Intervenor Mabru Power Systems, Inc. also represented by MARK D. BOWEN, Malin Haley DiMaggio & Bowen, PA, Fort Lauderdale, FL. Intervenors Shanghai Hopewell Industrial Co. Ltd. and Shanghai Hehe Industrial Co. Ltd. also represented by JASON XU, Rimon, P.C., Washington, DC.

---

Before TARANTO, CLEVENGER, and STOLL, *Circuit Judges*.

TARANTO, *Circuit Judge*.

Dometic Corp. and Dometic Sweden AB (together, Dometic) filed a complaint with the International Trade Commission against Citimarine, L.L.C., Mabru Power Systems, Inc., Shanghai Hopewell Industrial Co. Ltd., and Shanghai Hehe Industrial Co. Ltd. (collectively, Citimarine), seeking an order to block importation of certain products under section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337. Dometic asserted, as now relevant, that the products infringe claims 1–2, 4–5, 7, and 18–22 of its U.S. Patent No. 8,056,351, whose subject is an air conditioning device for nautical vehicles. The Commission denied relief to Dometic on claims 1–2, 4–5, and 7 on the ground that those claims are invalid for anticipation. The Commission denied relief to Dometic on claims 18–22 on two related grounds—that the accused imported products do not infringe those claims and that the domestic products asserted to meet section 337's domestic-industry requirement do not come within the claims. We now affirm.

# I

## A

The ’351 patent addresses the problem of providing easily installable marine air conditioners in a confined and tightly packed space. ’351 patent, col. 1, lines 19–27. It describes a device with a main body, blower, and assembly with certain components and rotational properties. *Id.*, col. 1, lines 35–42. The main body consists of a drain pan and the features mounted above the drain pan, in which the evaporator occupies a mounting area above it. *Id.*, col. 4, lines 1–7; *id.*, col. 9, lines 58–65; *id.*, col. 11, lines 24–26. The blower includes a fan for moving air into and out of the air conditioner system. *Id.*, col. 1, lines 37–39; *id.*, col. 11, lines 26–31. The assembly includes a guiding cover and a cylindrical duct element to facilitate the flow of air between the main body and blower, where the guiding cover is a cover-like element that is on top of the evaporator. *Id.*, col. 1, lines 38–39, 50–53; *id.*, col. 9, line 66, through col. 10, line 2.

Independent claim 1 reads as follows:

> 1. An air conditioning device for a nautical vehicle including:
>
> > a main body; and
> >
> > a blower including an inlet and an outlet, the inlet being in an air communication with the main body, the blower further including **blades rotating therewithin about a first axis**, and
> >
> > an **assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet**, the assembly including a **guiding cover** and a cylindrical duct element for maintaining the main body and

> the blower at the second base, the first base of the duct element dimensioned to correspondingly fit the guiding cover, and the duct element being rotatably adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet.

*Id.*, col. 12, line 52, through col. 13, line 3 (emphases added). As the emphases indicate, the claim recites the above-described components and two axes—one around which the fan blades inside the blower rotate, the other around which the blower as a whole can rotate, vis-à-vis the main body, to change the direction of the blower's outlet. *See id.*, col. 1, lines 39–42; *id.*, col. 2, lines 47–50; *id.*, col. 11, line 26, through col. 12, line 3.

Independent claim 18 reads as follows:

> 18. An air conditioning device for a nautical vehicle including:
>
> a main body; and
>
> a blower including an inlet and an outlet, the inlet being in an air communication with the main body, **the blower being rotatable about [a] first axis so that the outlet can be oriented toward a first direct[i]on and a second direction**, and **the first and second directions point to substantially different lateral sides of the main body**, and
>
> an **assembly for adjusting the blower with respect to the main body about a second axis so as to alter an orientation of the outlet**, the assembly including a guiding cover and a cyli[n]drical duct element for maintaining the main body and the blower and the blower in air

> communication with one another, the duct element having a first base and a second base, coupled to the blower at the duct element dimensioned to correspondingly fit the guiding cover, and the **duct element being rotat[a]bly adjustable around the guiding cover about the second axis** at the first base so as to alter the orientation of the outlet.

*Id.*, col. 14, lines 4–20 (emphases added). As the emphases indicate, this claim recites two axes, but neither is defined as the axis of the fan blades' rotation inside the blower (unlike an axis in claim 1). *Cf. id.*, col. 1, lines 39–40; *id.*, col. 12, lines 16–19. Instead, both axes in claim 18 are for changing the direction of the blower outlet. One is identified simply as an axis for rotating the blower to do so. *See id.*, col. 3, lines 1–4. The second is also an axis for adjusting the orientation of the blower but is identified as doing so by rotating the duct element of the assembly (attached to the blower) around the guiding cover. *See id.*, col. 1, lines 56–58; *id.*, col. 11, lines 17–18.

B

In November 2022, Dometic filed its complaint, accusing Citimarine of violating section 337(a)(1)(B) of the Tariff Act of 1930, 19 U.S.C. § 1337(a)(1)(B), by importing and then selling units of certain marine air conditioning systems that, Dometic asserted, infringe the '351 patent. J.A. 268–94. The Commission instituted an investigation based on the complaint the next month. *Certain Marine Air Conditioning Systems, Components Thereof, and Products Containing the Same*; *Institution of Investigation*, 87 Fed. Reg. 76216, 76216–17 (Dec. 13, 2022) (*Institution*). The accused products, as well as the domestic-industry articles protected by the patent, *see* 19 U.S.C. § 1337(a)(2), are "certain marine air conditioning systems, components thereof, and products containing the same." *Institution*, at 76216.

The Commission-assigned administrative law judge (ALJ) issued an order in May 2023, construing certain terms in the asserted claims. J.A. 3754–84. Relevantly, neither party requested a construction of "guiding cover," but the parties disputed the proper construction of the limitation "assembly for adjusting the blower with respect to the main body," which appears in claims 1 and 18. J.A. 2821–28. The parties addressed two limitations in claim 18: "the blower being rotatable about first axis so that the outlet can be oriented toward a first direct[i]on and a second direction"; and "an assembly for adjusting the blower with respect to the main body about a second axis," with the assembly's "duct element being rotat[a]bly adjustable around the guiding cover about the second axis." Citimarine contended that the claimed axes must be distinct, while Dometic took no position on that issue. *Compare* J.A. 3768–77 (Citimarine), *with* J.A. 2305–17 (Dometic). The ALJ determined that the first axis and second axis limitations of claim 18 need not be different (but refrained from answering whether the limitations require two modes of rotation). J.A. 3781.

In June 2023, Citimarine moved for summary determination against Dometic on the grounds that the technical prong of section 337's domestic-industry requirement was not satisfied and, alternatively or in addition, anticipation of asserted claims 1–5, 7, and 18–22 by, as now relevant, a prior-art product referred to as the Vector Compact. J.A. 7209–66; *see* J.A. 211. Of importance for the present appeal, Citimarine argued in particular that the Vector Compact practices (and practiced before the priority date of the '351 patent) the "guiding cover" limitation in independent claim 1 because "(1) [the] Vector Compact includes a metal cover-like element (also known as a 'shroud') that covers the evaporator of the unit; (2) it has a circular operating for directing air to the adjacent blower; and (3) it has a cylindrical section extending from the opening." J.A. 7232. Dometic opposed, arguing, among other things, that the

’351 patent describes the “guiding cover” in the assembly “as a ‘fan plate’ that is a ‘cover-like element’ that includes a ‘flat section with a circular opening for directing to the adjacent blower and has a cylindrical section extending from the operating.’” J.A. 9682.

The next month, the ALJ issued an initial determination that partly granted Citimarine’s motion, finding, as now relevant, that the Vector Compact anticipates claims 1–2, 4–5, and 7. *Certain Marine Air Conditioning Systems, Components Thereof, and Products Containing the Same*, Inv. No. 337-TA-1346, 2023 WL 4761667, at *13–14 (July 18, 2023) (*Initial Summary Determination*). The ALJ agreed with Citimarine’s argument that the shroud of the Vector Compact discloses the “guiding cover” of the ’351 patent, because it is a cover-like component that discloses the combination of components of the claimed guiding cover. *Initial Summary Determination* at *10–11. In September 2023, the Commission affirmed the *Initial Summary Determination*, adopting the findings pertaining to the guiding cover limitation. J.A. 190–208.

In December 2023, the ALJ issued a Final Initial Determination, concluding that no violation of section 337 had been proved for the remaining asserted clams, *i.e.*, claims 18–22.[1] *Certain Marine Air Conditioning Systems, Components Thereof, and Products Containing the Same*, Inv. No. 337-TA-1346, 2023 WL 8664238, at *20 (Dec. 8, 2023) (*Final Initial Determination*). In so doing, the ALJ supplemented his claim construction to contrast the blower rotation of the first axis limitation with the assembly (duct element) rotation of the second axis limitation. Under the former limitation, the ALJ concluded, the blower must have “a different type of rotation separate from the

[1] In October 2023, the Commission granted Dometic’s motion to remove claims 3, 11, and 17 from the investigation. J.A. 26776–78.

assembly's adjustment/rotation" of the second axis limitation (the latter involving the duct element's rotation around the guiding cover), with the required different type of rotation of the first axis limitation "involving a structural component that may be a part of, but is identifiably distinct from, the claimed portion of the 'assembly.'" *Id.* at *24. The ALJ found, under that requirement, that Dometic had not proved infringement by the accused products or satisfaction of the technical prong of the domestic-industry requirement. *Id.* at *33–34, 40–41.

In March 2024, the Commission affirmed the ALJ's noninfringement and technical-prong findings. *Certain Marine Air Conditioning Systems, Components Thereof, and Products Containing the Same*, Inv. No. 337-TA-1346, 2024 WL 1176054 (Mar. 11, 2024) (*Commission Determination*). In particular, the Commission agreed with the ALJ's claim construction requiring two modes of rotation for the blower. *Commission Determination*, at *24–35.

Dometic timely appealed the Commission's determination under 19 U.S.C. § 1337(c). We granted Citimarine leave to intervene. We have jurisdiction under 19 U.S.C. § 1337(c) and 28 U.S.C. § 1295(a)(6).

## II

We review the rulings of the Commission under the Administrative Procedure Act, 5 U.S.C. § 706. *See* 19 U.S.C. § 1337(c); *Broadcom Corp. v. International Trade Commission*, 28 F.4th 240, 249 (Fed. Cir. 2022). Rulings of law are reviewed under the de novo standard, and factual findings are reviewed for substantial-evidence support. *Broadcom*, 28 F.4th at 249; *see* 5 U.S.C. § 706(2)(E).

Dometic challenges both the Commission's ruling that claims 1–2, 4–5, and 7 are anticipated and the Commission's ruling that neither the accused products nor the domestic industry products practice claims 18–22. In each challenge, Dometic argues that the Commission relied on

an incorrect claim construction—one for the anticipation ruling, and a separate one for the nonfringement/domestic-industry ruling. The Commission agrees with Dometic that its anticipation ruling turns on a claim-construction dispute but suggests that the dispute over its nonfringement/domestic-industry ruling is not a matter of claim construction but of claim application.

We may assume, with Dometic, that the latter ruling, like the former, depends on a claim construction. We decide the two claim-construction disputes de novo, because their resolution turns only on intrinsic evidence. *See Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331–33 (2015). We resolve both disputes against Dometic and in favor of the Commission, and we therefore affirm.

A

Relevant to both claim-construction disputes is a principle we have articulated in a number of cases involving a claim that separately recites two structural elements of a claimed invention. In 2010, drawing from earlier claim-construction precedent, we stated that "[w]here a claim lists elements separately, 'the clear implication of the claim language' is that those elements are 'distinct component[s]' of the patented invention." *Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) (second alteration in original) (quoting *Gaus v. Conair Corp.*, 363 F.3d 1284, 1288 (Fed. Cir. 2004), and citing *Engel Industries, Inc. v. Lockformer Co.*, 96 F.3d 1398, 1404–05 (Fed. Cir. 1996)). We have explained, however, that the implication is merely a "'presumption' that separately listed claim limitations *may* indicate separate and distinct physical structure, but that presumption may always be rebutted in the context of a particular patent." *Google LLC v. EcoFactor, Inc.*, 92 F.4th 1049, 1058 (Fed. Cir. 2024) (emphasis added).

The context provided by the patent as a whole is therefore important in determining what to make of a separate

listing of two differently named structures. *Becton* itself, immediately after its statement of an implication of separate listing, turned to other claim language and the specification in determining that the two separately listed elements at issue could not be the very same structure. 616 F.3d at 1254–56; *see Google*, 92 F.4th at 1058 (stressing this aspect of *Becton*). The court in *Google* drew a different conclusion based on the different context presented there. *Google*, 92 F.4th at 1058 ("[T]he specification contemplates an embodiment in which one claimed input is calculated based on at least one other claimed input."); *see also Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1231–32 (Fed. Cir. 2011) ("[T]he specification teaches that the cutting box may also function as a 'dust collection structure.'"); *Rectractable Technologies, Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1303 (Fed. Cir. 2011) ("The claims and the specifications indicate that the 'needle holder' and 'retainer member' need not be separately molded pieces.").

Further, caution is required about identifying when the *Becton* presumption is triggered at all. Specifically, the precise nature of the interpretive question in dispute in a case may matter to how strong the *Becton* interpretive presumption is or whether it applies at all. Notably, *Becton* was focused on whether separate listing of structural elements implied distinctness simply in the sense that they could not be the very same structure—could not "be one and the same," *i.e.*, "the same structure" (because the two claim terms had "different meanings"). 616 F.3d at 1254 (citations omitted). Other cases in which we have applied the *Becton* presumption seem also to have involved a simple nonidentity dispute over whether a single physical structure could be two structures separately listed in a claim. *See Magnolia Medical Technologies, Inc. v. Kurin, Inc.*, ___ F.4th ____, ____, 2026 WL 628364, at *3–4, No. 24-2001, slip op. at 8–11 (Fed. Cir. Mar. 6, 2026); *Regeneron Pharmaceuticals, Inc. v. Mylan Pharmaceuticals Inc.*, 130 F.4th 1372, 1380 (Fed. Cir. 2025); *Kyocera Senco Industrial*

*Tools Inc. v. International Trade Commission*, 22 F.4th 1369, 1382 (Fed. Cir. 2022). In that context, the presumption is rooted in a common-sense fact about ordinary language.

It is not clear to what extent, if at all, such a presumption applies (in patent-claim construction or in ordinary language) where the question is not whether two separately named structures can be one and the same but, instead, is how two separately listed structures (*e.g.*, a house and a garage), clearly not the very same, are physically related to one another. Is there a presumption that two such structures, which are distinct in the sense of not being the same, cannot be physically related to each other in a particular way—for example, cannot touch except for one attaching to the other or share some portions with each other or be so disposed that one is inside the other? The simple ordinary-language principle that underlies *Becton*—that different words are presumed to have "different meanings," 616 F.3d at 1254—does not imply a particular restriction on the physical relationship of two plainly nonidentical structures. Without a different language principle, it may well be that, in ordinary usage, identifying the physical relationship of separately listed elements requires immediately turning to additional language or context, without any default starting point, or any strong one, rooted simply in the fact of separate listing. Dometic has not addressed this seemingly different question or pointed to cases or principles of ordinary-language interpretation that do so.

The distinction just noted would weaken or make inapplicable the *Becton* presumption—thus reinforcing the Commission's position—on the first of the two claim-construction disputes before us. But we need not rely on the idea that the *Becton* presumption is weaker or inapplicable where the question is not one of identity but of the physical relationship between what remain two structures even under the Commission's anticipation rationale. Here, even if the *Becton* presumption is triggered for the first dispute,

context overcomes it, as it has in other cases. With respect to the second claim-construction dispute, we note below that the presumption might apply, and if so, it would support the Commission's position, but we need not and do not rely on it to affirm the Commission based on its extensive and correct full claim-construction analysis.

B

Dometic's only challenge to the Commission's finding of anticipation of claim 1 and dependent claims 2, 4–5, and 7 concerns the "guiding cover" limitation of those claims. It is undisputed that, as claim 1 makes clear, the "guiding cover" is part of the claim-required "assembly." What is disputed is whether the "assembly" must be physically disjoint from (except for attaching to) the claim-required "main body." Dometic relies on *Becton* to argue that the two must be physically disjoint (except for attaching to each other) because they are separately listed in the claims. If so, the "guiding cover" (part of the "assembly") cannot be part of the "main body." It would follow, Dometic asserts, that the Commission's finding of anticipation by the Vector Compact product would have to be set aside, because the portion of the Vector Compact the Commission identified as the "guiding cover" (a shroud) is part of what the Commission identified as the "main body."

We reject Dometic's contention that the "assembly" must be physically disjoint from the "main body" (except for attaching to each other). The Commission's conclusion does not treat the Vector Compact shroud as being both the main body and the assembly, so the precise interpretive question here may well be materially different from the one squarely treated in *Becton*, as already discussed. But we do not rely on that possible distinction. Instead, we conclude that the *Becton* presumption, which we may assume to apply, is overcome here.

Nothing in the intrinsic evidence offers support to Dometic's position except the fact that the components,

"main body" and "assembly," are separately listed—which is what (by assumption) triggers the presumption. For example, no other claim language undermines a conclusion that a portion of the assembly can be part of the main body. This case is critically different from *Becton* in this respect. There, the court held that Becton's position "renders the asserted claims nonsensical," because claim language requiring a connection between the two listed elements (spring means and hinged arm) would be "facially nonsensical" if the two elements were actually "one and the same." *Becton*, 616 F.3d at 1255. Dometic identifies no claim language that suggests a comparable conclusion here.

Turning to the rest of the patent document, we find support for the Commission's interpretation allowing the guiding cover (as part of the assembly) to be included in the main body. Figure 1 of the specification includes a guiding cover and a main body, where the main body consists of the drain pan "and what is *mounted above it*." '351 patent , col. 11, lines 25–26 (emphasis added); *see id.*, fig. 1. The evaporator (along with the compressor and condenser) occupies a mounting area above the drain pan. *Id.*, col. 4, lines 1–7; *see also id.*, col. 9, lines 58–65. The guiding cover, which is part of the assembly, is "placed on the top of the evaporator." *Id.*, col. 9, line 66, through col. 10, line 2; *id.*, col. 12, line 61. The figure shows that, in the patent, the guiding cover can thus be mounted above the drain pan via the evaporator, and in turn, can be included in the main body, as the main body is defined.

The Abstract says that the inventive "air conditioning system for a nautical vehicle includes a *main body, including an assembly*, and a blower including an inlet and an outlet." '351 patent, Abstract (emphasis added). That phrasing directly supports the Commission's view. *See Hill-Rom Co. v. Kinetic Concepts, Inc.*, 209 F.3d 1337, 1341 n.* (Fed. Cir. 2000) ("We have frequently looked to the abstract to determine the scope of the invention, . . . and we are aware of no legal principle that would require us to

disregard that potentially helpful source of intrinsic evidence as to the meaning of claims.") (collecting cases). That characterization aligns with a statement in the specification, describing Figure 1, that "the air conditioner **1** can largely be divided into a main body **4** and the blower **2**." *Id.*, col. 11, lines 24–25.

Dometic points to the specification's statement that the system "includes a main body, a blower and an assembly," *id.*, col. 1, lines 36–37, but that statement does imply that no part of the assembly can be part of the main body, and the other statements already quoted indicate otherwise. Similarly, the shroud in the '351 patent (also contained in the Vector Compact product) does not help Dometic. It is mounted above the drain pan in the main body, consisting of three covers, one each for the evaporator, compressor, and condenser, and is also included in Figure 1. *Id.*, col. 4, lines 43–51; *id.*, col. 6, lines 17–22. The shroud thus contains components that are part of the main body, because they are mounted above it, precluding the shroud from being entirely distinct from either the assembly or the guiding cover, which can also be in the main body.

Dometic points to prosecution history, but we see there no basis to disturb the Commission's conclusion. During prosecution, the Examiner rejected then-pending claim 54 (which later issued as claim 1) as anticipated by U.S. Patent No. 5,848,536 ("Dodge"). J.A. 35178. Dodge teaches changing the orientation by "rotating the square mounting plate [ ] supporting the blower housing [ ] ninety degrees about an axis through the motor," J.A. 41672, col. 5, lines 16–18, and Dometic amended its claim to overcome the rejection, J.A. 35200–14. But Dometic has not shown that this prosecution history precludes a portion of the assembly from being part of the main body.

Dometic asserts that a "guiding cover" is "more than a mere cylindrical protrusion." Dometic Opening Br. at 39 (capitalization removed). But the Commission did not

construe the phrase to be a mere cylindrical protrusion. The ALJ expressly stated that anticipation existed even under Dometic's construction ("a combination of a flat section, circular opening, and cylindrical protrusion"), *Initial Summary Determination*, at *10, and the Commission affirmed without disagreeing, J.A. 203. And Dometic has not shown how its contention about the meaning of "guiding cover" (as opposed to its argument about the relation of the assembly and main body) would alter the Board's anticipation finding.

For those reasons, we affirm the Board's claim construction underlying its finding of anticipation of claims 1–2, 4–5, and 7.

C

Dometic's only challenge to the Commission's determinations of infringement and the absence of domestic industry regarding claim 18 and dependent claims 19–22 is a challenge to Commission's construction of the "first axis" limitation of claim 18. The Commission concluded that the first axis of rotation for the blower in that limitation must allow rotation independently of the rotation allowed in the "second axis" limitation, the latter expressly involving rotation of the duct element around the guiding cover, the former not (but instead, implicitly, rotation of the blower around the duct element)—so that, in effect, there are two structurally and functionally distinct rotational degrees of freedom. *See Commission Determination*, at *13–35. We reject Dometic's challenge to the Commission's construction.

The Commission invoked the *Becton* principle as one relatively small part of its analysis, applying it to claim 18's separate listing of a "blower being rotatable about [a] first axis . . ." and an "assembly for adjusting the blower with respect to the main body about a second axis . . . ." *Commission Determination*, at *9, 30; *see also* Commission Br. at 48–49; Citimarine Br. at 43. Dometic argues that any

*Becton* presumption here should be found to be rebutted. Dometic Reply Br. at 25–26. We need not explore whether the *Becton* presumption applies to the question here: It might be viewed as whether two different structures are presumptively required (the duct element of the assembly versus the blower itself); or it might be viewed as whether two different functional properties (rotation types) are required. *Cf. In re Kelley*, 305 F.2d 909, 914 (C.C.P.A. 1962) ("We see no reason why a single structural element . . . . which performs two separate functions, cannot support a claim reciting broadly these separate functions."). The Commission relied chiefly on direct claim-construction analysis, which *Becton* confirms. And we agree with the Commission's claim-construction analysis and deem it sufficient even without the confirmatory *Becton* point. The claim language and other intrinsic evidence strongly indicate that two independent rotation hubs—two types of rotation—are required.

Claim 18 recites two axes and two operations. It first requires that "the *blower* be[] rotatable about [a] *first axis* so that the outlet can be oriented toward a first direct[i]on and a second direction[.]" '351 patent, col. 14, lines 7–9 (emphases added). It then recites "an *assembly* for adjusting the blower with respect to the main body about a *second axis* so as to alter an orientation of the outlet." *Id.*, col. 14, lines 10–12 (emphases added). It elaborates, with respect to the second axis limitation, by requiring that the "duct element"—a part of the "assembly"—"be[] rotat[a]bly adjustable around the guiding cover about the second axis at the first base so as to alter the orientation of the outlet." *Id.*, col. 14, lines 17–20. As *Becton* and the authorities that it cites confirm, this claim language is naturally read as the Commission read it. This understanding makes sense of the difference in the "blower" and "assembly" language and the very existence of two separate limitations with their "first" and "second" axis requirements. *See Commission Determination*, at *21, 30.

The specification and figures teach, and explain the aim of, such a configuration. One may visualize a cylinder-shaped liquid container with a lid that can rotate around the container, where on the top of the lid (either centered or off-center) is a spout that itself can rotate independently of the lid's rotation. A reason for this independent rotation is apparent if the spout is off-center of the lid and is long enough that it sticks out beyond the rim of the container if pointed to the closest rim point but stays within the rim defining the cylinder if pointed to the farthest rim point: The spout's rotatability permits keeping the entire top-down-view profile within the cylinder. The specification and figures teach a version of that analogue—with the blower being the counterpart of the spout on the lid, and the lid being the attachment of the duct element of the assembly rotatable around the guiding cover.

The "assembly . . . second axis" limitation provides for the latter. *See* '351 patent, col. 1, lines 53–55; *id.*, col. 11, lines 54–56. The second rotational axis is used to reorient the blower relative to the main body by rotating the duct element of the assembly around the cylindrical section of the guiding cover, which can be achieved by loosening the clamp, rotating the duct element to the desired orientation, and then tightening the clamp. *Id.*, col. 1, lines 40–42; *id.*, col. 10, lines 16–22; *id.*, col. 11, lines 32–33; *id.*, col. 11, line 64, through col. 12, line 3. By rotating the entire duct element and attached blower, the orientation of blower outlet "can be altered and can vary by more than 270 degrees" relative to the main body, allowing the outlet to face many different directions, including the left and right sides of the units. *Id.*, col. 11, lines 41–44, 49–57.

The duct element has an opening to the guiding cover and an (opposite end) opening to the blower, and the latter can be smaller than and off-center from the former. *Id.*, figs. 24A, 24B, 25, 30A-1, 30A-2, 30B. The patent contemplates that the blower will have an outlet that should be able to point in different directions and may stick out from

the otherwise-cylindrical profile of the blower. *Id.*, figs. 28, 29. To achieve the ability to install the unit in many differently configured nautical vehicles, the ability to point in different directions is important, and sticking out is a problem, given limited space and numerous air-obstructing nearby objects. *Id.*, col. 1, lines 19–28; *id.*, col. 2, lines 14–17. The patent describes this problem as a problem of controlling the "height" of the device because the blower is on the side (not top) of the unit; it is like the liquid container in the analogy turned on its side (so that the container's width profile becomes a height profile). *Id.*, col. 12, lines 4–27. The height of the system can be adjusted based on how the blower is fastened in relation to the duct element and the direction in which the blower outlet (akin to the spout) points. *Id.*, col. 12, lines 6–21. The invention thus aims to solve problems of generating airflow and allowing a flexible installation while minimizing the system's height in a confined space, and it does so by using two types of rotations. *Id.*, col. 1, lines 37–42.

Dometic contends that the "first axis" and "second axis" may collapse into a single functional rotation and need not be distinct, Dometic Opening Br. at 51–55, but that argument misunderstands the invention. The fact that the blower and duct element are coupled does not eliminate the distinct structural roles of the two modes of rotation. *See* '351 patent, col. 1, lines 53–55; *id.*, col. 11, lines 37–38. Even if the axes may be colinear, that alignment would not collapse the two modes of rotation into one. Dometic's assertion that the coupled blower and duct element form a unitary structure such that both rotations move as one, Dometic Opening Br. at 56–59, is similarly misplaced because it does not grapple with the bases by which the two independent rotations occur.

The prosecution history further supports the Commission's construction requiring two modes of rotation of the blower. During prosecution, claim 18 (then-claim 72) was allowed only after Dometic amended "the blower being

rotatable about *an axis*" to a "first axis," and Dometic also added an assembly limitation for adjusting the blower about a "second axis." J.A. 35228 (emphasis added); *see also* J.A. 27725; J.A. 35179. Dometic's proposed construction of a potentially single mode of rotation would effectively reverse this change during prosecution and collapse the two axes in as-issued claim 18 into the single rotational axis of the pre-amendment version of the claim. *See Commission Determination*, at *22–23, 29.

For those reasons, we reject Dometic's challenge to the Board's claim construction underlying the findings that led to denial of relief for claims 18–22.

III

We have considered Dometic's other arguments and find them unpersuasive. For the foregoing reasons, we affirm the Commission's final determination.

The parties shall bear their own costs.

**AFFIRMED**